SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  973-639-9100
Fax:  973-639-8656

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  6310-367-7100
Fax: 631-367-1173

Attorneys for Plaintiff

<div align="center">

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| HEAVY & GENERAL LABORERS' LOCALS 472 & 172 WELFARE FUND, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| 3M COMPANY, INGE G. THULIN, MICHAEL F. ROMAN and NICHOLAS C. GANGESTAD, | ) ) ) ) ) |
| Defendants. | ) ) |

No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

<u>DEMAND FOR JURY TRIAL</u>

Plaintiff, by its undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to itself and upon information and belief based on the investigation of plaintiff's attorneys as to all other matters, which included, among other things, a review and analysis of: 3M Company's ("3M" or the "Company") Securities and Exchange Commission ("SEC") filings, Company releases, conference calls, defendants' public statements, media reports, analyst reports, industry reports, other complaints filed against 3M, and other publicly available information.   Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.   This securities class action is brought on behalf of purchasers of 3M common stock between February 9, 2017 and May 28, 2019, inclusive (the "Class Period") against 3M, its current and former Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") for violating §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) by engaging in a scheme to defraud investors and issuing false and misleading statements to conceal the truth about the Company's exposure to legal liability associated with its most lucrative product offerings: man-made chemicals known as per- and polyfluoroalkyl substances ("PFAS").

2.     While publicly denying that PFAS cause harm to humans and the environment, defendants concealed and misrepresented: (i) 3M's vast internal evidence dating back decades confirming that PFAS are toxic (which was first publicly revealed in February 2018 by Minnesota's Attorney General); (ii) 3M's decades-long history of suppressing negative information and/or damaging data about PFAS; and (iii) 3M's legal exposure to state, county, and local governments and individuals around the country as a result of its knowledge and intentional concealment of the toxic harm caused by the use of PFAS.  These omissions and misrepresentations caused 3M's stock price to trade at artificially inflated prices throughout the Class Period.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

4.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

5.     In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the U.S. mails, interstate telephone communications and the facilities of the national securities exchanges and markets.

## PARTIES

6.      Plaintiff Heavy & General Laborers' Locals 472 & 172 Welfare Fund purchased 3M stock at artificially inflated prices during the Class Period, as described in the accompanying certification, and suffered damages as a result of defendants' alleged misconduct.

7.      Defendant 3M is an American multinational conglomerate corporation that produces a variety of chemical substances and related products.  3M's most lucrative product has been PFAS.  3M's common stock trades on the New York Stock Exchange ("NYSE") under the ticker MMM.

8.      Defendant Inge G. Thulin ("Thulin") previously served as 3M's Executive Chairman (July 2018-June 2019) and Chairman, President, and CEO (2012-July 2018).  Defendant Thulin was also previously Executive Vice President and Chief Operating Officer of 3M (2011-2012), with responsibility for all of 3M's business segments and international operations, an Executive Vice President of International Operations (2004-2011), and originally joined 3M Sweden in 1979, working in sales and marketing.  As CEO, defendant Thulin spoke on 3M's behalf in releases, conference calls, and SEC filings.  Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant

Thulin certified the Company's Form 10-Ks filed with the SEC on February 9, 2017 and February 8, 2018. Defendant Thulin also signed the Company's Form 10-Ks dated February 9, 2017, February 8, 2018, and February 7, 2019.

9.     Defendant Michael F. Roman ("Roman") is 3M's Chairman of the Board (since May 2019) and CEO (since July 2018). According to 3M's website, defendant Roman has also served as Chief Operating Officer, led 3M's largest business group and was the Company's chief strategist. Defendant Roman joined 3M in 1988 as a senior design engineer. As CEO, defendant Roman spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Roman certified the Company's Form 10-K filed with the SEC on February 7, 2019. Defendant Roman also signed the Company's Form 10-K dated February 7, 2019.

10.     Defendant Nicholas C. Gangestad ("Gangestad") has served as 3M's CFO since 2014. As CFO, defendant Gangestad spoke on 3M's behalf in releases, conference calls, and SEC filings. Pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, SEC Rule 13a-14(a), and 18 U.S.C. §1350, defendant Gangestad certified the Company's Form 10-K filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019. Defendant Gangestad also signed the

Company's Form 10-Ks dated February 9, 2017, February 8, 2018, and February 7, 2019 on 3M's behalf.

11.    Defendants Thulin, Roman, and Gangestad are sometimes collectively referred to herein as the "Individual Defendants."

12.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of 3M, were in possession of and privy to confidential, proprietary information concerning 3M, its products, operations, finances, and financial condition, and its legal liability for PFAS-related litigation.  Because of their positions as 3M's senior-most executive officers, the Individual Defendants obtained, had access to, and/or were in possession of material adverse nonpublic information concerning 3M via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board of Directors meetings (and committees thereof), and via the reports, presentations and other information provided to them in connection therewith.  As a result of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.    As senior executive officers and controlling persons of a publicly traded company whose common stock, during the Class Period, was registered with the SEC pursuant to the Exchange Act and was actively traded on the NYSE and

governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding 3M's operations, business, and financial statements and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of 3M stock would be based upon truthful and accurate information. Defendants' materially false statements and omissions during the Class Period violated these requirements and obligations.

## BACKGROUND TO THE CLASS PERIOD

14.     3M's most lucrative product has been PFAS. PFAS are characterized by bonds between carbon and fluorine that are among the strongest in organic chemistry. PFAS are man-made chemicals that come in 5,000 or more varieties and are used in industrial and consumer products, including non-stick cookware, water-repellent clothing, camping gear, shoes, stain resistant fabrics, textiles and carpets, cosmetics, surfactants for electronics manufacturing, and products that resist grease, water, and oil, such as coated papers for fast-food takeout.

15.     Two of the best-known PFAS – which are unregulated, industrial chemicals – that 3M has produced for decades include perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA"), also called C8 because of the eight-carbon chain that makes up its chemical backbone. 3M's PFAS are used in products worldwide, including Scotchgard stain protectant, Teflon cookware, Gore-Tex water

resistant outdoor gear, greaseproof food paper, and aqueous firefighting foam. The same property that makes PFAS so effective in consumer products – one of the strongest molecular bonds ever discovered – means PFAS do not break down in the environment, hence the ominous nickname "forever" chemicals.

16.    3M has repeatedly claimed that PFAS are not a danger to public health. "'While the science behind PFAS is complex, the vast body of scientific evidence, which consists of decades of research conducted by independent third parties and 3M, does not show that PFOS or PFOA causes harm in people at current or historical levels,'" said company spokeswoman Fanna Haile-Selassie in a November 2018 *Bloomberg* article.

17.    In 2010, the State of Minnesota sued 3M, demanding $5 billion to clean up the damage 3M caused in the state. On the eve of trial in February 2018, the case settled for ***$850 million***, without any admission of wrongdoing by 3M. ***The settlement was the third-largest for a natural-resource damage claim in history***, behind the Deepwater Horizon and Exxon Valdez oil spill settlements.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

18.    In each of its Form 10-Ks filed with the SEC on February 9, 2017, February 8, 2018, and February 7, 2019, 3M made affirmatively misleading statements to investors regarding certain risk factors associated with investing in

3M, 3M's Environmental Law Compliance, and Environmental Matters and Litigation.

**False and Misleading Risk Factor Warning**

19.    Despite its actual knowledge of internal studies and documents evidencing the toxicity of PFAS dating back to the 1970s, as well as its awareness (or reckless disregard) of the potentially massive nationwide (and even global) legal liability for releasing PFAS into the environment since the 1960s, 3M only had one warning specific to its potential legal exposure in its Form 10-Ks. The February 7, 2019 Form 10-K warning stated as follows:

> * *The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery, anti-corruption, or other matters.* The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note 16 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

20.    Remarkably, the *only* change to that risk warning between 2017 and 2019 was to adjust the reference number of the note to the consolidated financial statements addressing legal proceedings in the last sentence. *See* Exhibit A (redline comparison of 2017, 2018, and 2019 Form 10-K excerpts). Plainly, the risk warning was a generic "catch-all" provision that was not tailored to 3M's actual known legal risks.

**Environmental Law Compliance**

21.    3M's statement regarding the Company's Environmental Law Compliance likewise remained identical between 2017 and 2019, other than clerical edits to the year and amount expended on capital projects related to protecting the environment in the third paragraph. The February 7, 2019 Form 10-K's Environmental Law Compliance section stated as follows:

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws. 3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note 16, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan

of action, or approval by regulatory agencies. Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In 2018, 3M expended approximately $27 million for capital projects related to protecting the environment. This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed. Capital expenditures for environmental purposes have included pollution control devices – such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers – at new and existing facilities constructed or upgraded in the normal course of business. Consistent with the Company's emphasis on environmental responsibility, capital expenditures (other than for remediation projects) for known projects are presently expected to be approximately $75 million over the next two years for new or expanded programs to build facilities or modify manufacturing processes to minimize waste and reduce emissions.

While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, ***the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position***.

22. The fact that this statement regarding the effect of environmental compliance on 3M's capital expenditures and earnings did not change from 2017 to 2019, despite defendants' actual knowledge of the increasing scrutiny of and litigation relating to PFAS, including the $671 million DuPont PFAS settlement and $850 million Minnesota settlement – as well as the additional litigation 3M disclosed each year in its Environmental Matters and Litigation discussion in the Form 10-Ks – is materially misleading to investors.

**Environmental Matters and Litigation**

23.     Unlike the risk factors and environmental law compliance sections of 3M's Form 10-Ks, which remained substantively identical from 2017 to 2019, the Environmental Matters and Litigation sections changed during that same period, as litigation relating to PFAS dramatically increased.   However, what did not substantively change (other than dates and dollar figures) was the last three paragraphs of this section, subtitled *Environmental Liabilities and Insurance Receivables*, which remained the same from 2017 to 2019 (other than edits to dates/dollar figures):

> *Environmental Liabilities and Insurance Receivables*
>
>     As of December 31, 2018, the Company had recorded liabilities of $25 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.  The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action.  Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions.   The Company adjusts recorded liabilities as further information develops or circumstances change.  The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.
>
>     As of December 31, 2018, the Company had recorded liabilities of $59 million for "other environmental liabilities" based upon an

evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA (including the best estimate of the probable liability under the settlement of the NRD Lawsuit for interim treatment of municipal and private wells), the remedial action agreement with ADEM, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years.

*It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods*. Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. *For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition*. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

24.    The MD&A disclosure violations and omissions were material under

SEC disclosure rules, which place an emphasis on materiality:

Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading.[1]

25.    Each of the MD&A disclosure violations and omissions discussed above (¶¶19-23) were either required MD&A disclosures on their own or, at a minimum, were required in light of the existing MD&A disclosures that 3M made regarding litigation exposure.

**The Market Begins to Learn of the Falsity of Defendants' PFAS Statements, But Defendants Continue to Conceal the Truth**

26.    After Minnesota settled its lawsuit with 3M, the Minnesota Attorney General posted a trove of internal 3M emails and memos on a state website, which had never been published before.  As *The Intercept* reported on July 31, 2018, in an article by Sharon Lerner entitled "3M Knew About the Dangers of PFOA and PFOS Decades Ago, Internal Documents Show," which included 3M's false denials:

> A lawsuit filed by Minnesota against 3M, the company that first developed and sold PFOS and PFOA, the two best-known PFAS compounds, has revealed that the company knew that these chemicals were accumulating in people's blood for more than 40 years.  ***3M researchers documented the chemicals in fish, just as the Michigan scientist did, but they did so back in the 1970s.  That same decade, 3M scientists realized that the compounds they produced were toxic***.  The company even had evidence back then of the compounds' effects on the

---

[1]    *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350;  34-48960;  FR-72,  https://www.sec.gov/rules/interp/33-8350.htm#P18-1728 (last visited July 26, 2019).

immune system, studies of which are just now driving the lower levels put forward by the ATSDR, as well as several states and the European Union.

The suit, which the Minnesota attorney general filed in 2010, charges that 3M polluted groundwater with PFAS compounds and "knew or should have known" that these chemicals harm human health and the environment, and "result in injury, destruction, and loss of natural resources of the State." The complaint argues that 3M "acted with a deliberate disregard for the high risk of injury to the citizens and wildlife of Minnesota." 3M settled the suit for $850 million in February, and the Minnesota Attorney General's Office released a large set of documents – including internal studies, memos, emails, and research reports – detailing what 3M knew about the chemicals' harms.

Some of the documents had been under seal since 2005 as a result of a separate lawsuit over PFAS contamination in Minnesota. And the documents had been in the EPA's possession for at least 18 years: In 2000, 3M gave the EPA hundreds of documents it had withheld from the agency, resulting in more than $1.5 million in penalties in 2006 for 244 violations of the Toxic Substances Control Act. Even so, for years the EPA did nothing. Even as a few government officials and company scientists understood the vast dangers they posed, PFAS were allowed to spread into groundwater and then drinking water, into people and their children, into animals, plants and the food system where they remain today.

\*     \*     \*

As a staff epidemiologist at 3M, Geary Olsen has had a wealth of data at his fingertips. The company he's worked for since at least 1998 makes more than 55,000 products and has more than 90,000 employees. Olsen had access to internal information about both and has been able to combine them to pursue the kinds of scientific questions most researchers can only dream of being able to ask and answer.

In one study, for instance, Olsen looked at blood tests of 3M employees at the company's plants in Antwerp, Belgium, and Decatur, Alabama, both of which made PFOA and PFOS, among other products. By the late 1990s when Olsen was embarking on this research, these

chemicals were known within the company to accumulate in humans and alter cholesterol levels in lab animals. Because the workers had undergone three separate rounds of blood tests, Olsen was able to trace the levels of the chemicals in workers' blood over time. And by combining his results with various clinical measures the company had been tracking in its workers, he was able to see whether there was a relationship between the chemical and these health outcomes.

Olsen's findings, written up in a draft report in October 2001, were clear. There was a positive association between the amount of PFOA in workers' blood and their levels of cholesterol and triglycerides, states the report, on which Olsen is listed as the principal investigator. The report devoted more than 20 tables to triglycerides and cholesterol, detailing a relationship that later studies would confirm: PFOA increased people's levels of triglycerides, which are a type of fat, and cholesterol, both of which can increase the chance of heart disease. The results were in keeping with rat evidence, as the report noted.

Yet less than two years later, when Olsen and the three co-authors on the report – all 3M employees – published an article based on the same research, it downplayed this key finding. Indeed, according to the study, which ran in the March 2003 issue of the Journal of Occupational and Environmental Medicine, "There were no substantial changes in hematological, lipid, hepatic, thyroid, or urinary parameters consistent with the known toxicological effects of PFOS or PFOA" – a statement that appears to contradict the authors' earlier finding.

In the 19th paragraph of the 2003 article, the authors note that PFOA was "positively associated with cholesterol and triglycerides" and that "serum PFOS was positively associated with the natural log of serum cholesterol . . . and triglycerides," but dismiss these effects as "minimal." The article omits most of the information that was contained in the draft's tables and clearly laid out the increase in cholesterol and triglycerides in exposed workers.

The minimizing of this bad news is just one of several instances in which 3M seems to have downplayed, spun, and tailored its own research to make these two PFAS chemicals and others it produced

appear safer than they were, according to the documents made public by Minnesota's attorney general.

In some cases, relatively reassuring findings about the chemicals made their way into the scientific literature, while other more concerning ones – like the 1993 observation that goats passed PFOS to their offspring through their milk, or the 1998 discovery that PFOS had made its way into eagles found in the wild, or the association between PFOA and lipids that Geary identified – did so only after many years. In several cases, 3M appears to have not pursued further research based on discoveries that suggested the chemicals posed harm.  And the company also relied on several paid scientists, including John Giesy, now a professor at the University of Saskatchewan, who weighed in on the environmental impact of PFOA and PFOS without disclosing their funding from 3M.

In an email, ***a 3M spokesperson strenuously denied that the company tailored its research around PFAS, writing that "neither 3M nor Dr. Olsen has distorted or suppressed the scientific evidence regarding PFAS in any way***."  The email also pointed out that the company eventually gave the EPA Olsen's 2001 report, which at this point has "been publicly available for well over a decade."  While acknowledging that Olsen found an association between cholesterol levels and PFOA, the 3M spokesperson noted that the effect of PFOA he documented in some workers – increasing cholesterol levels – was inconsistent with those observed in rats, whose levels decreased after exposure to the chemical, and that "the science is complex and neither the study nor the larger body of scientific evidence on this issue establishes causation."

In a separate email, ***the 3M spokesperson wrote that "the Minnesota Attorney General released a small set of documents that should not be taken out of context in an effort to distort the full record regarding 3M's actions with respect to PFOA or PFOS.  3M acted reasonably and responsibly*** in connection with products containing PFAS, and stands behind its environmental stewardship record."

27.    Thereafter, on November 2, 2018, *Bloomberg* reporters Tiffany Kary and Christopher Cannon published a lengthy exposé, entitled "Cancer-linked

Chemicals Manufactured by 3M Are Turning Up in Drinking Water," which also contained 3M's false denials and noted in relevant part:

> The [Minnesota] attorney general [Lori Swanson] wasn't finished. *She also said there had been a scientific cover-up – that 3M knew its chemicals were dangerous, yet kept that information from regulators and local residents*. Just as the suit settled, she posted a trove of 3M's internal emails and memos on a state website to back up her allegations.

> *3M's Haile-Selassie called the internal memos a small set of documents that "portrays an incomplete and misleading story and distorts the full record" of 3M's work*. It also distorts "who we are as a company," she said.

> The records, which include old typed field memos and presentations to 3M's board of directors, would appear to support Swanson's cover-up claim. As the company insisted for more than half a century that the chemicals were safe, the internal documents suggest that its own employees withheld evidence to the contrary. Meanwhile, they were woven into new innovations and spread everywhere, lodging in people and wildlife from the North Pole to the Faroe Islands. As Swanson was prepared to argue if the case had gone to trial, this gave Cottage Grove a regrettable distinction: "ground zero for a world problem."

> \*      \*      \*

> In 1997, a telling change appeared in the routine data sheets 3M sent to DuPont, which had been buying its PFAS for decades to manufacture Teflon. They said: "CANCER: WARNING: contains a chemical which can cause cancer." The warning cited joint studies by 3M and DuPont in 1983 and 1993, but gave no further details. Then, without explanation, the warnings soon disappeared, according to Minnesota's court filings.

> \*      \*      \*

> Scientists outside of 3M have become increasingly outspoken about the risks of PFAS. Linda Birnbaum, director of the toxicology

- 17 -

program in the National Institutes of Health, said there's evidence the chemicals are toxic.  Most of the thousands of PFAS variants haven't been tested, she said, but all that have been show problems.  Phil Brown, a Northeastern University sociology professor who specializes in toxic exposures, likens 3M's actions to cigarette makers who for decades avoided liability from their products' links to cancer.

<div align="center">*     *     *</div>

[College Grove Mayor Myron] Bailey said 3M has been more generous than usual since the settlement.  But he wants something more than the company's money.  "***To this day they have said they don't believe anything is wrong***," he said.  "If you are a business or individual who has done something wrong, I believe you can be accountable, and say you did it."

## EPA Proposed Action on PFAS

28.    On February 14, 2019, the EPA unveiled its PFAS Action Plan.  The same day, 3M issued a public statement on the EPA's PFAS Action Plan, stating:

"3M supports EPA's creation of a PFAS Action Plan and looks forward to reviewing the plan in detail.  3M agrees with EPA moving forward with the Safe Drinking Water Act's maximum contaminant level process with respect to PFOA and PFOS.  We support regulation rooted in the best-available science and believe that this plan may help prevent a patchwork of state standards that could increase confusion and uncertainty for communities."

## Defendants Disclose the Truth

29.    On April 25, 2019, 3M announced its first quarter 2019 financial results, acknowledging that the first quarter of 2019 "'was a disappointing start to the year for 3M'" and disclosing that on top of the "$1.16 per share impact" already recorded in the first quarter of 2018 related to the settlement with the State of Minnesota, 3M had "recorded significant litigation-related pre-tax charges of $548

million, or $0.72 per share" in the first quarter 2019 for additional PFAS liability. 3M also announced that it was cutting 2,000 jobs, approximately 2% of its 93,500 employees, and trimming fiscal year 2019 capital expenditures, including on manufacturing, in addition to accelerating other cost control reductions it said were already underway.  On this news, the price of 3M common stock declined nearly 13%.

30.     On May 14, 2019, New Jersey filed suit against 3M and other PFAS manufacturers alleging environmental and consumer fraud claims in connection with making and selling firefighting foam products for decades in New Jersey that contained toxic chemicals.  Noting that nearly one in five New Jersey residents had received tap water that contained at least trace amounts of one of these chemicals, some of which have been linked to cancer, the lawsuit alleged that the companies knew that their firefighting foam posed a significant health threat.

31.     On May 29, 2019, New Hampshire filed two lawsuits against 3M and others for PFAS contamination. New Hampshire Attorney General Gordon MacDonald said the goal was to recoup damages for the PFAS contamination that had been found in all ten New Hampshire counties, noting that, in towns like Merrimack and Portsmouth, the contamination had put hundreds of families on bottled water.  "'It is my hope that those responsible for the manufacture and distribution of PFAS will recognize the severity of the issues they've caused and

will become part of the solution,'" MacDonald was quoted saying.  On this news, the price of 3M common stock declined from its close of $163.35 per share on May 28, 2019 to trade as low as $160.50 per share in intraday trading and close at $161.40 per share on May 29, 2019.

32.    On June 6, 2019, Barclays issued a report, entitled "PFAS/PFOS/PFOA Liabilities for Chemours, 3M, and JCI," stating in relevant part:

> PFAS/PFOS/PFOA liability for Chemours, 3M, and JCI has been top-of-mind for many of our Industrial/Materials investors in recent weeks for three main reasons: a) an investor presentation on the risks to MMM/CC at the Sohn conference in early May.  After the Sohn conference on May 6th, CC and MMM were down the two days after that presentation 8% and 2% respectively vs. the XLI down 2%.  b) 3M updated its reserve for remediating plant sites with PFAS contamination with 1Q earnings.  c) The state of NJ AG came out with a headline grabbing suit against CC/3M/JCI plus others on March 25th.

33.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of 3M common stock, by publicly issuing false and misleading statements and omitting material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading because they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and its operations, as alleged herein.

34.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial

contributing cause of, the damages sustained by plaintiff and other members of the Class (as defined below). As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about 3M's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of 3M and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

35.     The economic loss plaintiff and other members of the Class suffered was a direct result of defendants' fraudulent scheme to artificially inflate the price of 3M's stock and maintain the price at artificially inflated levels, as was revealed by the subsequent and significant decline in the value of 3M's stock when defendants' earlier misrepresentations and omissions became publicly available.

## PRESUMPTION OF RELIANCE

36.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims

- 21 -

asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

37.   Plaintiff and the Class are also entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for 3M stock was an efficient market at all relevant times by virtue of the following factors, among others:

(a)   3M stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, 3M filed periodic public reports with the SEC and the NYSE;

(c)   3M regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)   3M was eligible to file, and did file, a shelf registration statement on Form S-3 with the SEC during the Class Period; and

(e)   3M was followed by several securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the market.

38.   As a result of the foregoing, the market for 3M stock promptly incorporated current information regarding 3M from publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all those who transacted in 3M stock during the Class Period suffered similar injury through their transactions in 3M stock at artificially inflated prices and a presumption of reliance applies.

39.   At the times they purchased 3M stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

## CLASS ACTION ALLEGATIONS

40.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of 3M common stock during the Class Period (the "Class"), excluding defendants and 3M's officers and directors at all relevant times, as well as their respective family members, legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

41.   The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  3M stock was actively traded on NYSE. Record owners and other members of the Class may be identified from records maintained by 3M or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions. While the exact number of Class members is unknown to plaintiff, 3M reported more than 575.8 million shares outstanding held by 76,596 shareholders of record as of January 31, 2019.

42.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether defendants' acts as alleged herein violated the federal securities laws;

(b)     Whether defendants' statements made to the investing public misrepresented or omitted material facts about 3M's business, operations, and financial condition;

(c)     Whether the price of 3M stock was artificially inflated during the Class Period; and

- 24 -

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
Against All Defendants**

46.     Plaintiff incorporates ¶¶1-45 by reference.

47.     During the Class Period, the defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     The defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of 3M stock during the Class Period.

49.     In addition to the duties of full disclosure imposed on the defendants as a result of their affirmative false and misleading statements to the public, the defendants had a duty to promptly disseminate truthful information with respect to 3M's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's PFAS litigation exposure trends, so that the market price of the Company's stock would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

50.     As a direct and proximate result of the defendants' wrongful conduct, plaintiff and the Class have suffered damages in connection with their respective purchases of 3M stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for 3M stock and experienced losses when the artificial inflation was released from 3M stock as a result of the

revelations and price declines detailed herein.  Plaintiff and the Class would not have purchased 3M stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

51.     By virtue of the foregoing, the defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

52.     Plaintiff incorporates ¶¶1-51 by reference.

53.     The Individual Defendants acted as controlling persons of 3M within the meaning of §20(a) of the Exchange Act:

(a)     By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading;

(b)     The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the

Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

        (c)    Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in 3M's day-to-day operations. The Individual Defendants also controlled the contents of 3M's periodic SEC reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public. The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

54.    By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants are liable pursuant to the Exchange Act;

C.     Awarding compensatory damages in favor of plaintiff and the Class against defendants, jointly and severally, for damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial;

D.     Awarding plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs, and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 29, 2019                 SEEGER WEISS LLP
                                      CHRISTOPHER A. SEEGER

                                      /s/ Christopher A. Seeger
                                      CHRISTOPHER A. SEEGER
                                      55 Challenger Road, 6th Floor
                                      Ridgefield Park, NJ  07660
                                      Telephone:  973-639-9100
                                      Fax:  973-639-8656
                                      cseeger@seegerweiss.com

                                      ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                      SAMUEL H. RUDMAN
                                      58 South Service Road, Suite 200
                                      Melville, NY  11747
                                      Telephone:  6310-367-7100
                                      Fax: 631-367-1173
                                      srudman@rgrdlaw.com

                                      Attorneys for Plaintiff

- 29 -

# EXHIBIT A

~~2018~~2019 Form 10K

**Cautionary Note Concerning Factors That May Affect Future Results**

This Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7, contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. The Company may also make forward-looking statements in other reports filed with the Securities and Exchange Commission, in materials delivered to shareholders and in press releases. In addition, the Company's representatives may from time to time make oral forward-looking statements.

Forward-looking statements relate to future events and typically address the Company's expected future business and financial performance. Words such as "plan," "expect," "aim," "believe," "project," "target," "anticipate," "intend," "estimate," "will," "should," "could," "forecast" and other words and terms of similar meaning, typically identify such forward-looking statements. In particular, these include, among others, statements relating to:

- the Company's strategy for growth, future revenues, earnings, cash flow, uses of cash and other measures of financial performance, and market position,
- worldwide economic, political, and capital markets conditions, such as interest rates, foreign currency exchange rates, financial conditions of our suppliers and customers, trade restrictions such as tariffs in addition to retaliatory counter measures, and natural and other disasters or climate change affecting the operations of the Company or our suppliers and customers,
- new business opportunities, product development, and future performance or results of current or anticipated products,
- the scope, nature or impact of acquisition, strategic alliance and divestiture activities,
- the outcome of contingencies, such as legal and regulatory proceedings,
- future levels of indebtedness, common stock repurchases and capital spending,
- future availability of and access to credit markets,
- pension and postretirement obligation assumptions and future contributions,
- asset impairments,
- tax liabilities,
- information technology security, and
- the effects of changes in tax (including the ~~newly enacted~~ Tax Cuts and Jobs Act), environmental and other laws and regulations in the United States and other countries in which we operate.

The Company assumes no obligation to update or revise any forward-looking statements.

Forward-looking statements are based on certain assumptions and expectations of future events and trends that are subject to risks and uncertainties. Actual future results and trends may differ materially from historical results or those reflected in any such forward-looking statements depending on a variety of factors. Important information as to these factors can be found in this document, including, among others, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the headings of "Overview," "Financial Condition and Liquidity" and annually in "Critical Accounting Estimates." Discussion of these factors is incorporated by reference from Part I, Item 1A, "Risk Factors," of this document, and should be considered an integral part of Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations." For additional information concerning factors that may cause actual results to vary materially from those stated in the forward-looking statements, see our reports on Form 10-K, 10-Q and 8-K filed with the SEC from time to time.

**Item 1A.  Risk Factors~~:~~**

Provided below is a cautionary discussion of what we believe to be the most important risk factors applicable to the Company. Discussion of these factors is incorporated by reference into and considered an integral part of Part ~~II~~I, Item ~~7~~2, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

\*      \*      \*

*\* The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery, anti-corruption, or other matters.* The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note ~~15~~16 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

\*      \*      \*

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws. 3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note ~~15~~16, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies. Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In ~~2017~~2018, 3M expended ~~about $33~~approximately $27 million for capital projects related to protecting the environment. This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed. Capital expenditures for environmental purposes have included pollution control devices — such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers — at new and existing facilities constructed or upgraded in the normal course of business. Consistent with the Company's emphasis on environmental responsibility, capital expenditures (other than for remediation projects) for known projects are presently expected to be ~~about $66~~approximately $75 million over the next two years for new or expanded programs to build facilities or modify manufacturing processes to minimize waste and reduce emissions.

While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position.

\*      \*      \*

<u>Environmental Matters and Litigation</u>

The Company's operations are subject to environmental laws and regulations including those pertaining to air emissions, wastewater discharges, toxic substances, and the handling and disposal of solid and hazardous wastes enforceable by national, state, and local authorities around the world, and private parties in the United States and abroad. These laws and regulations provide, under certain circumstances, a basis for the remediation of contamination, for restoration of or compensation for damages to natural resources, and for personal injury and

property damage claims. The Company has incurred, and will continue to incur, costs and capital expenditures in complying with these laws and regulations, defending personal injury and property damage claims, and modifying its business operations in light of its environmental responsibilities. In its effort to satisfy its environmental responsibilities and comply with environmental laws and regulations, the Company has established, and periodically updates, policies relating to environmental standards of performance for its operations worldwide.

Under certain environmental laws, including the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and similar state laws, the Company may be jointly and severally liable, typically with other companies, for the costs of remediation of environmental contamination at current or former facilities and at off-site locations. The Company has identified numerous locations, most of which are in the United States, at which it may have some liability. Please refer to the section entitled "*Environmental Liabilities and Insurance Receivables*" that follows for information on the amount of the accrual.

*Environmental Matters*

As previously reported, the Company has been voluntarily cooperating with ongoing reviews by local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies of possible environmental and health effects of various perfluorinated compounds, including ~~perfluorooctanyl compounds such as~~ perfluorooctanoate ("PFOA"), perfluorooctane sulfonate ("PFOS"), perfluorohexane sulfonate ("PFHxS"), or ~~similar compounds ("PFCs").~~other per- and polyfluoroalkyl substances (collectively "PFAS"). As a result of its phase-out decision in May 2000, the Company no longer manufactures ~~perfluorooctanyl~~certain PFAS compounds including PFOA, PFOS, PFHxS, and their pre-cursor compounds. The company ceased manufacturing and using the vast majority of these compounds within approximately two years of the phase-out announcement, and ceased all manufacturing and the last significant use of this chemistry by the end of 2008. The Company continues to manufacture a variety of shorter chain length PFAS compounds, including, but not limited to, pre-cursor compounds to perfluorobutane sulfonate (PFBS). These compounds are used as input materials to a variety of products, including engineered fluorinated fluids, fluoropolymers and fluoroelastomers, as well as surfactants, additives, and coatings. Through its ongoing life cycle management and its raw material composition identification processes associated with the Company's policies covering the use of all persistent and bio-accumulative materials, the Company continues to review, control or eliminate the presence of certain ~~PFCs~~PFAS in purchased materials or as byproducts in some of 3M's current fluorochemical manufacturing processes, products, and waste streams.

Regulatory activities concerning PFOA and/or PFOS continue in the United States, Europe and elsewhere, and before certain international bodies. These activities include gathering of exposure and use information, risk assessment, and consideration of regulatory approaches. As the database of studies of both PFOA and PFOS has expanded, the EPA has developed human health effects documents summarizing the available data from these studies. In February 2014, the EPA initiated external peer review of its draft human health effects documents for PFOA and PFOS. The peer review panel met in August 2014. In May 2016, the EPA announced lifetime health advisory levels for PFOA and PFOS at 70 parts per trillion (ppt) (superseding the provisional levels established by the EPA in 2009 of 400 ppt for PFOA and 200 ppt for PFOS). Where PFOA and PFOS are found together, EPA recommends that the concentrations be added together, and the lifetime health advisory for PFOA and PFOS combined is also 70 ppt. Lifetime health advisories ~~while not~~ which are non-enforceable~~, serve as guidance~~ and ~~are benchmarks for determining if~~non-regulatory, provide information about concentrations of ~~chemicals in tap~~drinking water ~~from public utilities~~contaminants at which adverse health effects ~~are safe for public consumption. In an effort~~not expected to occur over the specified duration. To collect exposure information under the Safe Drinking Water Act, the EPA published on May 2, 2012 a list of unregulated substances, including six ~~PFCs~~PFAS, required to be monitored during the period 2013-2015 by public water system suppliers to determine the extent of their occurrence. Through January 2017, the EPA reported results for 4,920 public water supplies nationwide. Based on the 2016 lifetime health advisory, 13 public water supplies exceed the level for PFOA and 46 exceed the level for PFOS (unchanged from the July 2016 EPA summary). A technical advisory issued by EPA in September 2016 on laboratory analysis of drinking water samples stated that 65 public water supplies had exceeded the combined level for PFOA and PFOS. These results are based on one or more samples collected during the period 2012-2015 and do not necessarily reflect current conditions of these public water supplies. EPA reporting does not identify the sources of the PFOA and PFOS in the public water supplies. EPA has announced a forthcoming management plan.

The Company is continuing to make progress in its work, under the supervision of state regulators, to address its historic disposal of PFCsPFAS-containing waste associated with manufacturing operations at the Decatur, Alabama, Cottage Grove, Minnesota, and Cordova, Illinois plants. As previously reported, the Company entered into a voluntary remedial action agreement with the Alabama Department of Environmental Management (ADEM) to address the presence of PFCsPFAS in the soil at the Company's manufacturing facility in Decatur, Alabama. Pursuant to a permit issued by ADEM, for approximately twenty years, the Company incorporated its wastewater treatment plant sludge containing PFCsPFAS in fields at its Decatur facility. After a review of the available options to address the presence of PFCsPFAS in the soil, ADEM agreed that the preferred remediation option is to use a multilayer cap over the former sludge incorporation areas on the manufacturing site with subsequent groundwater migration controls and treatment. Implementation of that plan continues and is expected to be, and construction of the cap was substantially completed in 2018.

The Company continues to work with the Minnesota Pollution Control Agency (MPCA) pursuant to the terms of the previously disclosed May 2007 Settlement Agreement and Consent Order to address the presence of certain PFCsPFAS in the soil and groundwater at former disposal sites in Washington County, Minnesota (Oakdale and Woodbury) and at the Company's manufacturing facility at Cottage Grove, Minnesota. Under this agreement, the Company's principal obligations include (i) evaluating releases of certain PFCsPFAS from these sites and proposing response actions; (ii) providing treatment or alternative drinking water upon identifying any level exceeding a Health Based Value ("HBV") or Health Risk Limit ("HRL") (i.e., the amount of a chemical in drinking water determined by the Minnesota Department of Health (MDH) to be safe for human consumption over a lifetime) for certain PFCsPFAS for which a HBV and/or HRL exists as a result of contamination from these sites; (iii) remediating identified sources of other PFCsPFAS at these sites that are not controlled by actions to remediate PFOA and PFOS; and (iv) sharing information with the MPCA about certain perfluorinated compounds. During 2008, the MPCA issued formal decisions adopting remedial options for the former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). In August 2009, the MPCA issued a formal decision adopting remedial options for the Company's Cottage Grove manufacturing facility. During the spring and summer of 2010, 3M began implementing the agreed upon remedial options at the Cottage Grove and Woodbury sites. 3M commenced the remedial option at the Oakdale site in late 2010. At each location the remedial options were recommended by the Company and approved by the MPCA. Remediation work has been completed at the Oakdale and Woodbury sites, and they are in an operational maintenance mode. Remediation will continue at the Cottage Grove site during 20182019.

In August 2014, the Illinois EPA approved a request by the Company to establish a groundwater management zone at its manufacturing facility in Cordova, Illinois, which includes ongoing pumping of impacted site groundwater, groundwater monitoring and routine reporting of results.

In May 2017, the MDH issued new HBVs for PFOS and PFOA. The new HBVs are 35 ppt for PFOA and 27 ppt for PFOS. In connection with its announcement, the MDH stated that "Drinking water with PFOA and PFOS, even at the levels above the updated values, does not represent an immediate health risk. These values are designed to reduce long-term health risks across the population and are based on multiple safety factors to protect the most vulnerable citizens, which makes them overprotective for most of the residents in our state." In December 2017, the MDH issued a new HBV for perfluorobutane sulfonate (PFBS) of 2 ppb. In February 2018, the MDH published reports finding no unusual rates of certain cancers or adverse birth outcomes (low birth rates or premature births) among residents of Washington and Dakota counties in Minnesota.

The EPA announced a four-step action plan in May 2018 regarding PFAS, which includes evaluating the need to set Safe Drinking Water Act maximum contaminant levels (MCLs) for PFOA and PFOS and beginning the steps necessary to designate PFOA and PFOS as "hazardous substances" under CERCLA. In November 2018, EPA asked for public comment on draft toxicity assessments for two PFAS compounds, including PFBS.

The U.S. Agency for Toxic Substances and Disease Registry (ATSDR) within the Department of Health and Human Services released a draft Toxicological Profile for PFAS for public review and comment in June 2018. In the draft report, ATSDR proposed draft Minimal Risk Levels (MRLs) for PFOS, PFOA and several other PFAS. An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure. MRLs are  not intended to define cleanup or action levels for ATSDR or other agencies. In August 2018, 3M submitted comments on the ATSDR proposal,

noting that there are major shortcomings with the current draft, especially with the MRLs, and that the ATSDR's profile must reflect the best science and full weight of evidence known about these chemicals.

In several states, the state legislature or the state environmental agency have been evaluating or have taken actions related to cleanup standards, groundwater values or drinking water values for PFOS, PFOA, and other PFAS.

The Company cannot predict what additional regulatory actions arising from the foregoing proceedings and activities, if any, may be taken regarding such compounds or the consequences of any such actions.

*Alabama Environmental Litigation*
*Litigation Related to Historical PFAS Manufacturing Operations in Alabama*

As previously reported, a former employee filed a ~~purported~~putative class action lawsuit in 2002 in the Circuit Court of Morgan County, Alabama (the "St. John case"), seeking unstated damages and alleging that the plaintiffs suffered fear, increased risk, subclinical injuries, and property damage from exposure to certain perfluorochemicals at or near the Company's Decatur, Alabama, manufacturing facility. The court in 2005 granted the Company's motion to dismiss the named plaintiff's personal injury-related claims on the basis that such claims are barred by the exclusivity provisions of the state's Workers Compensation Act. The plaintiffs' counsel filed an amended complaint in November 2006, limiting the case to property damage claims on behalf of a ~~purported~~putative class of residents and property owners in the vicinity of the Decatur plant. In June 2015, the plaintiffs filed an amended complaint adding additional defendants, including BFI Waste Management Systems of Alabama, LLC; BFI Waste Management of North America, LLC; the City of Decatur, Alabama; Morgan County, Alabama; Municipal Utilities Board of Decatur; and Morgan County, Alabama, d/b/a Decatur Utilities.

In 2005, the judge —__ in a second ~~purported~~putative class action lawsuit filed by three residents of Morgan County, Alabama, seeking unstated compensatory and punitive damages involving alleged damage to their property from emissions of certain perfluorochemical compounds from the Company's Decatur, Alabama, manufacturing facility that formerly manufactured those compounds (the "Chandler case") —__ granted the Company's motion to abate the case, effectively putting the case on hold pending the resolution of class certification issues in the St. John case. Despite the stay, plaintiffs filed an amended complaint seeking damages for alleged personal injuries and property damage on behalf of the named plaintiffs and the members of a ~~purported~~putative class. No further action in the case is expected unless and until the stay is lifted.

In February 2009, a resident of Franklin County, Alabama, filed a ~~purported~~putative class action lawsuit in the Circuit Court of Franklin County (the "Stover case") seeking compensatory damages and injunctive relief based on the application by the Decatur utility's wastewater treatment plant of wastewater treatment sludge to farmland and grasslands in the state that allegedly contain PFOA, PFOS and other perfluorochemicals. The named plaintiff seeks to represent a class of all persons within the State of Alabama who have had PFOA, PFOS, and other perfluorochemicals released or deposited on their property. In March 2010, the Alabama Supreme Court ordered the case transferred from Franklin County to Morgan County. In May 2010, consistent with its handling of the other matters, the Morgan County Circuit Court abated this case, putting it on hold pending the resolution of the class certification issues in the St. John case.

In October 2015, West Morgan-East Lawrence Water & Sewer Authority (Water Authority) filed an individual complaint against 3M Company, Dyneon, L.L.C, and Daikin America, Inc., in the U.S. District Court for the Northern District of Alabama. The complaint also includes representative plaintiffs who brought the complaint on behalf of themselves, and a class of all owners and possessors of property who use water provided by the Water Authority and five local water works to which the Water Authority supplies water (collectively, the "Water Utilities"). The complaint seeks compensatory and punitive damages and injunctive relief based on allegations that the defendants' chemicals, including PFOA and PFOS from their manufacturing processes in Decatur, have contaminated the water in the Tennessee River at the water intake, and that the chemicals cannot be removed by the water treatment processes utilized by the Water Authority. In September 2016, the court granted 3M's motion to dismiss plaintiffs' trespass claims with prejudice, negligence claims for personal injuries, and private nuisance claims, and denied the motion to dismiss the plaintiffs' negligence claims for property damage, public nuisance, abatement of nuisance, battery and wantonness.

In June 2016, the Tennessee Riverkeeper, Inc. (Riverkeeper), a non-profit corporation, filed a lawsuit in the U.S. District Court for the Northern District of Alabama against 3M; BFI Waste Systems of Alabama; the City of Decatur, Alabama; and the Municipal Utilities Board of Decatur, Morgan County, Alabama. The complaint alleges that the defendants violated the Resource Conservation and Recovery Act in connection with the disposal of certain PFCsPFAS through their ownership and operation of their respective sites. The complaint further alleges such practices may present an imminent and substantial endangerment to health and/or the environment and that Riverkeeper has suffered and will continue to suffer irreparable harm caused by defendants' failure to abate the endangerment unless the court grants the requested relief, including declaratory and injunctive relief.

In August 2016, a group of over 200 plaintiffs filed a putative class action against West Morgan-East Lawrence Water and Sewer Authority (Water Authority), 3M, Dyneon, Daikin, BFI, and the City of Decatur in state court in Lawrence County, Alabama. Plaintiffs are residents of Lawrence, Morgan and other counties who are or have been customers of the Water Authority. They contend defendants have released PFCsPFAS that contaminate the Tennessee River and, in turn, their drinking water, causing damage to their health and properties. In January 2017, the court in the St. John case, discussed above, stayed this litigation pending resolution of the St. John case.

In September 2016, the Water Works and Sewer Board of the City of Gadsden, Alabama filed a lawsuit in the Circuit Court of Etowah County Alabama against 3M and various carpet manufacturers. The complaint alleges that PFCs from the defendants' facilities contaminated the Coosa River as its raw water source for drinking water and seeks unstated damages for the installation and operation of a filtration system, expenses to monitor PFC levels, and lost profits and sales.

In January 2017, several hundred plaintiffs sued 3M, its subsidiary Dyneon, and Daikin America in Lawrence and Morgan Counties, Alabama. The plaintiffs are owners of property, residents, and holders of property interests who receive their water from the West Morgan-East Lawrence Water and Sewer Authority (Water Authority). They assert common law claims for negligence, nuisance, trespass, wantonness, and battery, and they seek injunctive relief and punitive damages. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged into Bakers Creek and the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, discharges wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result of the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

In May 2017, the Water Works and Sewer Board of the Town of Centre, Alabama filed a lawsuit in the Circuit Court of Cherokee County Alabama against 3M, DuPont, and various carpet and textile manufacturers. The complaint alleges that PFCs from the defendants' facilities contaminated the town's raw water source for drinking water and seeks unstated damages for the installation and operation of a filtration system, expenses to monitor PFC levels, lost profits and sales, and injunctive relief.

In November 2017, a purportedputative class action (the "King" case) was filed against 3M, its subsidiary Dyneon, Daikin America, and the West Morgan-East Lawrence Water and Sewer Authority (Water Authority) in the U.S. District Court for the Northern District of Alabama. The plaintiffs are residents of Lawrence and Morgan County, Alabama who receive their water from the Water Authority. They assert various common law claims, including negligence, nuisance, wantonness, and fraudulent concealment, and they seek injunctive relief, attorneys' fees, compensatory and punitive damages for their alleged personal injuries. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged chemicals into the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, dischargesdischarged wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result of the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

In January 2018, certain property owners in Trinity, Alabama filed a lawsuit against 3M, Dyneon, and three unnamed defendants in the U.S. District Court for the Northern District of Alabama. The plaintiffs assert claims for

negligence, strict liability, trespass, nuisance, wanton and reckless conduct, and citizen suit claims for violation of the Resource Conservation and Recovery Act. They allege these claims arise from the defendants' contamination of their property by disposal of PFAS in a landfill located on their property. The plaintiffs seek compensatory and punitive damages and a court order directing the defendants to remediate all PFAS contamination on their property. In September 2018, the case was dismissed by stipulation of the parties.

In September 2018, an individual plaintiff filed a lawsuit in the U.S. District Court for the Northern District of Alabama raising allegations and claims substantially similar to those asserted by plaintiffs in the King case.

*Litigation Related to Historical PFAS Manufacturing Operations in Minnesota*

In July 2016, the City of Lake Elmo filed a lawsuit in the U.S. District Court for the District of Minnesota against 3M alleging that the City suffered damages from drinking water supplies contaminated with PFAS, including costs to construct alternative sources of drinking water. The parties mediated in August 2018 and again in December 2018. Although the parties did not reach a resolution, discussions continue. Trial is scheduled to begin in September 2019.

~~*Minnesota Environmental Litigation*~~
*State Attorneys General Litigation related to PFAS*

In December 2010, the State of Minnesota, by its Attorney General ~~Lori Swanson, acting in its capacity as trustee of the natural resources of the State of Minnesota~~, filed a lawsuit in Hennepin County District Court against 3M to recover damages (including unspecified assessment costs and reasonable attorney's fees) for alleged injury to, destruction of, and loss of use of certain of the State's natural resources under the Minnesota Environmental Response and Liability Act (MERLA) and the Minnesota Water Pollution Control Act (MWPCA), as well as statutory nuisance and common law claims of trespass, nuisance, and negligence with respect to the presence of ~~PFCs~~PFAS in the groundwater, surface water, fish or other aquatic life, and sediments (the "NRD Lawsuit"). The State also ~~seeks~~sought declarations under MERLA that 3M is responsible for all damages the State may suffer in the future for injuries to natural resources from releases of ~~PFCs~~PFAS into the environment, and ~~under MWPCA~~ that 3M is responsible for compensation for future loss or destruction of fish, aquatic life, and other damages~~.~~ under the MWPCA. In September 2017, the State's damages expert submitted a report that ~~contends~~contended the State incurred $5 billion in damages. In November 2017, the State of Minnesota filed a motion for leave to amend its complaint to seek punitive damages from 3M, and 3M filed a motion for summary judgment contending, among other things, that the State's claims ~~are~~were barred by the applicable statute of limitations. ~~A hearing on those motions was held in December 2017.~~ In December 2017, the court urged the parties to attempt to resolve the litigation before trial, and in January 2018, the court appointed a mediator to facilitate that process. ~~If the parties are not able to resolve the matter, the trial is scheduled to begin in February 2018. An adverse ruling or judgment, settlement, or unfavorable development in the NRD Lawsuit could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in the period in which they are recorded and on the consolidated financial position of the Company. No liability has been recorded because the Company believes any such liability is not probable and estimable~~In February 2018, 3M and the State of Minnesota reached a resolution of the NRD Lawsuit. Under the terms of the settlement, 3M agreed to provide an $850 million grant to the State for a special "3M Water Quality and Sustainability Fund." This Fund will enable projects that support water sustainability in the Twin Cities East Metro region, such as continued delivery of water to residents and enhancing groundwater recharge to support sustainable growth. The projects will also result in habitat and recreation improvements, such as fishing piers, trails, and open space preservation. 3M recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 associated with the resolution of this matter.

In June 2018, the State of New York, by its Attorney General, filed a lawsuit in Albany Country Supreme Court against 3M, Tyco Fire Products LP, Chemguard, Inc., Buckeye Fire Equipment Co., National Foam, Inc., and Kidde-Fenwal, Inc., seeking to recover the costs incurred in responding to the contamination caused by Aqueous Film Forming Foam (AFFF) manufactured by 3M and others; damages for injury to, destruction of, and loss of the State's natural resources and related recreational series; and property damage.

In July 2018, the now former governor of Michigan requested that the now former Michigan Attorney General file a lawsuit against 3M and others related to PFAS in a public letter. The new Michigan Attorney General has not yet announced whether she will do so.

In December -

In November 2011, the Metropolitan Council filed a motion to intervene and a complaint in the NRD Lawsuit seeking compensatory damages and other legal, declaratory and equitable relief, including reasonable attorneys' fees, for costs and fees that the Metropolitan Council alleges it will be required to assess at some time in the future if the MPCA imposes restrictions on Metropolitan Council's PFOS discharges to the Mississippi River, including the installation and maintenance of a water treatment system. The Metropolitan Council's intervention motion was based on several theories, including common law negligence, and statutory claims under MERLA for response costs, and under the Minnesota Environmental Rights Act (MERA) for declaratory and equitable relief against 3M for PFOS and other PFC pollution of the waters and sediments of the Mississippi River. 3M did not object to the motion to intervene. In January 2012, 3M answered the Metropolitan Council's complaint and filed a counterclaim alleging that the Metropolitan Council discharges PFCs to the Mississippi River and discharges PFC-containing sludge and bio solids from one or more of its wastewater treatment plants onto agricultural lands and local area landfills. Accordingly, 3M's complaint against the Metropolitan Council asked that if the court finds that the State is entitled to any of the damages it sought, 3M be awarded contribution and apportionment from the Metropolitan Council, including attorneys' fees, under MERLA, and contribution from and liability for the Metropolitan Council's proportional share of damages awarded to the State under the MWPCA, as well as under statutory nuisance and common law theories of trespass, nuisance, and negligence. 3M also sought declaratory relief under MERA. In May 2017, the Metropolitan Council paid 3M approximately $1 million and agreed to dismiss its claims against 3M. As part of the settlement agreement, 3M agreed to dismiss its claims against the Metropolitan Council.

In April 2012, 3M filed a motion to disqualify the State of Minnesota's counsel, Covington & Burling, LLP (Covington). In October 2012, the court granted 3M's motion to disqualify Covington as counsel to the State, and the State and Covington appealed the court's disqualification to the Minnesota Court of Appeals. In July 2013, the Minnesota Court of Appeals affirmed the district court's disqualification order. In October 2013, the Minnesota Supreme Court granted both the State's and Covington's petition for review of the decision of the Minnesota Court of Appeals. In April 2014, the Minnesota Supreme Court affirmed in part, reversed in part, and remanded the case to the district court for further proceedings. The district court took evidence on the disqualification issues at a hearing in October 2015. In February 2016, the district court ruled that Covington violated the professional ethics rule against representing a client (here the State of Minnesota) in the same or substantially related matter where that person's interests are materially adverse to the interests of a former client (3M). The district court, however, denied 3M's motion to disqualify Covington because it further found that 3M impliedly waived by delaying to assert the conflict. Other activity in the case, which had been stayed pending the outcome of the disqualification issue, has resumed. Trial of the NRD Lawsuit is scheduled to begin in February 2018. In a separate but related action, the Company filed suit in the Ramsey County District Court against Covington for breach of its fiduciary duties to the Company and for breach of contract arising out of Covington's representation of the State of Minnesota in the NRD Lawsuit. In September 2016, the court granted 3M's motion for leave to amend the complaint to plead punitive damages. In February 2017, Covington settled this lawsuit with a payment by Covington or its insurer to 3M that is not material to 3M's results of operations or financial condition.

2018, the State of Ohio, through its Attorney General, filed a lawsuit in the Common Pleas Court of Lucas County, Ohio against 3M, Tyco Fire Products LP, Chemguard, Inc., Buckeye Fire Equipment Co., National Foam, Inc., and Angus Fire Armour Corp., seeking injunctive relief and compensatory and punitive damages for remediation costs and alleged injury to Ohio natural resources from AFFF manufacturers.

*Aqueous Film Forming Foam (AFFF) Environmental* -

In July 2016, the City of Lake Elmo filed a lawsuit in the U.S. District Court for the District of Minnesota against 3M alleging that the City suffered damages from drinking water supplies contaminated with PFCs, including costs to construct alternative sources of drinking water. Trial is scheduled to begin in September 2019.

*Aqueous Film Forming Foam (AFFF)* Litigation

3M manufactured and marketed ~~Aqueous Film Forming Foam (~~AFFF~~)~~ for use in firefighting at airports and military bases from approximately 1963 to 2000. As of December 31, ~~2017, twelve purported~~2018, 85 putative class

~~actions~~action and other lawsuits have been filed against 3M and other defendants in various state and federal courts in Arizona, Colorado, Delaware, Florida, Massachusetts, New Jersey, New York, Ohio, Pennsylvania, ~~Colorado, and New York alleging that~~ and Washington where current or former airports, military bases, or fire training facilities are or were located. In these cases, plaintiffs typically allege that certain ~~PFCs~~PFAS used in AFFF contaminated the soil and groundwater where AFFF was used ~~at current or former airports and air force military bases located in Colorado, Pennsylvania, and New York. An individual complaint also has been filed in federal court Pennsylvania. The plaintiffs in these cases generally allege that contaminated groundwater has caused various injuries, including~~and seek damages for loss of use and enjoyment of ~~their~~ properties, diminished property values, investigation costs, ~~and~~ remediation costs.~~Some~~, and in some cases~~seek~~, personal injury and funds for medical monitoring. Several companies have been sued along with 3M, including Ansul Co. (acquired by Tyco, Inc.), Angus Fire, Buckeye Fire Protection Co., Chemguard, National Foam, Inc., and United Technologies Corp.

In December 2018, the U.S. Judicial Panel on Multidistrict Litigation granted motions to transfer and consolidate all AFFF cases pending in federal courts to the U.S. District Court for the District of South Carolina to be managed in a multi-district litigation (MDL) proceeding to centralize pre-trial proceedings. As of December 31, 2018, there were 85 cases in the MDL.

*Other PFAS-related Environmental Litigation*

3M manufactured and sold products containing various perfluorooctanyl compounds (PFOA and PFOS), including Scotchgard, for several decades. Starting in 2017, 3M has been served with individual and putative class action complaints in various state and federal courts alleging, among other things, that 3M's customers' improper disposal of PFOA and PFOS resulted in the contamination of groundwater or surface water. The plaintiffs in these cases generally allege that 3M failed to warn its customers about the hazards of improper disposal of the product. They also generally allege that contaminated groundwater has caused various injuries, including personal injury, loss of use and enjoyment of their properties, diminished property values, investigation costs, and remediation costs. Several companies have been sued along with 3M, including Saint-Gobain Performance Plastics Corp., Honeywell International Inc. f/k/a Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., E.I. DuPont De Nemours and Co., and various carpet manufacturers.~~-~~
~~In November 2016, the Town of Barnstable, MA filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system. The town seeks to recover costs associated with the investigation, treatment, remediation, and monitoring of drinking water supplies allegedly contaminated with certain PFCs used in AFFF. In January 2017, the County of Barnstable, MA, filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief (including indemnification and contribution in connection with claims asserted against the County by the Town of Barnstable) against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system.~~

In New York, 3M is defending 22 individual cases and one putative class action~~-~~
~~In February 2017, husband and wife plaintiffs sued 3M and other defendants in federal court in Pennsylvania, alleging personal injury, loss of consortium and companionship, and associated damages.~~

~~In March 2017, plaintiff residents of Suffolk County, Long Island filed a class action complaint in state court in Suffolk County New York, naming the County and 3M and other alleged manufacturers of AFFF products. The action was removed to the Eastern District of New York.~~

~~In August 2017, three class action complaints were filed in state court in New York against 3M and other defendants including the Port Authority of New York and New Jersey. Plaintiffs allege PFC contamination of the local water supply linked to AFFF at Stewart Air National Guard Base and Stewart International Airport. The Port Authority is the leaseholder of the airport. All three cases have classes for diminution of property and medical monitoring. In September 2017, co-defendant Tyco removed all three cases to the U.S. District Court for the Southern District of New York.~~

In October 2017, a class action complaint was filed in Suffolk County, New York against 3M and others regarding PFCs allegedly released at the Suffolk County Firematics Training Facility. In November 2017, co-defendant National Foam removed the case to the U.S. District Court for the Eastern District of New York.

In December 2017, a complaint was filed by a group of 26 plaintiffs in Suffolk County, New York against 3M and others regarding PFCs allegedly released at Gabreski Airport.

In December 2017, a complaint was filed by the Suffolk County Water District in December 2017 in the U.S. District Court for the Eastern District of New York against 3M and others regarding PFCs allegedly released at Gabreski Airport and Suffolk County Firematics Training Facility.

*Other Environmental Litigation*

In September 2017, three complaints were filed in the U.S. District Court for the Northern District of New York against 3M, Saint-Gobain Performance Plastics Corp. ("Saint-Gobain"), Honeywell International Inc. ("Honeywell") and E.I. DuPont De Nemours and Company. Plaintiffs allege that 3M manufactured and sold PFOA that was used for manufacturing purposes at Saint-Gobain's and Honeywell's facilities located in the Village of Hoosick Falls and the Town of Hoosick. Plaintiffs claim that the drinking water around Hoosick Falls became contaminated with unsafe levels of PFOA due to the activities of the defendants, and allege that they suffered bodily injury due to the ingestion and inhalation of PFOA. Plaintiffs seek unstated compensatory, consequential, and punitive damages, as well as attorneys' fees and costs.

On December 1, 2017, eight plaintiffs filed a 12-count In Michigan, two putative class actionactions are pending in the U.S. District Court for the Western District of Michigan against 3M, and Wolverine World Wide and Waste Management, Inc., alleging(Wolverine) and other defendants. The complaints include some or all of the following claims: negligence, trespass, intentional and negligent infliction of emotional distress, battery, products liability, public and private nuisance, fraudulent concealment, and unjust enrichment. Each count was filed against each defendant. The action arisesThe actions arise from Wolverine's allegedly improper disposal of materials and wastes related to their shoe manufacturing operations. Plaintiffs allege Wolverine used 3M Scotchgard in its manufacturing process and that chemicals from 3M's product have contaminated the environment after being disposed of near drinking water sources. In addition to the two federal court class actions, as of December 31, 2018, 3M has been named as defendant in 214 private individual actions in Michigan state court based on similar allegations. Wolverine also filed a third-party complaint against 3M in a suit by the State of Michigan against Wolverine seeking to compel Wolverine to investigate and address contamination associated with its historic disposal activity.

In Alabama, 3M is defending two lawsuits filed in state court by local public water suppliers relating to 3M's sale of PFAS-containing products to carpet manufacturers in Georgia. The plaintiffs in these cases allege that the carpet manufacturers improperly discharged PFOA and PFOS into the surface water and groundwater, contaminating drinking water supplies of cities located downstream along the Coosa River.

In Delaware, 3M is defending one putative class action filed in federal court relating to alleged contamination allegedly caused by waste from Wolverine World Wide, which used Scotchgard in its manufacture of leather products. 3M allegedly supplied Scotchgard to Wolverine.

In Maine, 3M is defending one individual action in federal court relating to contamination of drinking water and dairy farm operations by PFAS from wastewater sludge. Plaintiffs contend that PFAS entered the wastewater via discharge from another company's facility in Kennebunk, Maine.

In New Jersey, 3M is defending one putative class action in federal court that relates to the DuPont "Chambers Works" plant. Plaintiffs allege that PFAS compounds from the plant have contaminated private wells for drinking water.

In October 2018, 3M and other defendants, including DuPont and Chemours, were named in a putative class action in the U.S. District Court for the Southern District of Ohio. The named plaintiff, a firefighter allegedly exposed to PFAS chemicals through his use of firefighting foam, purports to represent a class of "all individuals residing within the United States who, at the time a class is certified in this case, have detectable levels of PFAS materials in their

blood serum." The plaintiff brings claims for negligence, battery, and conspiracy, but does not seek damages for personal injury, medical monitoring, or property damage. Instead, the plaintiff seeks an order finding the defendants "are liable and responsible for the PFAS in Plaintiff's and the class members' blood and/or bodies" and an order "establishing an independent panel of scientists" to be "tasked with independently studying, evaluating, reviewing, identifying, publishing, and notifying/informing the Class" of research results.

*Other Environmental Litigation*

In July 2018, the Company, along with more than 120 other companies, was served with a complaint seeking cost recovery and contribution towards the cleaning up of approximately eight miles of the Lower Passaic River in New Jersey. The plaintiff, Occidental Chemical Corporation, alleges that it agreed to design and pay the estimated $165 million cost to remove and cap sediment containing eight chemicals of concern, including PCBs and dioxins. The complaint seeks to spread those costs among the defendants, including the Company. The Company's involvement in the case relates to its past use of two commercial drum conditioning facilities in New Jersey. Whether, and to what extent, the Company may be required to contribute to the costs at issue in the case remains to be determined.

For environmental litigation matters described ~~in this section for which a~~ above, no liability~~, if any,~~ has been recorded~~, as~~ the Company believes ~~the amount recorded, as well as the possible loss or range of loss in excess of the established accrual is not material to the Company's consolidated results of operations or financial condition. For~~liability in those matters ~~for which a liability has not been recorded, the Company believes any such liability~~ is not probable and estimable and the Company is not able to estimate a possible loss or range of loss at this time.

*Environmental Liabilities and Insurance Receivables*

As of December 31, ~~2017~~2018, the Company had recorded liabilities of $~~28~~25 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million. The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

As of December 31, ~~2017~~2018, the Company had recorded liabilities of $~~25~~59 million for "other environmental liabilities" based upon an evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA~~,~~ (including the best estimate of the probable liability under the settlement of the NRD Lawsuit for interim treatment of municipal and private wells), the remedial action agreement with ADEM~~, and to address trace amounts of perfluorinated compounds in drinking water sources in the City of Oakdale, Minnesota~~, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years. ~~During the first quarter of 2017, the Company collected from its insurer the outstanding receivable of $15 million related to "other environmental liabilities."~~

It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods. Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and

remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

~~2017~~2018 Form 10K

**Cautionary Note Concerning Factors That May Affect Future Results**

This Annual Report on Form 10-K, including "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7, contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. The Company may also make forward-looking statements in other reports filed with the Securities and Exchange Commission, in materials delivered to shareholders and in press releases. In addition, the Company's representatives may from time to time make oral forward-looking statements.

Forward-looking statements relate to future events and typically address the Company's expected future business and financial performance. Words such as "plan," "expect," "aim," "believe," "project," "target," "anticipate," "intend," "estimate," "will," "should," "could," "forecast" and other words and terms of similar meaning, typically identify such forward-looking statements. In particular, these include, among others, statements relating to:

- the Company's strategy for growth, future revenues, earnings, cash flow, uses of cash and other measures of financial performance, and market position,
- worldwide economic, political, and capital markets conditions, such as interest rates, foreign currency exchange rates, financial conditions of our suppliers and customers, and natural and other disasters or climate change affecting the operations of the Company or our suppliers and customers,
- new business opportunities, product development, and future performance or results of current or anticipated products,
- the scope, nature or impact of acquisition, strategic alliance and divestiture activities,
- the outcome of contingencies, such as legal and regulatory proceedings,
- future levels of indebtedness, common stock repurchases and capital spending,
- future availability of and access to credit markets,
- pension and postretirement obligation assumptions and future contributions,
- asset impairments,
- tax liabilities,
- information technology security, and
- the effects of changes in tax, (including the newly enacted Tax Cuts and Jobs Act), environmental and other laws and regulations in the United States and other countries in which we operate.

The Company assumes no obligation to update or revise any forward-looking statements.

Forward-looking statements are based on certain assumptions and expectations of future events and trends that are subject to risks and uncertainties. Actual future results and trends may differ materially from historical results or those reflected in any such forward-looking statements depending on a variety of factors. Important information as to these factors can be found in this document, including, among others, "Management's Discussion and Analysis of Financial Condition and Results of Operations" under the headings of "Overview," "Financial Condition and Liquidity" and annually in "Critical Accounting Estimates." Discussion of these factors is incorporated by reference from Part I, Item 1A, "Risk Factors," of this document, and should be considered an integral part of Part II, Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations." For additional information concerning factors that may cause actual results to vary materially from those stated in the forward-looking statements, see our reports on Form 10-K, 10-Q and 8-K filed with the SEC from time to time.

**Item 1A. Risk Factors.**

Provided below is a cautionary discussion of what we believe to be the most important risk factors applicable to the Company. Discussion of these factors is incorporated by reference into and considered an integral part of Part II, Item 7, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

\*          \*          \*

\*         \*         \*

*\* The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery, anti-corruption, or other matters.* The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note ~~14~~15 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

\*         \*         \*

**Environmental Law Compliance**

3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws. 3M is also involved in remediation actions relating to environmental matters from past operations at certain sites (refer to "Environmental Matters and Litigation" in Note ~~14~~15, Commitments and Contingencies).

Environmental expenditures relating to existing conditions caused by past operations that do not contribute to current or future revenues are expensed. Reserves for liabilities for anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies. Environmental expenditures for capital projects that contribute to current or future operations generally are capitalized and depreciated over their estimated useful lives.

In ~~2016~~2017, 3M expended about $~~28~~33 million for capital projects related to protecting the environment. This amount excludes expenditures for remediation actions relating to existing matters caused by past operations that do not contribute to current or future revenues, which are expensed. Capital expenditures for environmental purposes have included pollution control devices — such as wastewater treatment plant improvements, scrubbers, containment structures, solvent recovery units and thermal oxidizers — at new and existing facilities constructed or upgraded in the normal course of business. Consistent with the Company's emphasis on environmental responsibility, capital expenditures (other than for remediation projects) for known projects are presently expected to be about $~~70~~66 million over the next two years for new or expanded programs to build facilities or modify manufacturing processes to minimize waste and reduce emissions.

While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position.

\*         \*         \*

<u>Environmental Matters and Litigation</u>

The Company's operations are subject to environmental laws and regulations including those pertaining to air emissions, wastewater discharges, toxic substances, and the handling and disposal of solid and hazardous wastes enforceable by national, state, and local authorities around the world, and private parties in the United States and abroad. These laws and regulations provide, under certain circumstances, a basis for the remediation of

contamination, for restoration of or compensation for damages to natural resources, and for personal injury and property damage claims. The Company has incurred, and will continue to incur, costs and capital expenditures in complying with these laws and regulations, defending personal injury and property damage claims, and modifying its business operations in light of its environmental responsibilities. In its effort to satisfy its environmental responsibilities and comply with environmental laws and regulations, the Company has established, and periodically updates, policies relating to environmental standards of performance for its operations worldwide.

Under certain environmental laws, including the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 and similar state laws, the Company may be jointly and severally liable, typically with other companies, for the costs of remediation of environmental contamination at current or former facilities and at off-site locations. The Company has identified numerous locations, most of which are in the United States, at which it may have some liability. Please refer to the section entitled "*Environmental Liabilities and Insurance Receivables*" that follows for information on the amount of the accrual.

*Environmental Matters*

As previously reported, the Company has been voluntarily cooperating with ongoing reviews by local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies of possible environmental and health effects of various perfluorinated compounds, including perfluorooctanyl compounds such as perfluorooctanoate ("PFOA"), perfluorooctane sulfonate ("PFOS"), or similar compounds ("PFCs"). As a result of its phase-out decision in May 2000, the Company no longer manufactures perfluorooctanyl compounds. The company ceased manufacturing and using the vast majority of these compounds within approximately two years of the phase-out announcement, and ceased all manufacturing and the last significant use of this chemistry by the end of 2008. Through its ongoing life cycle management and its raw material composition identification processes associated with the Company's policies covering the use of all persistent and bio-accumulative materials, the Company continues to control or eliminate the presence of certain PFCs in purchased materials or as byproducts in some of 3M's fluorochemical manufacturing processes, products, and waste streams.

Regulatory activities concerning PFOA and/or PFOS continue in the United States, Europe and elsewhere, and before certain international bodies. These activities include gathering of exposure and use information, risk assessment, and consideration of regulatory approaches. ~~In October 2016, the European Commission notified the World Trade Organization of a draft regulation to restrict PFOA and its related substances under the EU's REACH Regulation (Registration, Evaluation, Authorization, and Restriction of Chemicals). If adopted, the regulation would restrict PFOA and its related substances to concentrations no greater than 25 parts per billion in constituents of other substances, in mixtures, and in articles. As the database of studies of both chemicals~~ As the database of studies of both PFOA and PFOS has expanded, the EPA has developed human health effects documents summarizing the available data from these studies. In February 2014, the EPA initiated external peer review of its draft human health effects documents for PFOA and PFOS. The peer review panel met in August 2014. In May 2016, the EPA announced lifetime health advisory levels for PFOA and PFOS at 70 parts per trillion (ppt) (superseding the provisional levels established by the EPA in 2009 of 400 ~~parts per trillion~~ppt for PFOA and 200 ~~parts per trillion~~ppt for PFOS). Where PFOA and PFOS are found together, EPA recommends that the concentrations be added together, and the lifetime health advisory for PFOA and PFOS combined is also 70 ~~parts per trillion.~~ppt. Lifetime health advisories, while not enforceable, serve as guidance and are benchmarks for determining if concentrations of chemicals in tap water from public utilities are safe for public consumption. In an effort to collect exposure information under the Safe Drinking Water Act, the EPA published on May 2, 2012 a list of unregulated substances, including six PFCs, required to be monitored during the period 2013-2015 by public water system suppliers to determine the extent of their occurrence. Through ~~July 2016~~January 2017, the EPA reported results for 4,~~909~~920 public water supplies nationwide. Based on the 2016 lifetime health advisory, 13 public water supplies exceed the level for PFOA and 46 exceed the level for PFOS. (unchanged from the July 2016 EPA summary). A technical advisory issued by EPA in September 2016 on laboratory analysis of drinking water samples stated that 65 public water supplies had exceeded the combined level for PFOA and PFOS. These results are based on one or more samples collected during the period 2012-2015 and do not necessarily reflect current conditions of these public water supplies. EPA reporting does not identify the sources of the PFOA and PFOS in the public water supplies.

The Company is continuing to make progress in its work, under the supervision of state regulators, to address its historic disposal of PFC-containing waste associated with manufacturing operations at the Decatur, Alabama, Cottage Grove, Minnesota, and Cordova, Illinois plants.

As previously reported, the Company entered into a voluntary remedial action agreement with the Alabama Department of Environmental Management (ADEM) to address the presence of PFCs in the soil at the Company's manufacturing facility in Decatur, Alabama. Pursuant to a permit issued by ADEM, for approximately twenty years, the Company incorporated its wastewater treatment plant sludge containing PFCs in fields at its Decatur facility. After a review of the available options to address the presence of PFCs in the soil, ADEM agreed that the preferred remediation option is to use a multilayer cap over the former sludge incorporation areas on the manufacturing site with subsequent groundwater migration controls and treatment. Implementation of that plan continues and is expected to be completed in 2018.

The Company continues to work with the Minnesota Pollution Control Agency (MPCA) pursuant to the terms of the previously disclosed May 2007 Settlement Agreement and Consent Order to address the presence of certain PFCs in the soil and groundwater at former disposal sites in Washington County, Minnesota (Oakdale and Woodbury) and at the Company's manufacturing facility at Cottage Grove, Minnesota. Under this agreement, the Company's principal obligations include (i) evaluating releases of certain PFCs from these sites and proposing response actions; (ii) providing treatment or alternative drinking water upon identifying any level exceeding a Health Based Value ("HBV") or Health Risk Limit ("HRL") (i.e., the amount of a chemical in drinking water determined by the Minnesota Department of Health (MDH) to be safe for human consumption over a lifetime) for certain PFCs for which a HBV and/or HRL exists as a result of contamination from these sites; (iii) remediating identified sources of other PFCs at these sites that are not controlled by actions to remediate PFOA and PFOS; and (iv) sharing information with the MPCA about certain perfluorinated compounds. During 2008, the MPCA issued formal decisions adopting remedial options for the former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). In August 2009, the MPCA issued a formal decision adopting remedial options for the Company's Cottage Grove manufacturing facility. During the spring and summer of 2010, 3M began implementing the agreed upon remedial options at the Cottage Grove and Woodbury sites. 3M commenced the remedial option at the Oakdale site in late 2010. At each location the remedial options were recommended by the Company and approved by the MPCA. Remediation work has been completed at the Oakdale and Woodbury sites, and they are in an operational maintenance mode. Remediation will continue at the Cottage Grove site during ~~2017~~2018.

In August 2014, the Illinois EPA approved a request by the Company to establish a groundwater management zone at its manufacturing facility in Cordova, Illinois, which includes ongoing pumping of impacted site groundwater, groundwater monitoring and routine reporting of results.

In May 2017, the MDH issued new HBVs for PFOS and PFOA. The new HBVs are 35 ppt for PFOA and 27 ppt for PFOS. In connection with its announcement, the MDH stated that "Drinking water with PFOA and PFOS, even at the levels above the updated values, does not represent an immediate health risk. These values are designed to reduce long-term health risks across the population and are based on multiple safety factors to protect the most vulnerable citizens, which makes them overprotective for most of the residents in our state." In December 2017, the MDH issued a new HBV for perfluorobutane sulfonate (PFBS) of 2 ppb.

The Company cannot predict what additional regulatory actions arising from the foregoing proceedings and activities, if any, may be taken regarding such compounds or the consequences of any such actions.

*Alabama Environmental Litigation*

As previously reported, a former employee filed a purported class action lawsuit in 2002 in the Circuit Court of Morgan County, Alabama (the "St. John case~~),~~"), seeking unstated damages and alleging that the plaintiffs suffered fear, increased risk, subclinical injuries, and property damage from exposure to certain perfluorochemicals at or near the Company's Decatur, Alabama, manufacturing facility. The court in 2005 granted the Company's motion to dismiss the named plaintiff's personal injury-related claims on the basis that such claims are barred by the exclusivity provisions of the state's Workers Compensation Act. The plaintiffs' counsel filed an amended complaint in November 2006, limiting the case to property damage claims on behalf of a purported class of residents and property owners in the vicinity of the Decatur plant. In June 2015, the plaintiffs filed an amended complaint adding

additional defendants, including BFI Waste Management Systems of Alabama, LLC; BFI Waste Management of North America, LLC; the City of Decatur, Alabama; Morgan County, Alabama; Municipal Utilities Board of Decatur; and Morgan County, Alabama, d/b/a Decatur Utilities.

In 2005, the judge -- in a second purported class action lawsuit filed by three residents of Morgan County, Alabama, seeking unstated compensatory and punitive damages involving alleged damage to their property from emissions of certain perfluorochemical compounds from the Company's Decatur, Alabama, manufacturing facility that formerly manufactured those compounds (the "Chandler case)") -- granted the Company's motion to abate the case, effectively putting the case on hold pending the resolution of class certification issues in the St. John case. Despite the stay, plaintiffs filed an amended complaint seeking damages for alleged personal injuries and property damage on behalf of the named plaintiffs and the members of a purported class. No further action in the case is expected unless and until the stay is lifted.

In February 2009, a resident of Franklin County, Alabama, filed a purported class action lawsuit in the Circuit Court of Franklin County (the "Stover case)") seeking compensatory damages and injunctive relief based on the application by the Decatur utility's wastewater treatment plant of wastewater treatment sludge to farmland and grasslands in the state that allegedly contain PFOA, PFOS and other perfluorochemicals. The named plaintiff seeks to represent a class of all persons within the State of Alabama who have had PFOA, PFOS, and other perfluorochemicals released or deposited on their property. In March 2010, the Alabama Supreme Court ordered the case transferred from Franklin County to Morgan County. In May 2010, consistent with its handling of the other matters, the Morgan County Circuit Court abated this case, putting it on hold pending the resolution of the class certification issues in the St. John case.

In October 2015, West Morgan-East Lawrence Water & Sewer Authority (Water Authority) filed an individual complaint against 3M Company, Dyneon, L.L.C, and Daikin America, Inc., in the U.S. District Court for the Northern District of Alabama. The complaint also includes representative plaintiffs who brought the complaint on behalf of themselves, and a class of all owners and possessors of property who use water provided by the Water Authority and five local water works to which the Water Authority supplies water (collectively, the "Water Utilities"). The complaint seeks compensatory and punitive damages and injunctive relief based on allegations that the defendants' chemicals, including PFOA and PFOS from their manufacturing processes in Decatur, have contaminated the water in the Tennessee River at the water intake, and that the chemicals cannot be removed by the water treatment processes utilized by the Water Authority. In September 2016, the court granted 3M's motion to dismiss plaintiffs' trespass claims with prejudice, negligence claims for personal injuries, and private nuisance claims, and denied the motion to dismiss the plaintiffs' negligence claims for property damage, public nuisance, abatement of nuisance, battery and wantonness.

In June 2016, the Tennessee Riverkeeper, Inc. (Riverkeeper), a non-profit corporation, filed a lawsuit in the U.S. District Court for the Northern District of Alabama against 3M; BFI Waste Systems of Alabama; the City of Decatur, Alabama; and the Municipal Utilities Board of Decatur, Morgan County, Alabama. The complaint alleges that the defendants violated the Resource Conservation and Recovery Act in connection with the disposal of certain PFCs through their ownership and operation of their respective sites. The complaint further alleges such practices may present an imminent and substantial endangerment to health and/or the environment and that Riverkeeper has suffered and will continue to suffer irreparable harm caused by defendants' failure to abate the endangerment unless the court grants the requested relief, including declaratory and injunctive relief. The Company believes that the complaint lacks merit.

In August 2016, a group of over 200 plaintiffs filed a class action against West Morgan-East Lawrence Water and Sewer Authority (Water Authority), 3M, Dyneon, Daikin, BFI, and the City of Decatur in state court in Lawrence County, Alabama. Plaintiffs are residents of Lawrence, Morgan and other counties who are or have been customers of the Water Authority. They contend defendants have released PFCs that contaminate the Tennessee River and, in turn, their drinking water, causing damage to their health and properties. In January 2017, the court in the St. John case, discussed above, stayed this litigation pending resolution of the St. John case.

In July 2016, the City of Lake Elmo filed a lawsuit in the U.S. District Court for the District of Minnesota against 3M alleging that the City suffered damages from drinking water supplies contaminated with PFCs, including costs to construct alternative sources of drinking water.

As of December 31, 2016, seven purported class actions were filed against 3M and other defendants in U.S. District Court - three in the District of Colorado and four in the Eastern District of Pennsylvania. The complaints seek unstated damages and other remedies, such as medical monitoring, and allege that the plaintiffs suffered personal injury and property damage from drinking water supplies contaminated with certain PFCs used in Aqueous Film Forming Foam (AFFF) at current or former airports and air force military bases located in Colorado and Pennsylvania.

In September 2016, the Water Works and Sewer Board of the City of Gadsden, Alabama filed a lawsuit in the Circuit Court of Etowah County Alabama against 3M and various carpet manufacturers. The complaint alleges that PFCs from the defendants' facilities contaminated the Coosa River as its raw water source for drinking water and seeks unstated damages for the installation and operation of a filtration system, expenses to monitor PFC levels, and lost profits and sales.

In November 2016, the Town of Barnstable, MassachusettsIn January 2017, several hundred plaintiffs sued 3M, its subsidiary Dyneon, and Daikin America in Lawrence and Morgan Counties, Alabama. The plaintiffs are owners of property, residents, and holders of property interests who receive their water from the West Morgan-East Lawrence Water and Sewer Authority (Water Authority). They assert common law claims for negligence, nuisance, trespass, wantonness, and battery, and they seek injunctive relief and punitive damages. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged into Bakers Creek and the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, discharges wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

In May 2017, the Water Works and Sewer Board of the Town of Centre, Alabama filed a lawsuit in the Circuit Court of Cherokee County Alabama against 3M, DuPont, and various carpet and textile manufacturers. The complaint alleges that PFCs from the defendants' facilities contaminated the town's raw water source for drinking water and seeks unstated damages for the installation and operation of a filtration system, expenses to monitor PFC levels, lost profits and sales, and injunctive relief.

In November 2017, a purported class action was filed against 3M, its subsidiary Dyneon, Daikin America, and the West Morgan-East Lawrence Water and Sewer Authority (Water Authority) in the U.S. District Court for the Northern District of Alabama. The plaintiffs are residents of Lawrence and Morgan County, Alabama who receive their water from the Water Authority. They assert various common law claims, including negligence, nuisance, wantonness, and fraudulent concealment, and they seek injunctive relief, attorneys' fees, compensatory and punitive damages for their alleged personal injuries. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged into the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, discharges wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

*Minnesota Environmental Litigation*

filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system. The town seeks to recover costs associated with the investigation, treatment, remediation, and monitoring of drinking water supplies allegedly contaminated with certain PFCs used in AFFF. In January 2017, the County of Barnstable, Massachusetts, filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief (including indemnification and contribution in connection with claims asserted against the County by the Town of Barnstable) against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system.

In December 2010, the State of Minnesota, by its Attorney General Lori Swanson, acting in its capacity as trustee of the natural resources of the State of Minnesota, filed a lawsuit in Hennepin County District Court against 3M to recover damages (including unspecified assessment costs and reasonable attorney's fees) for alleged injury to, destruction of, and loss of use of certain of the State's natural resources under the Minnesota Environmental Response and Liability Act (MERLA) and the Minnesota Water Pollution Control Act (MWPCA), as well as statutory nuisance and common law claims of trespass, nuisance, and negligence with respect to the presence of PFCs in the groundwater, surface water, fish or other aquatic life, and sediments (the "NRD Lawsuit"). The State also seeks declarations under MERLA that 3M is ‑responsible for all damages the State may suffer in the future for injuries to natural resources from releases of PFCs into the environment, and under MWPCA that 3M is responsible for compensation for future loss or destruction of fish, aquatic life, and other damages. In September 2017, the State's damages expert submitted a report that contends the State incurred $5 billion in damages. In November 2017, the State of Minnesota filed a motion for leave to amend its complaint to seek punitive damages from 3M, and 3M filed a motion for summary judgment contending, among other things, that the State's claims are barred by the applicable statute of limitations. A hearing on those motions was held in December 2017. In December 2017, the court urged the parties to attempt to resolve the litigation before trial, and in January 2018, the court appointed a mediator to facilitate that process. If the parties are not able to resolve the matter, the trial is scheduled to begin in February 2018. An adverse ruling or judgment, settlement, or unfavorable development in the NRD Lawsuit could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in the period in which they are recorded and on the consolidated financial position of the Company. No liability has been recorded because the Company believes any such liability is not probable and estimable.

In November 2011, the Metropolitan Council filed a motion to intervene and a complaint in the NRD Lawsuit seeking compensatory damages and other legal, declaratory and equitable relief, including reasonable attorneys' fees, for costs and fees that the Metropolitan Council alleges it will be required to assess at some time in the future if the MPCA imposes restrictions on Metropolitan Council's PFOS discharges to the Mississippi River, including the installation and maintenance of a water treatment system. The Metropolitan Council's intervention motion was based on several theories, including common law negligence, and statutory claims under MERLA for response costs, and under the Minnesota Environmental Rights Act (MERA) for declaratory and equitable relief against 3M for PFOS and other PFC pollution of the waters and sediments of the Mississippi River. 3M did not object to the motion to intervene. In January 2012, 3M answered the Metropolitan Council's complaint and filed a counterclaim alleging that the Metropolitan Council discharges PFCs to the Mississippi River and discharges PFC-containing sludge and bio solids from one or more of its wastewater treatment plants onto agricultural lands and local area landfills. Accordingly, 3M's complaint against the Metropolitan Council asksasked that if the court finds that the State is entitled to any of the damages it seekssought, 3M be awarded contribution and apportionment from the Metropolitan Council, including attorneys' fees, under MERLA, and contribution from and liability for the Metropolitan Council's proportional share of damages awarded to the State under the MWPCA, as well as under statutory nuisance and common law theories of trespass, nuisance, and negligence. 3M also seekssought declaratory relief under MERA. In May 2017, the Metropolitan Council paid 3M approximately $1 million and agreed to dismiss its claims against 3M. As part of the settlement agreement, 3M agreed to dismiss its claims against the Metropolitan Council.

In April 2012, 3M filed a motion to disqualify the State of Minnesota's counsel, Covington & Burling, LLP (Covington). In October 2012, the court granted 3M's motion to disqualify Covington as counsel to the State, and the State and Covington appealed the court's disqualification to the Minnesota Court of Appeals. In July 2013, the Minnesota Court of Appeals affirmed the district court's disqualification order. In October 2013, the Minnesota Supreme Court granted both the State's and Covington's petition for review of the decision of the Minnesota Court of Appeals. In April 2014, the Minnesota Supreme Court affirmed in part, reversed in part, and remanded the case to the district court for further proceedings. The district court took evidence on the disqualification issues at a hearing in October 2015. In February 2016, the district court ruled that Covington violated the professional ethics rule against representing a client (here the State of Minnesota) in the same or substantially related matter where that person's interests are materially adverse to the interests of a former client (3M). The district court, however, denied 3M's motion to disqualify Covington because it further found that 3M impliedly waived by delaying to assert the conflict. Other activity in the case, which had been stayed pending the outcome of the disqualification issue, has resumed. A trial date has not yet been set.Trial of the NRD Lawsuit is scheduled to begin in February 2018. In a separate but related action, the Company filed suit in the Ramsey County District Court against Covington for

breach of its fiduciary duties to the Company and for breach of contract arising out of Covington's representation of the State of Minnesota in the NRD Lawsuit. In September 2016, the court granted 3M's motion for leave to amend the complaint to plead punitive damages. In February 2017, Covington settled this lawsuit with a payment by Covington or its insurer to 3M that is not material to 3M's results of operations or financial condition.

In July 2016, the City of Lake Elmo filed a lawsuit in the U.S. District Court for the District of Minnesota against 3M alleging that the City suffered damages from drinking water supplies contaminated with PFCs, including costs to construct alternative sources of drinking water. Trial is scheduled to begin in September 2019.

*Aqueous Film Forming Foam (AFFF) Litigation*

3M manufactured and marketed Aqueous Film Forming Foam (AFFF) for use in firefighting at airports and military bases from approximately 1963 to 2000. As of December 31, 2017, twelve purported class actions have been filed against 3M and other defendants in various state and federal courts in Pennsylvania, Colorado, and New York alleging that certain PFCs used in AFFF contaminated the soil and groundwater where AFFF was used at current or former airports and air force military bases located in Colorado, Pennsylvania, and New York. An individual complaint also has been filed in federal court Pennsylvania. The plaintiffs in these cases generally allege that contaminated groundwater has caused various injuries, including loss of use and enjoyment of their properties, diminished property values, investigation costs, and remediation costs. Some cases seek funds for medical monitoring. Several companies have been sued along with 3M, including Ansul Co. (acquired by Tyco, Inc.), Angus Fire, Buckeye Fire Protection Co., Chemguard, National Foam, Inc., United Technologies Corp.

In November 2016, the Town of Barnstable, MA filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system. The town seeks to recover costs associated with the investigation, treatment, remediation, and monitoring of drinking water supplies allegedly contaminated with certain PFCs used in AFFF. In January 2017, the County of Barnstable, MA, filed an individual action in the U.S. District Court for the District of Massachusetts seeking unstated compensatory and punitive damages and other relief (including indemnification and contribution in connection with claims asserted against the County by the Town of Barnstable) against 3M and other suppliers of AFFF for alleged contamination of the aquifer supplying drinking water to the Hyannis water system.

In February 2017, husband and wife plaintiffs sued 3M and other defendants in federal court in Pennsylvania, alleging personal injury, loss of consortium and companionship, and associated damages.

In March 2017, plaintiff residents of Suffolk County, Long Island filed a class action complaint in state court in Suffolk County New York, naming the County and 3M and other alleged manufacturers of AFFF products. The action was removed to the Eastern District of New York.

In August 2017, three class action complaints were filed in state court in New York against 3M and other defendants including the Port Authority of New York and New Jersey. Plaintiffs allege PFC contamination of the local water supply linked to AFFF at Stewart Air National Guard Base and Stewart International Airport. The Port Authority is the leaseholder of the airport. All three cases have classes for diminution of property and medical monitoring. In September 2017, co-defendant Tyco removed all three cases to the U.S. District Court for the Southern District of New York.

In October 2017, a class action complaint was filed in Suffolk County, New York against 3M and others regarding PFCs allegedly released at the Suffolk County Firematics Training Facility. In November 2017, co-defendant National Foam removed the case to the U.S. District Court for the Eastern District of New York.

In December 2017, a complaint was filed by a group of 26 plaintiffs in Suffolk County, New York against 3M and others regarding PFCs allegedly released at Gabreski Airport.

In December 2017, a complaint was filed by the Suffolk County Water District in December 2017 in the U.S. District Court for the Eastern District of New York against 3M and others regarding PFCs allegedly released at Gabreski Airport and Suffolk County Firematics Training Facility.

*Other Environmental Litigation*

In September 2017, three complaints were filed in the U.S. District Court for the Northern District of New York against 3M, Saint-Gobain Performance Plastics Corp. ("Saint-Gobain"), Honeywell International Inc. ("Honeywell") and E.I. DuPont De Nemours and Company. Plaintiffs allege that 3M manufactured and sold PFOA that was used for manufacturing purposes at Saint-Gobain's and Honeywell's facilities located in the Village of Hoosick Falls and the Town of Hoosick. Plaintiffs claim that the drinking water around Hoosick Falls became contaminated with unsafe levels of PFOA due to the activities of the defendants, and allege that they suffered bodily injury due to the ingestion and inhalation of PFOA. Plaintiffs seek unstated compensatory, consequential, and punitive damages, as well as attorneys' fees and costs.

On December 1, 2017, eight plaintiffs filed a 12-count class action against 3M, Wolverine World Wide and Waste Management, Inc., alleging negligence, trespass, intentional and negligent infliction of emotional distress, battery, products liability, public and private nuisance, fraudulent concealment, and unjust enrichment. Each count was filed against each defendant. The action arises from Wolverine's allegedly improper disposal of materials and wastes related to their shoe manufacturing operations. Plaintiffs allege Wolverine used 3M Scotchgard in its manufacturing process and that chemicals from 3M's product have contaminated the environment after being disposed of near drinking water sources.

For environmental litigation matters described in this section for which a liability, if any, has been recorded, the Company believes the amount recorded, as well as the possible loss or range of loss in excess of the established accrual is not material to the Company's consolidated results of operations or financial condition. For those matters for which a liability has not been recorded, the Company believes any such liability is not probable and estimable and the Company is not able to estimate a possible loss or range of loss at this time.

*Environmental Liabilities and Insurance Receivables*

As of December 31, 20162017, the Company had recorded liabilities of $3828 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $118 million. The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

As of December 31, 20162017, the Company had recorded liabilities of $2925 million for "other environmental liabilities" based upon an evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA, the remedial action agreement with ADEM, and to address trace amounts of perfluorinated compounds in drinking water sources in the City of Oakdale, Minnesota, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years. As of December 31, 2016,During the Company'sfirst quarter of 2017, the Company collected from its insurer the outstanding receivable for insurance recoveriesof $15 million related to "other environmental liabilities" was $15 million.."

It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods. Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation

techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.