## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| In re 3M COMPANY SECURITIES LITIGATION | ) ) ) ) | Case No. 0:20-cv-2488-NEB-KMM |
| This document relates to: ALL ACTIONS. | ) ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

Wendy J. Wildung (#117055)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
wendy.wildung@faegredrinker.com

Meredith Kotler (admitted *pro hac vice*)
Mary Eaton (admitted *pro hac vice*)
Scott A. Eisman (admitted *pro hac vice*)
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022
Tel: (212) 277-4000
meredith.kotler@freshfields.com
mary.eaton@freshfields.com
scott.eisman@freshfields.com

*Attorneys for Defendants*

Date:  January 15, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................... vii

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ................................................................................. 4

    A.    3M's Prior Long-Chain PFAS Production ................................................. 4

    B.    3M's Extensive Disclosures and Warnings Regarding Potential
            PFAS-Related Liabilities During the CP ................................................. 5

            1.    ASC 450 ..................................................................................... 5

            2.    2017 Disclosures and Warnings Regarding PFAS-Related
                    Contingent Liabilities .............................................................. 7

            3.    2018 Updates, Additional Disclosures, and Warnings ................. 11

            4.    2019 Updates, Additional Disclosures, and Warnings ................. 15

    C.    This Action and the CAC's Allegations .................................................. 19

ARGUMENT ...................................................................................................... 20

I.    THE CAC FAILS TO PLEAD A SECTION 10(B) CLAIM ............................ 20

    A.    The CAC's Puzzle Pleading Fails to Comply with the PSLRA ................ 21

    B.    The CAC Fails to Plead Any Actionable Misstatement ........................... 22

            1.    The CAC Fails to Plead Falsity of 3M's PFAS-Related
                    Accruals and Beliefs Concerning Impact from Any Future
                    PFAS-Related Charges .............................................................. 22

            2.    3M's PFAS-Related Accruals and Beliefs Concerning Impact
                      from Any Potential Future Charges Are Inactionable
                    Opinions ................................................................................... 29

            3.    Plaintiffs' Challenges to the Roman and Gangestad
                    Statements Fail ......................................................................... 31

             4.    Plaintiffs Fail to Plead That 3M's Litigation Risk Factor Was
                    False ......................................................................................... 32

             5.    The Challenged Statements Are Protected by the PSLRA's
                    Safe Harbor .............................................................................. 33

    C.    The CAC Fails to Plead a Strong Inference of Scienter ........................... 34

1.   The CAC Fails to Plead Motive to Defraud.....................................35

2.   The CAC Fails to Adequately Plead Intentional or Reckless Conduct ...........................................................................................38

D.   Plaintiffs Fail to Allege Loss Causation......................................................42

1.   Plaintiffs Fail to Plead Loss Causation for the Q1 2019 Earnings Announcement ................................................................42

2.   The July 8, 2019 Announcement Was Not Corrective ..................43

II.   PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM............................44

CONCLUSION ................................................................................................................44

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*In re 2007 Novastar Fin., Inc. Sec. Litig.*,
  579 F.3d 878 (8th Cir. 2009) ................................................................. 21

*In re Acceptance Ins. Cos. Sec. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ................................................. 27, 28, 34

*In re Apogee Enters., Inc. Sec. Litig.*,
  2020 WL 1445856 (D. Minn. Mar. 25, 2020) .................................... *passim*

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F.Supp.2d 564 (S.D.N.Y. 2013),
  *aff'd*, 566 F.App'x 93 (2d Cir. 2014) ................................................. *passim*

*Beritelli v. Wells Fargo Bank, N.A.*,
  2013 WL 5460179 (W.D.N.C. Sept. 30, 2013) ................................... 32

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) .............................................................. 21

*In re Buca Inc. Sec. Litig.*,
  2006 WL 3030886 (D. Minn. Oct. 16, 2006) ................................. 36, 43

*In re Ceridian Corp. Sec. Litig.*,
  542 F.3d 240 (8th Cir. 2008) ............................................................ 36, 37

*Chapman v. Mueller Water Prods., Inc.*,
  466 F.Supp.3d 382 (S.D.N.Y. 2020) ............................................ 22, 30, 39

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*,
  129 F.Supp.3d 48 (S.D.N.Y. 2015) ....................................................... 43

*Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*,
  519 F.3d 778 (8th Cir. 2008) ................................................................. 36

*Cozzarelli v. Inspire Pharm. Inc*,
  549 F.3d 618 (4th Cir. 2008) ................................................................. 37

*Dalberth v. Xerox Corp.*,
  766 F.3d 172 (2d Cir. 2014) .................................................................. 28

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .................................................................................. 42

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ................................................ 27, 39, 40, 41

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) .................................................................... 30

*In re Frontier Commc'ns Corp. S'holders Litig.*,
    2019 WL 1099075 (D. Conn. Mar. 8, 2019) ............................................ 43

*In re Gander Mt. Co. Sec. Litig.*,
    2006 WL 140670 (D. Minn. Jan. 17, 2006) ............................................. 34

*Golub v. PPD Corp.*,
    576 F.2d 759 (8th Cir. 1978) ................................................................... 28

*Harris v. IVAX Corp.*,
    182 F.3d 799 (11th Cir. 1999) ................................................................. 33

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
    2017 WL 1536223 (D.N.J. Apr. 27, 2017),
    *aff'd*, 905 F.3d 106 (3d Cir. 2018) ...................................................... 29-30

*In re Intelligroup Sec. Litig.*,
    468 F. Supp.2d 670 (D.N.J. 2006) ........................................................... 43

*Julianello v. K-V Pharm. Co.*,
    791 F.3d 915 (8th Cir. 2015) ............................................................. 33, 34

*In re K-tel Int'l, Inc. Sec. Litig.*,
    300 F.3d 881 (8th Cir. 2002) ............................................................ *passim*

*Kushner v. Beverly Enters., Inc.*,
    317 F.3d 820 (8th Cir. 2003) ................................................................... 41

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) .................................................................... 43

*Lewis v. YRC Worldwide Inc.*,
    2020 WL 1493915 (N.D.N.Y. Mar. 27, 2020) ........................................ 31

*In re Lions Gate Ent. Corp. Sec. Litig.*,
    165 F.Supp.3d 1 (S.D.N.Y. 2016) ..................................................... 29, 30

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)........................ 43

*Luna v. Marvell Tech. Grp. Ltd.*,
2016 WL 5930655 (N.D. Cal. Oct. 12, 2016)............................ 22, 24, 30, 39

*McAdams v. McCord*,
584 F.3d 1111 (8th Cir. 2009) ............................................... 20, 42

*In re Medtronic Inc., Sec. Litig.*,
618 F.Supp.2d 1016 (D. Minn. 2009)..................................... 36, 37

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ................................................ 43

*In re Navarre Corp. Sec. Litig.*,
299 F.3d 735 (8th Cir. 2002) ...........................................*passim*

*In re NVE Corp. Sec. Litig.*,
551 F.Supp.2d 871 (D. Minn. 2007),
*aff'd*, 527 F.3d 749 (8th Cir. 2008)..................................... 37, 40

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)................................................... 3, 30

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) .................................................. 28

*In re Patterson Cos. Sec., Derivative & ERISA Litig.*,
479 F.Supp.2d 1014 (D. Minn. 2007)........................................ 40

*Plevy v. Haggerty*,
38 F.Supp.2d 816 (C.D. Cal. 1998) .................................... 37-38

*Podraza v. Whiting*,
790 F.3d 828 (8th Cir. 2015) ..........................................*passim*

*Rand-Heart of N.Y., Inc. v. Dolan*,
812 F.3d 1172 (8th Cir. 2016) ...................................... 4, 42, 43

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ................................................. 28

*Schaaf v. Residential Funding Corp.*,
517 F.3d 544 (8th Cir. 2008) ................................................. 42

*Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ............................................................ 29

*In re Target Corp. Sec. Litig.*,
    955 F.3d 738 (8th Cir. 2020) ...................................................................................... 37

*TCF Banking & Sav., F.A. v. Arthur Young & Co.*,
    706 F.Supp. 1408 (D. Minn. 1988) .................................................................. 28, 30, 34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................... 35

## Statutes

15 U.S.C. § 78u-4(b)(1) ...................................................................................................... 20

15 U.S.C. § 78u-4(b)(2) ...................................................................................................... 20

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................................................. 34

15 U.S.C. § 78u-5(i)(1) ....................................................................................................... 33

## Other Authorities

17 C.F.R. § 210.4-01(a)(1) .................................................................................................. 5

40 C.F.R. § 116.4 ................................................................................................................. 9

40 C.F.R. § 302.4 ................................................................................................................. 9

40 C.F.R. § 401.15 ............................................................................................................... 9

## TABLE OF ABBREVIATIONS

| Term | Definition |
|------|-----------|
| ¶ | Paragraphs of the CAC |
| 2016 10-K | 3M's Form 10-K for the year ended December 31, 2016, filed with the SEC on February 9, 2017, submitted at Ex.3 |
| 2017 10-K | 3M's Form 10-K for the year ended December 31, 2017, filed with the SEC on February 8, 2018, submitted at Ex.8 |
| 2018 10-K | 3M's Form 10-K for the year ended December 31, 2018, filed with the SEC on February 7, 2019, submitted at Ex.16 |
| 2019 10-K | 3M's Form 10-K for the year ended December 31, 2019, filed with the SEC on February 6, 2020, submitted at Ex.27 |
| 3M | Defendant 3M Company |
| AFFF | Aqueous Film-Forming Foam |
| AFFF MDL | *In re Aqueous Film-Forming Foam Multidistrict Litigation*, No. 2873 (D.S.C.) |
| AG | Attorney General |
| Ann.A | Annex A to this Memorandum of Law, submitted at Ex.57 |
| Ann.B | Annex B to this Memorandum of Law, submitted at Ex.58 |
| App. | Appendix to the CAC |
| ASC | FASB Accounting Standards Codification, excerpts submitted at Ex.52 |
| Board | 3M's Board of Directors |
| CAC | Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed December 19, 2019 |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CP | Putative Class Period, February 9, 2017 through July 8, 2019 |
| Defendants | 3M and the Individual Defendants |
| DuPont | DuPont Co. |
| Eisman Decl. | Declaration of Scott A. Eisman, executed January 15, 2021 |
| EPA | U.S. Environmental Protection Agency |

| Ex. | Exhibit to the Eisman Decl. |
|---|---|
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| FASB | Financial Accounting Standards Board |
| GAAP | Generally Accepted Accounting Principles |
| Gangestad | Defendant Nicholas C. Gangestad, 3M CFO during the CP |
| HALs | Health Advisory Levels promulgated by the EPA |
| Individual Defendants | Gangestad, Roman, and Thulin |
| Minnesota AG Litigation | *State ex rel. Swanson v. 3M Company*, No. 27-cv-10-28862 (Minn. 4th Jud. Dist. Ct., Hennepin Cnty.) |
| MDL | Multidistrict Litigation |
| PFAS | Per- and Polyfluoroalkyl Substances |
| Plaintiffs | Lead Plaintiffs State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of the State of Rhode Island; Iron Workers Local 580 Joint Funds; and Flossbach von Storch Invest S.A. |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 *et seq.* |
| PwC | PricewaterhouseCoopers LLP |
| Q1 | First Quarter |
| Q4 | Fourth Quarter |
| Roman | Defendant Michael F. Roman, 3M CEO during the CP |
| Rule 10b-5 | 17 C.F.R. § 240.10b-5 |
| SEC | U.S. Securities and Exchange Commission |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 20(a) | Section 20(a) of the Exchange Act |
| Thulin | Defendant Inge G. Thulin, 3M CEO and Chairman of the Board during portions of the CP |

## PRELIMINARY STATEMENT

This putative Section 10(b) securities class action concerns 3M's accruals for and disclosures about *contingent* liabilities related to its historic manufacture of long-chain PFAS. Those contingent liabilities stemmed from ongoing legal proceedings against 3M (and others), the ultimate outcome of which were uncertain and depended on future events. 3M was bound under GAAP to follow ASC 450, which requires companies to accrue for contingent liabilities *only* when it is "probable" that a liability (*i.e.*, negative litigation outcome or settlement) has been incurred, *and* any loss therefrom is "reasonably estimable." By contrast, disclosure of the contingency is required if there is a "reasonable possibility" that a loss has been incurred, with such disclosure limited to a description of the contingency's nature and an estimate of possible loss or statement that an estimate cannot be made.

Throughout the CP (February 9, 2017 to July 8, 2019), 3M complied with GAAP, accruing for all contingent liabilities for its PFAS-related legal proceedings where probable and reasonably estimable, and making the required disclosures where they were not. Indeed, 3M provided multiple pages of disclosure describing all significant PFAS-related legal proceedings, including each identified in the CAC. It directly informed investors that an estimate of loss therefrom could not be made. And it provided extensive warnings that predicting loss contingencies and litigation outcomes is difficult and inherently uncertain, that 3M's estimates could be off or change, that 3M reexamines its estimates each period and updates as appropriate, and that future estimates could have a

material adverse effect on 3M's position. These careful, detailed disclosures about 3M's PFAS-related contingent liabilities preclude any claim of securities fraud.

While the CAC is high on hyperbole, it fails to plead any facts (let alone particularized facts) sufficient to state a claim under the PSLRA's heightened pleading standards. The CAC does not allege that 3M's loss contingency accounting violated ASC 450, or that any PFAS-related liabilities were "probable" and "reasonably estimable" so as to require accrual. It fails to point to a single fact suggesting that Defendants did not genuinely believe the difficult accounting judgments and assessments 3M was required to make. Nor does it point to any internal documentation or witness statements contradicting Defendants' public statements so as to call their truthfulness into question.

Instead, Plaintiffs insist that Defendants "should have known," and disclosed, that the potential PFAS-related liabilities 3M was facing were "massive" or "enormous," principally because PFAS-related suits had been filed and one of those suits—an action commenced by the Minnesota AG—ultimately settled for $850 million just before trial.

Plaintiffs are wrong.

The course and outcome of litigation often is uncertain and difficult to predict. The fact that additional PFAS-related suits have been filed over time does not change that, especially where—as here—liability was and is being disputed, damages were and are being contested, 3M had and has defenses, cross-claims were and are available, and insurance may be available. Moreover, the nebulous disclosure of "massive" or "enormous" potential liabilities Plaintiffs demand is inconsistent with GAAP since accruing for contingent losses that are neither probable nor reasonably estimable would

have made 3M's financial statements misleading and unreliable. Simply because 3M elected to settle with the Minnesota AG "on the courthouse steps" does not make its prior assessments of that case or its later assessments of other cases (none of which have settled) false and misleading. As 3M disclosed, it had defenses to the Minnesota AG's claims that would have barred *any* recovery and, in any event, 3M gave detailed warnings about that litigation, including that the State had submitted an expert report claiming $5 billion in damages and that no reserve had been taken. Investors were thus fully informed of the risks and potential liabilities, not misled, and none of the allegations in the CAC suggests otherwise.

Plaintiffs' securities claims fail on multiple fronts:

- ***No falsity***. Plaintiffs fail to plead any "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting" 3M's disclosed accruals and statements regarding contingent PFAS-related liabilities when they were made. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir. 2002).

- ***Inactionable opinions***. 3M's PFAS-related litigation accruals and stated beliefs about potential future exposure are opinions, and Plaintiffs fail to plead either that (i) Defendants did not in fact believe their opinions, or (ii) facts "cutting the other way" were not disclosed. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 189-90 (2015). Indeed, all information to which Plaintiffs point, such as the Minnesota AG settlement, was disclosed.

- ***Safe harbor***. 3M's litigation accruals and estimates of potential future PFAS-related charges fall within the PSLRA's safe harbor because they are forward-looking and were accompanied by ample, specific cautionary language.

- ***No Strong Inference of Scienter***. The Individual Defendants' stock sales to which Plaintiffs point as motive to defraud are not remotely "suspicious." *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747-48 (8th Cir. 2002). Nor does the CAC plead facts raising the requisite "strong," or even plausible, inference that Defendants engaged in severely reckless, or intentional, conduct in setting PFAS-related litigation accruals or otherwise disclosing 3M's potential PFAS-related

liabilities. This is particularly so given (i) the complex, judgment-laden process of accounting for litigation loss contingencies; (ii) 3M's outside auditor's opinions that 3M's financial statements, including accruals, complied with GAAP; and (iii) 3M's extensive disclosures concerning PFAS-related contingent liabilities. *See Podraza v. Whiting*, 790 F.3d 828, 837-39 (8th Cir. 2015) (rejecting scienter allegations based on alleged failure to properly account for environmental remediation obligations).

- ***No loss causation***. Plaintiffs fail to point to any "corrective disclosure" that "revealed" the purported fraud and proximately caused their economic harm. *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1179-80 (8th Cir. 2016).

There can be no securities fraud claim for failing to accrue a particular amount of *contingent* legal liability that is being defended and is neither probable nor reasonably estimable, particularly when disclosure of the nature of the liability is undisputedly made. For any and all of these reasons, the CAC should be dismissed.

## FACTUAL BACKGROUND[1]

### A.    3M's Prior Long-Chain PFAS Production

Before 2000, 3M manufactured long-chain PFAS, chemicals used for heat, fire, stain, and friction resistance; oil, chemical, and water repellence; and electrical insulation. ¶¶ 29, 33. 3M separately used PFAS for its own products and sold them to other manufacturers (such as DuPont) for use in various products and applications. ¶¶ 38-39. 3M also manufactured AFFF, a PFAS-based firefighting foam, used at airbases, airports, and elsewhere. ¶ 39. 3M manufactured and lawfully disposed of PFAS at or near five sites:   Cottage Grove, Minnesota; Decatur, Alabama; Cordova, Illinois;

---

[1] This section is taken from the CAC's well-pleaded factual allegations, documents referenced therein, and documents that may be judicially noticed—including 3M's SEC filings, press releases, conference call transcripts, and historical stock prices—and that may be considered on this motion. *Podraza*, 790 F.3d at 837; *K-tel*, 300 F.3d at 889.

Antwerp, Belgium; and Gendorf, Germany. ¶ 81.

In 2000, following indications that long-chain PFAS could be harmful to humans, animals and the environment, 3M announced that it would phase out its manufacture of long-chain PFAS. ¶ 59. The phase-out was substantially complete by 2002, and manufacture ended by 2008. Ex.3, 116; *see* ¶ 61.

After 3M ceased production of PFAS, but before the start of the CP, environmental authorities and private litigants began asserting claims against 3M for alleged harm to persons, property or natural resources due to manufacturing and disposal of PFAS near 3M's three U.S. facilities ("Manufacturing and Disposal Matters"). All of those proceedings were disclosed in 3M's SEC filings, including the Minnesota AG Litigation alleging injury to natural resources from the Cottage Grove plant. Ex.1, 107-10; Ex.2, 41-45.[2]

### B.   3M's Extensive Disclosures and Warnings Regarding Potential PFAS-Related Liabilities During the CP

#### 1.   ASC 450

FASB's ASC are part of GAAP, which publicly traded companies must follow in reporting financial information. 17 C.F.R. § 210.4-01(a)(1). One of FASB's ASCs—ASC 450—governs contingencies, and ASC 450-20 governs loss contingencies, like those for potential litigation liability. A loss contingency is an "existing condition, situation or set of circumstances involving uncertainty as to possible . . . loss . . . to an

---

[2] Although commenced in 2010, the Minnesota AG Litigation was largely stayed, other than in connection with disqualification issues, from late 2012 until February 2016. Ex.3, 119.

entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-20-20 Glossary.[3]

Loss contingencies must be accrued only when (i) it is "probable" (defined as "likely") that a liability has been incurred, and (ii) the amount of loss can be "reasonably estimated." ASC 450-20-25-2; ASC 450-20-20 Glossary. Even losses that are reasonably estimable "shall not be accrued if it is not probable that . . . a liability has been incurred *at the date of an entity's financial statements*," because "those losses relate to a future period." ASC 450-20-25-2 (emphasis added). Accordingly, the mere filing of suit "does not automatically indicate that accrual of a loss may be appropriate"; the "degree of probability of an unfavorable outcome must be assessed." ASC 450-20-55-13. These requirements are intended to prevent accruals of amounts "so uncertain as to impair the integrity" of financial statements and mislead investors about the registrant's true financial condition. ASC 450-20-25-4.[4] ASC recognizes that both probability of occurrence and estimation of cost for environmental remediation liabilities are particularly difficult to assess and require analysis over a period of time. ASC 410-30-25-2; ASC 410-30-25-7.

By contrast, no accrual should be taken if a loss is only reasonably possible (meaning "more than remote but less than likely"). ASC 450-20-50-3; ASC 450-20-20

---

[3] ASC 450 can be publicly accessed at https://asc.fasb.org/topic&trid=2127136; *see also* Ex.52 for relevant excerpts.

[4] If both requirements are met and a company can estimate only a range of loss, it must accrue the best estimate within the range or, if no amount is better than any other, the low end of the range. ASC 450-20-30-1.

Glossary.   In that instance, the registrant must disclose (i) "the nature of the contingency," and (ii) the estimated loss or range of loss, or a statement that an estimate cannot be made.  ASC 450-20-50-4.

Each of 3M's quarterly and annual SEC filings contained extensive disclosures and warnings about 3M's PFAS-related contingent liabilities—including all lawsuits and regulatory matters referenced in the CAC—as well as its process for disclosing and accruing for them.  All of these disclosures were consistent with GAAP and confirmed as such by 3M's independent auditors, PwC.[5]  The CAC nowhere disputes this.

### 2.   2017 Disclosures and Warnings Regarding PFAS-Related Contingent Liabilities

In the section on contingencies, 3M's 2016 10-K, filed February 9, 2017, disclosed that 3M was involved in numerous lawsuits and proceedings that it was "vigorously defending," and warned that many "involve highly complex issues relating to causation, scientific evidence, and whether there are actual damages and are otherwise subject to substantial uncertainties," and that "[a]ssessments of . . . claims can involve a series of complex judgments about future events and can rely heavily on estimates and assumptions."  Ex.3, 12-13, 111-12.  3M detailed its accrual and disclosure process for litigation loss contingencies, which follows ASC 450:  3M "records liabilities for legal

---

[5] Each of 3M's CP annual filings included PwC's report and opinion that 3M's financial statements (including accruals) conformed with GAAP and fairly presented 3M's financial position.  Ex.3, 54; Ex.8, 55-56; Ex.16, 54-55.  Each CP quarterly filing included a PwC report and opinion that PwC was not aware of any material modification to the interim financial statements, including accruals, needed for conformity with GAAP.  Ex.5, 47; Ex.6, 52; Ex.7, 53; Ex.13, 46; Ex.14, 52; Ex.15, 53.

proceedings . . . where it can reasonably estimate the amount of the loss and where liability is probable"; if one or both of those criteria are not met but it is at least reasonably possible that a loss may be incurred, 3M discloses the legal proceeding and the amount of possible loss or states that such estimate cannot be made. *Id.*, 112.

The 2016 10-K also expressly cautioned about the "difficult[y in] reliably predict[ing]" and "inherent uncertainties" of litigation, and that:

- "unfavorable rulings or developments could occur," could lead 3M to "change current estimates of liabilities," or "make such estimates for matters previously not susceptible of reasonable estimates";

- "there can be no certainty that [3M] may not ultimately incur charges in excess of presently recorded liabilities"; and

- developments "could result in future charges that could have a material adverse effect on [3M's] results of operations or cash flows in the period in which they are recorded."

*Id.*, 12, 112.  3M stated that "[a]lthough [3M] cannot estimate its exposure to all legal proceedings, it currently believes that such future charges, if any, would not have a material adverse effect" on 3M's financial position, but also that, "[b]ased on experience and developments," 3M "reexamines its estimates of probable liabilities . . . each period, and whether it is able to estimate a liability previously determined to be not estimable and/or not probable," and makes "additions to or adjustments of its estimated liabilities." *Id.*, 112.  As a result, 3M warned, "the current estimates of the potential impact on [3M's] consolidated financial position . . . for the legal proceedings . . . could change." *Id.*

The 2016 10-K then provided a description of 3M's significant legal proceedings, including four pages on PFAS-related matters and litigation that disclosed, *inter alia*:

-8-

- updates on the Manufacturing and Disposal Matters previously disclosed, and other regulatory environmental updates;

- product liability cases recently filed against 3M and other defendants based on the use of PFAS (as opposed to its manufacture and disposal) in products, including AFFF, that were manufactured, sold, and used across the country ("Product Cases").

*Id.*, 116-19. 3M expressly disclosed that for these pending PFAS-related legal proceedings, any liability that was accrued (*i.e.*, believed to be probable and estimable) was believed to be immaterial, but otherwise 3M believed that any liability not accrued "is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time." *Id.*, 119.

The 2016 10-K also disclosed 3M's accruals for the probable and reasonably estimable loss for contingent legal proceeding liabilities.[6]  3M reported $38 million for "environmental remediation" and $29 million for "other environmental liabilities," which included identified PFAS-related Manufacturing and Disposal Matters.  *Id.*, 119-20.  3M warned that "it is difficult to estimate the cost of environmental compliance and remediation" given various uncertainties, and that developments "may occur that could affect [3M's] current assessment."  *Id.*, 120.  3M added that for sites where "remediation activity is largely complete and remaining activity relates primarily to operation and

---

[6] For environmental matters, 3M reported amounts accrued for (1) "environmental remediation," comprised of probable and reasonably estimable costs of remediating "hazardous substances" under state and federal law, and (2) "other environmental liabilities," comprised of probable and reasonably estimable loss related to legal proceedings concerning alleged environmental harm, including from PFAS (which is not classified as a hazardous substance).  Ex.3, 119-20; *see, e.g.*, 40 C.F.R. §§ 116.4, 302.4, 401.15; Ex.54.

maintenance of the remedy, including required post-remediation monitoring," 3M believed its exposure to loss above the amounts accrued was not material. *Id.* 3M further disclosed that, where remediation activity "is largely ongoing," it "cannot estimate a possible loss or range of loss in excess of the associated established accruals." *Id.*[7]

3M's quarterly filings for 2017 repeated that 3M was defending various lawsuits and proceedings, and referred investors to the 2016 10-K for a description of the process for disclosing and recording litigation liabilities. Ex.5, 31; Ex.6, 36; Ex. 7, 37. The filings again provided detailed disclosures about 3M's pending and newly filed Manufacturing and Disposal Matters and Product Cases, including that trial in the Minnesota AG Litigation had been scheduled for February 2018. Ex.5, 34-38; Ex.6, 39-43; Ex.7, 40-45. 3M again disclosed that, for these PFAS-related legal proceedings, any probable and estimable liability was accrued and believed to be immaterial, but otherwise 3M believed any liability "is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time." Ex.5, 38; Ex.6, 43-44; Ex.7, 45.

The quarterly filings also disclosed updated accruals for "environmental remediation" ($36-38 million) and "other environmental liabilities" ($27-29 million) and repeated 3M's estimates of exposure to loss where remediation was "largely complete"

---

[7] The 2016 10-K included an Environmental Law Compliance section, which described 3M's process for reserving for probable and reasonably estimable remediation costs; noted that 3M "cannot predict with certainty" future cleanup costs and capital expenditures; and added that 3M "does not believe [those costs and expenditures] will have a material effect on its capital expenditures, earnings or competitive position." Ex.3, 7-8. The section also referred investors to Note 14, with its extensive disclosures and warnings regarding legal proceedings liability. Each of 3M's CP annual filings included a substantially similar section. Ex.8, 8; Ex.16, 7-8.

and "largely ongoing." Ex.5, 38-39; Ex.6, 44; Ex.7, 45. They also again cautioned about the difficulty of estimating remediation costs and litigation outcomes, that estimates could change, and that future unfavorable developments "could result in future charges that could have a material adverse effect" on 3M. Ex.5, 39; Ex.6, 44; Ex.7, 45.

### 3.      2018 Updates, Additional Disclosures, and Warnings

3M's 2017 10-K, filed February 8, 2018, likewise described 3M's process for accruing and disclosing loss contingencies under ASC 450. Ex.8, 117. It also repeated extensive warnings about the difficulties, uncertainties and complexities involved in assessing legal proceeding claims; provided 3M's estimates of potential impact from any future charges for such claims; cautioned that 3M would reexamine its estimates each period and make adjustments and that current estimates could change; and warned that developments could result in future charges having a material adverse effect on 3M's position when recorded. *Id.*, 12, 117.

The 2017 10-K then provided detailed disclosures concerning its significant PFAS-related legal proceedings, including these updates on the Minnesota AG Litigation:

- in September 2017, the State submitted an expert report asserting $5 billion in damages;

- in November 2017, the State filed a motion seeking punitive damages, and 3M filed a summary judgment motion arguing that all claims were barred by the applicable statute of limitations; and

- both motions were heard in December 2017, with the court "urg[ing] the parties to attempt to resolve the litigation before trial" and later appointing a mediator.

*Id.*, 124. 3M told investors that "[i]f the parties are not able to resolve the matter, the trial

is scheduled to begin in February 2018," and warned that an adverse ruling, judgment, settlement or unfavorable development in the litigation "could result in future charges that could have a material adverse effect on [3M's] . . . consolidated financial position." *Id.* 3M also explained that "[n]o liability has been recorded because [3M] believes any such liability is not probable and estimable." *Id.*

As for other PFAS-related legal proceedings, the 2017 10-K provided updated disclosures on the status of the Manufacturing and Disposal Matters and Product Cases, including details concerning newly filed cases in each category. *Id.*, 121-26. As before, 3M stated that any accrued (*i.e.*, probable and estimable) liability for these PFAS-related proceedings was believed to be not material, but otherwise 3M believed any liability "is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time." *Id.*, 126.

As for accruals for "environmental remediation" and "other environmental liabilities," the 2017 10-K provided updated amounts ($28 million and $25 million, respectively); warned about the difficulty in estimating environmental compliance and remediation costs and potential for future changes thereto; and repeated 3M's belief that any additional exposure to loss, above the accruals, was not material at sites where remediation was "largely complete," but could not be estimated where remediation was "largely ongoing," *id.*, 126-27.

On February 20, 2018, the day trial was scheduled to begin, 3M announced an agreement to settle the Minnesota AG Litigation for $850 million, to be paid in the form of a grant to the State for certain environmental projects, plus up to an additional $40

million for temporary water-treatment solutions.  ¶¶ 106-107; Ex.9.  3M disclosed that it recorded a pre-tax charge of $897 million, including legal fees, in Q1 2018 in connection with that settlement.  ¶ 112.[8]

During 3M's Q1 earnings conference call on April 24, 2018, 3M's CEO Michael Roman was asked whether the settlement would serve as a precedent for settlements with other states, as "[t]here's been a lot of media mudslinging around different scenarios, most of which seem highly improbable."  Ex.10, 4; ¶ 173.  Roman responded:

> This is a unique situation.  This is our home state and something that we've been working on with them for a number of years.  So this is a unique situation in both the nature of the case as well as the grant and the process that we're working through with them.

Ex.10, 4; ¶¶ 119-120, 173.  The CAC does not allege that 3M has ever entered similar settlements with other states or parties.

By letter dated April 27, 2018, the SEC inquired why a loss contingency for the Minnesota AG Litigation settlement was not "probable and estimable," and thus accrued for, as of December 31, 2017.  Ex.11, 2; ¶ 116.  3M's May 8, 2018 response explained that the liability was not probable because 3M had pending dispositive motions asserting (i) a substantial statute of limitations defense that would have barred all recovery, and (ii) other substantial legal and factual defenses, supported by expert reports and scientific studies.  Ex.12, 3; ¶ 117.  3M also explained that any loss above $0 was not estimable, given the range between $0 based on 3M's defenses and $5 billion based on the State's claims, and that under ASC 450-20-30, "when no amount within the range is a better

---

[8] The settlement agreement reserved 3M's defenses.  Ex.9, 7.

estimate than any other amount . . . the minimum amount in the range shall be accrued." Ex.12, 3-4. 3M further explained that, between December 31, 2017 and February 8, 2018, it was proceeding along "two parallel paths," one "actively preparing to try the case" and one mediating as requested by the trial judge, although the parties remained far apart. *Id.*, 4. After February 8, 3M explained, it continued along those paths, going "to great lengths to put on the strongest case possible at trial," and also participating in mediation discussions that intensified, with "[k]ey critical terms and amounts . . . com[ing] together . . . shortly before trial," and the parties reaching agreement on amount and other material terms on February 20, the first day scheduled for trial. *Id.* The SEC took no further action, as the CAC concedes.

Thereafter, 3M's 2018 quarterly filings again referred investors to the 2017 10-K for the process for disclosing and recording legal proceedings liabilities. Ex.13, 32; Ex.14, 37; Ex.15, 38. They also provided detailed disclosures of PFAS-related legal proceedings, including updates on pending and additional Manufacturing and Disposal Matters and Product Cases. Ex.13, 35-39; Ex.14, 40-44; Ex.15, 41-46. As before, 3M disclosed that for these matters, any probable and estimable liability was accrued and believed to be not material, but otherwise 3M believed any liability "is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time." Ex.13, 39; Ex.14, 44; Ex.15, 46.

The 2018 quarterly filings again updated accruals for "environmental remediation" ($29-31 million) and "other environmental liabilities" ($54-69 million). Ex.13, 39; Ex.14, 45; Ex.15, 46. They also repeated 3M's estimates for exposure to loss, above the

accruals, where remediation was "largely complete" and "largely ongoing"; and reiterated warnings about the difficulty of reliably predicting litigation outcomes and estimating remediation costs, noting that developments "could result in future charges that could have a material adverse effect" on 3M's financial position.  Ex.13, 40, 70; Ex.14, 45, 82; Ex.15, 46, 82.

### 4.  2019 Updates, Additional Disclosures, and Warnings

3M's process for accruing and disclosing loss contingencies under ASC 450 was repeated in its 2018 Form 10-K, filed February 7, 2019.  Ex.16, 110.  3M again included extensive warnings about the difficulties involved in assessing legal proceeding claims; 3M's estimates of potential impact from any future charges for those claims; 3M's regular reexamination of its estimates; and that estimates of potential liability and impact on 3M therefrom could change and have a material adverse impact on 3M.  *Id.*, 12, 110.

Pages of detailed disclosures on 3M's significant PFAS-related legal proceedings then followed, including:

- Manufacturing and Disposal Matters previously disclosed and updates thereto;

- Product Cases previously disclosed and adding a number of new matters against 3M and other manufacturers as well as new AFFF class and individual actions, with the federal AFFF actions (totaling 85 as of December 31, 2018) to be transferred to an MDL in the District of South Carolina.  *Id.*, 117-18.[9]

*Id.*, 113-19.  3M explained that for these PFAS-related matters, "no liability has been recorded as [3M] believes liability in those matters is not probable and estimable and

---

[9] After the December 2018 MDL consolidation, the MDL court held monthly status conferences, with discovery stayed until May 20, 2019.  Ex.56.

[3M] is not able to estimate a possible loss or range of loss at this time." *Id.*, 119.

The 2018 10-K then disclosed updated accruals for "environmental remediation" ($25 million) and "other environmental liabilities" ($59 million). *Id.* 3M again warned about the difficulty in estimating environmental compliance and remediation costs, and noted 3M's belief that any additional exposure to loss, above the accruals, was not material at sites where remediation was "largely complete," but could not be estimated where remediation was "largely ongoing." *Id.*, 119-20.

On April 25, 2019, 3M reported Q1 2019 results, with disappointing news on several fronts, *see* ¶¶ 122, 190:  sales were down 5%, organic local-currency sales declined 1.1%, and adjusted EPS was down almost 11%. Ex.18, 1. 3M also announced a corporate restructuring to "drive productivity, reduce costs, and increase cash flow as we manage through challenges in some of our end markets." *Id.* 3M further announced two litigation reserves, one ($313 million) for coal mine dust claims, and one ($235 million) for litigation related to 3M's "historical manufacture and disposal of PFAS-containing waste" in Alabama, Illinois, Minnesota, Belgium and Germany. *Id.*, 2. 3M's stock price thereafter declined. ¶¶ 191, 249.

During an earnings call that day, Roman reiterated that the PFAS-related $235 million reserve was limited to potential liability for Manufacturing and Disposal Matters: "We also established a PFAS reserve of $235 million to cover certain environmental matters and litigation *related to the manufacture and disposal of PFAS at five 3M facilities* including three in the United States and two in Europe. *This reserve does not include any product claims related to PFAS*." Ex.19, 3 (emphasis added). He later

-16-

repeated:

> [This reserve] is not covering any of the product related PFAS litigation. . . . [T]he product litigation at this point that we're defending ourselves against is not probable and estimable. And so, we will update as appropriate and as we get some clarity on that.

*Id.*, 5; *see* ¶ 124.   When asked why the reserve for the Manufacturing and Disposal Matters "might not just be 850 [million] times 4," based on the Minnesota AG Litigation settlement, Roman explained:

> [O]ur manufacture footprint is different in every one of those sites. . . . [I]t's not . . . simple math of multiplying times 5. We now define probable and estimable for the litigation that we face in those five sites as with this reserve.

Ex.19, 7.

The following day (April 26, 2019), 3M filed its first quarterly filing for 2019, referring investors to the 2018 10-K for the process for disclosing and recording legal proceedings liabilities, Ex.20, 31, and providing pages of disclosures about significant PFAS-related legal proceedings and updates (including additional Product Cases filed), *id.*, 34-40.  For these proceedings, 3M again disclosed that "no liability has been recorded as [3M] believes liability in those matters is not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time, except for those matters described below." *Id.*, 40.

The filing then repeated that 3M had increased its accrual for "other environmental liabilities" to $292 million, representing "3M's best estimate of the probable loss" in connection with specifically identified Manufacturing and Disposal Matters, and adding that it is "not able to estimate a possible loss or range of loss in excess of the established

-17-

accruals at this time." *Id.* The filing reiterated 3M's belief that any additional exposure to loss, above the accruals, was not material at sites where remediation was "largely complete," but could not be estimated where remediation was "largely ongoing." *Id.*, 40-41. The filing again warned about the difficulty of reliably predicting litigation outcomes and estimating environmental compliance and remediation costs, noting that developments "could result in future charges that could have a material adverse effect" on 3M's financial position. *Id.*, 40-41, 74.

On May 15, 2019, 3M's then-CFO Nicholas Gangestad spoke at a Goldman Sachs conference and reiterated that the PFAS-related reserve "does not cover any product claims related to PFAS." Ex.21, 3. When asked whether the coal-mine-dust and PFAS-litigation reserves "ring-fenced" all potential liability, Gangestad distinguished between (i) liability 3M assessed as probable and estimable, and (ii) that which could not be so assessed, and thus was not included in the reserve:

> On PFAS, the ring-fence . . . around liability [is] around our 5 manufacturing sites and disposal of PFAS. Because that's a view where we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs will be. So that portion, I would call ring-fenced. *What I would not call ring-fenced is the product liability side.* A number of cases out there [are] around product liability, where our customers have purchased PFAS containing materials that then in itself is creating an environmental issue that's resulting in litigation. *What we are saying is we cannot estimate what that is. We don't see it as probable. We can't see a way to estimate what that is. And at this point, we're just not even speculating on what kind of amount that would be.*

*Id.*, 4 (emphasis added). The CAC selectively quotes from only the first half of this

statement.  ¶¶ 13, 137, 196.[10]

On July 8, 2019, 3M disclosed that it continued to search for PFAS at former landfills in Morgan and Lawrence, Alabama Counties, as part of its ongoing effort to identify and address historic waste disposal sites that may contain PFAS.  Ex.24; ¶¶ 198-199.  The disclosure was consistent with 3M's prior disclosures, for years, that it was working "under the supervision of state regulators[] to address its historic disposal of [PFAS]-containing waste associated with manufacturing operations" in Decatur and other locations.  Ex.3, 116; Ex.8, 121; Ex.16, 114.[11]  After the July 8 disclosure, 3M's stock price declined.  ¶¶ 200, 254.[12]

## C.   **This Action and the CAC's Allegations**

This matter was initially filed in New Jersey, but ultimately transferred to this District per writ of mandamus issued by the Third Circuit.  Ex.28.

The CAC alleges that all Defendants violated Section 10(b), and the Individual Defendants violated Section 20(a).  The gravamen of the CAC is that Defendants "materially understated" 3M's PFAS-related contingent liabilities, when they were

---

[10] Roman reiterated these same points during a May 20, 2019 investor conference.  Ex.22, 3-4.

[11] Local Alabama media had similarly reported since March 2019.  Ex.17.

[12] Consistent with its disclosures, post CP 3M continued to examine whether any contingent liabilities related to environmental matters and litigation had become probable and estimable.  In its 2019 10-K, filed February 6, 2020, 3M disclosed that, during the fourth quarter of 2019, it had updated its evaluation of (i) certain Manufacturing and Disposal Matters, and (ii) certain Product Cases "based on continued, productive settlement discussions with multiple parties.  As previously disclosed, 3M has been engaged in mediation and resolution negotiations in multiple cases."  Ex.27, 121.  As a result, 3M recorded a pre-tax charge of $214 million, bringing its recorded liabilities for "other environmental liabilities" to $445 million.  *Id.*

supposedly "massive," "enormous" and "significant"—and thereby purportedly "denied," "downplayed" and "drastically minimiz[ed]" those liabilities and "suggest[ed] that [PFAS] was a non-issue for 3M." ¶¶ 3-13, 144-150. Plaintiffs challenge 31 statements made during the CP concerning accruals for or potential impact on 3M from PFAS-related liabilities, including remarks made during an earnings conference call and at an investor conference, and statements contained in 3M's SEC filings. ¶¶ 151-196. Plaintiffs seek to recover for stock drops allegedly caused by purported corrective disclosures—supposedly "revealing" fraud—on April 25 and July 8, 2019. ¶¶ 190-192, 198-200, 248-259.

## ARGUMENT

### I.      THE CAC FAILS TO PLEAD A SECTION 10(b) CLAIM

To plead a claim for securities fraud under Section 10(b) and Rule 10b-5, a complaint must allege (1) a material misrepresentation or omission; (2) scienter, *i.e.*, intent to "deceive, manipulate, or defraud"; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Podraza*, 790 F.3d at 836; *McAdams v. McCord*, 584 F.3d 1111, 1113 (8th Cir. 2009).

Securities complaints must be dismissed unless they comply with the PSLRA's heightened pleading requirements to (1) specify each false statement or misleading omission and explain why it was misleading; and (2) state "with particularity" facts giving rise to a "strong inference" that the defendant acted with the scienter. *K-tel*, 300 F.3d at 889; *In re Apogee Enters., Inc. Sec. Litig.*, 2020 WL 1445856, *7 (D. Minn. Mar. 25, 2020); 15 U.S.C. § 78u-4(b)(1)-(2). These requirements were imposed to curb abuses

of securities fraud litigation, *Podraza*, 790 F.3d at 836, and preclude pleading "fraud by hindsight," *K-tel*, 300 F.3d at 889; *Navarre*, 299 F.3d at 741-42.

## A.      The CAC's Puzzle Pleading Fails to Comply with the PSLRA

Within the 116-page, 269-paragraph CAC, Plaintiffs purportedly identify the allegedly "false and misleading statements and omissions" at ¶¶ 144-197, by reproducing lengthy block quotes—some spanning three pages—from 3M's disclosures and sporadically italicizing and bolding snippets. *See, e.g.*, ¶¶ 153-156, 158-159, 168-171. The CAC nowhere identifies what about each statement was allegedly false and misleading, including the portions in bolded, italicized type. Instead, each lengthy quote is followed by the verbatim repetition that "[t]he statements described in [identified paragraphs] above were materially false and misleading for the reasons described in ¶¶ 144-151." *See, e.g.*, ¶¶ 157, 160, 172.

This "puzzle" or "kitchen sink" pleading approach is insufficient under the PSLRA. *See In re 2007 Novastar Fin., Inc. Sec. Litig.*, 579 F.3d 878, 883 (8th Cir. 2009) (affirming dismissal of puzzle-pleaded complaint). "[A]bsent an indication of precisely *what* statements [plaintiff] alleges to be misleading," or "any link between an alleged misleading statement and specific factual allegations demonstrating the reasons why the statement was false or misleading," the CAC cannot satisfy the PSLRA. *Id.* at 883-84.[13] The CAC thus fails at the threshold.

---

[13] *Accord Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37-38 (2d Cir. 2012); *see Apogee*, 2020 WL 1445856, *8 (citing cases addressing puzzle pleading).

**B.**     <u>The CAC Fails to Plead Any Actionable Misstatement</u>

    **1.**     <u>The CAC Fails to Plead Falsity of 3M's PFAS-Related Accruals and Beliefs Concerning Impact from Any Future PFAS-Related Charges</u>

The bulk of the CAC challenges 3M's disclosed accruals for PFAS-related contingent liabilities and estimates about potential impact from any future PFAS-related charges on 3M's financial position.[14]  To plead falsity under the PSLRA, Plaintiffs must plead "facts or further particularities that, if true, demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made."  *K-tel*, 300 F.3d at 891; *Apogee*, 2020 WL 1445856, *10.  It is axiomatic that the mere fact that a reserve or charge was ultimately taken does not plead that earlier statements were false—that is quintessential fraud by hindsight.  *K-tel*, 300 F.3d at 891, 893; *Chapman v. Mueller Water Prods., Inc.*, 466 F.Supp.3d 382, 408 (S.D.N.Y. 2020); *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, *5 (N.D. Cal. Oct. 12, 2016).

Here, the CAC does not plead a single fact contradicting 3M's public statements when they were made.  It nowhere claims that 3M had a separate, internal set of numbers, accruals, or assessments analyzing the potential litigation exposure or future charges differently.  It does not cite a *single* internal document or witness analyzing—from a legal, financial, accounting, or other perspective—the probability or estimability of 3M's PFAS-related litigation or remediation liabilities.  Nor, critically, does it allege that 3M's accruals violated ASC 450 or that 3M's financial statements otherwise failed to comply

---

[14] ¶¶ 153-154, 156, 159, 162, 165, 169-171, 176, 179, 182, 186-188, 194.

with GAAP. That is not surprising because PwC signed off on 3M's financial statements and 3M gave extensive disclosure:

- detailing the process for contingent liability accrual and disclosure, *supra* 7-8, 10-11, 14-15, 17;

- disclosing the accruals for "other environmental liabilities" expressly associated with specific Manufacturing and Disposal Matters, and providing pages of disclosure of all significant PFAS-related legal proceedings, followed by the statement that any non-accrued liability for those legal proceedings was "not probable and estimable and [3M] is not able to estimate a possible loss or range of loss at this time," *supra* 8-12, 14-18;

- expressly stating, on February 8, 2018, that no accrual had been taken for the Minnesota AG Litigation, and on multiple occasions that no accrual had been taken for the Product Cases, as 3M would not speculate on such liability that was not probable and reasonably estimate, *supra* 12, 15-18;

- warning of the complexities, uncertainties and difficulty in predicting litigation outcomes and environmental remediation costs, and cautioning that "there can be no certainty" 3M would not incur charges in excess of accruals; current estimates could be off or change; and there could be future charges that could have a material adverse effect on 3M's financial position in the period they are recorded, *supra* 7-12, 14-16, 18; and

- noting that 3M would reexamine its potential liabilities each period, based on experience and developments, and make adjustments or additions (which it then did), *supra* 8, 11, 15, 17-18 & n.12.

Likewise, the CAC does not allege that any non-accrued PFAS-related contingent liability (*i.e.*, potential settlement or adverse outcome) was "probable and reasonably estimable" at the time of the challenged statements. Instead, Plaintiffs point to an assortment of information, none of which required 3M to record any additional accrual during the CP:

***The Minnesota AG Litigation Settlement***, ¶¶ 144-145:  Plaintiffs insist that 3M should have earlier accrued for the settlement, *see* ¶¶ 8, 109, 111, but proffer nothing but fraud-by-hindsight:  they fail to plead a single fact indicating that liability was probable and reasonably estimable before February 20, 2018 (when the matter settled), especially given 3M's defenses and trial preparation.  *Supra* 13-14.   Meanwhile, 3M timely disclosed developments in the litigation, including the trial date, the State's export report seeking $5 billion in damages and motion seeking punitive damages, and the court-ordered mediation.  *Supra* 10-12.  3M also stated that no reserve had been taken for the litigation, and warned that, absent settlement, trial would proceed and an adverse judgment or settlement could result in future charges that could have an adverse material effect on 3M's financial position.  *Supra* 12; *see Luna*, 2016 WL 5930655, *7 (no actionable misstatement when issuer's decision not to accrue litigation reserve was disclosed); *In re Bank of Am. AIG Disclosure Sec. Litig.* ("*BoA*"), 980 F.Supp.2d 564, 584 (S.D.N.Y. 2013) (ASC 450-20 did not require more than statement that potential litigation loss was inestimable where loss range was between $0-10 billion), *aff'd*, 566 F.App'x 93 (2d Cir. 2014).

Nor did settlement of the Minnesota AG Litigation, which was a Manufacturing and Disposal Matter, render liability in any *other* proceeding probable and reasonably estimable.  With respect to other Manufacturing and Disposal Matters, for example, Plaintiffs cannot allege that the "footprint" of manufacturing in Alabama or Illinois was the same as in Minnesota, *see supra* 17, or that 3M's defenses (reserved in the settlement) were no longer viable.  As for the Product Cases, those are based on PFAS use by various

manufacturers in products sold and used around the country, and thus involve multiple defendants, and different kinds of plaintiffs, legal theories, and alleged harm than the Minnesota AG Litigation.  Moreover, throughout the CP, the Product Cases were in far earlier procedural postures; many were not even filed until 2019, shortly before (or after) the last allegedly false statement on May 15, 2019.  *Supra* 15; ¶¶ 102, 135, 138.  And discovery in the AFFF MDL was stayed through May 20, 2019.  Ex.56.

*EPA's 2016 Lowering of HALs*, ¶ 146:  The CAC nowhere disputes that 3M disclosed the 2016 HALs, *see* Ex.3, 116; Ex.8, 121; Ex.16, 114, and that HALs are not enforceable, Ex.55.  Regardless, the CAC nowhere alleges that, during the CP, 3M faced any legal proceeding or remediation cost as a result of this regulatory development, much less that an unfavorable outcome of any such claims was probable and reasonably estimable.  *See BoA*, 980 F.Supp.2d at 582 (disclosures about pending litigations are not rendered false by omission of potential or threatened litigation).

*Early Science Studies*, ¶ 147:  Plaintiffs point to snippets of scientific studies from the 1960s-1990s—all publicly available, ¶¶ 58, 115—about potential health or environmental harm from PFAS, ¶¶ 41-56.  But Plaintiffs fail to point to a *single* internal document or witness addressing 3M's potential *legal and financial* exposure from pending PFAS-related legal proceedings or remediation activities.  Rather, Plaintiffs simply assert that "Defendants knew, or were reckless in not knowing, by February of 2017, that 3M faced enormous liabilities."  ¶ 147.  Such conclusory allegations are insufficient.  *Apogee*, 2020 WL 1445856, *7 (under PSLRA, "catch-all" or "blanket" assertions must be disregarded).

***Analyst Reports***, ¶¶ 13, 139, 206:   The CAC also points to Barclays and Wolfe analyst reports from June and August 2019 proffering estimates of 3M's potential PFAS-liability, expressly based on extrapolation solely from publicly available information. Ex.23, 3-4; Ex.26, 1, 3, 5-8.  Neither report even purported to opine that any liability was "probable"; Barclays noted that many of the PFAS claims had "low probability of proving causation," Ex.23, 4; and Wolfe observed that "[t]he subject is complex . . . most of the cases are still to receive judgement . . . [and as] a result, any analysis of this topic is speculative, by definition." Ex.26, 3."[15]   The two reports also contradicted each other: Wolfe "assign[ed] zero value to the [Product Cases], since we have yet to see any material judgements against 3M," Ex.26, 3, whereas Barclays assigned almost 80% of its rough approximation to those cases, Ex.23, 3-4.   These "back of the envelope" calculations do not remotely suggest that any additional non-accrued PFAS-liability was probable and estimable in May 2019, when the last challenged statement was made. And, like the referenced scientific studies, the reports were public and available to all investors.  *See BoA*, 980 F.Supp.2d at 576-77 (rejecting claim that bank was required to disclose imminence and expected liability where, *inter alia*, media reported that bank's potential exposure was at least $10 billion).[16]

---

[15] The CAC similarly concedes that Deutsche Bank analysts observed in April 2019 that "PFAS litigation remains an unquantifiable concern." ¶ 126.

[16] Plaintiffs' suggestion that the mere pendency of various PFAS litigations required 3M to make disclosures regarding "the magnitude of *potential* damages associated with 3M's manufacture and distribution of PFAS," ¶ 118 (emphasis added), is specious.  3M was not required to make any such disclosure, let alone record an accrual, under ASC 450. *Supra* 5-7.  That DuPont settled personal injury claims in 2017 for $671 million, ¶¶ 77,

Given 3M's extensive disclosures and warnings, and Plaintiffs' failure to plead *any* facts showing that any non-accrued PFAS-related liability was probable and reasonably estimable during the CP, Plaintiffs' claims are foreclosed.  In *Elam v. Neidorff*, 544 F.3d 921, 927 (8th Cir. 2008), faced with the allegation that an issuer should have earlier disclosed certain medical costs, the Eighth Circuit held that plaintiffs "fail[ed] to point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants as of [the allegedly false financial statements] that indicated [the company] would need to increase estimated medical costs."  That the company had a mandatory pre-authorization program for treatments and cost-monitoring systems, and even "tout[ed] its ability to predict medical costs," was insufficient.  *Id.*  Likewise, in *In re Acceptance Insurance Cos. Securities Litigation*, 423 F.3d 899 (8th Cir. 2005), plaintiffs alleged that an insurer's reserves between 1995 and 1999—reviewed annually by PwC—were misleadingly understated because they failed to take into account a 1995 court decision that broadened certain construction liability and likely increased insurance claims.  The Eighth Circuit affirmed dismissal, holding that plaintiffs failed to allege any facts showing that defendants knew their reserves were inadequate, and that the company's disclosure that "court holdings could have an adverse effect on reserves and subsequent losses could occur as a result," was adequate to warn of

---

118, did not render 3M's PFAS-related liabilities probable and reasonably estimable either.  That settlement came 18 years after litigation was commenced, and only after several high-profile trial losses.  *See* ¶¶ 95-96; Ex.4, 2-3.  Even the article Plaintiffs cite notes that "the facts in [other PFAS] cases, including the actions taken by companies and alleged health problems, would ultimately determine their outcome." *Id.*, 2.

additional claims. *Id.* at 902-04; *see K-tel*, 300 F.3d at 893 (despite allegation that company should have earlier disclosed certain loss contingencies, "[t]he complaint does not explain what specific information was available and how any loss could be reasonably estimated" at time of earlier disclosures).[17]

Plaintiffs also fail to allege what amount of loss should have been accrued and disclosed, and instead toss out labels like "enormous," "massive," and "significant" liabilities. *E.g.*, ¶¶ 3, 144, 147. Such descriptions are not required by GAAP or the securities laws and, if used, would have "impair[ed] the integrity" of 3M's financial statements. ASC 450-20-25-4. Moreover, 3M had no obligation to accuse itself of wrongdoing, especially as it was, and is, vigorously defending various litigations, or to provide Plaintiffs' desired characterization of the litigations and anticipated outcomes. *See Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir. 1978) (issuer not required to characterize disclosed facts "as plaintiffs would").[18]

Finally, it is pure fiction to assert that 3M "denied," "downplayed," or "drastically minimized" its PFAS-related liabilities, ¶¶ 3, 6, 148, or "suggest[ed] that [PFAS] was a

---

[17] *See also Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 548 (8th Cir. 1997) (rejecting claims that defendants failed to reserve for potential taxes given warnings); *TCF Banking & Sav., F.A. v. Arthur Young & Co.*, 706 F.Supp. 1408, 1412 (D. Minn. 1988) (to support allegation that defendant recklessly established inadequate reserves, plaintiff must specify which accounting or auditing standards applied and how they were violated).

[18] *Accord Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014) (company not required "to phrase disclosures in pejorative terms" or "frame its public information with specific adjectives"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (company "under no duty to cast its business in a pejorative, rather than a positive, light").

non-issue for 3M," ¶ 150.  3M's extensive disclosures and warnings—while largely omitted from the CAC—belie any such assertion.  *See supra* 7-18.[19]

### 2.    3M's PFAS-Related Accruals and Beliefs Concerning Impact from Any Potential Future Charges Are Inactionable Opinions

The CAC's challenge to 3M's accruals and stated beliefs estimating potential impact from any future PFAS-related charges separately fails because those statements are inactionable opinions.

Courts routinely hold that the "inherently subjective" assessments of contingent outcomes under ASC 450, and beliefs regarding the future impact of those potential outcomes, are protected opinions.  *See In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, *11 (D.N.J. Apr. 27, 2017) (litigation accruals are opinions; ASC 450-20 is "not the kind of fixed rule[] that would qualify as [an] objective standard"), *aff'd*, 905

---

[19] Plaintiffs' challenge to 3M's estimates of potential impact from any future PFAS-related charges fail for yet additional reasons, beyond those above.  *First*, most of the statements made the unremarkable point that any non-accrued costs for remediation activities "largely complete" were believed to be immaterial.  *See*, *e.g.*, ¶¶ 153, 159, 162. The CAC fails to allege any fact disputing this.  Moreover, those statements immediately continued that where remediation was "largely ongoing," 3M could not estimate possible loss in excess of accruals.  *Id.  Second*, to the extent 3M disclosed its estimates of potential impact from any future PFAS-related charges for legal proceedings, 3M expressly stated that it "could not estimate its exposure to all legal proceedings"; 3M would reexamine estimates each period and make adjustments; and estimates could be wrong, change, or lead to adverse material effects on 3M's position.  *See* ¶¶ 156, 171, 188; *see also* Ex.3, 12, 112; Ex.8, 12, 117; Ex.16, 12, 110.  Again, the CAC fails to allege a single fact disputing these statements—and, indeed, 3M followed the disclosed path, increasing its PFAS-related reserve in April 2019 and again during Q4 2019, based on then-recent developments.  *See supra* 16-18 & n.12; *Société Générale Sec. Servs., GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, *5-6 (N.D. Ill. Sept. 26, 2018) (statement that company did not believe government investigations would "have a material adverse effect" inactionable where plaintiff failed to allege defendants knew of contrary facts); *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F.Supp.3d 1, 15-16 (S.D.N.Y. 2016) (same).

F.3d 106 (3d Cir. 2018); *Lions Gate*, 165 F.Supp.3d at 15-16 (company's stated belief of potential impact on financial condition is opinion).[20]

Under the Supreme Court's decision in *Omnicare*, opinions are actionable only if (1) they are not believed by the speaker, (2) they contain "embedded statements of fact," or (3) they omit material facts "about the basis for the [speaker's] opinion" that, if disclosed, would likely "conflict with what a reasonable investor would take from the statement itself." 575 U.S. at 184-89.

Plaintiffs do not even attempt to plead the first two avenues, and they fail on the third. Even putting aside 3M's extensive disclosures about significant legal proceedings and accruals, all of the information to which Plaintiffs point was disclosed or in the public record. *Supra* 24-26. Thus, no material fact allegedly "cutting the other way," *Omnicare*, 575 U.S. at 189-90, was kept from investors. Moreover, none of this information showed that any non-accrued PFAS liability was probable and reasonably estimable during the CP, *supra* 24-26, and thus none rendered false Defendants' opinions about 3M's contingent liabilities, precluding liability for these statements. *See Chapman*, 466 F.Supp.3d at 402 (complaint failed to allege facts "demonstrat[ing] that the accounting for Meuller's warranty reserves, at the time Meuller estimated the reserves,

---

[20] *Accord Luna*, 2016 WL 5930655, *5 (litigation reserves are "judgment[s]" based on "flexible accounting concepts"); *see also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (loan loss reserves are opinions); *TCF*, 706 F.Supp. at 1412 (reserves are "estimates or predictions" about "future" events); *see generally K-tel*, 300 F.3d at 889-90 (GAAP "tolerate a range of 'reasonable' [accounting] treatments, leaving the choice among alternatives to management").

did not represent a fair estimate of Mueller's probable expenses").[21]

### 3.   Plaintiffs' Challenges to the Roman and Gangestad Statements Fail

***Roman's April 24, 2018 statement***:   The CAC fails to plead any facts demonstrating the falsity of Roman's statement that the Minnesota AG Litigation settlement was a "unique situation."   ¶¶ 10, 106-107, 119-120, 173-174.   Roman explained the basis for his opinion, including that Minnesota is 3M's home state; 3M had been "working . . . with" Minnesota regulators "for a number of years" on PFAS-related issues; the settlement was structured as a grant for clean drinking water and natural resource projects; and the settlement provided for a unique "process" that the parties to the litigation were "working through."  ¶ 173.   There was nothing false about any of this, and the CAC does not allege otherwise.  *See* Ex.9, 3, 5.  (And, indeed, there has been no similar settlement in the intervening years.)

***Gangestad's May 15, 2019 statement***:   Plaintiffs' challenge here fares no better. On May 15, Gangestad *twice* reiterated what Roman and 3M had made clear three weeks earlier:  that the April 2019 $235 million reserve did *not* include any potential liability for Product Cases.  *Supra* 16-18.   When asked what liability was "ring-fenced" by the two litigation reserves, Gangestad responded that it was liability "around our 5 manufacturing sites and disposal of PFAS," *i.e.*, the Manufacturing and Disposal Matters.  Ex.21, 4; ¶¶ 137, 196.  *He then immediately added*—although omitted from the CAC—that "[w]hat I would not call ring-fenced is the product liability side," *i.e.*, the Product Cases, because

---

[21] *Accord Lewis v. YRC Worldwide Inc.*, 2020 WL 1493915, *12 (N.D.N.Y. Mar. 27, 2020) (non-accrual for DOJ investigation did not render reserves false).

"we cannot estimate what that is.  We don't see it as probable."  Ex.21, 4.  Plaintiffs cannot manufacture securities fraud through selective quotation.  *See Apogee*, 2020 WL 1445856, *10 (plaintiff could not use "altered" quotation to "convert an allegation of fraud by hindsight into actionable fraud").[22]

### 4.    Plaintiffs Fail to Plead That 3M's Litigation Risk Factor Was False

The CAC also challenges 3M's Risk Factor regarding the unpredictability of legal proceedings, which appeared in 3M's annual and quarterly filings throughout the CP and cautioned, *inter alia*, that the outcome of legal proceedings "may differ from [3M's] expectations" or cause 3M to change its estimates of liabilities, and that "a future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on [3M's] results of operations or cash flows in any particular period."  ¶¶ 155, 158, 161, 164, 168, 175, 178, 181, 185, 193.  Plaintiffs plead nothing false about this statement.

Moreover, the Risk Factor was just one of multiple disclosures and warnings regarding 3M's PFAS-related legal proceedings, its potential contingent liabilities therefrom, and related accruals.  *See supra* 7-18.  Given the extensive disclosures about specific PFAS-related legal proceedings, 3M's general litigation risk factor could not

---

[22] These two statements are separately inactionable opinions.  *See* Point I.B.2; *Beritelli v. Wells Fargo Bank, N.A.*, 2013 WL 5460179, *10 (W.D.N.C. Sept. 30, 2013) (statement that property presented "a unique investment opportunity" was inactionable opinion).

have been false.  *See BoA*, 980 F. Supp.2d at 580 (rejecting challenge to general litigation

risk factor given additional disclosures).[23]

### 5. The Challenged Statements Are Protected by the PSLRA's Safe Harbor

Under the PSLRA's safe harbor, there can be no liability for forward-looking

statements that are (1) identified as such and "accompanied by meaningful cautionary

language"; or (2) "immaterial"; or (3) "made without actual knowledge that [the

statement] was false or misleading." *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 920-21

(8th Cir. 2015).  The first two prongs, if met, require dismissal regardless of the speaker's

state of mind.  *See id.* at 922; *Harris v. IVAX Corp.,* 182 F.3d 799, 803 (11th Cir. 1999).

Forward-looking statements include projections of financial items, statements of

future performance, and any assumptions underlying them. 15 U.S.C. § 78u-5(i)(1).  The

pertinent inquiry is whether the truth or falsity of the statement cannot be discerned until

some point in time after the statement is made, and thus even a "present tense" statement

may still be forward-looking under the safe harbor.  *Julianello*, 791 F.3d at 921.

There can be no question that each of the challenged statements—all of which

concerned predictions about (i) the extent of 3M's potential liability in pending litigation

---

[23] To the extent the CAC challenges two additional categories of statements, Plaintiffs again fail to plead falsity.  *First*, the CAC bolds and italicizes statements about accruals for non-PFAS environmental remediation.  *E.g.*, ¶ 194.  The CAC lacks any allegations regarding *non-PFAS* liabilities.  *Second*, the CAC fails to plead any fact contradicting the Environmental Law Compliance sections from 3M's CP 10-Ks.  ¶¶ 154, 170, 187.  That section did not purport to address legal proceedings or contingencies therefrom.  *See supra* n.7.  Regardless, it merely reiterated 3M's method for reserving for cleanup activities; opined that such cleanup costs would not have a material effect on capital expenditures, earnings, or competitive position; and referenced the contingencies Note (which, in turn, warned of difficulties estimating remediation costs).  ¶¶ 154, 170, 187.

or proceedings, or (ii) any potential impact from future charges on 3M's financial position—is forward-looking.  *See Acceptance*, 423 F.3d at 902 ("[r]eserves . . . are estimates of liabilities" company "will pay" in future); *TCF*, 706 F.Supp. at 1412 (reserves "involve[] economic forecasting, not the reporting of known facts").

Moreover, all of the challenged statements were accompanied by "meaningful cautionary statements," 15 U.S.C. § 78u-5(c)(1)(A)(i), including the disclosures and warnings discussed above, *see supra* 7-18.[24]  These were not "generic" or "boilerplate" warnings, *see* ¶¶ 155, 158, but specific to 3M's PFAS-related legal proceedings and the uncertainties and difficulties predicting (and accruing for) their potential outcomes and impact on 3M.  *See, e.g.*, *Julianello*, 791 F.3d at 918, 922 (finding sufficient warnings that company might fail to predict "demand for our new pharmaceutical products" and realization of "exclusivity" period).

Even absent such cautionary language, the safe harbor shields the challenged statements because the CAC nowhere pleads "facts showing actual knowledge of falsity on the part of any Defendant."  *In re Gander Mt. Co. Sec. Litig.*, 2006 WL 140670, *13 (D. Minn. Jan. 17, 2006); *see infra* Point I.C.2.

## C.    The CAC Fails to Plead a Strong Inference of Scienter

The CAC separately fails because it does not plead "particular[ized] facts giving rise to a strong inference" that Defendants acted with scienter.  *Tellabs, Inc. v. Makor*

---

[24] Before Roman's and Gangestad's comments on April 24, 2018 and May 15, 2019, participants were cautioned that there would be forward-looking statements, and referred to 3M's existing risk disclosures.  Ex.10, 2; Ex.21, 2.

*Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  The requisite "strong inference" must be "more than merely 'reasonable' or 'permissible'"; it must be "cogent and at least as compelling as any opposing inference" of nonfraudulent intent, which must also be considered.  *Tellabs*, 551 U.S. at 324; *Apogee*, 2020 WL 1445856, *11.

Scienter requires intentional or reckless conduct, which can be alleged through particularized facts showing (i) motive and opportunity to defraud, or (ii) a "mental state embracing an intent to . . . defraud," or conduct rising to "severe recklessness."  *Podraza*, 790 F.3d at 836; *K-tel*, 300 F.3d at 893-94.  The CAC fails to allege either.

### 1. The CAC Fails to Plead Motive to Defraud

Only allegations of "unusual or heightened motive," *Podraza*, 790 F.3d at 840—not motives "generally possessed by all corporate directors and officers," *K-tel*, 300 F.3d at 894—give rise to a "strong inference" under the PSLRA.  The CAC attempts to plead motive based on stock sales by the Individual Defendants during the CP.  ¶¶ 228-229.  But "[i]nsider stock sales are not inherently suspicious."  *Navarre*, 299 F.3d at 747.  They must "be 'unusual,' either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved, before they will give rise to the required inference of scienter."  *Id.*

Far from meeting this high bar, the identified sales bear virtually every hallmark of non-suspicious trading as recognized by the Eighth Circuit, including:

- Each Individual Defendant *increased* his 3M holdings over the CP, Ann.A, negating scienter, *see Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 247 (8th

Cir. 2008); *In re Medtronic Inc., Sec. Litig.*, 618 F.Supp.2d 1016, 1037 (D. Minn. 2009).[25]

- Each sold only a fraction of his 3M holdings across the CP—1.72% for Roman, 5.27% for Gangestad, and 10.85% for former CEO Chairman Inge Thulin, Ann.B—further defeating any scienter inference, *see Navarre*, 299 F.3d at 747 (sales of up to 32% of holdings not suspicious); *Medtronic*, 618 F.Supp.2d at 1037 (same for sales of 14%).[26]

Moreover, the CAC's allegations fail to provide context for the Individual Defendants' stock sales, other than to assert that Thulin's and Gangestad's "proceeds" (not "profits") from sales during the two years before the CP were lower, ¶ 230—which is explained by their lower earlier holdings and by the lower earlier 3M stock price.  Ex.47, 35; Ex.48, 80; Ann.A (column 3).  No context is alleged for Roman.  This failure to provide context for all three defendants' sales is fatal.  *See Crowell*, 519 F.3d at 783; *K-tel*, 300 F.3d at 896; *In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, *14 (D. Minn. Oct. 16, 2006).

While these alone are dispositive, Plaintiffs' stock sale allegations suffer additional defects:

- *Roman*:  Roman's single sale on February 2, 2018 (3% of his holdings on that date, Ann.B) was a "cashless carryover," meaning he exercised an option that was expiring in three months and sold only those shares needed to cover the option purchase price, fees, and taxes.  Ex.41, 2 & n.1.  That is non-suspicious as a matter of law.  *See Medtronic*, 618 F.Supp.2d at 1038 (stock sales "in conjunction with the exercise of an option or to pay taxes are not suspicious").
- *Gangestad*:  Gangestad's 2017 sales took place in the first days and first fourth of the 31-month CP, which is not suspicious.  *See In re Target Corp. Sec. Litig.*, 955 F.3d 738, 743 (8th Cir. 2020) (sales early in class period not suspicious); *In re*

---

[25] Overall holdings include stocks and exercisable options.  *See Crowell*, 519 F.3d at 783.

[26] When (as is typical) a stock sale is made through separate transactions over the course of a day, the SEC permits the aggregated reporting of transactions priced within $1. Ex.53, 445. The Individual Defendants' Form 4s, however, separately broke them out. *See, e.g.*, Ex.41 (separately reporting transactions between $264.59-$264.69).

*NVE Corp. Sec. Litig.*, 551 F.Supp.2d 871, 889 (D. Minn. 2007) (same), *aff'd*, 527 F.3d 749 (8th Cir. 2008). Indeed, the CAC nowhere claims that his 2017 sales (2.59% and 3.73% of his holdings at the time, Ann.B), or his February 2019 sales (1.87% of his then-holdings, Ann.B), were suspicious in timing. That leaves his February 2018 sale (1,681 shares, or 1.63% of his then-holdings, Ann.B), ¶¶ 232-233. That was made in conjunction with the routine exercise of compensation-based options, Ex.40, as he did on each of his other sale dates, Ex.34; Ex.37; Ex.44; *see Medtronic*, 618 F.Supp.2d at 1038.

- *Thulin*: Thulin's 2017 sales—which the CAC nowhere alleges were suspicious in timing—took place on the very first day, and within the first fourth, of the CP, leaving only his sales in January 2018 and January and March 2019. All four of those later sales were leading up to his June 2018 and July 2019 retirements from 3M's management and then Board, ¶ 23, further rendering them not suspicious, *see K-tel*, 300 F.3d at 896.[27] All four were small (ranging 1.08%-5.61% of his then-holdings, Ann.B), and in conjunction with the routine exercise of options expiring within the last of their nine years, Ex.39, 8; Exs.42-43; Ex.46, 10; *see Ceridian*, 542 F.3d at 247 (sales of "in the money" shares held in options about to expire not suspicious).[28]

Apparently recognizing that the Individual Defendants' sales were not remotely suspicious, Plaintiffs reference what appears to be every single CP sale by any 3M employee required to file a Form 4, as if that would change the result. ¶ 228 & App.E. These 14 individuals are not defendants, they did not make the challenged statements, they are not alleged to have had "insider" information, and they are nowhere mentioned in the CAC. Thus, their sales are entirely irrelevant. *See Navarre*, 299 F.3d at 747-48 (even sales of 100% of holdings fail to show strong inference of scienter without link between challenged statements and sellers); *Plevy v. Haggerty*, 38 F.Supp.2d 816, 834

---

[27] *Accord Cozzarelli v. Inspire Pharm. Inc*, 549 F.3d 618, 628 (4th Cir. 2008).

[28] During the three years before the CP, Thulin routinely exercised and sold options expiring within a year. Ex.29, 14; Ex.30, 3; Ex.31, 2; Ex.32, 2.

n.12 (C.D. Cal. 1998) (non-defendant stock sales "are irrelevant to alleging scienter against the five named Defendants" and their inclusion in complaint is "misleading").

### 2.    The CAC Fails to Adequately Plead Intentional or Reckless Conduct

Without motive, allegations of intentional or reckless conduct must be "particularly strong."   *K-tel*, 300 F.3d at 894; *Apogee*, 2020 WL 1445856, *11. Recklessness is limited to "*highly unreasonable* omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standards of ordinary care," presenting a danger of misleading investors that is "either known to the defendant or is so obvious that the defendant must have been aware of it." *Apogee*, at *11; *see K-tel*, 300 F.3d at 893.

The CAC nowhere alleges any facts, let alone particularized facts, showing that it was "obvious to," much less "known" by, the Individual Defendants that, as of the time of the challenged statements, it was *both* (i) probable that any additional PFAS liability had been incurred (*i.e.*, that an adverse judgment, settlement, or other loss was probable), and (ii) such loss was reasonably estimable.  This is particularly true given that PwC confirmed compliance with GAAP, and 3M's thorough response to the SEC's April 27, 2018 letter.  *See supra* 13-14 & n.5.  Indeed, none of the information to which Plaintiffs point shows that Defendants "knew or had access to information suggesting" that any non-accrued PFAS-related liability was probable and reasonably estimable, or that 3M's disclosures were somehow materially incorrect.  *See supra* 24-26.  Rather, Defendants' extensive disclosures and warnings—including noting which PFAS-related liabilities were accrued and which were not—preclude any claim that Defendants acted

-38-

intentionally or recklessly under established law.  *See supra* 7-18.

In *Podraza*, 790 F.3d at 838, for example, a company's accounting for environmental remediation liabilities was questioned by the SEC and ultimately changed, with the company restating its financials.   Affirming dismissal of the complaint, the Eighth Circuit identified several factors—all present here—contradicting any inference that the defendants knew or should have known different accounting treatment was required:  the company's auditor had confirmed that the financial statements complied with GAAP; the company had provided the SEC with a "thorough" explanation of its accounting decision; and the company repeatedly and accurately explained how it treated costs.  *Id.* at 838-39.  The case for dismissal here is stronger, because the CAC does not allege that 3M's financial statements violated GAAP or were restated.   Similarly, in *Elam*, 544 F.3d at 929, the Eighth Circuit affirmed dismissal of a complaint that had alleged defendants "must have known" that second quarter earnings would be lower due to contingent medical costs in the first quarter.   Allegations that the company had "sophisticat[ed]" cost-estimating processes were insufficient to show defendants knew their estimates were inaccurate.  *Id.*[29]

That leaves Plaintiffs with two boilerplate scienter allegations that are routinely

---

[29] *See also Chapman*, 466 F.Supp.3d at 414 (no scienter where "Plaintiffs' factual allegations have not demonstrated that [warranty reserve] estimates should have been revised earlier"); *Luna*, 2016 WL 5930655, *8 (scienter negated by company's full disclosure of litigation and decision not to accrue reserve); *BoA*, 980 F.Supp.2d at 586 (no scienter for bank's failure to disclose imminence and amount of litigation, given "third party disclosure of relevant information, BoA's own disclosures, and BoA's apparent compliance with relevant regulatory provisions").

rejected in this Circuit:

**Defendants' Positions**:  Plaintiffs insist that the Individual Defendants, by virtue of their "positions" within 3M, had "access" to unspecified information contradicting 3M's disclosures.  ¶¶ 214-215.  That is plainly insufficient.  *See In re Patterson Cos. Sec., Derivative & ERISA Litig.*, 479 F.Supp.2d 1014, 1032-33 (D. Minn. 2007) (allegations based on positions "are exactly the type of generalized allegations 'the court must disregard under the PSLRA'").  "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information" and specify what the contrary facts were.  *NVE*, 551 F.Supp.2d at 886; *see K-tel*, 300 F.3d at 893 (complaint must "explain what specific information was available and how any loss could be reasonably estimated").

The CAC nowhere does so.  The public scientific studies from the 1960s-1990s, ¶¶ 41-56, say nothing about potential legal liability or accounting treatment, let alone decades later and where multiple manufacturers are involved.  Plaintiffs also reference 3M's annual Sustainability Reports, ¶¶ 222-225, but those make only general assertions that 3M "annually assesses" major risks, makes materiality assessments, and had completed environmental site assessments to identify potential historical liabilities.  *Id.*

**Core Operations**:  Attempting to invoke the "core operations" doctrine, Plaintiffs assert that the Individual Defendants "would have been aware of key facts related to [3M's] operations and major litigations." ¶¶ 218, 227.  The Eighth Circuit has not decided the validity of the core operations doctrine, but has observed that several circuits have rejected it.  *Elam*, 544 F.3d at 929.  Regardless, (i) long-chain PFAS—long ago

phased out—are not "core" to 3M's current operations that generate $32 billion in sales annually, Ex.27, 15, and (ii) Plaintiffs plead no facts (particularized or otherwise) showing that Defendants had "knowledge of contradictory crucial information"—that additional non-accrued probable, estimable PFAS liabilities existed and required further disclosure—when they made the challenged statements. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 829 (8th Cir. 2003); *see Elam*, 544 F.3d at 929 (plaintiff attempting to invoke core operations doctrine would have to allege that specific contradictory information "was known within the company"). The CAC's "speculation" that the information "must have existed and must have been known" is "plainly insufficient." *Elam*, 544 F.3d at 930.

Considering the CAC's non-conclusory factual allegations as a whole, no cogent and compelling inference of fraudulent intent has been pleaded. Indeed, the only plausible inference is that Defendants applied their good-faith judgment to the information they knew at the time to establish accruals and make disclosures about 3M's PFAS-related contingent liabilities, all after review by PwC; that they re-assessed and updated those accruals and disclosures on a periodic basis; and that they provided appropriate explanations and cautions. "[T]aken as a whole, the facts pled in the Complaint tend to show that Defendants disclosed what they knew of problems . . . as they learned them." *Apogee*, 2020 WL 1445856, *12. The fact that Defendants have been unable to date to predict litigation outcomes and assign accrual numbers for certain of 3M's PFAS-related legal proceedings reflects the uncertainties surrounding complex environmental claims, not fraud.

**D.**     **Plaintiffs Fail to Allege Loss Causation**

The CAC should independently be dismissed for failure to plead loss causation—*i.e.*, "that the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). A complaint must allege "facts showing a causal connection between the defendant's misstatements and the plaintiff's losses." *McAdams,* 584 F.3d at 1114. Where, as here, plaintiffs rely on a "corrective disclosure" theory, that disclosure must both (1) "present facts to the market that are new, that is, publicly revealed for the first time," and (2) correct a misrepresentation or reveal the supposedly hidden fraud. *Rand-Heart*, 812 F.3d at 1180. Moreover, "not every bit of bad news that has a negative effect on the price of a security necessarily has a *corrective* effect for purposes of loss causation." *Id.* A reduced stock price "may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura,* 544 U.S. at 343.

**1.     Plaintiffs Fail to Plead Loss Causation for the Q1 2019 Earnings Announcement**

3M's April 25, 2019 press release disclosed multiple pieces of bad news, most of which were undisputedly unrelated to the alleged fraud regarding PFAS-related accruals and would alone have led to a reduction of 3M's stock price on that date. Ex.18. Plaintiffs cannot ignore these other disclosures, as they must "show that the defendant's fraud—and not other events—caused the security's drop in price." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 550 (8th Cir. 2008). Plaintiffs' failure to allege that any

loss was caused by disclosure of the additional PFAS-related reserve—and not by the other, more dire news of April 25—is fatal.  *See In re Frontier Commc'ns Corp. S'holders Litig.*, 2019 WL 1099075, *24 (D. Conn. Mar. 8, 2019) (loss causation not pleaded where alleged corrective disclosure contained multiple pieces of news).[30]

## 2.    The July 8, 2019 Announcement Was Not Corrective

Plaintiffs' attempt to recover for the stock drop after 3M's July 8, 2019 announcement that it was continuing to search for and remediate PFAS in Alabama landfills is even weaker.  The announcement did not reveal any fraud or anything new.  Rather, it reiterated—as 3M had disclosed for years, *supra* 19, and local media had reported months earlier, Ex.17—that 3M was continuing to investigate for additional PFAS near its prior PFAS disposal sites, Ex.24.  *See Rand-Heart*, 812 F.3d at 1180 (affirming finding of no loss causation where announcement merely "elaborate[d]" on previously disclosed information); *Buca*, 2006 WL 3030886, *9 (press release merely repeated previously-announced restatement and that two officers had been suspended).  Moreover, the repetition that 3M was continuing to search for PFAS is not a *corrective* disclosure.  The mere announcement of an investigation, without subsequent negative findings, is not corrective.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), *as amended* (Sept. 11, 2014).[31]

---

[30] *Accord City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 129 F.Supp.3d 48, 85 (S.D.N.Y. 2015); *In re Intelligroup Sec. Litig.*, 468 F. Supp.2d 670, 701 (D.N.J. 2006); *see also Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 157-58 (2d Cir. 2007).

[31] *Accord Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013).

## II.    PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM

Because Plaintiffs have failed to state a predicate Section 10(b) claim, the Individual Defendants can have no secondary liability as "controlling persons" under Section 20(a).  *See Navarre*, 299 F.3d at 748; *Apogee*, 2020 WL 1445856, *14.

## CONCLUSION

For these reasons, the Court should dismiss the CAC.

Dated:  January 15, 2021                                  Respectfully submitted,

**FAEGRE DRINKER BIDDLE & REATH LLP**

By:  /s/ *Wendy J. Wildung*
Wendy J. Wildung (#117055)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
wendy.wildung@faegredrinker.com

**FRESHFIELDS BRUCKHAUS DERINGER US LLP**

By:  /s/ *Meredith Kotler*
Meredith Kotler (admitted *pro hac vice*)
Mary Eaton (admitted *pro hac vice*)
Scott A. Eisman (admitted *pro hac vice*)
601 Lexington Avenue
New York, NY 10022
Tel: (212) 277-4000
meredith.kotler@freshfields.com
mary.eaton@freshfields.com
scott.eisman@freshfields.com

*Attorneys for Defendants*

-44-