# Exhibit 20

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 10-Q

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2019**

**Commission file number:  1-3285**

# 3M COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **DELAWARE** | **41-0417775** |
| (State or other jurisdiction of | (I.R.S. Employer |
| incorporation or organization) | Identification No.) |
| | |
| **3M Center, St. Paul, Minnesota** | **55144** |
| (Address of principal executive offices) | (Zip Code) |

**(651) 733-1110**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.:

| | |
|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ |
| Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date.

| **Class** | **Outstanding at March 31, 2019** |
|---|---|
| Common Stock, $0.01 par value per share | 576,426,706 shares |

**NOTE 14.  Commitments and Contingencies**

*Legal Proceedings:*

The Company and some of its subsidiaries are involved in numerous claims and lawsuits, principally in the United States, and regulatory proceedings worldwide. These include various products liability (involving products that the Company now or formerly manufactured and sold), intellectual property, and commercial claims and lawsuits, including those brought under the antitrust laws, and environmental proceedings. Unless otherwise stated, the Company is vigorously defending all such litigation. Additional information about the Company's process for disclosure and recording of liabilities and insurance receivables related to legal proceedings can be found in Note 16 "Commitments and Contingencies" in the Company's Annual Report on Form 10-K for the year ended December 31, 2018.

The following sections first describe the significant legal proceedings in which the Company is involved, and then describe the liabilities and associated insurance receivables the Company has accrued relating to its significant legal proceedings.

Respirator Mask/Asbestos Litigation

As of March 31, 2019, the Company is a named defendant, with multiple co-defendants, in numerous lawsuits in various courts that purport to represent approximately 2,335 individual claimants, compared to approximately 2,320 individual claimants with actions pending at December 31, 2018.

The vast majority of the lawsuits and claims resolved by and currently pending against the Company allege use of some of the Company's mask and respirator products and seek damages from the Company and other defendants for alleged personal injury from workplace exposures to asbestos, silica, coal mine dust or other occupational dusts found in products manufactured by other defendants or generally in the workplace. A minority of the lawsuits and claims resolved by and currently pending against the Company generally allege personal injury from occupational exposure to asbestos from products previously manufactured by the Company, which are often unspecified, as well as products manufactured by other defendants, or occasionally at Company premises.

The Company's current volume of new and pending matters is substantially lower than it experienced at the peak of filings in 2003. The Company expects that filing of claims by unimpaired claimants in the future will continue to be at much lower levels than in the past. Accordingly, the number of claims alleging more serious injuries, including mesothelioma, other malignancies, and black lung disease, will represent a greater percentage of total claims than in the past. Over the past twenty years, the Company has prevailed in fourteen of the fifteen cases tried to a jury (including the lawsuits in 2018 described below). In 2018, 3M received a jury verdict in its favor in two lawsuits – one in California state court in February and the other in Massachusetts state court in December – both involving allegations that 3M respirators were defective and failed to protect the plaintiffs against asbestos fibers. In April 2018, a jury in state court in Kentucky found 3M's 8710 respirators failed to protect two coal miners from coal mine dust and awarded compensatory damages of approximately $2 million and punitive damages totaling $63 million. In August 2018, the trial court entered judgment and the Company has appealed. During March and April 2019, the Company agreed in principle to settle a substantial majority of the coal mine dust lawsuits in Kentucky and West Virginia for $340 million, including the $65 million jury verdict in April 2018 in the Kentucky case mentioned above currently on appeal.

The Company has demonstrated in these past trial proceedings that its respiratory protection products are effective as claimed when used in the intended manner and in the intended circumstances. Consequently, the Company believes that claimants are unable to establish that their medical conditions, even if significant, are attributable to the Company's respiratory protection products. Nonetheless the Company's litigation experience indicates that claims of persons alleging more serious injuries, including mesothelioma, other malignancies, and black lung disease, are costlier to resolve than the claims of unimpaired persons, and it therefore believes the average cost of resolving pending and future claims on a per-claim basis will continue to be higher than it experienced in prior periods when the vast majority of claims were asserted by medically unimpaired claimants.

As previously reported, the State of West Virginia, through its Attorney General, filed a complaint in 2003 against the Company and two other manufacturers of respiratory protection products in the Circuit Court of Lincoln County, West Virginia, and amended its complaint in 2005. The amended complaint seeks substantial, but unspecified, compensatory damages primarily for reimbursement of the costs allegedly incurred by the State for worker's compensation and healthcare benefits provided to all workers with occupational pneumoconiosis and unspecified punitive damages. The case was inactive from the fourth quarter of 2007 until late 2013, other than a

case management conference in March 2011. In November 2013, the State filed a motion to bifurcate the lawsuit into separate liability and damages proceedings. At the hearing on the motion, the court declined to bifurcate the lawsuit. No liability has been recorded for this matter because the Company believes that liability is not probable and estimable at this time. In addition, the Company is not able to estimate a possible loss or range of loss given the lack of any meaningful discovery responses by the State of West Virginia, the otherwise minimal activity in this case and the fact that the complaint asserts claims against two other manufacturers where a defendant's share of liability may turn on the law of joint and several liability and by the amount of fault, if any, a jury might allocate to each defendant if the case is ultimately tried.

*Respirator Mask/Asbestos Liabilities and Insurance Receivables*

The Company regularly conducts a comprehensive legal review of its respirator mask/asbestos liabilities. The Company reviews recent and historical claims data, including without limitation, (i) the number of pending claims filed against the Company, (ii) the nature and mix of those claims (i.e., the proportion of claims asserting usage of the Company's mask or respirator products and alleging exposure to each of asbestos, silica, coal or other occupational dusts, and claims pleading use of asbestos-containing products allegedly manufactured by the Company), (iii) the costs to defend and resolve pending claims, and (iv) trends in filing rates and in costs to defend and resolve claims, (collectively, the "Claims Data"). As part of its comprehensive legal review, the Company regularly provides the Claims Data to a third party with expertise in determining the impact of Claims Data on future filing trends and costs. The third party assists the Company in estimating the costs to defend and resolve pending and future claims. The Company uses these estimates to develop its best estimate of probable liability.

Developments may occur that could affect the Company's estimate of its liabilities. These developments include, but are not limited to, significant changes in (i) the key assumptions underlying the Company's accrual, including, the number of future claims, the nature and mix of those claims, the average cost of defending and resolving claims, and in maintaining trial readiness (ii) trial and appellate outcomes, (iii) the law and procedure applicable to these claims, and (iv) the financial viability of other co-defendants and insurers.

As a result of the settlements-in-principle of the coal mine dust lawsuits mentioned above, the Company's assessment of other current and expected coal mine dust lawsuits (including the costs to resolve all current and expected coal mine dust lawsuits in Kentucky and West Virginia), its review of its respirator mask/asbestos liabilities, and the cost of resolving claims of persons who claim more serious injuries, including mesothelioma, other malignancies, and black lung disease, the Company increased its accruals in the first quarter of 2019 for respirator mask/asbestos liabilities by $313 million pre-tax, or $238 million after tax ($0.40 per diluted share). In the first quarter of 2019, the Company made payments for legal fees and settlements of $32 million related to the respirator mask/asbestos litigation. As of March 31, 2019, the Company had an accrual for respirator mask/asbestos liabilities (excluding Aearo accruals) of $954 million, up $281 million from the accrual at December 31, 2018. This accrual represents the Company's best estimate of probable loss and reflects an estimation period for future claims that may be filed against the Company approaching the year 2050. The Company cannot estimate the amount or upper end of the range of amounts by which the liability may exceed the accrual the Company has established because of the (i) inherent difficulty in projecting the number of claims that have not yet been asserted or the time period in which future claims may be asserted, (ii) the complaints nearly always assert claims against multiple defendants where the damages alleged are typically not attributed to individual defendants so that a defendant's share of liability may turn on the law of joint and several liability, which can vary by state, (iii) the multiple factors described above that the Company considers in estimating its liabilities, and (iv) the several possible developments described above that may occur that could affect the Company's estimate of liabilities.

As of March 31, 2019, the Company's receivable for insurance recoveries related to the respirator mask/asbestos litigation was $4 million. The Company continues to seek coverage under the policies of certain insolvent and other insurers. Once those claims for coverage are resolved, the Company will have collected substantially all of its remaining insurance coverage for respirator mask/asbestos claims.

Respirator Mask/Asbestos Litigation — Aearo Technologies

On April 1, 2008, a subsidiary of the Company purchased the stock of Aearo Holding Corp., the parent of Aearo Technologies ("Aearo"). Aearo manufactured and sold various products, including personal protection equipment, such as eye, ear, head, face, fall and certain respiratory protection products.

32

Table of Contents

As of March 31, 2019, Aearo and/or other companies that previously owned and operated Aearo's respirator business (American Optical Corporation, Warner-Lambert LLC, AO Corp. and Cabot Corporation ("Cabot")) are named defendants, with multiple co-defendants, including the Company, in numerous lawsuits in various courts in which plaintiffs allege use of mask and respirator products and seek damages from Aearo and other defendants for alleged personal injury from workplace exposures to asbestos, silica-related, coal mine dust, or other occupational dusts found in products manufactured by other defendants or generally in the workplace.

As of March 31, 2019, the Company, through its Aearo subsidiary, had accruals of $28 million for product liabilities and defense costs related to current and future Aearo-related asbestos and silica-related claims. This accrual represents the Company's best estimate of Aearo's probable loss and reflects an estimation period for future claims that may be filed against Aearo approaching the year 2050. Responsibility for legal costs, as well as for settlements and judgments, is currently shared in an informal arrangement among Aearo, Cabot, American Optical Corporation and a subsidiary of Warner Lambert and their respective insurers (the "Payor Group"). Liability is allocated among the parties based on the number of years each company sold respiratory products under the "AO Safety" brand and/or owned the AO Safety Division of American Optical Corporation and the alleged years of exposure of the individual plaintiff. Aearo's share of the contingent liability is further limited by an agreement entered into between Aearo and Cabot on July 11, 1995. This agreement provides that, so long as Aearo pays to Cabot a quarterly fee of $100,000, Cabot will retain responsibility and liability for, and indemnify Aearo against, any product liability claims involving exposure to asbestos, silica, or silica products for respirators sold prior to July 11, 1995. Because of the difficulty in determining how long a particular respirator remains in the stream of commerce after being sold, Aearo and Cabot have applied the agreement to claims arising out of the alleged use of respirators involving exposure to asbestos, silica or silica products prior to January 1, 1997. With these arrangements in place, Aearo's potential liability is limited to exposures alleged to have arisen from the use of respirators involving exposure to asbestos, silica, or silica products on or after January 1, 1997. To date, Aearo has elected to pay the quarterly fee. Aearo could potentially be exposed to additional claims for some part of the pre-July 11, 1995 period covered by its agreement with Cabot if Aearo elects to discontinue its participation in this arrangement, or if Cabot is no longer able to meet its obligations in these matters.

Developments may occur that could affect the estimate of Aearo's liabilities. These developments include, but are not limited to: (i) significant changes in the number of future claims, (ii) significant changes in the average cost of resolving claims, (iii) significant changes in the legal costs of defending these claims, (iv) significant changes in the mix and nature of claims received, (v) trial and appellate outcomes, (vi) significant changes in the law and procedure applicable to these claims, (vii) significant changes in the liability allocation among the co-defendants, (viii) the financial viability of members of the Payor Group including exhaustion of available insurance coverage limits, and/or (ix) a determination that the interpretation of the contractual obligations on which Aearo has estimated its share of liability is inaccurate. The Company cannot determine the impact of these potential developments on its current estimate of Aearo's share of liability for these existing and future claims. If any of the developments described above were to occur, the actual amount of these liabilities for existing and future claims could be significantly larger than the amount accrued.

Because of the inherent difficulty in projecting the number of claims that have not yet been asserted, the complexity of allocating responsibility for future claims among the Payor Group, and the several possible developments that may occur that could affect the estimate of Aearo's liabilities, the Company cannot estimate the amount or range of amounts by which Aearo's liability may exceed the accrual the Company has established.

Environmental Matters and Litigation

The Company's operations are subject to environmental laws and regulations including those pertaining to air emissions, wastewater discharges, toxic substances, and the handling and disposal of solid and hazardous wastes enforceable by national, state, and local authorities around the world, and private parties in the United States and abroad. These laws and regulations provide, under certain circumstances, a basis for the remediation of contamination, for restoration of or compensation for damages to natural resources, and for personal injury and property damage claims. The Company has incurred, and will continue to incur, costs and capital expenditures in complying with these laws and regulations, defending personal injury and property damage claims, and modifying its business operations in light of its environmental responsibilities. In its effort to satisfy its environmental responsibilities and comply with environmental laws and regulations, the Company has established, and periodically updates, policies relating to environmental standards of performance for its operations worldwide.

Under certain environmental laws, including the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) and similar state laws, the Company may be jointly and severally liable, typically with other companies, for the costs of remediation of environmental contamination at current or former facilities and at off-site locations. The Company has

33

Table of Contents

identified numerous locations, most of which are in the United States, at which it may have some liability. Please refer to the section entitled "*Environmental Liabilities and Insurance Receivables*" that follows for information on the amount of the accrual.

*Environmental Matters*

As previously reported, the Company has been voluntarily cooperating with ongoing reviews by local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies of possible environmental and health effects of various perfluorinated compounds, including perfluorooctanoate ("PFOA"), perfluorooctane sulfonate ("PFOS"), perfluorohexane sulfonate ("PFHxS"), or other per- and polyfluoroalkyl substances (collectively "PFAS"). As a result of its phase-out decision in May 2000, the Company no longer manufactures certain PFAS compounds including PFOA, PFOS, PFHxS, and their pre-cursor compounds. The company ceased manufacturing and using the vast majority of these compounds within approximately two years of the phase-out announcement and ceased all manufacturing and the last significant use of this chemistry by the end of 2008. The Company continues to manufacture a variety of shorter chain length PFAS compounds, including, but not limited to, pre-cursor compounds to perfluorobutane sulfonate (PFBS). These compounds are used as input materials to a variety of products, including engineered fluorinated fluids, fluoropolymers and fluorelastomers, as well as surfactants, additives, and coatings. Through its ongoing life cycle management and its raw material composition identification processes associated with the Company's policies covering the use of all persistent and bio-accumulative materials, the Company continues to review, control or eliminate the presence of certain PFAS in purchased materials or as byproducts in some of 3M's current fluorochemical manufacturing processes, products, and waste streams.

Regulatory activities concerning PFOA and/or PFOS continue in the United States, Europe and elsewhere, and before certain international bodies. These activities include gathering of exposure and use information, risk assessment, and consideration of regulatory approaches. As the database of studies of both PFOA and PFOS has expanded, the EPA has developed human health effects documents summarizing the available data from these studies. In February 2014, the EPA initiated external peer review of its draft human health effects documents for PFOA and PFOS. The peer review panel met in August 2014. In May 2016, the EPA announced lifetime health advisory levels for PFOA and PFOS at 70 parts per trillion (ppt) (superseding the provisional levels established by the EPA in 2009 of 400 ppt for PFOA and 200 ppt for PFOS). Where PFOA and PFOS are found together, EPA recommends that the concentrations be added together, and the lifetime health advisory for PFOA and PFOS combined is also 70 ppt. Lifetime health advisories, which are non-enforceable and non-regulatory, provide information about concentrations of drinking water contaminants at which adverse health effects are not expected to occur over the specified exposure duration. To collect exposure information under the Safe Drinking Water Act, the EPA published on May 2, 2012 a list of unregulated substances, including six-PFAS chemicals, required to be monitored during the period 2013-2015 by public water system suppliers to determine the extent of their occurrence. Through January 2017, the EPA reported results for 4,920 public water supplies nationwide. Based on the 2016 lifetime health advisory, 13 public water supplies exceed the level for PFOA and 46 exceed the level for PFOS (unchanged from the July 2016 EPA summary). A technical advisory issued by EPA in September 2016 on laboratory analysis of drinking water samples stated that 65 public water supplies had exceeded the combined level for PFOA and PFOS. These results are based on one or more samples collected during the period 2012-2015 and do not necessarily reflect current conditions of these public water supplies. EPA reporting does not identify the sources of the PFOA and PFOS in the public water supplies.

The Company is continuing to make progress in its work, under the supervision of state regulators, to address its historic disposal of PFAS-containing waste associated with manufacturing operations at its Decatur, Alabama; Cottage Grove, Minnesota; and Cordova, Illinois plants. As previously reported, the Company entered into a voluntary remedial action agreement with the Alabama Department of Environmental Management (ADEM) to address the presence of PFAS in the soil at the Company's manufacturing facility in Decatur, Alabama. Pursuant to a permit issued by ADEM, for approximately 20 years, the Company incorporated its wastewater treatment plant sludge containing PFAS in fields at its Decatur facility. After a review of the available options to address the presence of PFAS in the soil, ADEM agreed that the preferred remediation option is to use a multilayer cap over the former sludge incorporation areas on the manufacturing site with subsequent groundwater migration controls and treatment. Implementation of that plan continues, and construction of the cap was substantially completed in 2018.

The Company continues to work with the Minnesota Pollution Control Agency (MPCA) pursuant to the terms of the previously disclosed May 2007 Settlement Agreement and Consent Order to address the presence of certain PFAS in the soil and groundwater at former disposal sites in Washington County, Minnesota (Oakdale and Woodbury) and at the Company's manufacturing facility at Cottage Grove, Minnesota. Under this agreement, the Company's principal obligations include (i) evaluating releases of certain PFAS from these sites and proposing response actions; (ii) providing treatment or alternative drinking water upon identifying any level exceeding a Health Based Value ("HBV") or Health Risk Limit ("HRL") (i.e., the amount of a chemical in drinking water determined

34

Table of Contents

by the Minnesota Department of Health (MDH) to be safe for human consumption over a lifetime) for certain PFAS for which a HBV and/or HRL exists as a result of contamination from these sites; (iii) remediating identified sources of other PFAS at these sites that are not controlled by actions to remediate PFOA and PFOS; and (iv) sharing information with the MPCA about certain perfluorinated compounds. During 2008, the MPCA issued formal decisions adopting remedial options for the former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). In August 2009, the MPCA issued a formal decision adopting remedial options for the Company's Cottage Grove manufacturing facility. During the spring and summer of 2010, 3M began implementing the agreed upon remedial options at the Cottage Grove and Woodbury sites. 3M commenced the remedial option at the Oakdale site in late 2010. At each location the remedial options were recommended by the Company and approved by the MPCA. Remediation work has been completed at the Oakdale and Woodbury sites, and they are in an operational maintenance mode. Remediation will continue at the Cottage Grove site during 2019.

In August 2014, the Illinois EPA approved a request by the Company to establish a groundwater management zone at its manufacturing facility in Cordova, Illinois, which includes ongoing pumping of impacted site groundwater, groundwater monitoring and routine reporting of results.

In May 2017, the MDH issued new HBVs for PFOS and PFOA. The new HBVs are 35 ppt for PFOA and 27 ppt for PFOS. In connection with its announcement the MDH stated that "Drinking water with PFOA and PFOS, even at the levels above the updated values, does not represent an immediate health risk. These values are designed to reduce long-term health risks across the population and are based on multiple safety factors to protect the most vulnerable citizens, which makes them overprotective for most of the residents in our state." In December 2017, the MDH issued a new HBV for perfluorobutane sulfonate (PFBS) of 2 ppb. In February 2018, the MDH published reports finding no unusual rates of certain cancers or adverse birth outcomes (low birth rates or premature births) among residents of Washington and Dakota Counties in Minnesota. In April 2019, the MDH issued a new HBV for PFOS of 15 ppt and a new HBV for PFHxS of 47 ppt.

In May 2018, the EPA announced a four-step PFAS action plan, which includes evaluating the need to set Safe Drinking Water Act maximum contaminant levels (MCLs) for PFOA and PFOS and beginning the steps necessary to designate PFOA and PFOS as "hazardous substances" under CERCLA. In November 2018, EPA asked for public comment on draft toxicity assessments for two PFAS compounds, including PFBS. In February 2019, the EPA issued a PFAS Action Plan that outlines short- and long-term actions the EPA is taking to address PFAS – actions that include developing a national drinking water determination for PFOA and PFOS, strengthening enforcement authorities and evaluating cleanup approaches, nationwide drinking water monitoring for PFAS, expanding scientific knowledge for understanding and managing risk from PFAS, and developing consistent risk communication tools for communicating with other agencies and the public.

The U.S.  Agency for Toxic Substances and Disease Registry (ATSDR) within the Department of Health and Human Services released a draft Toxicological Profile for PFAS for public review and comment in June 2018. In the draft report, ATSDR proposed draft Minimal Risk Levels (MRLs) for PFOS, PFOA and several other PFAS. An MRL is an estimate of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse non-cancer health effects over a specified duration of exposure. MRLs are not intended to define cleanup or action levels for ATSDR or other agencies. In August 2018, 3M submitted comments on the ATSDR proposal, noting that there are major shortcomings with the current draft, especially with the MRLs, and that the ATSDR's profile must reflect the best science and full weight of evidence known about these chemicals.

In several states, the state legislature or the state environmental agency have been evaluating or have taken actions related to cleanup standards, groundwater values or drinking water values for PFOS, PFOA, and other PFAS.

The Company cannot predict what additional regulatory actions arising from the foregoing proceedings and activities, if any, may be taken regarding such compounds or the consequences of any such actions.

*Litigation Related to Historical PFAS Manufacturing Operations in Alabama*

As previously reported, a former employee filed a putative class action lawsuit in 2002 in the Circuit Court of Morgan County, Alabama (the "St. John case"), seeking unstated damages and alleging that the plaintiffs suffered fear, increased risk, subclinical injuries, and property damage from exposure to certain perfluorochemicals at or near the Company's Decatur, Alabama, manufacturing facility. The court in 2005 granted the Company's motion to dismiss the named plaintiff's personal injury-related claims on the basis that such claims are barred by the exclusivity provisions of the state's Workers Compensation Act. The plaintiffs'

35

Table of Contents

counsel filed an amended complaint in November 2006, limiting the case to property damage claims on behalf of a putative class of residents and property owners in the vicinity of the Decatur plant. In June 2015, the plaintiffs filed an amended complaint adding additional defendants, including BFI Waste Management Systems of Alabama, LLC; BFI Waste Management of North America, LLC; the City of Decatur, Alabama; Morgan County, Alabama; Municipal Utilities Board of Decatur; and Morgan County, Alabama, d/b/a Decatur Utilities.

In 2005, the judge – in a second putative class action lawsuit filed by three residents of Morgan County, Alabama, seeking unstated compensatory and punitive damages involving alleged damage to their property from emissions of certain perfluorochemical compounds from the Company's Decatur, Alabama, manufacturing facility that formerly manufactured those compounds (the "Chandler case") – granted the Company's motion to abate the case, effectively putting the case on hold pending the resolution of class certification issues in the St. John case. Despite the stay, plaintiffs filed an amended complaint seeking damages for alleged personal injuries and property damage on behalf of the named plaintiffs and the members of a putative class. No further action in the case is expected unless and until the stay is lifted.

In February 2009, a resident of Franklin County, Alabama, filed a putative class action lawsuit in the Circuit Court of Franklin County (the "Stover case") seeking compensatory damages and injunctive relief based on the application by the Decatur utility's wastewater treatment plant of wastewater treatment sludge to farmland and grasslands in the state that allegedly contain PFOA, PFOS and other perfluorochemicals. The named plaintiff seeks to represent a class of all persons within the State of Alabama who have had PFOA, PFOS, and other perfluorochemicals released or deposited on their property. In March 2010, the Alabama Supreme Court ordered the case transferred from Franklin County to Morgan County. In May 2010, consistent with its handling of the other matters, the Morgan County Circuit Court abated this case, putting it on hold pending the resolution of the class certification issues in the St. John case.

In October 2015, West Morgan-East Lawrence Water & Sewer Authority (Water Authority) filed an individual complaint against 3M Company, Dyneon, L.L.C, and Daikin America, Inc., in the U.S. District Court for the Northern District of Alabama. The complaint also includes representative plaintiffs who brought the complaint on behalf of themselves, and a class of all owners and possessors of property who use water provided by the Water Authority and five local water works to which the Water Authority supplies water (collectively, the "Water Utilities"). The complaint seeks compensatory and punitive damages and injunctive relief based on allegations that the defendants' chemicals, including PFOA and PFOS from their manufacturing processes in Decatur, have contaminated the water in the Tennessee River at the water intake, and that the chemicals cannot be removed by the water treatment processes utilized by the Water Authority. In September 2016, the court granted 3M's motion to dismiss plaintiffs' trespass claims with prejudice, negligence claims for personal injuries, and private nuisance claims, and denied the motion to dismiss the plaintiffs' negligence claims for property damage, public nuisance, abatement of nuisance, battery and wantonness. In April 2019, 3M and the Water Authority settled the lawsuit described above for $35 million. The Water Authority will fund a new water filtration system and, as part of the settlement, 3M agreed to indemnify the Water Authority from liability resulting from the resolution of the currently pending and future lawsuits against the Water Authority alleging liability or damages related to 3M PFAS.

In June 2016, the Tennessee Riverkeeper, Inc. (Riverkeeper), a non-profit corporation, filed a lawsuit in the U.S. District Court for the Northern District of Alabama against 3M; BFI Waste Systems of Alabama; the City of Decatur, Alabama; and the Municipal Utilities Board of Decatur, Morgan County, Alabama. The complaint alleges that the defendants violated the Resource Conservation and Recovery Act in connection with the disposal of certain PFAS through their ownership and operation of their respective sites. The complaint further alleges such practices may present an imminent and substantial endangerment to health and/or the environment and that Riverkeeper has suffered and will continue to suffer irreparable harm caused by defendants' failure to abate the endangerment unless the court grants the requested relief, including declaratory and injunctive relief. This case is stayed until June 2019 with mediation scheduled for May 2019.

In August 2016, a group of over 200 plaintiffs filed a putative class action against West Morgan-East Lawrence Water and Sewer Authority (Water Authority), 3M, Dyneon, Daikin, BFI, and the City of Decatur in state court in Lawrence County, Alabama. Plaintiffs are residents of Lawrence, Morgan and other counties who are or have been customers of the Water Authority. They contend defendants have released PFAS that contaminate the Tennessee River and, in turn, their drinking water, causing damage to their health and properties. In January 2017, the court in the St. John case, discussed above, stayed this litigation pending resolution of the St. John case.

In January 2017, several hundred plaintiffs sued 3M, its subsidiary Dyneon, and Daikin America in Lawrence and Morgan Counties, Alabama. The plaintiffs are owners of property, residents, and holders of property interests who receive their water from the West

Table of Contents

Morgan-East Lawrence Water and Sewer Authority (Water Authority). They assert common law claims for negligence, nuisance, trespass, wantonness, and battery, and they seek injunctive relief and punitive damages. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged into Bakers Creek and the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, discharges wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result of the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

In November 2017, a putative class action (the "King" case) was filed against 3M, its subsidiary Dyneon, Daikin America, and the West Morgan-East Lawrence Water and Sewer Authority (Water Authority) in the U.S. District Court for the Northern District of Alabama. The plaintiffs are residents of Lawrence and Morgan County, Alabama who receive their water from the Water Authority. They assert various common law claims, including negligence, nuisance, wantonness, and fraudulent concealment, and they seek injunctive relief, attorneys' fees, compensatory and punitive damages for their alleged personal injuries. The plaintiffs contend that the defendants own and operate manufacturing and disposal facilities in Decatur that have released and continue to release PFOA, PFOS and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River. The plaintiffs also contend that the defendants have discharged chemicals into the Decatur Utilities Dry Creek Wastewater Treatment Plant, which, in turn, discharged wastewater containing these chemicals into the Tennessee River. The plaintiffs contend that, as a result of the alleged discharges, the water supplied by the Water Authority to the plaintiffs was, and is, contaminated with PFOA, PFOS, and related chemicals at a level dangerous to humans.

In January 2018, certain property owners in Trinity, Alabama filed a lawsuit against 3M, Dyneon, and three unnamed defendants in the U.S. District Court for the Northern District of Alabama. The plaintiffs assert claims for negligence, strict liability, trespass, nuisance, wanton and reckless conduct, and citizen suit claims for violation of the Resource Conservation and Recovery Act. They allege these claims arise from the defendants' contamination of their property by disposal of PFAS in a landfill located on their property. The plaintiffs seek compensatory and punitive damages and a court order directing the defendants to remediate all PFAS contamination on their property. In September 2018, the case was dismissed by stipulation of the parties.

In September 2018, an individual plaintiff filed a lawsuit in the U.S. District Court for the Northern District of Alabama raising allegations and claims substantially similar to those asserted by plaintiffs in the King case.

*Litigation Related to Historical PFAS Manufacturing Operations in Minnesota*

In July 2016, the City of Lake Elmo filed a lawsuit in the U.S. District Court for the District of Minnesota against 3M alleging that the City suffered damages from drinking water supplies contaminated with PFAS, including costs to construct alternative sources of drinking water. In April 2019, 3M and the City of Lake Elmo agreed to settle the lawsuit for less than $5 million.

*State Attorneys General Litigation related to PFAS*

In December 2010, the State of Minnesota, by its Attorney General, filed a lawsuit in Hennepin County District Court against 3M to recover damages (including unspecified assessment costs and reasonable attorney's fees) for alleged injury to, destruction of, and loss of use of certain of the State's natural resources under the Minnesota Environmental Response and Liability Act (MERLA) and the Minnesota Water Pollution Control Act (MWPCA), as well as statutory nuisance and common law claims of trespass, nuisance, and negligence with respect to the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediments (the "NRD Lawsuit"). The State also sought declarations under MERLA that 3M is responsible for all damages the State may suffer in the future for injuries to natural resources from releases of PFAS into the environment, and that 3M is responsible for compensation for future loss or destruction of fish, aquatic life, and other damages under the MWPCA. In September 2017, the State's damages expert submitted a report that contended the State incurred $5 billion in damages. In November 2017, the State of Minnesota filed a motion for leave to amend its complaint to seek punitive damages from 3M, and 3M filed a motion for summary judgment contending, among other things, that the State's claims were barred by the applicable statute of limitations. In December 2017, the court urged the parties to attempt to resolve the litigation before trial, and in January 2018, the court appointed a mediator to facilitate that process. In February 2018, 3M and the State of Minnesota reached a resolution of the NRD Lawsuit. Under the terms of the settlement, 3M agreed to provide an $850 million grant to the State for a special "3M Water Quality and Sustainability Fund." This Fund will enable projects that support water sustainability in the Twin Cities East Metro region, such as continued delivery of water to residents and

37

enhancing groundwater recharge to support sustainable growth. The projects will also result in habitat and recreation improvements, such as fishing piers, trails, and open space preservation. 3M recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 associated with the resolution of this matter.

In June 2018, the State of New York, by its Attorney General, filed a lawsuit in Albany Country Supreme Court against 3M, Tyco Fire Products LP, Chemguard, Inc., Buckeye Fire Equipment Co., National Foam, Inc., and Kidde-Fenwal, Inc., seeking to recover the costs incurred in responding to the contamination caused by Aqueous Film Forming Foam (AFFF) manufactured by 3M and others; damages for injury to, destruction of, and loss of the State's natural resources and related recreational series; and property damage. This case was removed to federal court and transferred to the MDL for AFFF cases.

In July 2018, the now former governor of Michigan requested that the now former Michigan Attorney General file a lawsuit against 3M and others related to PFAS in a public letter. The new Michigan Attorney General has not yet announced whether she will do so.

In December 2018, the State of Ohio, by its Attorney General, filed a lawsuit in the Common Pleas Court of Lucas County, Ohio against 3M, Tyco Fire Products LP, Chemguard, Inc., Buckeye Fire Equipment Co., National Foam, Inc., and Angus Fire Armour Corp., seeking injunctive relief and compensatory and punitive damages for remediation costs and alleged injury to Ohio natural resources from AFFF manufacturers. This case was removed to federal court and transferred to the MDL for AFFF cases.

In February 2019, the State of New York, by its Attorney General, filed a second lawsuit in Albany County Supreme Court against 3M, Tyco Fire Products LP, Chemguard, Inc., Buckeye Fire Equipment Co., and National Foam, Inc. seeking (1) compensatory damages consisting of (i) costs incurred and to be incurred by the State in investigating, monitoring, remediating, and otherwise responding to injuries and/or threats to public health and the environment caused by defendants' AFFF products used at sites across New York State; and (ii) damages for harm to the State's natural resources; (2) punitive damages; and (3) injunctive and equitable relief in the form of a monetary fund for the State's reasonably expected future damages, and/or requiring defendants to perform investigative and remedial work in response to the threats and/or injuries they have caused.

In March 2019, the New Jersey Attorney General filed two actions against 3M, Dupont, and Chemours on behalf of the New Jersey Department of Environmental Protection (NJDEP), the NJDEP's commissioner, and the New Jersey Spill Compensation Fund. One complaint was filed in Salem County and alleges the defendants should pay for clean-up and removal costs and damages as a result of alleged discharges of hazardous substances and pollutants by the defendants at Dupont's Chambers Works facility in Pennsville, New Jersey. The other complaint was filed in Middlesex County and seeks similar relief relating to DuPont's Parlin, New Jersey facility. 3M is included as a defendant in both cases because it allegedly supplied PFOA to DuPont for use at the facilities at issue. Both cases expressly seek to have the defendants pay all costs necessary to investigate, remediate, assess, and restore the affected natural resources of New Jersey.

*Aqueous Film Forming Foam (AFFF) Environmental Litigation*

3M manufactured and marketed AFFF for use in firefighting at airports and military bases from approximately 1963 to 2000. As of March 31, 2019, 96 putative class action and other lawsuits have been filed against 3M and other defendants in various state and federal courts where current or former airports, military bases, or fire training facilities are or were located. In these cases, plaintiffs typically allege that certain PFAS used in AFFF contaminated the soil and groundwater where AFFF was used and seek damages for loss of use and enjoyment of properties, diminished property values, investigation costs, remediation costs, and in some cases, personal injury and funds for medical monitoring. Several companies have been sued along with 3M, including Ansul Co. (acquired by Tyco, Inc.), Angus Fire, Buckeye Fire Protection Co., Chemguard, National Foam, Inc., and United Technologies Corp .

In December 2018, th e U.S. Judicial Panel on Multidistrict Litigation granted motions to transfer and consolidate all AFFF cases pending in federal courts to the U.S. District Court for the District of South Carolina to be managed in a multi-district litigation (MDL) proceeding to centralize pre-trial proceedings. As of March 31, 2019, there were 88 cases in the MDL.

*Other PFAS-related Environmental Litigation*

3M manufactured and sold products containing various perfluorooctanyl compounds (PFOA and PFOS), including Scotchgard, for several decades. Starting in 2017, 3M has been served with individual and putative class action complaints in various state and federal courts alleging, among other things, that 3M's customers' improper disposal of PFOA and PFOS resulted in the contamination of

38

groundwater or surface water. The plaintiffs in these cases generally allege that 3M failed to warn its customers about the hazards of improper disposal of the product. They also generally allege that contaminated groundwater has caused various injuries, including personal injury, loss of use and enjoyment of their properties, diminished property values, investigation costs, and remediation costs. Several companies have been sued along with 3M, including Saint-Gobain Performance Plastics Corp., Honeywell International Inc. f/k/a Allied-Signal Inc. and/or AlliedSignal Laminate Systems, Inc., E.I. DuPont De Nemours and Co., and various carpet manufacturers.

In New York, 3M is defending 22 individual cases and one putative class action filed in the U.S. District Court for the Northern District of New York against 3M, Saint-Gobain Performance Plastics Corp. ("Saint-Gobain"), Honeywell International Inc. and E.I. DuPont De Nemours and Company. Plaintiffs allege that 3M manufactured and sold PFOA that was used for manufacturing purposes at Saint-Gobain's and Honeywell's facilities located in the Village of Hoosick Falls and the Town of Hoosick. Plaintiffs claim that the drinking water around Hoosick Falls became contaminated with unsafe levels of PFOA due to the activities of the defendants and allege that they suffered bodily injury due to the ingestion and inhalation of PFOA. Plaintiffs seek unstated compensatory, consequential, and punitive damages, as well as attorneys' fees and costs.

In Michigan, two putative class actions are pending in the U.S. District Court for the Western District of Michigan against 3M and Wolverine World Wide (Wolverine) and other defendants. The complaints include some or all of the following claims: negligence, trespass, intentional and negligent infliction of emotional distress, battery, products liability, public and private nuisance, fraudulent concealment, and unjust enrichment. The actions arise from Wolverine's allegedly improper disposal of materials and wastes related to their shoe manufacturing operations. Plaintiffs allege Wolverine used 3M Scotchgard in its manufacturing process and that chemicals from 3M's product have contaminated the environment after being disposed of near drinking water sources. In addition to the two federal court class actions, as of March 31, 2019, 3M has been named as a defendant in 214 private individual actions in Michigan state court based on similar allegations. Wolverine also filed a third-party complaint against 3M in a suit by the State of Michigan against Wolverine seeking to compel Wolverine to investigate and address contamination associated with its historic disposal activity.

In Alabama, 3M is defending two lawsuits filed in state court by local public water suppliers relating to 3M's sale of PFAS-containing products to carpet manufacturers in Georgia. The plaintiffs in these cases allege that the carpet manufacturers improperly discharged PFOA and PFOS into the surface water and groundwater, contaminating drinking water supplies of cities located downstream along the Coosa River.

In Delaware, 3M is defending one putative class action filed in federal court relating to alleged contamination allegedly caused by waste from Wolverine World Wide, which used Scotchgard in its manufacture of leather products. 3M allegedly supplied Scotchgard to Wolverine.

In Maine, 3M is defending one individual action in federal court relating to contamination of drinking water and dairy farm operations by PFAS from wastewater sludge. Plaintiffs contend that PFAS entered the wastewater via discharge from another company's facility in Kennebunk, Maine.

In New Jersey, 3M is defending one putative class action in federal court that relates to the DuPont "Chambers Works" plant. Plaintiffs allege that PFAS compounds from the plant have contaminated private wells for drinking water.

In October 2018, 3M and other defendants, including DuPont and Chemours, were named in a putative class action in the U.S. District Court for the Southern District of Ohio. The named plaintiff, a firefighter allegedly exposed to PFAS chemicals through his use of firefighting foam, purports to represent a class of "all individuals residing within the United States who, at the time a class is certified in this case, have detectable levels of PFAS materials in their blood serum." The plaintiff brings claims for negligence, battery, and conspiracy, but does not seek damages for personal injury, medical monitoring, or property damage. Instead, the plaintiff seeks an order finding the defendants "are liable and responsible for the PFAS in Plaintiff's and the class members' blood and/or bodies" and an order "establishing an independent panel of scientists" to be "tasked with independently studying, evaluating, reviewing, identifying, publishing, and notifying/informing the Class" of research results.

In March 2019, the New Jersey Department of Environmental Protection (NJDEP) issued a directive, information request and notice to Solvay, DuPont, Chemours, and 3M relating to PFAS. The NJDEP, in its effort to obtain a "full understanding" of Respondents' historical and current "development, manufacture, transport, use, storage, release, discharge, and/or disposal of PFAS in New Jersey,"

requested information from each respondent and a collective meeting with the NJDEP to discuss costs to "investigate, test, treat, cleanup, and remove" PFAS from New Jersey's environment.

*Other Environmental Litigation*

In July 2018, the Company, along with more than 120 other companies, was served with a complaint seeking cost recovery and contribution towards the cleaning up of approximately eight miles of the Lower Passaic River in New Jersey. The plaintiff, Occidental Chemical Corporation, alleges that it agreed to design and pay the estimated $165 million cost to remove and cap sediment containing eight chemicals of concern, including PCBs and dioxins. The complaint seeks to spread those costs among the defendants, including the Company. The Company's involvement in the case relates to its past use of two commercial drum conditioning facilities in New Jersey. Whether, and to what extent, the Company may be required to contribute to the costs at issue in the case remains to be determined.

For environmental matters and litigation described above, no liability has been recorded as the Company believes liability in those matters is not probable and estimable and the Company is not able to estimate a possible loss or range of loss at this time, except for those matters described below.

*Environmental Liabilities and Insurance Receivables*

The Company periodically examines whether the contingent liabilities related to the environmental matters and litigation described above are probable and estimable based on experience and developments in those matters. During the first quarter of 2019, the EPA issued its PFAS Action Plan and the Company settled the litigation with the Water Authority (both matters are described in more detail above). The Company recently completed a comprehensive review with the assistance of environmental consultants and other experts regarding environmental matters and litigation related to historical PFAS manufacturing operations in Minnesota, Alabama, Gendorf Germany, and at four former landfills in Alabama. As a result of these developments and of that review, the Company increased its accrual for "other environmental liabilities" by $235 million pre-tax (including the settlement with the Water Authority) or $186 million after tax ($0.32 per diluted share). As of March 31, 2019, the Company had recorded liabilities of $292 million for "other environmental liabilities." This accrual represents the Company's best estimate of the probable loss: (i) to implement the Settlement Agreement and Consent Order with the MPCA (including the best estimate of the probable liability under the settlement of the NRD Lawsuit with the State of Minnesota for interim treatment of municipal and private wells), (ii) the remedial action agreement with ADEM,  (iii) mitigation plans for the presence of PFAS in the soil and groundwater at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury), (iv) to cover certain environmental matters and litigation in which 3M is a defendant related to the manufacture and disposal of PFAS at five 3M facilities, including three in the United States and two in Europe. The Company is not able to estimate a possible loss or range of loss in excess of the established accruals at this time.

As of March 31, 2019, the Company had recorded liabilities of $25 million for estimated non-PFAS related "environmental remediation" costs to clean up, treat, or remove hazardous substances at current or former 3M manufacturing or third-party sites. The Company evaluates available facts with respect to each individual site each quarter and records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods. Developments may occur that could affect the Company's current assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to

40

operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

The Company has both pre-1986 general and product liability occurrence coverage and post-1985 occurrence reported product liability and other environmental coverage for environmental matters and litigation. As of March 31, 2019, the Company's receivable for insurance recoveries related to the environmental matters and litigation was $33 million. The Company increased its receivables for insurance recoveries by $25 million in the first quarter of 2019 related to these matters. Various factors could affect the timing and amount of recovery of this and future expected increases in the receivable, including (i) delays in or avoidance of payment by insurers; (ii) the extent to which insurers may become insolvent in the future, (iii) the outcome of negotiations with insurers, and (iv) the scope of the insurers' purported defenses and exclusions to avoid coverage.

*Product Liability Litigation*

As of March 31, 2019, the Company is a named defendant in lawsuits involving approximately 5,080 plaintiffs (compared to approximately 5,015 plaintiffs at December 31, 2018) who allege the Bair Hugger™ patient warming system caused a surgical site infection. Nearly all of the lawsuits are pending in federal court in Minnesota. The plaintiffs claim they underwent various joint arthroplasty, cardiovascular, and other surgeries and later developed surgical site infections due to the use of the Bair Hugger™ patient warming system (the Bair Hugger™ product line was acquired by 3M as part of the 2010 acquisition of Arizant, Inc., a leading manufacturer of patient warming solutions designed to prevent hypothermia and maintain normal body temperature in surgical settings). The plaintiffs seek damages and other relief based on theories of strict liability, negligence, breach of express and implied warranties, failure to warn, design and manufacturing defect, fraudulent and/or negligent misrepresentation/concealment, unjust enrichment, and violations of various state consumer fraud, deceptive or unlawful trade practices and/or false advertising acts.

The U.S. Judicial Panel on Multidistrict Litigation (JPML) granted the plaintiffs' motion to transfer and consolidate all cases pending in federal courts to the U.S. District Court for the District of Minnesota to be managed in a multi-district litigation (MDL) proceeding. In 2017, the U.S. District Court and the Minnesota state courts denied the plaintiffs' motions to amend their complaints to add claims for punitive damages. At a joint hearing before the U.S. District Court and the Minnesota State court, on the parties' motion to exclude each other's experts, and 3M's motion for summary judgment with respect to general causation, the federal court did not exclude the plaintiffs' experts and denied 3M's motion for summary judgment on general causation. The U.S. District Court is reconsidering that decision. In January 2018, the state court, after hearing the same arguments, excluded plaintiffs' experts and granted 3M's motion for summary judgment on general causation, dismissing all 61 cases pending before the state court in Minnesota. Plaintiffs appealed that ruling and the state court's punitive damages ruling. In January 2019, the Minnesota Court of Appeals affirmed the Minnesota state court orders in their entirety. The Minnesota Supreme Court denied plaintiffs' petition for review.

In April 2018, the federal court partially granted 3M's motion for summary judgment in the first bellwether case, leaving for trial a claim for strict liability based upon design defect. The court dismissed the plaintiff's claims for negligence, failure to warn, and common law and statutory fraud. In the trial of the first bellwether case in May 2018, the jury returned a unanimous verdict in 3M's favor finding that the Bair Hugger™ patient warming system was not defective and was not the cause of the plaintiff's injury. The plaintiff has appealed the verdict to the U.S. Court of Appeals for the Eighth Circuit. Of the other 12 bellwether cases designated for trial, the courts or the plaintiffs have so far dismissed 11 cases. The remaining bellwether case had been set for trial in May 2019, but the federal court has postponed that trial pending ruling in defendants' motion to reconsider.

3M is also defending two state court actions. One case is pending in Hidalgo County, Texas and combines Bair Hugger product liability claims with medical malpractice claims and set for trial in September 2019. Another case is pending in Ramsey County, Minnesota, and was filed after the Minnesota state court's summary judgment ruling.

In June 2016, the Company was served with a putative class action filed in the Ontario Superior Court of Justice for all Canadian residents who underwent various joint arthroplasty, cardiovascular, and other surgeries and later developed surgical site infections due to the use of the Bair Hugger™ patient warming system. The representative plaintiff seeks relief (including punitive damages) under Canadian law based on theories similar to those asserted in the MDL. No liability has been recorded for the Bair Hugger™ litigation because the Company believes that any such liability is not probable and estimable at this time.

41

Table of Contents

In September 2011, 3M Oral Care launched Lava Ultimate CAD/CAM dental restorative material. The product was originally indicated for inlay, onlay, veneer, and crown applications. In June 2015, 3M Oral Care voluntarily removed crown applications from the product's instructions for use, following reports from dentists of patients' crowns debonding, requiring additional treatment. The product remains on the market for other applications. 3M communicated with the U.S. Food and Drug Administration, as well as regulators outside the United States. 3M also informed customers and distributors of its action, offered to accept return of unused materials and provide refunds. In May 2018, 3M reached a preliminary settlement for an amount that did not have a material impact to the Company of the lawsuit pending in the U.S. District Court for the District of Minnesota that sought certification of a class of dentists in the United States and its territories. The settlement is subject to the court's approval and certification of the settlement class, with a right of class members to opt-out of the settlement and bring individual claims against the Company.

Aearo Technologies sold Dual-Ended Combat Arms – Version 2 earplugs starting in 2006. 3M acquired Aearo Technologies in 2008 and sold these earplugs from 2008 through 2015, when the product was discontinued. In December 2018, a military veteran filed an individual lawsuit against 3M in the San Bernardino Superior Court in California alleging that he sustained personal injuries while serving in the military caused by 3M's Dual-Ended Combat Arms earplugs – Version 2. The plaintiff asserts claims of product liability and fraudulent misrepresentation and concealment. The plaintiff seeks various damages, including medical and related expenses, loss of income, and punitive damages. As of March 31, 2019, the Company is a named defendant in approximately 635 lawsuits (including 6 putative class actions) in various state and federal courts that purport to represent approximately 1,700 individual claimants making similar allegations. In April 2019, th e U.S. Judicial Panel on Multidistrict Litigation granted motions to transfer and consolidate all cases pending in federal courts to the U.S. District Court for the Northern District of Florida to be managed in a multi-district litigation (MDL) proceeding to centralize pre-trial proceedings.

For product liability litigation matters described in this section for which a liability has been recorded, the Company believes the amount recorded is not material to the Company's consolidated results of operations or financial condition. In addition, the Company is not able to estimate a possible loss or range of loss in excess of the established accruals at this time.

**NOTE 15.  Leases**

The Company adopted ASU No. 2016-02 and related standards (collectively ASC 842, *Leases* ), which replaced previous lease accounting guidance, on January 1, 2019 using the modified retrospective method of adoption. 3M elected the transition method expedient which allows entities to initially apply the requirements by recognizing a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. As a result of electing this transition method, prior periods have not been restated. Due to the cumulative net impact of adopting ASC 842, the January 1, 2019 balance of retained earnings was increased by $14 million, primarily relating to previously deferred gains from sale-leaseback transactions. In addition, adoption of the new standard resulted in the recording of right of use assets and associated lease liabilities of $0.8 billion each as of January 1, 2019. The Company's accounting for finance leases (previously called capital leases) remains substantially unchanged. ASC 842 did not have a material impact on 3M's consolidated income statement. 3M elected the package of practical expedients permitted under the transition guidance within ASC 842, which includes not reassessing lease classification of existing leases. The Company did not elect the hindsight practical expedient.

3M determines if an arrangement is a lease upon inception. A contract is or contains a lease if the contract conveys the right to control the use of an identified asset for a period of time in exchange for consideration. The right to control the use of an asset includes the right to obtain substantially all of the economic benefits of the underlying asset and the right to direct how and for what purpose the asset is used. 3M determines certain service agreements that contain the right to use an underlying asset are not leases because 3M does not control how and for what purpose the identified asset is used. Examples of such agreements include master supply agreements, product processing agreements, warehouse and distribution services agreements, power purchase agreements, and transportation purchase agreements.

Operating lease right-of-use assets and liabilities are recognized at commencement date based on the present value of lease payments over the lease term. The discount rate used to calculate present value is 3M's incremental borrowing rate or, if available, the rate implicit in the lease. 3M determines the incremental borrowing rate for each lease based primarily on its lease term and the economic environment of the applicable country or region.

**3M COMPANY**
**FORM 10-Q**
**For the Quarterly Period Ended March 31, 2019**
**PART II.  Other Information**

**Item 1.  Legal Proceedings.**

Discussion of legal matters is incorporated by reference from Part I, Item 1, Note 14, "Commitments and Contingencies" of this document, and should be considered an integral part of Part II, Item 1, "Legal Proceedings."

**Item 1A.  Risk Factors.**

Provided below is a cautionary discussion of what we believe to be the most important risk factors applicable to the Company. Discussion of these factors is incorporated by reference into and considered an integral part of Part I, Item 2, "Management's Discussion and Analysis of Financial Conditions and Results of Operations."

* *Results are impacted by the effects of, and changes in, worldwide economic, political, regulatory, capital markets and other external conditions.* The Company operates in more than 70 countries and derives approximately 60 percent of its revenues from outside the United States. The Company's business is subject to global competition and geopolitical risks and may be adversely affected by factors in the United States and other countries that are beyond its control, such as slower economic growth, disruptions in financial markets, economic downturns in the form of either contained or widespread recessionary conditions, inflation, elevated unemployment levels, sluggish or uneven recovery, government actions impacting international trade agreements, imposing trade restrictions such as tariffs, and retaliatory counter measures, government deficit reduction and other austerity measures in specific countries or regions, or in the various industries in which the Company operates; social, political or labor conditions in specific countries or regions; natural and other disasters affecting the operations of the Company or its customers and suppliers; or adverse changes in the availability and cost of capital, interest rates, tax rates, tax laws, or exchange control, ability to expatriate earnings and other regulations in the jurisdictions in which the Company operates. Natural occurrences and human activities are increasingly releasing greenhouse gases into the atmosphere, contributing to changes in the earth's climate. Climate change, as well as related environmental and social regulations, may negatively impact the Company or its customers and suppliers, in terms of availability and cost of natural resources, sources and supply of energy, product demand and manufacturing, and the health and well-being of individuals and communities in which we operate.

* *Change in the Company's credit ratings could increase cost of funding.* The Company's credit ratings are important to 3M's cost of capital. The major rating agencies routinely evaluate the Company's credit profile and assign debt ratings to 3M. This evaluation is based on a number of factors, which include financial strength, business and financial risk, as well as transparency with rating agencies and timeliness of financial reporting. 3M currently has an AA- credit rating with a stable outlook from Standard & Poor's and has an A1 credit rating with a stable outlook from Moody's Investors Service. The Company's credit ratings have served to lower 3M's borrowing costs and facilitate access to a variety of lenders. The addition of further leverage to the Company's capital structure could impact 3M's credit ratings in the future. Failure to maintain strong investment grade ratings would adversely affect the Company's cost of funding and could adversely affect liquidity and access to capital markets.

* *The Company's results are affected by competitive conditions and customer preferences.* Demand for the Company's products, which impacts revenue and profit margins, is affected by (i) the development and timing of the introduction of competitive products; (ii) the Company's response to downward pricing to stay competitive; (iii) changes in customer order patterns, such as changes in the levels of inventory maintained by customers and the timing of customer purchases which may be affected by announced price changes, changes in the Company's incentive programs, or the customer's ability to achieve incentive goals; (iv) changes in customers' preferences for our products, including the success of products offered by our competitors, and changes in customer designs for their products that can affect the demand for some of the Company's products; and (v) changes in the business environment related to disruptive technologies, such as artificial intelligence, block-chain, expanded analytics and other enhanced learnings from increasing volume of available data.

* *Foreign currency exchange rates and fluctuations in those rates may affect the Company's ability to realize projected growth rates in its sales and earnings.* Because the Company's financial statements are denominated in U.S. dollars and approximately 60 percent of the Company's revenues are derived from outside the United States, the Company's results of operations and its ability to realize

72

projected growth rates in sales and earnings could be adversely affected if the U.S. dollar strengthens significantly against foreign currencies.

* *The Company's growth objectives are largely dependent on the timing and market acceptance of its new product offerings, including its ability to continually renew its pipeline of new products and to bring those products to market.* This ability may be adversely affected by difficulties or delays in product development, such as the inability to identify viable new products, obtain adequate intellectual property protection, or gain market acceptance of new products. There are no guarantees that new products will prove to be commercially successful.

* *The Company's future results are subject to fluctuations in the costs and availability of purchased components, compounds, raw materials and energy, including oil and natural gas and their derivatives, due to shortages, increased demand, supply interruptions, currency exchange risks, natural disasters and other factors.* The Company depends on various components, compounds, raw materials, and energy (including oil and natural gas and their derivatives) supplied by others for the manufacturing of its products. It is possible that any of its supplier relationships could be interrupted due to natural and other disasters and other events, or be terminated in the future. Any sustained interruption in the Company's receipt of adequate supplies could have a material adverse effect on the Company. In addition, while the Company has a process to minimize volatility in component and material pricing, no assurance can be given that the Company will be able to successfully manage price fluctuations or that future price fluctuations or shortages will not have a material adverse effect on the Company.

* *Acquisitions, strategic alliances, divestitures, and other unusual events resulting from portfolio management actions and other evolving business strategies, and possible organizational restructuring could affect future results.* The Company monitors its business portfolio and organizational structure and has made and may continue to make acquisitions, strategic alliances, divestitures and changes to its organizational structure. With respect to acquisitions, future results will be affected by the Company's ability to integrate acquired businesses quickly and obtain the anticipated synergies. The Company has recently announced the realignment from five to four business segments to better serve its global customers and markets. Successful execution of these and other organizational changes will be important to the Company's future results.

* *The Company's future results may be affected by its operational execution, including scenarios where the Company generates fewer productivity improvements than estimated.* The Company's financial results depend on the successful execution of its business operating plans. The Company utilizes various tools, such as Lean Six Sigma, and engages in ongoing global business transformation. Business transformation is defined as changes in processes and internal/external service delivery across 3M to move to more efficient business models to improve operational efficiency and productivity, while allowing 3M to serve customers with greater speed and efficiency. This is enabled by the ongoing multi-year phased implementation of an enterprise resource planning (ERP) system on a worldwide basis. There can be no assurance that all of the projected productivity improvements will be realized. Operational challenges, including those related to productivity improvements, could have a material adverse effect on the Company's business, financial conditions and results of operations.

* *The Company employs information technology systems to support its business, including ongoing phased implementation of an ERP system as part of business transformation on a worldwide basis over the next several years. Security breaches and other disruptions to the Company's information technology infrastructure could interfere with the Company's operations, compromise information belonging to the Company or its customers, suppliers, and employees, exposing the Company to liability which could adversely impact the Company's business and reputation.* In the ordinary course of business, the Company relies on centralized and local information technology networks and systems, some of which are managed by third parties, to process, transmit and store electronic information, and to manage or support a variety of businesses. Additionally, the Company collects and stores certain data, including proprietary business information, and may have access to confidential or personal information in certain of our businesses that is subject to privacy and security laws, regulations and customer-imposed controls. Despite our cybersecurity measures (including employee and third-party training, monitoring of networks and systems, patching, maintenance, and backup of systems and data), the Company's information technology networks and infrastructure may still be vulnerable to damage, disruptions or shutdowns due to attacks by hackers, breaches, employee error or malfeasance, power outages, computer viruses, ransomware, telecommunication or utility failures, systems failures, service or cloud provider breaches, natural disasters or other catastrophic events. It is possible for such vulnerabilities to remain undetected for an extended period, up to and including several years. While we have experienced, and expect to continue to experience, these types of vulnerabilities to the Company's information technology networks and infrastructure, none of them to date has had a material impact to the Company. There may be other challenges and risks as the Company upgrades and standardizes its ERP system on a worldwide basis. Any such events could result in legal claims or proceedings, liability or penalties

73

Table of Contents

under privacy laws, disruptions or shutdowns, and damage to the Company's reputation, which could adversely affect the Company's business. Although the Company maintains insurance coverage for various cybersecurity and business continuity risks, there can be no guarantee that all costs or losses incurred will be fully insured.

*\* The Company's defined benefit pension and postretirement plans are subject to financial market risks that could adversely impact our results.* The performance of financial markets and discount rates impact the Company's funding obligations under its defined benefit plans. Significant changes in market interest rates, decreases in the fair value of plan assets and investment losses on plan assets, and relevant legislative or regulatory changes relating to defined benefit plan funding may increase the Company's funding obligations and adversely impact its results of operations and cash flows.

*\* The Company's future results may be affected by various legal and regulatory proceedings and legal compliance risks, including those involving product liability, antitrust, intellectual property, environmental, the U.S. Foreign Corrupt Practices Act and other anti-bribery laws, U.S. trade sanctions compliance, or other matters.* The outcome of these legal proceedings may differ from the Company's expectations because the outcomes of litigation, including regulatory matters, are often difficult to reliably predict. Various factors or developments can lead the Company to change current estimates of liabilities and related insurance receivables where applicable, or make such estimates for matters previously not susceptible of reasonable estimates, such as a significant judicial ruling or judgment, a significant settlement, significant regulatory developments or changes in applicable law. A future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect on the Company's results of operations or cash flows in any particular period. For a more detailed discussion of the legal proceedings involving the Company and the associated accounting estimates, see the discussion in Note 14 "Commitments and Contingencies" within the Notes to Consolidated Financial Statements.

**Item 2.  <u>Unregistered Sales of Equity Securities and Use of Proceeds.</u>**

**Issuer Purchases of Equity Securities**

Repurchases of 3M common stock are made to support the Company's stock-based employee compensation plans and for other corporate purposes. In November 2018, 3M's Board of Directors replaced the Company's February 2016 repurchase program with a new repurchase program. This new program authorizes the repurchase of up to $10 billion of 3M's outstanding common stock, with no pre-established end date.

**Issuer Purchases of Equity Securities (registered pursuant to Section 12 of the Exchange Act)**

| Period | Total Number of Shares Purchased (1) | | Average Price Paid per Share | | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs (2) | | Maximum Approximate Dollar Value of Shares that May Yet Be Purchased under the Plans or Programs (Millions) |
|---|---|---|---|---|---|---|---|
| January 1-31, 2019 | 1,723,445 | $ | 192.18 | | 1,723,187 | $ | 9,065 |
| February 1-28, 2019 | 1,052,365 | $ | 204.91 | | 1,048,301 | $ | 8,850 |
| March 1-31, 2019 | 355,200 | $ | 204.83 | | 355,200 | $ | 8,777 |
| Total January 1-March 31, 2019 | 3,131,010 | $ | 197.89 | | 3,126,688 | $ | 8,777 |

(1)  The total number of shares purchased includes: (i) shares purchased under the Board's authorizations described above, and (ii) shares purchased in connection with the exercise of stock options.

(2)  The total number of shares purchased as part of publicly announced plans or programs includes shares purchased under the Board's authorizations described above.