UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| In re 3M COMPANY SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Civ. No. 0:20-cv-02488-NEB-KMM

<u>CLASS ACTION</u>

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 5

　　3M's Knowledge of the Dangers of PFAS................................................... 5

　　3M Faces an Onslaught of PFAS-Related Litigation and Tightening
　　　　Drinking Water Standards.................................................................... 7

　　3M Claims *De Minimis* Liabilities Arising from Its Manufacture and
　　　　Disposal of PFAS .................................................................................. 8

　　3M's Settlement with the Minnesota A.G. Enhanced 3M's Exposure to
　　　　Other Suits........................................................................................... 10

　　3M Delinquently Admits Liabilities Associated with PFAS ..................... 11

ARGUMENT............................................................................................................ 14

I.　THE COMPLAINT PLEADS FALSITY ............................................................ 15

　　A.　The Complaint Pleads Defendants' False and Misleading Statements
　　　　and Omissions ................................................................................ 15

　　　　1.　3M's Accruals Were False and Misleading ................................... 16

　　　　　　a.　3M's Unrealistic Accruals Violated GAAP......................... 17

　　　　　　b.　3M Had a Clear Duty under GAAP to Quantify a
　　　　　　　　Reasonable "Range of Loss" Related to PFAS..................... 24

　　　　2.　3M Accompanied Its *De Minimis* Reserves with False and
　　　　　　Misleading Assurances that Further Liabilities Were Not
　　　　　　Material ...................................................................................... 27

　　　　3.　Following the Minnesota A.G. Settlement, Roman's Denial of
　　　　　　"Any Shoes to Drop," "Similar Issues in Other States," or
　　　　　　"Precedent for Other States" Was False and Misleading................. 31

　　　　4.　Gangestad's Claim that 3M's "Liability Around Our 5
　　　　　　Manufacturing Sites and Disposal of PFAS" Is
　　　　　　"Ring-Fenced" Was False and Misleading ..................................... 32

　　B.　The Court Should Reject Defendants' Other Falsity-Based
　　　　Arguments ..................................................................................... 34

**Page**

1.      Defendants' Statements Are Not "Protected Opinions" .................. 34

2.      Defendants' Statements Are Not Protected by the Safe Harbor ...... 37

        a.      Defendants' Alleged False Statements Were Not
                Forward-Looking ................................................................. 37

        b.      Defendants' Purported Cautionary Language Was Not
                "Meaningful" ....................................................................... 38

3.      Defendants' "Puzzle Pleading" Argument is Misplaced ................ 40

II.    THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER ......... 41

       A.     Plaintiffs Have Alleged Facts Demonstrating a Mental State
              Embracing an Intent to Deceive, Manipulate, or Defraud .......................... 41

       B.     3M's Failure to Take an Appropriate Reserve Was at Least Reckless ....... 49

       C.     Plaintiffs Have Alleged the Individual Defendants' Motive and
              Opportunity to Commit Fraud .................................................................... 50

       D.     Defendants' Proposed Alternative Inference that They Acted in
              "Good Faith" Is Neither Cogent nor Compelling ....................................... 54

III.   THE COMPLAINT PLEADS LOSS CAUSATION ............................................. 55

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Acme Precision Prods., Inc. v. Am. Alloys Corp.*,
  422 F.2d 1395 (8th Cir. 1970) .................................................................. 45

*Arnlund v. Deloitte & Touche LLP*,
  199 F.Supp.2d 461 (E.D. Va. 2002) ......................................................... 48

*Barrie v. IntervoiceBrite, Inc.*,
  397 F.3d 249 (5th Cir. 2005) .................................................................... 16

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F.Supp.3d 1035 (D. Minn. 2015) ........................................................ 14

*Brogren v. Pohlad*,
  960 F.Supp. 1401 (D. Minn. 1997) ........................................................... 36

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ..................................................................... 56

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) .................................................................... 51

*Chapman v. Mueller Water Prods., Inc.*,
  466 F.Supp.3d 382 (S.D.N.Y. 2020) ........................................................ 24

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*,
  2013 WL 1100819
  (W.D. La. Mar. 15, 2013) ........................................................................ 58

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
  2011 WL 2650717
  (W.D. Mich. July 6, 2011) ........................................................................ 40

*De Vito v. Liquid Holdings Grp., Inc.*,
  2018 WL 6891832
  (D.N.J. Dec. 31, 2018) ............................................................................. 56

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................. 55

*Elam v. Neidorff*,
  544 F.3d 921 (8th Cir. 2008) ............................................................... 23, 42

**Page**

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)..................................................................... 51

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .................................................................*passim*

*Freedman v. St. Jude Med., Inc.*,
  4 F.Supp.3d 1101 (D. Minn. 2014).................................................... 15, 31, 32

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F.Supp.2d 171 (S.D.N.Y. 2010)........................................................... 50

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591
  (E.D.N.Y. July 26, 2016) .......................................................................... 46

*Godinez v. Alere Inc.*,
  272 F.Supp.3d 201 (D. Mass. 2017) ........................................................... 19

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
  2011 WL 1257756
  (N.D. Ohio Mar. 31, 2011)......................................................................... 19

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
  958 F.Supp.2d 1065 (D. Minn. 2013)......................................................... 38

*In re 2007 Novastar Fin. Sec. Litig., Inc.*,
  579 F.3d 878 (8th Cir. 2009) ..................................................................... 40

*In re Acceptance Ins. Cos. Sec. Litig.*,
  423 F.3d 899 (8th Cir. 2005) ..................................................................... 24

*In re Am. Italian Pasta Co. Sec. Litig.*,
  2006 WL 1715168
  (W.D. Mo. June 19, 2006) ..................................................................... 41, 45

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F.Supp.2d 241 (S.D.N.Y. 2010)........................................................... 16

*In re Apogee Enters., Inc. Sec. Litig.*,
  2020 WL 1445856
  (D. Minn. Mar. 25, 2020)........................................................................... 23

**Page**

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F.Supp.2d 564 (S.D.N.Y. 2013) ........................................................................ 29

*In re Bayer AG Sec. Litig.*,
2004 WL 2190357
(S.D.N.Y. Sept. 30, 2004) ............................................................................ 18, 19, 20

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F.Supp.2d 148 (S.D.N.Y. 2008) ........................................................................ 56

*In re Bristol-Myers Squibb Sec. Litig.*,
2005 WL 2007004
(D.N.J. Aug. 17, 2005) .............................................................................................. 54

*In re Buffets, Inc. Sec. Litig.*,
906 F.Supp. 1293 (D. Minn. 1995) ........................................................................... 51

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ................................................................................... 16

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F.Supp.2d 688 (S.D. Ohio 2006) ....................................................................... 51

*In re CenturyLink Sales Practices & Sec. Litig.*,
403 F.Supp.3d 712 (D. Minn. 2019) ................................................................*passim*

*In re Cirrus Logic, Inc.*,
2008 WL 4065925
(W.D. Tex. Aug. 28, 2008) ....................................................................................... 48

*In re CitiGroup Inc. Bond Litig.*,
723 F.Supp.2d 568 (S.D.N.Y. 2010) .............................................................. 19, 21, 22

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
469 F.Supp.2d 88 (S.D.N.Y. 2006) .......................................................................... 53

*In re Frontier Commc'ns, Corp. S'holders Litig.*,
2019 WL 1099075
(D. Conn. Mar. 8, 2019) ..................................................................................... 56, 57

*In re Gentiva Sec. Litig.*,
932 F.Supp.2d 352 (E.D.N.Y. 2013) ........................................................................ 58

**Page**

*In re Grand Casinos Sec. Litig.*,
   988 F.Supp. 1273 (D. Minn. 1997) ............................................................. 34

*In re K-tel Int'l, Inc. Sec. Litig.*,
   300 F.3d 881 (8th Cir. 2002) ............................................................. 23, 50

*In re LDK Solar Sec. Litig.*,
   584 F.Supp.2d 1230 (N.D. Cal. 2008) ........................................................ 49

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
   639 F.Supp.2d 1038 (N.D. Cal. 2009) ........................................................ 57

*In re Medtronic Inc., Sec. Litig.*,
   618 F.Supp.2d 1016 (D. Minn. 2009) ..................................................... 51, 52

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F.Supp.2d 277 (S.D.N.Y. 2013) ........................................................... 54

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F.Supp.2d 620 (E.D. Va. 2000) ........................................................... 53

*In re Miller Energy Res. Sec. Litig.*,
   2014 WL 415730
   (E.D. Tenn. Feb. 4, 2014) ...................................................................... 57

*In re MoneyGram Int'l, Inc. Sec. Litig.*,
   626 F.Supp.2d 947 (D. Minn. 2009) ....................................................... 17, 58

*In re Nash Finch Co. Sec. Litig.*,
   502 F.Supp.2d 861 (D. Minn. 2007) ....................................................... 38, 52

*In re Navarre Corp. Sec. Litig.*,
   295 F.3d 791 (8th Cir. 2002) ................................................................... 52

*In re Novatel Wireless Sec. Litig.*,
   830 F.Supp.2d 996 (S.D. Cal. 2011) ........................................................... 57

*In re Oxford Health Plans, Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y.1999) ........................................................... 52, 53

**Page**

*In re Pemstar, Inc. Sec. Litig.*,
  2003 WL 21975563
  (D. Minn. Aug. 15, 2003)......................................................................................... 29

*In re Peritus Software Servs., Inc. Sec. Litig.*,
  52 F.Supp.2d 211 (D. Mass. 1999) ........................................................................... 54

*In re Perrigo Co. PLC Sec. Litig.*,
  435 F.Supp.3d 571 (S.D.N.Y. 2020).....................................................................*passim*

*In re Raytheon Sec. Litig.*,
  157 F.Supp.2d 131 (D. Mass. 2001) .......................................................................... 50

*In re Refco, Inc. Sec. Litig.*,
  503 F.Supp.2d 611 (S.D.N.Y. 2007)........................................................................... 44

*In re Reliance Sec. Litig.*,
  91 F.Supp.2d 706 (D. Del. 2000)............................................................................... 37

*In re Retek Inc. Sec. Litig.*,
  621 F.Supp.2d 690 (D. Minn. 2009)........................................................................... 55

*In re Rhythms Sec. Litig.*,
  300 F.Supp.2d 1081 (D. Colo. 2004).......................................................................... 56

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
  729 F.Supp.2d 1276 (N.D. Okla. 2010)....................................................................... 46

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889
  (S.D.N.Y. Nov. 26, 2018) ......................................................................................... 35

*In re Silver Wheaton Corp. Sec. Litig.*,
  2016 WL 3226004
  (C.D. Cal. June 6, 2016)............................................................................................ 50

*In re St. Jude, Med. Inc. Sec. Litig.*,
  836 F.Supp.2d 878 (D. Minn. 2011)................................................................. 39, 40, 55

*In re St. Paul Travelers Sec. Litig. II*,
  2006 WL 2735221
  (D. Minn. Sept. 25, 2006) ......................................................................................... 45

**Page**

*In re StaffMark, Inc. Sec. Litig.*,
123 F.Supp.2d 1160 (E.D. Ark. 2000) .......................................................................... 36

*In re Target Corp. Sec. Litig.*,
955 F.3d 738 (8th Cir. 2020) ....................................................................................... 41

*In re Toyota Motor Corp. Sec. Litig.*,
2011 WL 2675395
(C.D. Cal. July 7, 2011) ............................................................................................... 49

*In re UnitedHealth Grp. PSLRA Litig.*,
2007 WL 1621456
(D. Minn. June 4 2007) ............................................................................................... 14

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F.Supp.3d 635 (E.D. Pa. 2015) ............................................................................ 46

*In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*,
286 F.Supp.2d 1047 (D. Minn. 2003) .......................................................................... 42

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ........................................................................................ 42

*Kanefsky v. Honeywell Int'l Inc.*,
2020 WL 2520669
(D.N.J. May 18, 2020) ................................................................................................. 19

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
708 F.Supp.2d 334 (S.D.N.Y. 2010) ........................................................................... 56

*Kushner v. Beverly Enters. Inc.*,
317 F.3d 820 (8th Cir. 2003) ....................................................................................... 32

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
2011 U.S. Dist. LEXIS 60761
(N.D. Ala. June 7, 2011) .............................................................................................. 50

*Luna v. Marvell Tech. Grp. Ltd.*,
2016 WL 5930655
(N.D. Cal. Oct. 12, 2016) ............................................................................................. 24

**Page**

*Lustgraaf v. Behrens*,
    619 F.3d 867 (8th Cir. 2010) ...................................................................... 15

*Malone v. Microdyne Corp.*,
    26 F.3d 471 (4th Cir. 1994) ........................................................................ 17

*Mulligan v. Impax Labs., Inc.*,
    36 F.Supp.3d 942 (N.D. Cal. 2014) ........................................................... 43

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...........................................................................*passim*

*Podraza v. Whiting*,
    790 F.3d 828 (8th Cir. 2015) ...................................................................... 49

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ...................................................................... 45

*Rand-Heart of NY, Inc. v. Dolan*,
    812 F.3d 1172 (8th Cir. 2016) .................................................................... 39

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................ 46, 48

*Rehm v. Eagle Fin. Corp.*,
    954 F.Supp. 1246 (N.D. Ill. 1997) ............................................................. 48

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562
    (C.D. Cal. Feb. 27, 2015) ........................................................................... 46

*S. Ferry LP #2 v. Killinger*,
    687 F.Supp.2d 1248 (W.D. Wash. 2009) .................................................... 47

*S.E.C. v. Brincat*,
    2001 WL 1662099
    (N.D. Ill. Dec. 6, 2001) .............................................................................. 55

*S.E.C. v. RPM Int'l, Inc.*,
    282 F.Supp.3d 1 (D.D.C. 2017) ................................................................. 34

**Page**

*S.E.C. v. Syron*,
  934 F.Supp.2d 609 (S.D.N.Y. 2013) .......................................................................... 30

*S.E.C. v. True N. Fin. Corp.*,
  909 F.Supp.2d 1073 (D. Minn. 2012) ........................................................................ 29

*Sanchez v. Centene Corp.*,
  407 F.Supp.3d 831 (E.D. Mo. 2019) ............................................................... 15, 33, 47

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ..................................................................................... 43

*Schuh v. HCA Holdings, Inc.*,
  947 F.Supp.2d 882 (M.D. Tenn. 2013) ....................................................................... 16

*Schuster v. Anderson*,
  413 F.Supp.2d 983 (N.D. Iowa 2005) ......................................................................... 56

*Sec. & Exch. Comm'n v. C. Jones & Co.*,
  2009 WL 539615
  (D. Colo. Mar. 3, 2009) ............................................................................................. 36

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) ....................................................................................... 34

*Silverman v. Motorola, Inc.*,
  2008 WL 4360648
  (N.D. Ill. Sept. 23, 2008) ........................................................................................... 55

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ..................................................................................... 36

*Stephenson v. Deutsche Bank AG*,
  282 F.Supp.2d 1032 (D. Minn. 2003) .................................................................... 14, 40

*Stevelman v. Alias Res. Inc.*,
  174 F.3d 79 (2d Cir. 1999) ......................................................................................... 53

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ........................................................................................ 14, 41, 50

**Page**

*White v. Heartland High-Yield Mun. Bond-Fund*,
  2005 WL 5954971
  (E.D. Wis. Nov. 28, 2005) ...................................................................................... 49

*Whitney v. Guys, Inc.*,
  700 F.3d 1118 (8th Cir. 2012) ................................................................................ 14

*Williams v. Roper*,
  2016 WL 4368097
  (E.D. Mo. Aug. 16, 2016) ....................................................................................... 19

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b) ...................................................................................................................... 58
  §78j(b)-5 .................................................................................................................... 17
  §78j(b)-5-1 ........................................................................................................... 51, 54
  §78t(b) ....................................................................................................................... 58
  §78u-5(c)(1)(A)(i) ..................................................................................................... 38
  §78u–5(c)(1)(B)(i) ..................................................................................................... 40
  §78z ........................................................................................................................... 48

## SECONDARY AUTHORITIES

Michael J. Kaufman & John M. Wunderlich, *Messy Mental Markers: Inferring Scienter from Core Operations in Securities Fraud Litigation*, 73 Ohio State L.J. 507, 517 (2012) .................................................................................................................. 41, 42

## PRELIMINARY STATEMENT

3M distributed toxic PFAS for generations while knowingly concealing the health and environmental dangers of these poisonous chemicals.  That is not in dispute.  The Company faces material liabilities from this decades-long misconduct, having to date paid or reserved well *over a billion dollars* for PFAS-related liabilities, with securities analysts estimating that the Company's true exposures are many billions more.  Defendants reserved *as little as $25 million* for this historical *multi-billion dollar* liability during the Class Period and told investors that any further PFAS-related liabilities would "*not be material*," were "*ring-fenced*," and that there were no more "*shoes to drop*." [1]

Defendants now ask the Court to find that these obvious falsehoods were true as a matter of law.  They suggest the Court disregard the well-pleaded allegations of the Complaint, credit their alternative factual allegations and accounting pronouncements, and draw a series of implausible and unsupportable inferences in their favor.  At its heart, Defendants' motion asks the Court to endorse their factual contention that – despite all the evidence – 3M's misconduct and the liabilities arising from it were not as severe as alleged in the Complaint, in the Minnesota A.G.'s filings, or in the numerous other lawsuits and investigations that are cited in the Complaint.  Defendants will have the right to test their factual assertions at a later stage.  But Defendants' proclamation that they did nothing wrong is not a legitimate basis for dismissal.

---

[1]    Capitalized terms not defined herein are as defined in the Consolidated Amended Complaint (the "Complaint," ECF No. 44).  Unless otherwise noted, emphasis has been added and internal citations and quotations have been omitted.

*First*, the Court should reject Defendants' false factual contention that – despite the vast discrepancy between the Company's known multi-billion dollar PFAS liabilities and its *de minimis* accruals – 3M's reserves were still somehow technically compliant with Generally Accepted Accounting Principles ("GAAP"). Defendants' accounting arguments are both groundless and premature.

The allegations of the Complaint are more than sufficient to allege GAAP violations. Indeed, far greater losses were both "probable" and "reasonably estimated," and GAAP required disclosure of a "range of loss." The Complaint supports these conclusions with particularized allegations of contemporaneous facts known by Defendants – such as the nearly $900 million PFAS settlement with Minnesota's A.G. a full year before the end of the Class Period – confirming Defendants' awareness of the gravity, scope, and extent of 3M's misconduct and PFAS-related liabilities. Defendants could not avoid their clear obligation under GAAP to quantify the Company's known PFAS exposures by denying the reality of those liabilities.

The Company has in effect ***admitted*** that its PFAS reserves were materially understated by increasing them over $500 million since that time, even though Defendants have ***always had the same information*** about the Company's historical PFAS-related misconduct. Regardless, the Eighth Circuit has clearly explained that whether "reserves were an adequate response is a ***question of fact*** that cannot render the complaint[] inadequate." *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001).

- 2 -

*Second*, the Court should reject Defendants' remaining "falsity" arguments, which do not shield their materially false and misleading statements. Defendants' falsehoods were not inactionable "opinions" – indeed, the allegations of the Complaint far exceed the relevant standard because the statements contained embedded factual representations, omitted material liabilities, and establish that Defendants could not reasonably have believed that 3M faced *zero dollars* in further potential PFAS liabilities. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186-87 (2015). The plain language alleged in the Complaint likewise refutes the assertion that statements about then-existing PFAS-related exposures were somehow "forward looking" or that Defendants' boilerplate cautionary language was sufficient to warn investors about the undisclosed billions in 3M's then-existing PFAS-related exposures.

*Third*, the Court should reject Defendants' scienter arguments since the Complaint – and public record – establish an insurmountable inference of knowledge and/or recklessness. As the Minnesota A.G. explained in November 2017:

> 3M fully understood—by no later than the early 1960s—that it's disposal practices were certain to pollute groundwater[.] 3M has also been aware for many decades that the PFCs it dumped . . . posed a substantial risk to human health and the environment . . . But 3M concealed this critical fact from government regulators and the scientific community for decades. In order to protect its hundreds of millions of dollars in annual revenue from PFCs, 3M misled scientists seeking to determine the source of PFCs in peoples' blood. 3M likewise went to great lengths to distort the broader scientific community's understanding of the serious health effects posed by PFCs, funding friendly research (to which many strings were attached) while simultaneously paying money to ensure that less favorable research would be suppressed . . . 3M had reaped billions of dollars in profits from a business it had long known was causing serious harm to the environment and risk to human health.

Ex. 1 at 1-3.[2]

The notion that Defendants knew nothing about such allegations is absurd. So too is their argument that the Court should disregard the Individual Defendants' approximate $40 million in unusual personal securities sales during the Class Period, including large sales made shortly before the Company announced its settlement with the State of Minnesota. The Complaint's allegations reflect, at a minimum, "an extreme departure from the standards of ordinary care . . . that present[ed] a danger of misleading . . . either known to the defendant or is so obvious that the defendant must have been aware of it." *Green Tree*, 270 F.3d at 654.

*Finally*, the Court should reject Defendants' meritless loss causation arguments. Defendants again attempt to upend the relevant pleading standard, insisting that the Court disregard the Complaint's allegations in favor of Defendants' alternative factual narrative and inferences drawn therefrom. Here, the Complaint pleads that on April 25, 2019, 3M announced a new $235 million increase in PFAS-related reserves, leading to the Company's worst stock price decline in over thirty years. The Complaint also pleads that on July 8, 2019, Defendants announced further PFAS contamination investigations, signaling to the market that – contrary to Defendants' prior reassurances – there were in fact more PFAS "shoes to drop." This caused another steep stock price decline. That is more than sufficient to plead loss causation.

---

[2]   All references to "Ex. __" are to exhibits to the accompanying Declaration of Gregg M. Fishbein in Support of this Memorandum of Law.

- 4 -

For these and other reasons detailed herein, the Court should deny Defendants' motion to dismiss in its entirety.

## FACTUAL BACKGROUND

Beginning in the 1940s, 3M developed a class of synthetic chemical compounds called "PFAS," which can be used to manufacture a wide range of consumer and industrial products. ¶4.[3] 3M has since made billions of dollars selling PFAS and products made from them to federal and state agencies, as well as to the public. ¶¶38-39. Over the course of the Company's history, 3M has made more money from PFAS than from any other product. ¶29.

3M and many of its industrial PFAS customers (most notably DuPont) routinely disposed of PFAS and its waste byproducts into public waterways and unlined dumps. ¶40. This resulted in years of unmitigated PFAS contamination at and near 3M's facilities and at hundreds of other sites in the U.S. and abroad. *Id.*

### 3M's Knowledge of the Dangers of PFAS

For decades, 3M falsely told the world and investors that PFAS are safe and create no risk of environmental liability for the Company. ¶6. In reality, 3M knew for many years before the beginning of the Class Period that PFAS are toxins that cause death and disease in humans and animals and environmental devastation. ¶3. Internal 3M documents have revealed that: the Company completed studies in the 1950s demonstrating the toxicity of PFAS to animals and humans (¶47); in 1963, a 3M internal manual identified PFAS as toxic and a 1966 3M study confirmed the "acute oral toxicity" of PFAS (¶48); no later than the

---

[3]   Paragraphs of the Complaint are cited as "¶__."

1960s, the Company was aware that PFAS would pollute U.S. drinking water sources (¶41); beginning in 1976, 3M began investigating its own employees' exposure to PFAS and internally "recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds" (¶50); by 1977, 3M knew that PFAS were toxic to fish and could impact "human food source[s] by significantly reducing the survival rates" (¶43); in 1999, based on the mountain of evidence within 3M, one of the Company's leading scientists concluded that PFAS is "probably more damaging than PCB" (¶46); and a different scientist, who was paid tens of millions of dollars by 3M to study the effects of PFAS, described PFAS as "one of the strongest cancer promoters I've ever seen[.]" Ex. 2 at 15.

Defendants concealed these damning facts from regulators, investors, and the public at large while giving the false impression that 3M was focused on the public's safety. ¶¶54, 56, 57, 63. For decades, 3M succeeded in covering-up the Company's detailed knowledge about the harmful effects of PFAS. ¶57. 3M's cover-up scheme was not brought to light until midway through the Class Period in 2018, as discussed further below. ¶115.

By 2000, regulators and others outside of 3M finally began to appreciate the deadly effects of PFAS – about which 3M itself had known for decades. The Company subsequently announced that it would begin to phase out its PFAS production. ¶59. 3M did not actually end its production of PFAS until 2008. Mem. 5.[4]

---

[4]   All citations to "Mem. __" are to Defendants' Memorandum of Law in Support of Their Motion to Dismiss, ECF No. 91.

**3M Faces an Onslaught of PFAS-Related Litigation and
Tightening Drinking Water Standards**

Notwithstanding 3M's decades-long efforts to keep regulators and the public in the dark about the toxicity of PFAS, State Attorneys General, municipalities, and private citizens have initiated numerous lawsuits and enforcement actions against 3M and its largest PFAS customer, DuPont, related to the multitude of harms caused by PFAS. Examples of this wave of lawsuits are described in the Complaint at ¶¶77-91, 94-95, and 98-102. In February 2017, DuPont and related companies agreed to pay $671 million to settle certain personal injury lawsuits resulting from PFAS exposure in the vicinity of just one manufacturing site that heavily utilized 3M's PFAS. ¶¶95-97. This settlement reflects only a portion of the scope of liabilities 3M faces as a result of its manufacture, sale and disposal of PFAS.

Meanwhile, federal and state regulators began to tighten the standards for drinking water such that the number of water sources and wells contaminated by 3M's PFAS chemicals increased substantially, thus further enlarging 3M's environmental liabilities. ¶¶67-70. For instance, in May 2016, the EPA raised its standards related to PFAS and drinking water safety. ¶68. The EPA's new standards expanded the scope of 3M's contamination problem by "significantly increas[ing] the number of water systems impacted" by PFAS. ¶69. In March 2017, New Jersey's Department of Environmental Protection established a new standard for maximum amounts of PFOA in drinking water based an alarming study showing that PFAS had been found in "approximately 60% of the 80 [New Jersey public water systems] tested." ¶74. Similarly, in May 2017, the Minnesota Department of Health set a new, lower accepted level for PFAS found in Minnesota's drinking water. Ex. 2 at 1, 27.

By no later than the beginning of the Class Period in February 2017 (and likely earlier), Defendants knew, or were at least reckless in not knowing, that 3M was facing significant liabilities related to the Company's manufacture, sale, and disposal of PFAS. ¶¶144, 147. The basis for Defendants' knowledge included, *inter alia*, 3M's own internal scientific studies regarding the toxicity of PFAS; the Company's knowledge of how it had recklessly disposed of PFAS (including by releasing it into the drinking water of numerous communities); the onslaught of litigation brought against the Company by State Attorneys General, municipalities, and private parties; DuPont's agreement to pay $671 million related to products made using 3M's PFAS; and the tightening of standards and regulations by the EPA and State regulators related to PFAS and the safety of drinking water.

### 3M Claims *De Minimis* Liabilities Arising from Its Manufacture and Disposal of PFAS

Despite these overwhelming indicia of 3M's PFAS-related liabilities, during the Class Period, the Company recorded *de minimis* liabilities for PFAS. For much of the Class Period, 3M recorded liabilities for what it called "other environmental liabilities" ranging from $25 million to no higher than $69 million. ¶125. (3M now admits that the other similarly miniscule category of recorded liabilities for "environmental remediation" did not include any liabilities for PFAS. Mem. 9 n.6.). These paltry recorded liabilities are indefensible given the unfolding devastation caused by PFAS and the Company's knowledge discussed above. In connection with these *de minimis* charges, 3M asserted that any "exposure to loss in excess of the amount accrued ***would not be material to the Company***[] . . . [and/or] ***the Company cannot estimate a possible loss or range of loss*** in excess of the associated established accruals[.]" ¶¶153, 159, 162, 165, 169, 176, 179, 182,

186. In other words, while 3M (supposedly) could not estimate a possible loss or range of loss, it could (somehow) assure investors that any loss would not be material. Particularly given Defendants' knowledge of the circumstances outlined above, these statements were false and misleading. The liabilities recorded by 3M for PFAS were significantly understated, as the Company's subsequent actions would demonstrate.

The Minnesota A.G. sued 3M for harms caused by PFAS in 2010. ¶87. On February 20, 2018, 3M announced that it had agreed to pay Minnesota $850 million and to provide up to an additional $40 million for certain water treatment solutions (for a total of nearly $900 million). ¶¶106-107, 112. Until that date, 3M *never* took a charge or disclosed a possible range of loss for that litigation. ¶111. Based on the totality of facts known to the Company, it would be absurd to infer that at no point prior to the announcement of the settlement did 3M reasonably understand that it would not need to pay a significant sum to resolve that litigation. Analysts covering 3M immediately noted the contradiction between the modest previously-recorded environmental liabilities on the Company's books and this nearly $900 million liability. ¶113. Indeed, the SEC viewed this as suspicious enough that it demanded information from 3M about its prior disclosures. ¶116.

Analysts were understandably concerned that the huge sum paid to Minnesota was indicative of an increased scope and magnitude of liabilities owed to other states, municipalities, and private plaintiffs, especially given that 3M had also manufactured PFAS in Alabama, Illinois, Belgium, and Germany. ¶¶81, 145, 149. Defendant Roman assured the market that "No, this is a unique situation. This is our home state and something that we've

- 9 -

been working on with them for a number of years." ¶119. Analysts accepted Defendants' false assertions that the Minnesota liability was somehow siloed within the State. ¶121.

### 3M's Settlement with the Minnesota A.G.
### Enhanced 3M's Exposure to Other Suits

In reality, the Company's settlement with the Minnesota A.G. was merely the tip of an enormous iceberg representing 3M's PFAS liabilities, not only because of the settlement amount, but also because of the detailed facts disclosed by the Minnesota A.G. in connection with that litigation. ¶115. These documents showed "a half-century of deceptions" by 3M, including how 3M had orchestrated a "scientific cover-up" of the dangers of PFAS. Ex. 2 at 5, 11; *see also* Ex. 1 at 26 (motion filed by Minnesota A.G. in Nov 2017 detailing some of 3M's misconduct – including that "3M engaged in a widespread campaign to conceal the risks posed by [PFAS] from the public – a campaign that continues to this day."). The Minnesota A.G.'s "airing of the company's internal memos drew a roadmap . . . for establishing what 3M knew and when it knew it[.]" Ex. 2 at 25.

This evidence strengthened claims against 3M and resulted in new lawsuits against the Company. For instance, a class action was brought against 3M and related parties in October 2018 on behalf of tens of thousands of residents and former residents whose drinking water had been contaminated by PFAS from Wurtsmith Air Force Base in Michigan. Ex. 3. As explained in that lawsuit, the plaintiffs there discovered the Company's concealment and misconduct only "as a result of 3M's settlement of [the PFAS] lawsuit brought by the State of Minnesota." *Id*. at ¶118. Similarly, the Middlesex Water Company of New Jersey filed a lawsuit against 3M in February 2019 for PFAS contamination based at least in part on evidence obtained by the State of Minnesota in its PFAS litigation against

3M. Ex. 4 at ¶39. That lawsuit also cited the EPA's tightened regulations regarding the safety of drinking water and PFAS as a basis for the suit. *Id*. at ¶60. In short, the damage caused to 3M by its settlement with the Minnesota A.G. was not limited to the nearly $900 million liability it paid in connection with that settlement. Rather, the settlement further confirmed that vast additional PFAS liabilities remained out of public sight because they had not been fully accounted for and disclosed by the Company, notwithstanding Defendants' false and misleading statements to the contrary.

### 3M Delinquently Admits Liabilities Associated with PFAS

This fact was driven home on April 25, 2019, when 3M finally announced that it was establishing a meaningful (albeit still woefully inadequate) reserve of $235 million related to its manufacture and disposal of PFAS. ¶122. Defendant Roman explained that this figure was focused only on the five locations where 3M had manufactured PFAS, and did not cover liabilities arising out of products-related PFAS litigation. ¶124. In other words, there could be enormous *additional* liabilities arising from PFAS products-related litigations. ¶¶95-96, 118.[5] Despite this disclosure, analysts were skeptical that this $235 million was sufficient considering the nearly $900 million settlement reached with Minnesota. ¶127. On the news of this charge, 3M common stock plummeted, wiping out more than $16 billion of 3M's market capitalization on the worst daily performance for 3M's common stock in over 30 years. ¶130. 3M tried to pin this new charge of $235 million on a "recently completed . . . comprehensive review . . . regarding environmental matters and litigation

---

[5] Analysts at Barclays estimate that 3M's PFAS products-related liabilities are approximately $3.9 billion. ¶139. If independent analysts are capable of estimating these liabilities, there is no reason that 3M cannot estimate such liabilities itself.

related to historical PFAS manufacturing operations in Minnesota, Alabama, Gendorf Germany, and at four former landfills in Alabama." ¶131.  There is no reason to infer that this charge could not and thus should not have been taken years earlier based on all of the facts known by and in the possession of Defendants at that time.

Defendants made further false and misleading statements to the investing public in an attempt to quell concerns that the $235 million charge was yet another understatement of 3M's liabilities associated with its manufacture, sale, and disposal of PFAS.  For instance, on May 15, 2019, Defendant Gangestad asserted that 3M's $235 million charge established the outside range of what the Company could be liable for in connection with its five PFAS manufacturing sites.  ¶137.  In particular, Gangestad stated: "On PFAS, the ring-fence I would call it [sic] is *ring-fenced* around liability around our 5 manufacturing sites and disposal of PFAS. . . ."  *Id.*

Less than two months later, on July 8, 2019, 3M announced that it was investigating PFAS contamination at three municipal landfills that had accepted waste from 3M's Alabama PFAS plant.  ¶140.  The Company further announced that "for the past several months, 3M has been conducting a thorough search for former landfills . . . to test for any waste that may include PFAS."  ¶141.  The market understood that this disclosure was at odds with Defendants' recent "ring-fence" statements, and 3M's common stock declined $2.81 per share on this news.  ¶143.  The market's suspicions were further confirmed after the Class Period on February 6, 2020, when 3M took an additional $214 million charge, thus nearly doubling the "ring-fenced" amount and bringing its recorded liabilities to $445 million for its PFAS manufacturing and disposal sites.  Ex. 5 at 121.  3M increased its

- 12 -

accruals for PFAS-related environmental liabilities even more by setting aside an additional $100 million throughout 2020.  Ex. 6 at 41; Ex. 7 at 47; Ex. 8 at 48-49.[6]

Thus, despite knowing all of the facts necessary to make a reasonable estimate of the range of loss for PFAS liabilities at the beginning of the Class Period (and likely earlier), in a matter of months Defendants went from asserting that 3M's liabilities associated with its manufacturing and disposal sites were approximately $25 million (¶¶153, 159, 162, 165, 169) – and that any additional amount would not be material and/or could not be estimated (¶¶153, 159, 162, 165, 169, 176, 179, 182, 186) – to disclosing 3M's settlement of nearly $900 million with the State of Minnesota (¶¶106, 112); to taking an additional charge of $235 million for these liabilities (¶¶122-123); to taking yet another charge of $214 million for these liabilities (Ex. 5 at 121); and to raising its PFAS accruals by an additional $100 million thereafter.  Ex. 6 at 41; Ex. 7 at 47; Ex. 8 at 48-49.  Given 3M's history of delayed and deceitful statements about these liabilities, analysts have understandably conducted their

---

[6]   3M's PFAS-related liabilities continue to swell even today.  By way of example, just a few weeks ago, the city of Bemidji (Minnesota) and 3M reached a settlement to resolve claims relating to the presence of PFAS in the city's drinking water. According to a joint statement, under the terms of the settlement, 3M will contribute $12.5 million to support the construction and operation of a new water treatment facility in Bemidji.   *See* https://www.twincities.com/2021/03/10/3m-agrees-to-pay-12-5m-for-new-bemidji-water-treatment-plant/.  And, in early March, the City of La Crosse (Wisconsin) filed a lawsuit against a host of chemical manufacturers, including 3M.  According to news reports, the suit in question alleges that "the manufacturers knew since the 1960s that PFAS could be released from their foam and seep into groundwater, posing a risk to human health, yet continued to produce and sell it without warning their customers."   *See* https://minnesota.cbslocal.com/2021/03/04/la-crosse-sues-foam-makers-over-pfas-pollution/. As one recent article explained, the La Crosse lawsuit is "among thousands of legal challenges that have been filed across the country by local governments, citizens and firefighters due to PFAS contamination."   *See* https://www.wpr.org/city-la-crosse-files-lawsuit-calling-out-23-companies-pfas-contamination.

own review of these potential liabilities, with some estimating that these liabilities are more far more likely in the range of $5-6 billion (¶139). Notably, on July 8, 2019 – the last day of the Class Period – other analysts estimated "3M's US liability at an average of $6bn+, based solely on litigation cases filed to date . . . [and] at an average of $22bn+, based on contaminated sites identified to date." Ex. 9 at 1.

## ARGUMENT

At the pleading stage, courts "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and "afford the plaintiff all reasonable inferences to be drawn from those allegations," *Stephenson v. Deutsche Bank AG*, 282 F.Supp.2d 1032, 1054 (D. Minn. 2003). Courts also "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012). A securities complaint "should not be dismissed for failure to state a claim where there is a 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support plaintiffs' claims." *In re UnitedHealth Grp. PSLRA Litig.*, 2007 WL 1621456, at *1 (D. Minn. June 4 2007) (alteration in original) (citation omitted). Moreover, "[a]ny ambiguities concerning the sufficiency of the claims must be resolved in favor of the nonmoving party." *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F.Supp.3d 1035, 1045 (D. Minn. 2015).

- 14 -

## I.     THE COMPLAINT PLEADS FALSITY

### A.     The Complaint Pleads Defendants' False and Misleading Statements and Omissions

Plaintiffs' well-pleaded allegations demonstrate that Defendants materially understated and misled investors regarding the Company's exposure to PFAS liabilities by "creat[ing] an impression of a state of affairs" that "materially differed from the one that actually existed." *Freedman v. St. Jude Med., Inc.*, 4 F.Supp.3d 1101, 1114 (D. Minn. 2014).

Securities analysts have assessed that 3M's PFAS liabilities ranged from ***$5 billion*** to ***$22+ billion***; but during the Class Period the Company reserved ***as little as $25 million*** in environmental liabilities and Defendants stated that any further exposures "***would not be material***." ¶¶125, 139, 153, 159, 162, 165, 169, 176, 179, 182, 206; Ex. 9 at 1. The Complaint demonstrates that as concerns grew about the Company's potential exposures, Defendants falsely claimed there were no additional "shoes to drop" and liability had been "ring-fenced" (*i.e.*, limited) around specific facilities. The Complaint further identifies multiple objective contemporaneous facts known by Defendants about 3M's spiraling environmental liabilities – including the Minnesota A.G.'s comprehensive investigation and subsequent settlement – that Defendants assured investors were immaterial. To date, the Company has raised its accruals for PFAS-related liabilities by over $500 million (including material accruals added after the Complaint was filed). These facts are more than "'sufficient to support an inference' that [Defendants'] statements were false or misleading when made." *Sanchez v. Centene Corp.*, 407 F.Supp.3d 831, 840 (E.D. Mo. 2019) (noting "[a] complaint need not prove falsity") (citing *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010)).

Unable to confront this reality squarely, Defendants instead resort to hyper-technical *factual* contentions concerning GAAP. But the Court should reject Defendants' baseless argument that 3M's *de minimis* reserves were GAAP-compliant. Not only is this assertion false – the Complaint's allegations are more than sufficient to plead GAAP violations – but the Eighth Circuit has expressly held that whether "reserves were an adequate response is a *question of fact* that cannot render the complaint[] inadequate." *Green Tree*, 270 F.3d at 666 ("Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case. We will not prejudge that issue.").[7]

### 1.   3M's Accruals Were False and Misleading

3M's *de minimis* accruals for its massive environmental liabilities were false and misleading. The Complaint alleges that the Company's PFAS-related liabilities were both "probable" and could be "reasonably estimated" during the Class Period. GAAP therefore required material accruals that Defendants failed to disclose. GAAP also obliged Defendants to disclose – at a minimum – a "range of loss" related to PFAS. Defendants could not, consistent with GAAP, simply deem meritless the many PFAS claims against 3M and thereby avoid disclosing and quantifying the extent of those liabilities (particularly when

---

[7]   *See also Barrie v. IntervoiceBrite, Inc.*, 397 F.3d 249, 257 (5th Cir. 2005) ("Because the accounting questions in this case are disputed, dismissal was not appropriate."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) (stating "it is a factual question whether [the company's] accounting practices were consistent with GAAP"); *Schuh v. HCA Holdings, Inc.*, 947 F.Supp.2d 882, 894 (M.D. Tenn. 2013) ("In any event, [a GAAP violation] is not a claim susceptible to resolution by way of the present motion to dismiss."); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F.Supp.2d 241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss.").

Defendants were in possession of damning information about the toxicity of PFAS to humans and the environment but hid that information from regulators for decades, *see generally* ¶¶41-57).[8]

### a.   3M's Unrealistic Accruals Violated GAAP

The Complaint alleges that Defendants materially understated 3M's environmental liabilities by reporting trivial accruals in the Company's financial statements throughout the Class Period.  In contrast to the billions of dollars in PFAS-related liabilities that 3M faced, Defendants reported accruals for "other environmental liabilities" ranging from only $25 million to $69 million throughout the Class Period – materially less than the Company's true (but undisclosed) multi-billion dollar exposure.  To date, Defendants have raised the Company's accruals for PFAS-related liabilities by over $500 million.  Additionally, once the Company admitted its Class Period reserves were insufficient by materially raising them, analysts initially estimated the Company's true environmental liabilities to range from $5-6 billion, with more recent estimates reaching as high as more than $22 billion.

Notwithstanding this massive shortfall, Defendants ask the Court to rule that the Company's deficient accruals were technically compliant with GAAP as a matter of law and without the benefit of expert testimony.  Defendants erroneously assert that Accounting Standards Codification ("ASC") 450 – the principal GAAP provision concerning accruals for

---

[8]   Defendants' GAAP violations alone establish falsity.  *See In re MoneyGram Int'l, Inc. Sec. Litig.*, 626 F.Supp.2d 947, 973 (D. Minn. 2009) ("Clear violations of GAAP support falsity.").  In contrast, GAAP compliance does ***not*** provide *per se* immunity from liability for securities fraud.  *See Malone v. Microdyne Corp.*, 26 F.3d 471, 478 (4th Cir. 1994) (noting "courts have found defendants liable for securities fraud under Rule 10b-5 despite having complied with GAAP") (collecting cases).

loss contingencies – permitted their misleading disclosures. ASC 450 permits no such thing. Rather, ASC 450 required 3M to accrue liabilities (with a commensurate charge against earnings) for any material loss contingencies that were "probable" and could be "reasonably estimated." ASC 450-20-25-2; *see also In re Perrigo Co. PLC Sec. Litig.*, 435 F.Supp.3d 571, 582 (S.D.N.Y. 2020); *In re Bayer AG Sec. Litig.*, 2004 WL 2190357, at \*12 (S.D.N.Y. Sept. 30, 2004).

3M's PFAS-related liabilities far exceeded its meager accruals and were both probable and reasonably estimable throughout the Class Period, requiring Defendants to record those liabilities as accruals in 3M's financial statements. These undisclosed liabilities were probable because, as Defendants knew no later than the start of the Class Period, 3M had engaged in a decades-long practice of distributing toxic PFAS and concealing that wrongful conduct. These undisclosed liabilities could be reasonably estimated by Defendants because they had multiple objective facts in their possession, including:

- DuPont's $671 million settlement (just four days after the start of the Class Period) arising from distribution of 3M-sourced PFAS – *i.e.*, a case demonstrating the likelihood of liability related to PFAS and ascribing specific dollar amounts to those liabilities. ¶96.

- The Company's nearly $900 million settlement with the Minnesota A.G., which identified detailed evidence of 3M's egregious PFAS-related misconduct and again attached specific dollar figures to 3M's PFAS-related liabilities. ¶106.

- The Minnesota A.G.'s September 2017 expert report showing that State had suffered $5 billion in damages as a result of 3M's PFAS. ¶111. (Defendants also knew additional information about the Company's extensive manufacture, disposal, and distribution of PFAS at numerous locations outside of Minnesota. ¶81.)

- The EPA's 2016 reduction of the health advisory levels to only 70 ppt for PFOA and PFOS, an indication of the extensive and growing regulatory and

public concern with PFAS, and another reason that material liabilities were increasingly probable.  ¶¶68-69.

- The "trove of internal emails and memoranda produced by 3M" which "made clear that 3M was aware as far back as the 1970s . . . that PFAS pose a serious risk to public health" and "that for decades 3M withheld that information from state and federal regulators."  ¶115.[9]

The Complaint thus more than sufficiently pleads that 3M's inadequate accruals for environmental liabilities were materially false and misleading.  *See, e.g.*, *Green Tree*, 270 F.3d at 666-67 (noting "the defendants had in their possession facts that rendered their financial results materially false when they published them"); *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *5 (D.N.J. May 18, 2020) (finding allegations that the company knew it had sufficient data to estimate the liabilities in question sufficient to sustain a claim for violation of ASC 450); *Godinez v. Alere Inc.*, 272 F.Supp.3d 201, 216 (D. Mass. 2017) (sustaining allegation that the facts necessary for recording a loss under accepted accounting standards were known to defendants once  the company was advised of product malfunctions and that the product's removal from the market was imminent); *In re CitiGroup Inc. Bond Litig.*, 723 F.Supp.2d 568, 578 (S.D.N.Y. 2010) (finding loan loss reserves understated where they reflected only mortgages *already in default* and did not include mortgages *likely to default*); *In re Bayer*, 2004 WL 2190357, at *12 (finding allegations that the FDA notified

---

[9]  This "trove" of internal Company emails and memoranda is summarized in the Minnesota A.G.'s November 17, 2017 filing.  *See* Ex. 1; *see also Williams v. Roper*, 2016 WL 4368097, at *3 (E.D. Mo. Aug. 16, 2016) (taking "judicial notice of the . . . filings from state court").  Courts permit allegations derived from information disclosed in other proceedings.  *See, e.g.*, *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 2011 WL 1257756, at *11 (N.D. Ohio Mar. 31, 2011) (noting "plaintiff's reliance . . . [on] governmental 'allegations does not demonstrate that it lacks evidentiary support, but rather provides it with the necessary evidentiary support'") (citations omitted).

- 19 -

the company of the dangers of their drug sufficient to show that the defendants "possessed information making it more likely than not that a loss contingency would arise").[10]

*Bayer* is instructive. There, the court upheld allegations that defendants failed to accrue for liabilities related to the drug Baycol, which the FDA ordered withdrawn from the market because of safety issues. 2004 WL 2190357, at \*12-14. The court held that the liabilities were "probable" once "defendants were aware of problems with Baycol" because that "information ma[de] it more likely than not that a loss contingency would arise." *Id*. The court further held that "the amount of the loss could reasonably be estimated, as required by GAAP" once defendants were forced to withdraw Baycol from the market, which made "defendants' statements regarding litigation reserves . . . materially misleading." *Id*. The court expressly rejected the defendants' contention that they could avoid the required accruals by claiming that the Baycol claims were "groundless." *Id*.

The same analysis applies here. Plaintiffs have shown that Defendants were aware that PFAS was dangerous and that 3M had previously withdrawn it from the market due to those safety issues. Indeed, whereas in *Bayer* the court concluded that the defendants' accruals were materially understated based on a single allegation concerning one meeting reflecting knowledge of Baycol's problems, here the Complaint raises specific and extensive

---

[10]   Notably, GAAP is clear that a contingency is "reasonably estimated" even if the issuer cannot attach a specific dollar amount to the liability. In a section titled "Assessing Whether a Loss Is Reasonably Estimable," ASC 450 specifically states that an issuer "***shall not delay accrual of a loss until only a single amount can be reasonably estimated***. To the contrary, when [a loss is probable] and information available indicates that the estimated amount of loss is within a range of amounts, ***it follows that some amount of loss has occurred and can be reasonably estimated***. Thus, when [a loss is probable] with respect to a particular loss contingency and the reasonable estimate of the loss is a range, the condition . . . is met ***and an amount shall be accrued for the loss***." ASC 450-20-25-5.

allegations reflecting Defendants' knowledge about the dangers of PFAS and specific examples of the amounts associated with those liabilities. Those averments are more than sufficient to plead that 3M's materially inadequate accruals violated GAAP and were materially false and misleading.

*CitiGroup* supports the same conclusion. There, the court upheld the plaintiffs' allegation that the company's loan loss reserves "failed to reflect losses that were both probable and estimable given the housing market collapse." 723 F.Supp.2d at 578. As the court explained, the plaintiffs averred that "loss reserves were meant to reflect not only losses already incurred but those likely to accrue in the future, [but] Citigroup's ***reserve levels instead merely took into account its <u>actual losses</u>*** for much of the relevant period." *Id.* at 592. Thus, taken as true, "the complaint plausibly allege[d] that Citigroup's loan loss reserves failed to accurately account for losses likely to incur, and, as such materially misled investors about the company's financial health." *Id.*

So too here. During the Class Period, Defendants failed to account for the Company's likely liabilities accurately – *i.e.*, for "losses that were both probable and estimable" – and instead limited disclosure to losses already incurred (or nearly certain), in direct violation of GAAP. *Id.* For example, Defendants did not accrue a ***single dollar*** for any liabilities related to the Minnesota A.G.'s litigation, disclosing no loss until ***after*** the specific dollar value of that settlement was announced. Defendants took the same approach with the dozens of other PFAS-related investigations and lawsuits identified in the Complaint, accruing ***nothing*** for most of those likely sources of liability during the Class Period. Thus, consistent with

- 21 -

*CitiGroup*, the Complaint here demonstrates that Defendants "failed to accurately account for [PFAS-related] losses likely to incur."  723 F.Supp.2d at 592.

Additionally, the Company effectively ***admitted*** to understating its earlier accruals by materially raising them near the end of the Class Period (and again thereafter) based on information Defendants already knew.  For example, on April 25, 2019, Defendants announced a new $235 million accrual for environmental liabilities based on a vaguely-described "recently completed . . . comprehensive review . . . regarding environmental matters and litigation related to historical PFAS manufacturing operations" (¶131) – *i.e.*, the Company raised its accruals based on a ***review of existing information*** necessarily known to Defendants when they disclosed their earlier understated accruals, ***not*** because Defendants learned new facts.

*Green Tree* weighs heavily against Defendants' position.  There, the Eighth Circuit reinstated securities fraud claims alleging an understatement of reserves related to loan prepayment rates.  As the Court explained, the defendant corporation increased its reserves by $190 million, a materially greater sum than previously announced, because "in reviewing its [earlier] financial modeling, it 'determined it ***had not fully considered*** the effect'" of certain financial data in its possession – *i.e.*, like here, the new disclosure was based on a new review of existing data.  270 F.3d at 650.  Just as in *Green Tree*, even if Defendants here "had not fully considered" the facts until they conducted their belated "comprehensive review," their subsequent material upward correction of the Company's earlier environmental accruals provides additional evidence that the Company's Class Period accruals were materially false and misleading.

- 22 -

Moreover, Defendants *continued to raise* their PFAS-related accruals by material amounts thereafter, lending even more support to the inference that Defendants understated 3M's accruals during the Class Period.  In February 2020, just two months after Plaintiffs filed the Complaint, Defendants took a further $214 million charge, bringing 3M's accrual for environmental liabilities to $445 million – far larger than the miniscule accruals disclosed during the Class Period.  Since that time, the Company has increased its accrual for environmental liabilities even further, with over $100 million specifically attributed to PFAS.  Ex. 6 at 41; Ex. 7 at 47; Ex. 8 at 48-49.  3M thus has raised its accruals for historical PFAS-related environmental liabilities by *more than $500 million* above the *de minimis* amounts disclosed during the Class Period.  In *Green Tree*, the Eighth Circuit found that "the sheer size of the $390 million write-down adds to the inference that the defendants must have been aware the problem was brewing."  270 F.3d at 666.  The facts alleged here merit the same inference.

In contrast, Defendants rely on cases in which the defendants' subsequent correction was the *only* basis for pleading falsity.[11]  None of those cases involved *$500 million* in

---

[11]   For example, in *K-tel* the Eight Circuit rejected allegations concerning a failure to accrue for losses where the plaintiffs "fail[ed] to specify any . . . circumstances that K-tel knew at the time" of the challenged SEC filings.  *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002).  Not so here, where (as detailed above) the Complaint sets forth multiple specific objective contemporaneous facts known to Defendants showing that the Company's miniscule reserves were materially understated and misleading.  Likewise, in *Apogee*, the allegations were based *solely* on a single defendant's admission that "cost and execution complexities" had been underestimated "in hindsight."  *In re Apogee Enters., Inc. Sec. Litig.*, 2020 WL 1445856, at *4 (D. Minn. Mar. 25, 2020).  Similarly, Defendants cite *Elam v. Neidorff*, where plaintiffs' principal allegation was that defendant Centene "must have known about the additional . . . medical costs . . . *because Centene touts its ability to predict medical costs.*"  544 F.3d 921, 927 (8th Cir. 2008).

- 23 -

additional accruals by the defendant.  None involved analyst estimates of true liabilities ranging in the billions.  And none involved the particularized allegations present here of multiple historical and contemporaneous facts known to Defendants that – like the Minnesota A.G. and DuPont settlements – reflect specific knowledge of the Company's massive but undisclosed PFAS-liabilities during the Class Period.[12]

### b.    3M Had a Clear Duty under GAAP to Quantify a Reasonable "Range of Loss" Related to PFAS

Defendants ask the Court to rule, as a matter of law, that their environmental accruals were adequate under GAAP.  As detailed above, the Court should reject that argument as incorrect and procedurally improper.  But even if Defendants' strained reading of GAAP were correct – and it is not – GAAP *still* required Defendants, at a minimum, to quantify the "range of loss" related to PFAS.  ASC 450-20-50-4; *see also Perrigo*, 435 F.Supp.3d at 582.

Here, there is no reasonable dispute that during the Class Period the Company's massive PFAS liabilities were at least "reasonably possible" (defined as "more than remote").  GAAP therefore required an "estimate of the possible loss or range of loss[.]"

---

[12]  The presence of such contemporaneous facts here distinguishes this case from other citations offered by Defendants.  *See, e.g.*, *In re Acceptance Ins. Cos. Sec. Litig.*, 423 F.3d 899, 903 (8th Cir. 2005) ("Appellants argue that numerous statements made by the Appellees after the registration statement was issued show that Acceptance's reserves were inadequate at the time of issuance.  However, this type of retrospective analysis of awareness cannot be the basis for a claim."); *Chapman v. Mueller Water Prods., Inc.*, 466 F.Supp.3d 382, 407-408 (S.D.N.Y. 2020) ("Plaintiffs argue this statement was false because Defendants had been aware of product failures . . . 'since at least January 2016.'  But Plaintiffs do not allege . . . that the information Mueller had about failures in such products in or before January 2016 was other than what was 'expected.'"); *Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *5-7 (N.D. Cal. Oct. 12, 2016) (finding that the plaintiff could not rely solely on the "eventual accrual of a reserve to show that Marvell's financial statements were misleading" and acknowledging that more "specific factual allegations that explained why and how the alleged GAAP violations were fraudulent" likely would have raised a question of fact).

ASC 450-20-50-4; *Perrigo*, 435 F.Supp.3d at 582.  Defendants nevertheless assert they could satisfy this standard by pronouncing untruthfully that such an estimate "cannot be made." Mem. at 1; ASC 450-20-50-4.  Defendants' GAAP arguments are wrong and improper on this motion to dismiss.

*Perrigo* rejected the argument Defendants advance here.  In *Perrigo*, the defendant company learned of a material tax liability from Ireland's tax authority.  435 F.Supp.3d at 578.  There, as here, defendants "disagree[d] with" that claim and "intend[ed] to contest it." *Id*.  Defendants there did not disclose a range of loss and told investors that the liabilities "cannot be quantified at this stage" but "could be material."  *Id*. at 578.

Defendants in *Perrigo* argued – just as Defendants wrongly assert here – that their "disclosures complied with ASC 450 because they included a statement that an estimate could not be made."  *Id*. at 586; *compare with, e.g.*, Mem. at 1.  In a thorough analysis of ASC 450, the *Perrigo* court rejected this implausible interpretation of GAAP outright, holding that the company "had a ***duty to quantify its exposure*** . . . even if it 'disagreed' . . . and intended to contest it."  *Id*. at 586.  As the court explained:

> Defendants' interpretation would ***severely undermine the disclosure obligations in ASC 450***.  If the defendants' position were adopted, whenever a reporting entity intends to contest the amount at issue, it could avoid quantifying and reporting its exposure by saying that it disagreed with the claimant's position and there was, as of yet, no final determination on the amount of any deficiency.

*Id*. at 587.  Accordingly, under GAAP, even "when an issue is '***open to considerable interpretation***,' an entity nonetheless ***must*** estimate the possible loss where such an estimate can be made and disclose that exposure to loss if the issue is resolved adversely."  *Id*.

As detailed above, the Complaint sets forth specific objective information that was available to Defendants to estimate – at a minimum – a range of loss related to PFAS liabilities. And, as litigants in the multiple claims and investigations identified in the Complaint, it is reasonable to infer that Defendants had far more detailed information available to estimate and disclose the required range of loss. Thus, as in *Perrigo*, Defendants were "not freed from a duty to quantify and disclose that exposure to loss" and could not evade that obligation by simply "includ[ing] a statement that an estimate could not be made." *Id.* at 586-587.

The Court should also reject Defendants' interpretation of GAAP because the SEC's authoritative guidance directly contradicts it, specifically emphasizing that quantifying ranges of loss for environmental liabilities is a critical requirement. In response to the question "What financial statement disclosures should be furnished with respect to recorded and unrecorded product or environmental remediation liabilities?" the SEC's response – which is codified within GAAP – is unequivocal:

> ***[E]nvironmental remediation liabilities typically are of such significance that detailed disclosures*** regarding the judgments and assumptions underlying the recognition and ***measurement of the liabilities*** are necessary to prevent the financial statements from being misleading and to ***inform readers fully regarding the range of reasonably possible outcomes*** that could have a material effect on the registrant's financial condition, results of operations, or liquidity."[13]

---

[13] Staff Accounting Bulletin ("SAB") No. 114 – Revisions Conforming to FASB's Accounting Standards Codification. SAB sets forth the SEC staff's views regarding accounting-related disclosure practices and are authoritative U.S. GAAP for SEC registrants. ASC Topic No. 105-10-05-1.

Put simply: Defendants cannot impose their misinterpretation of GAAP as a defense at the pleading stage and prevail, especially when the SEC rejects their view.

Defendants also neglect to address their *other* GAAP violations. For example, ASC 275 concerning "Risks and Uncertainties" likewise required Defendants to quantify an estimated a "range of loss" because it was "*at least reasonably possible* that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that *existed at the date of the financial statements will change in the near term* due to one or more future confirming events." ASC 275-10-50-8; ASC 275-10-50-9. Defendants' failure to even mention ASC 275 is another reason why the Court should reject their technical, fact-based accounting arguments on this motion to dismiss.

Ultimately, Defendants cannot dispute that the allegations here present an even stronger case of falsity than in *Perrigo*. As noted above, despite the untrue claim that the liabilities "cannot be quantified at this stage," defendants in *Perrigo* stated that those liabilities "*could be material*." *Id.* at 578. In contrast, beyond failing to quantify any range of loss as required, Defendants here also told investors they "believe[d]" that "all legal proceedings . . . would *not have a material adverse effect*," ¶156, and that 3M "[did] *not believe*" that "environmental compliance . . . [would] *have a material effect*" on the Company's financials. ¶¶154-156.

### 2. 3M Accompanied Its *De Minimis* Reserves with False and Misleading Assurances that Further Liabilities Were Not Material

In addition to the Company's materially false and misleading PFAS accruals (and related failure to disclose a range of PFAS-related loss), *see supra* at 16-27, 3M's SEC

filings also included multiple materially false and misleading statements assuring investors that the Company did not have further material PFAS-related exposures.  Defendants stated that they "believe[d]" that the Company's "exposure to all legal proceedings . . . *would not have a material adverse effect*" on the Company, ¶¶156, 171, 188, despite possessing overwhelming internal evidence to the contrary.  *See supra* at 5-6.  Defendants likewise stated that "[w]hile [3M] cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, *[3M] does not believe they will have a material effect* on its capital expenditures, earnings or competitive position."  ¶¶154, 170, 187.  These statements were false and misleading when made in light of 3M's massive and ever-increasing liabilities relating to PFAS.  ¶¶118, 144-152.[14]

Defendants contend that they cured these obviously false and misleading statements with boilerplate risk disclosures.  As noted in the Complaint, 3M's SEC filing contained catch-all disclaimers concerning "risk factors" including everything from "antitrust," to "environmental," to "anti-corruption" – and noting that any "future adverse ruling, settlement or unfavorable development could result in future charges that could have a material adverse effect." ¶155.[15]  But such generic "risk factors" cataloging every legal threat imaginable are

---

[14]  For example, this statement was false and misleading on February 9, 2017, ¶154, given EPA's 2016 lowering of the health advisory levels to just 70 ppt for PFOA and PFAS, ¶¶68-70, 93, and the January 2017 lawsuit in Alabama, ¶94; it was false and misleading on February 8, 2018, ¶170, given the Minnesota A.G.'s September 2017 expert report asserting $5 billion in damages, ¶111; and it was false and misleading on February 7, 2019, ¶187, given the publication of the trove of internal emails highlighting 3M's liability, ¶115.

[15]  Similarly, 3M argues that it "warned" that an "adverse judgment . . . could have an adverse material effect[.]"  Mem. 24 (citing Defs.' Ex. 8 at 124).  Defendants ignore that in

insufficient to warn investors of known, then-existing risks, and are themselves sufficient to give rise to actionable claims for securities fraud. *See, e.g.*, *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F.Supp.3d 712, 726 (D. Minn. 2019) (finding "misleading statements about regulatory risks" actionable following $150,000 settlement with Minnesota A.G. concerning "deceptive billing practices"); *S.E.C. v. True N. Fin. Corp.*, 909 F.Supp.2d 1073, 1104-05 (D. Minn. 2012) (noting "a jury could determine that . . . the risks disclosures were material and misleading," where they disclosed "risks of default" but "did not actually state that 'defaults' had occurred"); *In re Pemstar, Inc. Sec. Litig.*, 2003 WL 21975563, at *8 (D. Minn. Aug. 15, 2003) ("Although Defendants' risk disclosures warned investors of potential risks that could occur in the future, such language [was] insufficient" because "[b]y failing to reference problems that they had already been made aware of [their] disclosures could be materially misleading.").[16]

---

the very next sentence after this hypothetical (*i.e.*, "could have") warning, 3M stated that "[n]o liability has been recorded because the Company believes any such liability is not probable and estimable." Ex. 16 at 124. Likewise, Defendants quote 3M's 2016 and 2017 Forms 10-K as warning that unfavorable "developments 'could result'" in "a material adverse effect," Mem. 8 (citing Defs.' Ex. 3 at 12, 112); Mem. 11 (citing Defs.' Ex. 8 at 117). They omit the very next sentence where 3M emphasized that "it currently believes . . . that such future charges, if any, would ***not have a material adverse effect*** . . . ." Ex. 17 at 112; Ex. 16 at 117.

[16]   Defendants cite *In re Bank of America AIG Disclosure Securities Litigation* (*see* Mem. 33), but that case reaffirmed that "[i]t is true that '[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability.'" 980 F.Supp.2d 564, 580 (S.D.N.Y. 2013) (citation omitted). Here, 3M's generic legal disclaimer (Ex. 10 at 7) was rendered misleading by the Company's more specific reassurances that its environmental liabilities "would not be material," ¶176, in light of 3M's "decades of unmitigated PFAS contamination," ¶40, and "decades" of "withh[olding] . . . from state and federal regulators" that "PFAS pose[s] a serious risk to public health" as "confirmed" by the "documents" which "had never been published previously" before being released by the Minnesota A.G. "soon after the settlement was announced[.]" ¶115.

Defendants also misleadingly splice together language from 3M's "quarterly filings for 2017" regarding its "Environmental Liabilities" and "Risk Factors," but *mis-cite* those spliced quotations, thereby creating the false appearance that the quoted language appeared on the same page.  Specifically, Defendants state that 3M's "quarterly filings . . . cautioned about the difficulty of estimating remediation costs and litigation outcomes, that estimates could change, and that future unfavorable developments '*could result in future charges that could have a material adverse effect*'" on 3M.  Mem. 11 (citing Defs.' Ex. 5 at 39; Ex. 6 at 44; Ex. 7 at 45).  But this emphasized language ("could result in future charges . . .") *does not appear* at Ex. 5 at 39, Ex. 6 at 44, or Ex. 7 at 45—the section regarding "Environmental Liabilities."  *See, e.g.*, Ex. 10 at 39.  Rather, 3M relegated its "Risk Factors" discussion to 30 pages later under "Part II. Other Information[.]"  *See* Ex. 10 at 69; Ex. 11 at 80; Ex. 12 at 82.[17]  Defendants' practice of splicing and mis-citing material from 30 pages apart in 3M's Form 10-Qs is significant because 3M's discussions of its "legal proceedings," ¶156, and "Environmental Liabilities, ¶153," *specifically denied environmental liability* whereas 3M's boilerplate "risk factors" advised (in language that told investors nothing one way or another about the Company) that an "unfavorable development" of essentially any variety "could have a material adverse effect."  *See* Mem. 11.  *See also SEC v. Syron*, 934 F.Supp.2d 609, 630 (S.D.N.Y. 2013) (noting dismissal inappropriate when "it [was] not clear that [second disclosure] would have corrected the misimpression created by [first] disclosure").

---

[17]   Defendants accuse Plaintiffs of "us[ing] 'altered' quotation[s]," Mem. 32, but ironically, it is *Defendants* who engage in such alteration by combining 3M's "environmental liabilities" disclosures with its "risk factors" and omitting to cite the separate pages on which those "risk factors" appear, thus creating the false appearance that those "risk factors" appeared on the same page as 3M's discussion of its "environmental liabilities."  *Id.* at 11.

Defendants also wrongly claim that "the [Complaint] fails to plead any fact contradicting" their blanket denial of environmental liability. Mem. 33 n.23. Defendants ignore that 3M has increased its reserves for environmental liabilities by more than $500 million since that time, including their "reserve of $235 million to resolve certain environmental matters" as of the filing of the Complaint. ¶122. Thus, the allegations of the Complaint and the Company's public filings since that time directly contradict Defendants' argument.

> **3.    Following the Minnesota A.G. Settlement, Roman's Denial of "Any Shoes to Drop," "Similar Issues in Other States," or "Precedent for Other States" Was False and Misleading**

On April 24, 2018, an analyst asked Roman about the Minnesota A.G. "litigation settlement" and "if there are any shoes to drop"; whether "we could reasonably expect to hear news of shoes, however small, dropping?"; whether the Minnesota A.G. Litigation was "a precedent for other states"; whether 3M "rule[s] out any similar issues in other states?"; and for his "perspective on that." ¶173. Roman offered an unconditional denial: "No, this is a unique situation." *Id.*

Defendants argue "there was nothing false about any" of Roman's statements because "there has been no similar settlement in the intervening years." Mem. 31. But "'[t]he law is well-settled . . . that so-called "half-truths" – literally true statements that create a materially misleading impression – will support claims for securities fraud.'" *St. Jude*, 4 F.Supp.3d at 1114. Here, Roman's denial that investors "could reasonably expect to hear news of [other] shoes, however small, dropping," ¶173, was false in light of the mountain of non-public internal documents in 3M's possession which demonstrated its massive liability, ¶115, and

- 31 -

which, contrary to Roman's reassurances, foreseeably led to a further "reserve of $235 million to resolve certain environmental matters . . . related to its historical manufacture and disposal of PFAS-containing waste."  ¶122.

> **4.      Gangestad's Claim that 3M's "Liability Around Our 5 Manufacturing Sites and Disposal of PFAS" Is "Ring-Fenced" Was False and Misleading**

On May 15, 2019, Gangestad stated, "On PFAS, the ring-fence *I would call it is [sic] ring-fenced around liability around our 5 manufacturing sites and disposal of PFAS.* Because that's a view where we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs will be. *So that portion, I would call **ring-fenced**.*"  ¶196.  By "voluntarily" choosing to speak about 3M's "liability around our 5 manufacturing sites and disposal of PFAS," Gangestad had "a duty to speak fully and truthfully on those subjects.'"  *Kushner v. Beverly Enters. Inc.,* 317 F.3d 820, 831 (8th Cir. 2003).  Yet, by stating that "that portion" of 3M's "liability" was "ring-fenced,"[18] ¶196  when it was not, ¶197  Gangestad "create[d] an impression of a state of affairs" that "materially differ[ed]" from reality.  *St. Jude*, 4 F.Supp.3d at 1114.

Gangestad's statement was false because 3M was already then "conducting a new investigation regarding the possible presence of PFAS in three closed municipal landfills that accepted waste from the Company's Decatur, Alabama plant, a fact which Defendants knew, or recklessly disregarded."  ¶197; *see also* ¶¶140-143 (noting that on July 8, 2019, 3M revealed its "investigation into the possible presence of PFAS in three closed municipal

---

[18]  The term "ring-fence" has been defined to "to put (an amount of money) aside for a specific purpose."  *See, e.g.*, https://www.merriam-webster.com/dictionary/ring-fence (last visited March 29, 2021).

landfills" and "other sites," which 3M had been "conducting" "for the past several months").[19]  Moreover, the Company has raised its reserves for PFAS-related liabilities by over $300 million since Gangestad claimed they were "ring fenced."  On January 28, 2020, 3M announced that it had recorded an additional charge of $214 million related to "environmental matters" and "litigation related" to its manufacture and disposal of PFAS (Ex. 13 at 5-6), and has since recorded over $100 million in *further* PFAS-related liabilities. Ex. 6 at 41; Ex. 7 at 47; Ex. 8 at 48-49.

Defendants do not contend that Gangestad's statement was not false or misleading, or that it was immaterial to investors.  Rather, Defendants criticize Plaintiffs for not quoting Gangestad's further statement that "[w]hat I would not call ring-fenced is the product liability side[.]"  Mem. 18, 31-32.  The Complaint neither suggests nor implies that Gangestad meant that 3M's PFAS-related "product liability" was "ring-fenced."  To the contrary, the Complaint makes clear that it was Gangestad's "statement . . . that liability *around 3M's five manufacturing sites* was 'ring fenced' [that] was materially false and misleading when made, because it failed to disclose material facts about the magnitude of potential damages associated with 3M's manufacture and distribution of PFAS."  ¶197.  It was "that portion" which Gangestad said "I would call ring-fenced."  ¶196.

Defendants also assert that Gangestad's "ring-fence" statements suggest "fraud by hindsight."  Mem. 32.  To the contrary, the Complaint demonstrates that on the date that

---

[19]  By "the past *several months*," ¶141, 3M obviously meant at least two months  hence, 3M's "investigation" already was underway as of May 15, 2019, when Gangestad made his "ring-fenced" statement.  *See Sanchez,* 407 F.Supp.3d at 840 ("A complaint . . . need only allege facts 'sufficient to support an inference' that statements were false or misleading when made.").

Gangestad claimed that 3M had "ring-fenced . . . liability around our 5 manufacturing sites" (May 15, 2019), ¶196, the Company already had commenced an expanded investigation into other "former landfills . . . that may include PFAS" and other "waste disposal sites." ¶¶140-143, 197. "[G]iven the short time frame" between Gangestad's statements and the revelation of expanding environmental remediation in Alabama, "it is reasonable to infer that management was on notice of these problems during the class period." *In re Grand Casinos Sec. Litig.*, 988 F.Supp. 1273, 1283 (D. Minn. 1997) (rejecting "fraud-by-hindsight' argument).

### B. The Court Should Reject Defendants' Other Falsity-Based Arguments

#### 1. Defendants' Statements Are Not "Protected Opinions"

Defendants' financial disclosures and related statements were not protected opinions under *Omnicare*. *See* 575 U.S. at 186 (explaining "opinions" are only those statements that are "inherently subjective and uncertain"); *Perrigo*, 435 F.Supp.3d at 586 (holding that misrepresentation of "loss contingency" under ASC 450 was not a protected opinion under *Omnicare*); *SEC v. RPM Int'l, Inc.*, 282 F.Supp.3d 1, 27-28 (D.D.C. 2017) (holding "statements regarding loss contingencies" actionable under *Omnicare*); *see also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("There is nothing unique about representations and omissions regarding [] reserves that removes them from the purview of the antifraud provisions of the federal securities laws.").[20]

---

[20] Significantly, 3M's failure to take the required accruals necessarily means that 3M *overstated its reported earnings* during the Class Period. As noted *supra* at 17-18, ASC 450 requires a commensurate charge against earnings for every dollar accrued. *See* ASC 450-20-25-2. Earnings are obviously objective data and are not "inactionable opinions."

As Defendants concede, opinions are actionable when they (1) are not believed by the speaker; (2) convey false "embedded" facts; *or* (3) omit material facts.  Mem. 30 (quoting *Omnicare*, 575 U.S. at 184-89).  Here, all three points apply.  <u>First</u>, "Plaintiffs do not admit that Defendants' beliefs were honestly held."  *CenturyLink*, 403 F.Supp.3d at 728-29 (rejecting argument that statements were "inactionable as Defendants' subjective beliefs").  Indeed, the SEC questioned how 3M could have "not recorded any liability" for the Minnesota A.G. Litigation up to the moment it "settled the lawsuit . . . for $850 million." ¶116.  And, although the Minnesota A.G. had submitted its expert report in the case against 3M contending that the State had suffered $5 billion in damages, ¶111, the Company did not, as required, provide an "estimate of the possible loss or range of loss" that had any connection to the liability the 3M was facing.  ASC 450-20-50-4.  Because "Defendants knew that [3M's] reserves did not account for losses that it was likely to incur and its reserve figures provided a misleading picture" of 3M's liabilities, their statements are actionable under *Omnicare*.  *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018).

*Second*, 3M's accruals for environmental liabilities contained "embedded" facts in the form of the artificially low dollar amounts (¶125) of 3M's environmental liabilities, which the Company claimed were "based upon an evaluation of currently available facts with respect to each individual site" and "based on the evaluation of currently available facts to implement" its settlement agreements with "the MPCA" and "ADEM" and requirements to "address trace amounts of [PFAS] compounds in drinking water sources in the City of Oakdale, Minnesota, as well as presence in the soil and groundwater at the Company's

manufacturing facilities in Decatur, Alabama and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota[.]" ¶153.

*Third*, 3M's accruals for environmental liabilities "omitted" material facts "cutting the other way," *Omnicare*, 575 U.S. at 189-90, concerning the billions of dollars of additional liabilities that 3M faced. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) ("[A]n opinion or prediction is actionable if there is a gross disparity between prediction and fact."); *Sec. & Exch. Comm'n v. C. Jones & Co.*, 2009 WL 539615, at *5 (D. Colo. Mar. 3, 2009) (same, collecting cases). Courts within the Eighth Circuit have long recognized that projections are actionable when, as here, they are offered without a "reasonable basis." *Brogren v. Pohlad*, 960 F.Supp. 1401, 1408 (D. Minn. 1997); *see also In re StaffMark, Inc. Sec. Litig.*, 123 F.Supp.2d 1160, 1170 (E.D. Ark. 2000) (stating predictions are actionable when "plaintiffs allege sufficient facts tending to show that the defendants made the projections ***without a reasonable basis***").

Defendants also argue that both Gangestad and Roman's statements, ¶¶173-174, 196, were "inactionable opinions," Mem. 32 n.22. But, these statements did not contain "words like 'I think' or 'I believe,'" which "convey some lack of certainty as to the statement's content." *Omnicare*, 575 U.S. at 187. Rather, Gangestad and Roman's statements conveyed certainty and reliability. For example, Gangestad told investors that 3M had concluded that the Company's "liability around our 5 manufacturing sites and disposal of PFAS" was "ring-fenced" a conclusion he supported based on an alleged evaluation in which "we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs will be." ¶196. Likewise, following the

settlement of the Minnesota A.G. litigation, Roman categorically denied that there would be "shoes, however small, dropping" elsewhere and that the settlement would serve as "precedent for other states" saying: "No, this is a unique situation." ¶173. Roman assured the market he knew this because it was "something that we've been on working with them for a number of years" and that the settlement was unique "in both the nature of the case as well as the grant and the process . . . ." *Id.*

### 2. Defendants' Statements Are Not Protected by the Safe Harbor

#### a. Defendants' Alleged False Statements Were Not Forward-Looking

The "safe harbor does not apply" to "statements of present fact or past fact[.]" *CenturyLink*, 403 F.Supp.3d at 729. "Combining false or misleading statements about past or present facts with forward-looking statements does not invoke the safe harbor." *Id.*

Defendants argue that "each of the challenged statements," including "the extent of 3M's potential liability in pending litigation" and the "potential impact from future charges on 3M's financial position," were "forward-looking." Mem. 33-34. However, a company's "current, good faith estimate of the range of loss that there is a reasonable possibility it has already incurred is not a forward-looking statement." *Perrigo*, 435 F.Supp.3d at 587; *see also In re Reliance Sec. Litig.*, 91 F.Supp.2d 706, 721 (D. Del. 2000) (noting loss reserves are "directed to the then- present state of the Company's financial condition"). Here, 3M emphasized that its accruals for "environmental remediation" and "other environmental liabilities" were "based upon an evaluation of *currently available facts*." ¶¶153, 159, 162, 165, 169, 176, 179, 182, 186.

- 37 -

Similarly, Gangestad's comments during the May 15, 2019 investor conference consisted of "statements of present fact or past fact, to which the safe harbor does not apply." *CenturyLink*, 403 F.Supp.3d at 729. *See* ¶196 ("*[W]e looked* at all the discussions *going on* in all of the sites, all the litigation and *putting* our best estimate together of what *we think* all of those costs will be. So that portion, *I would call* ring-fenced."); *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 958 F.Supp.2d 1065, 1076-77 (D. Minn. 2013) (holding statement that company was "on track" and "in line" to "meet or exceed our annual guidance" was "not forward looking" and "actionable as a statement of present condition").

### b.     Defendants' Purported Cautionary Language Was Not "Meaningful"

To fall within the safe harbor, a forward-looking statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. §78u-5(c)(1)(A)(i). "Meaningful cautionary language is 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *In re Nash Finch Co. Sec. Litig.*, 502 F.Supp.2d 861, 872 (D. Minn. 2007). "[C]autionary language can not [sic] be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false." *Id.* at 873.

Here, 3M's boilerplate forward-looking caution for its quarterly earnings calls did not even mention PFAS. *See* Ex. 14 at 3. Instead, the Company merely cautioned that "factors that could cause actual results to differ materially are the following: . . . (11) legal

- 38 -

proceedings, including significant developments that could occur in the legal and regulatory proceedings described in the Company's Annual Report on Form 10-K for the year ended Dec. 31, 2017, and any subsequent quarterly reports on Form 10-Q. . . ." *Id.*[21] It is difficult to imagine a more generic and meaningless warning to investors than that "significant developments" in "legal proceedings" could "cause actual results to differ materially[.]" Ex. 14 at 3. Unsurprisingly, courts have rejected such statements as ineffective boilerplate. *See, e.g.*, *In re St. Jude, Med. Inc. Sec. Litig.*, 836 F.Supp.2d 878, 893 (D. Minn. 2011) (holding "generic" disclosure that "'expectations . . . [are] subject to certain risks and uncertainties that could cause actual results to differ materially' . . . may not serve as a 'meaningful cautionary statement'"). Thus, 3M did not provide investors with "a realistic description of the risks applicable to the particular circumstances." *Rand-Heart of NY, Inc. v. Dolan*, 812 F.3d 1172, 1178-79 (8th Cir. 2016).

Also, for Roman's and Gangestad's statements on April 24, 2018 and May 15, 2019, respectively, the Company included only a boilerplate "forward-looking statement" slide during these events. *See* Ex. 14 at 3; Ex. 15 at 2. And, during the April 24, 2018 earnings call, Roman spoke entirely in the past and present-tense ¶173 ("No, this is a unique situation.") and did not use any of the "words" that 3M's boilerplate slide told investors to look out for to "identify . . . statements" that were supposedly "forward-looking," Ex. 14 at

---

[21] While they argue that "[t]hese were not 'generic' or 'boilerplate' warnings," Mem. 34, tellingly Defendants do not cite or quote the warning itself, and instead merely cite (in a footnote) the cursory instruction by 3M's Director of Investor Relations at the beginning of earnings calls to "take a moment to read the forward-looking statement on slide three." Mem. 34 n.24 (citing Defs.' Ex. 10 at 2).

3.  Similarly, during his May 15, 2019 presentation, Gangestad also spoke in the past and present-tense.  ¶196 ("*[W]e looked* at all the discussions *going on* in all of the sites. . .").[22]

### 3.     Defendants' "Puzzle Pleading" Argument is Misplaced

As in *In re St. Jude, Medical Inc. Securities Litigation*, 836 F.Supp.2d at 887, the Complaint here "plainly enumerates the individual statements that Plaintiffs allege are false" (¶¶153-156, 158-159, 161-162, 164-165, 168-171, 173, 175-176, 178-179, 181-182, 185-188, 194, 196) and "the specific language that misled investors is highlighted" (*id.*).[23] Indeed, that Defendants' motion to dismiss identifies each of the false and misleading statements belies their assertion of a "puzzle pleading." *See Stephenson*, 282 F.Supp.2d at 1075 ("[I]f the motions to dismiss are any indication – [the allegations of the complaint] have effectively alerted Defendants of the claims against them.  As such, they are consistent with the Federal Rules." (citation omitted)).  Accordingly, Defendants' argument should be rejected.

---

[22]  Any safe-harbor defense also fails because Defendants' statements were "made with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. §78u–5(c)(1)(B)(i).  *See infra* at 41-49.

[23]  The Complaint alleges, for each date that Defendants made a challenged statement, the particular facts supporting why each statement was false or misleading, including where those facts are alleged in further detail.  *See, e.g.*, ¶¶144-151, 172.  This is appropriate internal citation, not a "puzzling" cross-reference.  *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 2011 WL 2650717, at *7 (W.D. Mich. July 6, 2011) (noting the "use of a single set of reasons to explain why various statements [a]re false . . . is a permissible way to establish falsity").  These allegations distinguish the pleading here from that in *In re 2007 Novastar Financial Securities Litigation, Inc.*, 579 F.3d 878, 882 (8th Cir. 2009) (Mem. 21), which did not provide "*any* indication as to what specific statements . . . are alleged to be false or misleading."

## II. THE COMPLAINT PLEADS A STRONG INFERENCE OF SCIENTER

Scienter may be established by pleading *any* of the following: "(1) 'facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud,' (2) 'conduct which rises to the level of severe recklessness,' *or* (3) 'allegations of motive and opportunity.'" *In re Target Corp. Sec. Litig.*, 955 F.3d 738, 742 (8th Cir. 2020) (citation omitted). A "strong inference" of scienter is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Notably, the inference "need not be irrefutable." *Id*. The Court must "consider the complaint in its entirety" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id*. at 322-23. Critically, the scienter-pleading standard "does not license [courts] to resolve disputed facts at this stage of the case." *Green Tree*, 270 F.3d at 666. Indeed, the pleading stage "is not the time to put Plaintiffs to their proof." *In re Am. Italian Pasta Co. Sec. Litig.*, 2006 WL 1715168, at *6 (W.D. Mo. June 19, 2006).

### A. Plaintiffs Have Alleged Facts Demonstrating a Mental State Embracing an Intent to Deceive, Manipulate, or Defraud

"[A]t the motion to dismiss stage, it is reasonable to assume that top management were 'aware of matters central to that business's operation.'" *CenturyLink*, 403 F.Supp.3d at 731. "Courts have recognized that the core operations inference extends to any matter of importance *that might affect the company in a significant way*." Michael J. Kaufman & John M. Wunderlich, *Messy Mental Markers: Inferring Scienter from Core Operations in*

*Securities Fraud Litigation*, 73 Ohio State L.J. 507, 517 (2012).[24]  Here, the Complaint

details how, at least by the beginning of the Class Period, Defendants knew (or were reckless

in not knowing) that 3M faced significant liabilities related to its manufacture, distribution,

and disposal of PFAS.  ¶144.[25]  The Complaint references decades of 3M documents –

including internal memos, studies, reports, research, investigations, testing, correspondence,

and manuals, ¶¶41, 43-45, 48-50, 52-53, 56 – all corroborating how the Company knew that

PFAS is highly toxic, ¶¶48, 51, 53, 55; PFAS is non-biodegradable, ¶¶41, 43, 45-46; PFAS

had been steadily bioaccumulating in the bodies of its employees, ¶53 (a "trend" of "serious

concern");[26] PFAS was "emanating from [3M's] plant[s]" and into nearby rivers and fish,

¶44; and that PFAS "[would] eventually reach the water table and pollute domestic wells,"

---

[24]  Defendants posit that "[t]he Eighth Circuit has not decided the validity of the core operations doctrine," Mem. 40, but numerous courts have applied the doctrine in situations analogous to those here, *see, e.g.*, *Elam*, 544 F.3d at 929 (recognizing, without deciding, that knowledge may be imputed to company's key officers when the information is at the core of its operations); *In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*, 286 F.Supp.2d 1047, 1059 (D. Minn. 2003) (noting "the corporation's statements regarding the importance of its trading subsidiaries to its overall business strategy" supported scienter inference).

[25]  According to the annual Sustainability Reports, 3M's "senior management" assists in an annual assessment of "the major risks facing the company."  ¶222.  Thus, common sense would dictate that the Individual Defendants had, at least, a working knowledge of the Company's mounting environmental liabilities during the Class Period.  *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 272-73 (3d Cir. 2009) ("In assessing the allegations holistically . . . , the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective.").

[26]  A particularly harrowing example of 3M's internal knowledge of PFAS's toxicity to humans occurred in 1981, when the Company reassigned "approximately 25 women of childbearing potential" from its Decatur, Alabama PFAS manufacturing plant to prevent their continued exposure to PFAS, in response to a recent internal toxicology study linking PFAS to birth defects in rat fetuses.  ¶53.  Yet, no wider actions were taken and, by 1984, 3M's continued internal testing showed that fluorochemicals had continued to steadily bioaccumulate in the bodies of 3M employees.  *Id.*

¶41. Despite all of this internal knowledge, 3M continued for years to mass produce PFAS, ¶37, and actually increased PFAS production, ¶48, while affirmatively concealing and suppressing its findings, ¶¶54-56; affirmatively marketing PFAS as harmless to the environment, ¶45; and "perpetuat[ing] the myth" (over its own employees' protests) that PFAS is "biodegradable," *id. See also* ¶¶43-44 (3M had internal studies and reports during the 1970s and 1980s concerning the harms associated with PFAS); ¶46 (in 1999 a 3M environmental specialist concluded that PFAS was "probably more damaging than PCB"); ¶¶47-57 (alleging 3M's knowledge of the harm of PFAS over several decades); ¶115 ("internal emails and memoranda" published by the Minnesota A.G. making clear that 3M had been aware of the public health harms associated with PFAS from at least the 1970s).[27]

Defendants' awareness of 3M's probable PFAS-related liability grew as more lawsuits were filed against 3M, significant developments took place in various cases, and more courts allowed other cases against the Company to proceed. In connection with the Minnesota A.G. Litigation, on November 17, 2017, approximately half-way through the Class Period, the Minnesota A.G. filed a motion to amend the complaint to seek punitive damages against 3M. *See* Ex. 1. In support of its motion, the Minnesota A.G. asserted that there was clear and convincing evidence that 3M had acted with deliberate disregard for the

---

[27] The fact that "on multiple occasions, 3M worked to suppress or downplay its own researchers' findings regarding the risks attached to PFAS exposure," ¶54, and that 3M had a "culture . . . that stifled inquiry and disclosure regarding the true risks of PFAS," ¶57, is probative of scienter. *See, e.g.*, *Mulligan v. Impax Labs., Inc.*, 36 F.Supp.3d 942, 970 (N.D. Cal. 2014) ("An inference of scienter is strengthened by the allegation of pervasive and long standing problems which allegedly were covered up as a matter of policy."); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 709 (9th Cir. 2016) (finding scienter where defendants "intentionally withheld information material to the market's assessment of whether and when the FDA would likely approve [a drug]").

- 43 -

rights or safety of others.  Moreover, the Minnesota A.G. Litigation was not a one-off allegation.  Rather, numerous similar lawsuits were filed both before the start of the Class Period, *see* ¶89 ("numerous other cases have been filed against 3M" related to PFAS contamination since 2015); ¶¶90-91 (courts denied 3M's motions to dismiss in 2016 and 2017); ¶99 ("approximately 120 class action and other lawsuits have been filed against 3M"), and during the Class Period but before certain of Defendants' false statements, *see* ¶102 (actions filed by several states related to PFAS contamination).[28]

Additionally, immediately prior to the start of the Class Period, several news reports put Defendants on further notice of 3M's probable liability related to its manufacture, distribution, and disposal of PFAS.  *See, e.g.*, ¶81 ("the Company is engaged in a host of lawsuits and remediation efforts in connection with the manufacture, distribution, and disposal of PFAS"); ¶70 (citing 2016 news report that "8 Alabama Drinking Water Systems Have Chemicals Linked to Cancer Above Safe Levels"); ¶72 (August 19, 2016 research article stating that "6 million Americans . . . are living with drinking water containing PFAS"); ¶73 (*Minneapolis Star Tribune* article reported that eighty households in Washington County were forced to drink bottled water and use filtration systems due to risks associated with PFAS-contaminated groundwater).  These numerous "red flags" contribute to the scienter analysis.  *See, e.g.*, *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 649 (S.D.N.Y. 2007) ("[S]cienter may be found where there are 'specific allegations of various

---

[28]  There can be no dispute that these cases put Defendants on notice of 3M's probability of liability given that, in 2017, DuPont and other related companies agreed to pay $671 million to settle thousands of personal injury lawsuits related to 3M-produced PFOA's health impacts.  ¶95.

reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false.").

Defendants' post-Class Period statements further enhance the inference of scienter. *See Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 981 (8th Cir. 2012) ("[B]oth post-class-period data and pre-class data [can] be used to 'confirm what a defendant should have known during the class period,' [since] '[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (alterations in original)). Here, in September 2019, 3M's Senior Vice President, Denise Rutherford, acknowledged to Congress that "[w]e at 3M have studied the potential impacts of PFAS, including PFOS and PFOA, *for decades*." ¶227.[29] Particularly when combined with the "duration and nature" of the Company's exposure to PFAS-related liabilities, "it is reasonable to infer that members of upper management were aware of it, involved in it, or were so unaware of what was happening they were discharging their duties in a reckless manner." *Am. Italian Pasta Co.*, 2006 WL 1715168, at *5. Put simply, there can be no dispute that "by no later than February of 2017, if not earlier, 3M and its executives were well aware that the Company was facing massive liabilities for 3M's manufacture, distribution, and disposal of PFAS." ¶104.

---

[29] This knowledge may be imputed to 3M. *See Acme Precision Prods., Inc. v. Am. Alloys Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970) ("It is a well settled principle that knowledge of officers and key employees of a corporation, obtained while acting in the course of their employment and within the scope of their authority, is imputed to the corporation itself."). As the court in *In re St. Paul Travelers Securities Litigation II*, 2006 WL 2735221 (D. Minn. Sept. 25, 2006) observed, "[t]he scienter of senior executives can be imputed to the corporate defendants." *Id.* at *4 n.3.

That the Individual Defendants made specific pronouncements regarding the Company's financial exposure to PFAS-related litigation further demonstrates their scienter. *See, e.g.*, ¶124 (Roman: "[W]hat we were able to do with the reserve this quarter is to really establish reserves that help us resolve the litigation that is related to environmental matters . . . ."); ¶137 (Gangestad stating 3M's PFAS-related liability was "***ring-fenced***").  It is well-settled that "an inference of scienter can be established by the fact that the Defendants touched on the specific issue . . . in their public statements." *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015).  Indeed, "[a]ctively communicating with the public about [an] issue demonstrates defendants' sensitivity to it." *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at \*2 (E.D.N.Y. July 26, 2016) (citing *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014) (finding it "absurd" to consider senior vice-president did not have knowledge of information contradicting her statements when "she took an active role in communicating to the press" about particular matter at hand)).[30]

Significantly, the specific statements at issue here were made in direct response to questions from analysts. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F.Supp.3d 635, 653 (E.D. Pa. 2015) ("[M]aybe 'the most powerful evidence of scienter is the content and context' of the statements made by [defendants], which were made 'in response to . . . analysts' questions. . . . [D]efendants' omission of actual circumstances that were contrary to

---

[30]  The fact that the Individual Defendants signed SOX certifications attesting to the accuracy of the Company's financial reporting and the design and effectiveness of 3M's disclosure controls and procedures, *see, e.g.*, ¶¶152, 167, 184, is probative of scienter, *see, e.g.*, *In re SemGroup Energy Partners, L.P., Sec. Litig.*, 729 F.Supp.2d 1276, 1298 (N.D. Okla. 2010) (noting the executing SOX certifications "which contradicted facts that were then available" to signatories was "indicia of scienter").

their answers present[ed] 'an obvious risk of misleading investors.'" (first ellipsis in original)). For example, on April 24, 2018, shortly after the announcement of the settlement of the Minnesota A.G. Litigation, Roman responded to an analyst's question regarding whether the Minnesota settlement was "a precedent for other states?  Or does it rule out any similar issues in other states?"  ¶119.  Roman responded:  "*No, this is a unique situation. This is our home state and something that we've been working on with them for a number of years*."  *Id.*[31]

Finally, the size of the settlement of the Minnesota A.G. Litigation and the temporal proximity between the announcement of that settlement and the Company's disclosures in its 2017 Form 10-K (filed just twelve days earlier, on February 8, 2018), further supports a finding of scienter.  In that filing, 3M reported that it had reserved only $28 million for estimated "environmental remediation" and $25 million for "other environmental liabilities" as of December 31, 2017.  ¶109.  Less than two months after that date – and twelve days after filing its Form 10-K – 3M announced the $850 million settlement to resolve the Minnesota A.G. Litigation.  ¶106.  *See Green Tree*, 270 F.3d at 666 (noting "sheer size" of write-down supports "inference that the defendants must have been aware the problem was brewing"); *Sanchez*, 407 F.Supp.3d at 846 (noting "sheer size" of liabilities "contribute[d] to the belief that Defendants were aware of the undisclosed liabilities yet intentionally did not

---

[31]  Alternatively, if the Individual Defendants were not knowledgeable about these material matters on which they purported to speak in well-supported detail, such recklessness would readily satisfy the scienter requirement.  *See S. Ferry LP #2 v. Killinger*, 687 F.Supp.2d 1248, 1260 (W.D. Wash. 2009) (noting when defendant speaks and does not have actual knowledge about the subject at hand, "it would be at least actionably reckless to reassure the public about these matters at all").

disclose the information"); *see also Arnlund v. Deloitte & Touche LLP*, 199 F.Supp.2d 461, 482 (E.D. Va. 2002) ("An inference of scienter [also] can be supported by the temporal relationship among several events."); *Reese*, 747 F.3d at 574 ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.").

Roman's acknowledgement that 3M had been working to resolve the Minnesota A.G. Litigation "for a number of years," ¶119, belies the possibility that Defendants did not know (or were not reckless) about the likely size of the settlement when the Company filed its Form 10-K less than two weeks before the settlement was announced. And, given the facts here, 3M is not entitled to an inference that it genuinely believed its estimated environmental liabilities were such a small percentage of the Minnesota A.G. Litigation settlement announced just weeks later. *See* ¶111 (alleging Minnesota A.G. Litigation could proceed and that the State's September 2017 expert report concluded that the State of Minnesota has suffered $5 billion in damages). *See Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants['] protests that they were completely unaware of [the truth] and the stronger is the inference that defendants must have known about the discrepancy.").[32]

---

[32]   3M suggests that the SEC's inaction following the Company's April 27, 2018 letter to the agency, *see* Mem. 13-14, 38, bears on the scienter calculus. But a defendant cannot rely upon or otherwise invoke the SEC's inaction as a defense to securities fraud. *See, e.g.*, 15 U.S.C. §78z ("No action or failure to act [by the SEC] with regard to any statement or report filed with or examined by [the SEC pursuant to the Exchange Act] or rules and regulations thereunder [shall] be deemed a finding by such authority that such statement or report is true and accurate on its face or that it is not false or misleading."). Simply put, a regulator's "decision to take no enforcement action is not a determination on the merits . . . in any sense." *In re Cirrus Logic, Inc.*, 2008 WL 4065925, at *5 (W.D. Tex. Aug. 28, 2008); *see*

In sum, it would be absurd to suggest that Defendants were not aware of the probability that the Company would incur significant liability in connection with its manufacture, distribution, and disposal of PFAS. *See In re Toyota Motor Corp. Sec. Litig.*, 2011 WL 2675395, at \*4 (C.D. Cal. July 7, 2011) ("***The defects at issue were simply too significant*** for it to be plausible that top Toyota management was not aware of the possible ramifications of the problem by the time the statements at issue were made.").[33]

## B.   3M's Failure to Take an Appropriate Reserve Was at Least Reckless

Scienter can be established by allegations of conduct evincing "an extreme departure from the standards of ordinary care, and that present[s] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Green Tree*, 270 F.3d at 654.

Here, Defendants acknowledge that "3M was bound under GAAP to follow ASC 450, which requires companies to accrue for contingent liabilities" when they are probable and the loss is reasonably estimable. Mem. 1. Knowing this, 3M was required to increase its

*also White v. Heartland High-Yield Mun. Bond-Fund*, 2005 WL 5954971, at \*3 (E.D. Wis. Nov. 28, 2005) ("SEC inaction does not support any inference as to a defendant's culpability."); *In re LDK Solar Sec. Litig.*, 584 F.Supp.2d 1230, 1245 (N.D. Cal. 2008) (letter informing defendant that the SEC had concluded its investigation "did not 'clear' [defendant] of wrongdoing").

[33] Defendants devote significant attention to *Podraza v. Whiting*, 790 F.3d 828 (8th Cir. 2015), *see* Mem. 39, but the facts there are entirely different. In *Podraza*, the Eighth Circuit agreed with the district court that "[t]he facts were known to the market at all times, and [Plaintiffs'] inference of intent or recklessness does not account for why [Defendants] would set out to commit fraud while repeatedly and accurately explaining exactly how the company was treating the costs, including the exact amount of the costs expected to be incurred." 790 F.3d at 838-39 (alterations in original). Here, not only did Defendants fail to "accurately explain[]," they also omitted material facts regarding the magnitude of potential liability associated with 3M's manufacture and distribution of PFAS.

- 49 -

environmental reserves during the Class Period and, by failing to do so in a timely manner, Defendants were actionably reckless. *See In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 148 (D. Mass. 2001) (holding GAAP violation resulting in $200 million accounting overstatement probative of scienter). Indeed, the magnitude of increase in reserves, from $28 million for "other environmental liabilities" (the only category that included PFAS) in the Form 10-K filed just before the settlement of the Minnesota A.G. Litigation, ¶109, to $235 million on April 25, 2019, ¶122 – a figure analysts recognized was still woefully inadequate, ¶126 – is particularly probative of scienter. *See, e.g.*, *Freudenberg v. E\*Trade Fin. Corp.*, 712 F.Supp.2d 171, 200 n.10 (S.D.N.Y. 2010) (noting "a drastic increase in reserves is 'suggestive' of scienter"); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 60761, at \*29-30 (N.D. Ala. June 7, 2011) ("Defendants' significant and sudden increase in loan loss reserves . . . supports a strong inference of scienter.").[34]

## C.    Plaintiffs Have Alleged the Individual Defendants' Motive and Opportunity to Commit Fraud

While allegations of motive are not required to allege scienter, *see, e.g.*, *Tellabs*, 551 U.S. at 325, motive allegations can contribute to the "overall picture of scienter," *Green Tree*, 270 F.3d at 664. In particular, "unusual insider trading activity during the class period may permit an inference of bad faith and scienter.'" *In re K-tel*, 300 F.3d at 895; *see also In*

---

[34] Defendants argue that scienter is lacking because "PwC confirmed compliance with GAAP[.]" Mem. 38. This argument is unavailing, particularly at this stage of the litigation, as confirmed by the fact that "many courts have found adequate allegations of scienter even when the defendants had obtained 'clean' audit opinions from their independent auditors and had never restated their financial statements." *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at \*11 (C.D. Cal. June 6, 2016) (collecting cases).

*re Buffets, Inc. Sec. Litig.*, 906 F.Supp. 1293, 1300 (D. Minn. 1995) ("[I]nsider trading in suspicious amounts or at suspicious times is, of course, presumptively probative of bad faith and scienter."); *In re Medtronic Inc., Sec. Litig.*, 618 F.Supp.2d 1016, 1038 (D. Minn. 2009) ("[T]he suspicious timing of stock sales can create an inference of scienter.").

Here, the Individual Defendants' trading activity during the Class Period was massively out of line with their previous trades. Thulin's $36.5 million in proceeds from 3M stock sales during the Class Period is nearly *five times* greater than the $7.7 million in proceeds that he obtained from stock sales in all of 2015 and 2016.[35] ¶230. Similarly, Gangestad obtained more than $2.8 million in proceeds from 3M stock sales during the Class Period, nearly *twelve times* more than the $238,727 in proceeds that he obtained in 2015 and 2016. *Id.*

Furthermore, each of the Individual Defendants sold a significant number of shares just before the February 20, 2018 public announcement of the settlement of the Minnesota

---

[35] Critically, of the Individual Defendants' more than 250 separate sales of stock during the Class Period, just eight transactions – Thulin's January 30 and 31, 2019 sales – were made pursuant to a Rule 10b5-1 trading plan. ¶235. Without a 10b5-1 trading plan, the Individual Defendants were able to consciously trade while in possession of material inside information. *See In re Cardinal Health, Inc. Sec. Litig.*, 426 F.Supp.2d 688, 734 n.58 (S.D. Ohio 2006) ("[W]ithout a 10b5-1 plan in existence, Jensen's trading activity could very well point to Jensen's effort to dump his [company] stock"). Because Thulin's January 30 and 31, 2019 sales were made pursuant to a Rule 10b5-1 trading plan entered into *during* the Class Period, Defendants may not rely on that trading plan as a defense. ¶235; *see Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) ("When executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations."); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 554 (5th Cir. 2007) ("[T]he attempt to use the 10b5-1 Plan as a non-suspicious explanation is flawed because, *inter alia*, Reynolds entered into the Plan during the Class Period.").

- 51 -

A.G. Litigation. *See* ¶228. In particular, Thulin sold approximately $15 million of shares on January 31, 2018 – mere weeks before the settlement was announced – receiving more proceeds from 3M stock sales than in all of 2015 and 2016 combined. ¶231. On February 1, 2018, Gangestad sold shares of 3M stock valued at more than $419,000, and then sold shares of 3M stock for proceeds of $1,022,621 the following day. ¶232. Roman chose to make *all* of his Class Period sales – for proceeds of over $1 million – on February 2, 2018. ¶228. It is hard to envision more suspiciously timed sales. *See Nash Finch*, 502 F.Supp.2d at 882 (finding strong inference of scienter when "Plaintiff further alleges that the timing of the sales was suspicious because Marshall and McDermott were aware of all of the undisclosed problems, and their sales 'were just two to three months before the Company's . . . public disclosure'").

In response, Defendants cite to *In re Navarre Corp. Securities Litigation* for the proposition that insider "[t]rading must coincide with false or misleading statements." 295 F.3d 791, 805 (8th Cir. 2002). There is no such absolute requirement. Rather, the insider trades must simply be unusual in their timing or amount. *See Medtronic*, 618 F.Supp.2d at 1038 ("[T]he suspicious timing of stock sales can create an inference of scienter."). Indeed, a quintessential example of insider trading is selling shares shortly before bad news known inside a company is released to the public. *See, e.g.*, *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y.1999) ("Trades made a short time before a negative public announcement are suspiciously timed.").

Defendants next attempt to explain away the sales with purportedly innocuous explanations. *See* Mem. 35-37. For example, Defendants' contention that Roman may have

- 52 -

"exercised an option that was expiring in three months," *id.* at 36, ignores the fact that stock sales benefit the seller regardless of whether they were made to offset payments required for the exercise of stock options or to pay taxes. And, in any event, "[t]he fact that there might be an innocent explanation for the timing of [a defendant]'s sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations – which, as defendants keep forgetting, [the court] must accept as true for purposes of this motion to dismiss." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F.Supp.2d 88, 100 (S.D.N.Y. 2006) (rejecting at the pleadings stage defendants' alternative explanation for stock sale); *see also Oxford Health*, 187 F.R.D. at 140 ("When all of the circumstances surrounding the Individual Defendants' trading are known, they may ultimately defeat the plaintiffs' claims of individual insider trading and fraud. At this point, however, the plaintiffs' allegations of unusually large insider trades at suspicious times are sufficient to create, along with the other allegations, a strong inference of scienter."). Defendants will have an opportunity to try to explain away their highly suspicious trading later, but not at the pleading stage.[36]

Defendants further contend that stock sales by non-defendants "are entirely irrelevant." Mem. 37. Not so. Class Period stock sales by non-defendants also can support an inference of scienter. *See, e.g.*, *Stevelman v. Alias Res. Inc.*, 174 F.3d 79, 85 (2d Cir.

---

[36] Defendants' arguments regarding the percentage of the Individual Defendants' sales fare no better. *See* Mem. 36-37. Not every factor needs to be present to find that trading was highly suspicious and courts are careful to note that the test is in the disjunctive: insider selling in suspicious amounts *or* at suspicious times is evidence of scienter. *See supra* at 50-51. Furthermore, courts recognize that "an insider may not always trade all his shares in the Company . . . the trader may hold on to a portion of his shares to hedge against the unforeseen or to obscure the insider trading from the SEC." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 647 (E.D. Va. 2000).

1999) (holding motive adequately alleged when CEO sold stock along with "several other insiders"); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F.Supp.2d 211, 224 n.5 (D. Mass. 1999) ("[T]he Court may consider the sales of company insiders not named as defendants.").

In sum, there is no dispute that nearly all of the Individual Defendants' insider trading was made outside of a Rule 10b5-1 trading plan, in amounts far exceeding their sales prior to the Class Period, and highly concentrated in the days before the announcement of the settlement of the Minnesota A.G. Litigation. As such, Plaintiffs have more than sufficiently alleged Defendants' motive and opportunity to commit securities fraud.

**D.     Defendants' Proposed Alternative Inference that They Acted in "Good Faith" Is Neither Cogent nor Compelling**

In response to Plaintiffs' well-pled scienter allegations, Defendants assert that "the only plausible inference is that Defendants applied their good-faith judgment to the information they knew at the time[.]" Mem. 41. But, "a subjective belief ***based on inquiry that is reckless*** can never properly be considered a 'good faith' belief." *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *14 (D.N.J. Aug. 17, 2005) (citation omitted). Moreover, while a particular defendant's "genuine belief" may be relevant at the proof stage, it is not relevant to a motion to dismiss. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F.Supp.2d 277, 320-21 (S.D.N.Y. 2013) (rejecting "at this stage" "any plausible opposing inference" concerning defendants' "genuine belief that MF Global would succeed and that the Company's collapse resulted merely from a flawed business plan" and noting plaintiff need not prove scienter until "[a]fter discovery"). And even then, a defendant's "good faith"

- 54 -

is not an absolute defense to reckless misconduct. *S.E.C. v. Brincat*, 2001 WL 1662099, at *1 (N.D. Ill. Dec. 6, 2001).

## III.    THE COMPLAINT PLEADS LOSS CAUSATION

The Complaint's allegations also satisfy the pleading requirements for loss causation. The Complaint alleges two corrective disclosures – the $235 million PFAS-related accrual disclosed on April 25, 2019, and the announcement of further PFAS-related investigations on July 8, 2019 – each of which led to immediate material stock price declines. That is more than sufficient to plead loss causation. *See* ¶¶246-259; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (noting loss causation is "not meant to impose a great burden upon a plaintiff" and "a short and plain statement" providing "notice of . . . the relevant economic loss" and "the causal connection . . . between that loss and the misrepresentation" is all that is required).[37]

Defendants contend that the April 25, 2019 stock price correction – the single largest one-day 3M stock price decline in over thirty years – was caused by other "dire" non-PFAS related financial information. But the "possibility that other forces can contribute to a decline in value of the plaintiff's securities always exists [and t]here is no requirement at the pleading stage that a plaintiff 'affirmatively rule out those other factors in its complaint.'" *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *15 (N.D. Ill. Sept. 23, 2008).

---

[37]    *See also St. Jude*, 836 F.Supp.2d at 910 ("[C]ourts . . . have found loss causation satisfied, at least at the pleading stage, by allegations that the plaintiff bought securities at a price artificially inflated by a defendant's misrepresentations, and that the price dropped once the truth was revealed."); *In re Retek Inc. Sec. Litig.*, 621 F.Supp.2d 690, 701 (D. Minn. 2009) (stating allegations of "enough fact to raise a reasonable expectation that discovery will reveal evidence' of loss causation," are sufficient).

Additionally, the Court should not credit Defendants' counterfactual narrative at this stage. *See In re Rhythms Sec. Litig.*, 300 F.Supp.2d 1081, 1092 (D. Colo. 2004) (addressing loss causation and noting "competing factual assertions" that "speak to the merits of the case" are "not appropriate for weighing at this stage of the proceedings").  A plaintiff "need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014); *see also Schuster v. Anderson*, 413 F.Supp.2d 983, 1014 (N.D. Iowa 2005) (noting that "a plaintiff must prove that the pecuniary injury is directly attributable to the wrongful conduct" but "it does not need to be the exclusive or even primary cause").  Nor must Plaintiffs plead "that *no other possible* event could have caused plaintiffs' losses." *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F.Supp.2d 334, 343 (S.D.N.Y. 2010).[38]

Defendants' authorities are not to the contrary.  For example, Defendants assert that when an "alleged corrective disclosure contain[s] multiple pieces of news," then "loss causation [is] not pleaded."  Mem. 43 (citing *In re Frontier Commc'ns, Corp. S'holders Litig.*, 2019 WL 1099075 (D. Conn. Mar. 8, 2019)).  But *Frontier* reiterates that "the corrective disclosure" need not be "the only possible cause for decline in the stock price," so long as the complaint "allege[s] sufficient facts to raise a reasonable inference that

---

[38] *See also De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at \*41 (D.N.J. Dec. 31, 2018) ("[I]t is not possible or even necessary to back out confounding causes at the motion to dismiss stage."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F.Supp.2d 148, 166 (S.D.N.Y. 2008) ("Any further requirement to ascribe the actual amount of loss to one cause or another does not arise on a motion to dismiss.").

[defendants' misstatements or fraudulent conduct] caused an ascertainable portion of its loss." 2019 WL 1099075, at *23 (second alteration in original) (citations omitted).

Defendants also assert that the July 8, 2019 disclosure regarding the existence of additional PFAS-contaminated sites was "not corrective" because it was merely an "announcement of an investigation" that "did not reveal any fraud or anything new." Mem 43. Here again, Defendants' argument misstates the law and misconstrues the Complaint's allegations. A later-in-time announcement regarding a previously disclosed problem may be "corrective" when it "revealed new information regarding the scope and magnitude" of the conduct at issue. *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F.Supp.2d 1038, 1049 (N.D. Cal. 2009); *see also In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *22 (E.D. Tenn. Feb. 4, 2014) (upholding loss causation allegations and noting while the "report did include information previously disclosed publicly, the report also included some 'new' information"). When viewed against the backdrop of the Minnesota A.G. settlement and the sudden and massive PFAS-related reserves first disclosed in April 2019, the July 8, 2019 disclosure revealed new information regarding the mushrooming scope and magnitude of 3M's PFAS liabilities and serves as a corrective disclosure. *See, e.g.*, *In re Novatel Wireless Sec. Litig.*, 830 F.Supp.2d 996, 1021 (S.D. Cal. 2011) ("Even if some information had come into the market prior to July 20, 2007 partial disclosures at an earlier date do not negate loss causation upon fuller disclosure of the relevant truth.").

The Complaint also alleges that 3M's April 2019 disclosure was accompanied by subsequent assurances that this amount "ring fenced" the Company's PFAS liability with regard to its PFAS manufacturing sites (including those in and around Decatur, Alabama).

*See* ¶¶137; 140-143; 196-200.  It further alleges that, only several months later, 3M disclosed the "investigation" into its PFAS disposal practices (and the associated environmental harms) in the vicinity of its Alabama operations that portended additional significant PFAS-related liabilities for the Company, and caused an additional decline in the stock's price.  *See* ¶¶196-200; 219-220.  Plaintiffs have not "simply rel[ied] on revelation of [an] investigation *without more*[,]" *CenturyLink*, 403 F.Supp.3d at 736, but have alleged that the July 8, 2019 disclosure and resulting loss was the foreseeable byproduct of Defendants' years-long effort to understate and downplay 3M's burgeoning PFAS-related liabilities.[39]  *See* ¶¶140-143; 198-200; 251-259.  The Complaint therefore satisfies the pleading requirements for loss causation.[40]

---

[39]   Even assuming that this was the simple announcement of an investigation – which it was not – the vast weight of authority holds that "an announcement regarding a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure for purposes of loss causation."  *In re Gentiva Sec. Litig.*, 932 F.Supp.2d 352, 388 (E.D.N.Y. 2013); *see also, e.g., City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *6-7 (W.D. La. Mar. 15, 2013) (loss causation alleged based on announcement of Senate Finance Committee investigation).

[40]   Because Plaintiffs have alleged a primary violation under §10(b) as to Defendant 3M, the control person claim under Section 20(a) is viable.  *See, e.g.*, *MoneyGram*, 626 F.Supp.2d at 985 (D. Minn. 2009) (upholding §20(a) claims when "the complaint adequately assert[ed] a primary violation of §10(b)").

DATED:  March 30, 2021                    Respectfully submitted,

                                          LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                                 */s/ Gregg M. Fishbein*
                                          ─────────────────────────────
                                          GREGG M. FISHBEIN (#202009)
                                          KAREN HANSON RIEBEL (#219770)
                                          KATE M. BAXTER KAUF (#392037)
                                          100 Washington Avenue South, Suite 2200
                                          Minneapolis, MN  55401-2159
                                          Telephone:  612/339-6900
                                          612/339-0981 (fax)
                                          gmfishbein@locklaw.com

                                          Liaison Counsel

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          CHAD JOHNSON*
                                          NOAM MANDEL*
                                          DESIREE CUMMINGS*
                                          420 Lexington Avenue
                                          New York, NY  10170
                                          Telephone:  212/693-1058
                                          chadj@rgrdlaw.com
                                          noam@rgrdlaw.com
                                          dcummings@rgrdlaw.com

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          SAMUEL H. RUDMAN
                                          ROBERT D. GERSON*
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)
                                          srudman@rgrdlaw.com
                                          rgerson@rgrdlaw.com


                                    - 59 -

- 60 -

MOTLEY RICE LLC
GREGG S. LEVIN*
JOSH LITTLEJOHN*
CHRISTOPHER F. MORIARTY*
MAX N. GRUETZMACHER*
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
jlittlejohn@motleyrice.com
cmoriarty@motleyrice.com
mgruetzmacher@motleyrice.com

Lead Counsel for Lead Plaintiffs

* Admitted *Pro Hac Vice*