UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

In Re: 3M COMPANY SECURITIES        )   File No. 20-cv-2488
LITIGATION                          )           (NEB-KMM)
                                    )
Heavy & Laborers' Locals 472 &      )
172 Welfare Fund, et al.,           )   St. Paul, Minnesota
Individually and on Behalf of       )   July 8, 2021
All Others Similarly Situated,      )   9:55 a.m.
                                    )
          Plaintiffs,               )
                                    )
vs.                                 )
                                    )
3M Company, et al.,                 )
                                    )
          Defendants.               )
------------------------------------------------------------

BEFORE THE HONORABLE NANCY E. BRASEL
UNITED STATES DISTRICT COURT JUDGE

**(MOTION HEARING)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

ERIN D. DROST, RMR-CRR
(651) 848-1227

APPEARANCES

For the Plaintiffs:                Robbins Geller Rudman & Dowd
                                   CHRISTOPHER CHAD JOHNSON, ESQ.
                                   SARAH DELANEY, ESQ.
                                   420 Lexington Avenue
                                   Suite 1832
                                   New York, New York 10170

                                   Robbins Geller Rudman & Dowd LLP
                                   ROBERT D. GERSON, ESQ.
                                   58 South Service Road
                                   Suite 200
                                   Melville, New York 11747

                                   Lockridge Grindal Nauen PLLP
                                   GREGG MARTIN FISHBEIN, ESQ.
                                   100 Washington Avenue South
                                   Suite 2200
                                   Minneapolis, Minnesota 54401

                                   Motley Rice, LLC
                                   GREGG S. LEVIN, ESQ.
                                   28 Bridgeside Boulevard
                                   Mount Pleasant, South Carolina
                                   29464

For the Defendants:                Freshfields Bruckhaus Deringer
                                   US LLP
                                   MARY EATON, ESQ.
                                   MEREDITH E. KOTLER, ESQ.
                                   601 Lexington Avenue
                                   31st Floor
                                   New York, New York 10022

                                   Faegre Drinker Biddle & Reath
                                   LLP
                                   WENDY JO WILDUNG, ESQ.
                                   90 South Seventh Street
                                   Suite 2200
                                   Minneapolis, Minnesota 55402

Court Reporter:                    ERIN D. DROST RMR-CRR
                                   Suite 146
                                   316 North Robert Street
                                   St. Paul, Minnesota 55101

**P R O C E E D I N G S**

**IN OPEN COURT**

THE COURT:  Madam Clerk, we are on the record.  Would you call the case for us, please.

THE COURTROOM DEPUTY:  In Re: 3M Company Securities Litigation.  Heavy and Laborers' Locals 472 and 172 Welfare Fund, et al. v. 3M Company, et al., Civil Case Number 20-cv-2488.

Counsel, please state your appearances for the record, starting with our plaintiffs.

MR. JOHNSON:  Good morning, Your Honor.  Chad Johnson of the Robbins Geller firm on behalf of plaintiffs.  With me in the Robbins Geller firm are Robert Gerson and Sarah Delaney.

MR. GERSON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. LEVIN:  Good morning, Your Honor.  Gregg Levin from the firm of Motley Rice, LLC, in Mount Pleasant, South Carolina.

THE COURT:  Good morning.

MR. LEVIN:  Good morning.

MR. FISHBEIN:  Good morning, Your Honor.  Gregg Fishbein, Lockridge Grindal Nauen, for plaintiffs.

THE COURT:  Good morning.

MR. FISHBEIN:  Good morning.

THE COURT:  I'm glad to see you all here today. You're welcome, when you are speaking, to take your masks off if you are comfortable doing so.

And for the defendant?

MS. KOTLER:  Good morning, Your Honor.  Meredith Kotler of Freshfields.  With me at counsel table is my partner Mary Eaton from Freshfields.

MS. EATON:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. KOTLER:  And I'll leave it to Ms. Wildung to introduce herself.

MS. WILDUNG:  Good morning, Your Honor.  Wendy Wildung from Faegre Drinker Biddle & Reath also representing the defendants.

THE COURT:  Good morning.  And you have folks with you from the defendant as well?

MS. KOTLER:  Yes, Your Honor.  Also in the courtroom are Courtney Enloe, chief litigation counsel at 3M.

MS. ENLOE:  Good morning.

THE COURT:  Good morning.

MS. KOTLER:  And Joanne Sum-Ling, assistant general counsel in litigation.

MS. SUM-LING:  Good morning.

THE COURT:  Good morning.  Well, I am -- I know you have traveled.  This is the first hearing I have had where folks have traveled and are in my courtroom, and I have to say that makes it a good moment for me and I hope for you as well.  So welcome.  I'm glad to see you here in person.

We're here on a motion to dismiss that is brought by the defendants.  My understanding, Ms. Kotler, is that you'll be arguing the motion to dismiss.  I have reviewed all of the submissions that you have given me, so I'll let you go forward with your argument.  You may do so from the podium.

MS. KOTLER:  Thank you, Your Honor.  May it please the Court, and it's wonderful to be here.

Defendants have moved to dismiss this securities class action filed on behalf of investors who claim that during the class period defendants falsely represented 3M's financial status and, in particular, the financial and legal exposure to pending litigation that had not at the time or still has not yet been adjudicated, litigation that 3M was and is defending in connection with the prior manufacture of certain chemicals.

For many reasons that I'll get to in a moment, the operative complaint falls far short of the heightened pleading standards that apply for pleading securities fraud

under the PSLRA.  That's especially so given three reasons: First, the extensive disclosures and warnings that 3M gave about its pending litigation and the difficulty predicting outcomes for it; second, that 3M's auditor, PwC, reviewed and certified all annual and quarterly financial statements, including the contingent liability accruals, as conforming to GAAP; and, third, the absence of particularized facts that showed that the defendants, when they spoke, had information contradicting their estimates of future negative litigation outcomes.

Boiled to its essence, the amended complaint complains that the defendants didn't predict negative litigation outcomes that hadn't or haven't yet happened and in cases where 3M was and is defending the claims.  That isn't securities fraud, Your Honor.  That's the inherent uncertainty and difficulty in predicting complex litigation.

And so as Your Honor knows from the briefing, we have a number -- we've asserted a number of bases for dismissal here:  The failure to plead false or actionable statements, forward-looking statements for challenge by the safe harbor, the failure to plead scienter, and the failure to plead loss causation.

What I was planning to do, other than to answer any questions and all questions Your Honor has, was not to repeat the briefing, of course, but to briefly highlight

just a few of 3M's disclosures and then identify what we believe the plaintiffs are challenging and not challenging. I say "believe" because one of the many defects here is that the puzzle-pleaded complaint makes it difficult to know exactly what they are challenging and not.  Your Honor described that puzzle pleading in the *Apogee* case.  It was also the basis for dismissal in *Novastar*.  And then I really just want to turn to two, mainly, of the defects, falsity and scienter.  So I will proceed to do that unless Your Honor has any questions at the outset.

THE COURT:  One of the questions that I have is that both parties use contingent liability or PFAS liability and PFAS litigation.  And in your briefs, you tend to use litigation, that you are accruing for litigation.  In the plaintiffs' briefs, they tend to state that exposure as liabilities more broadly.  Does it matter who's right?  And how should the Court interpret those different terms as the parties are using them?

MS. KOTLER:  Sure.  That's a good question, Your Honor.  So what ASC 450, which is the relevant codification or rule that governs accounting for contingent liabilities, does describe is that you accrue for either asserted claims or threatened claims, unasserted claims.  A claim can be a proceeding, it can be a litigation, but it does have to be a claim, a set of facts.

Where the claim is asserted, as Your Honor knows from our briefing, you cannot accrue unless you have both a probability of a negative outcome and a reasonable estimability.  And, by the way, as we noted for Your Honor, probability means at least a 70 percent likelihood of occurrence.

For unasserted claims, you actually need two things.  You need a probability that the claim will be asserted, and then, beyond that, you, again, need the probability of a negative outcome and reasonable estimability.

So I think whether you call it liability, I think they mean litigations because the amended complaint talks about different litigations.  So whether you call it litigation or you call it liability, because it's either an actual claim or a threatened claim or an unasserted claim, that still would have to be probable that it would be asserted, and then again you'd have to have probability of a negative outcome.

You know, Your Honor, there's one provision of ASC that I think I'd love to just tell you because I think it will also help, and that is the provision for unasserted claims.  Again, you know, the plaintiffs don't really talk about unasserted claims, but I can talk about that as well, but we don't think that the analysis is any different.

ERIN D. DROST, RMR-CRR
(651) 848-1227

Again, they would have to show doubly, double probability that it would be asserted, and then again still you'd have to have a probability of a negative outcome and the reasonable estimability.

So that section, which we didn't cite in our briefing because they didn't talk about unasserted claims, is -- one moment.  No.  You know, Your Honor, I'm not finding it at the moment, but I will find it after.  I read it actually this morning and I refreshed.  So I'm not sure why I'm not finding it at this exact moment.

THE COURT:  That's all right.  You can get it to me later.

MS. KOTLER:  There's a section and it is excerpted in Section 52 of the Eisman declaration, and I will find it when I sit.

THE COURT:  Thank you.  So one of the questions that leads me to is that there's a lot of discussion, including the back and forth with the SEC, about why the reserve wasn't at 850 or at 5 billion or at whatever number it should have been for the Minnesota AG litigation.  I understand that argument as to why, under 450, it wasn't -- there wasn't an accrual for the AG litigation.  What I don't understand is why, under 450, the 235 was taken, why that number was chosen.  And maybe it's not in the record, and I don't know what the plaintiffs are alleging about that other

than it was a surprise and everything prior to that was inadequate, but I don't know, under 450, why 235 was the number.

MS. KOTLER: Sure. So let me back up for a moment to answer that question and say a couple of things. But to immediately answer your question, as explained, the basis given, and it's in the 8-K -- excuse me -- the 10-Q, when it was taken, 3M explained that, as it had always disclosed, it routinely and periodically reviewed the pending claims, and it would update its assessments, including whether it could even estimate, and it had recently done that in the prior quarter. It had looked at all the pending cases and it determined to update its numbers as it would.

But, Your Honor, I think one of the assumptions in that question is that this is a case where the defendants are to explain their basis versus the plaintiffs explaining their basis. This is a securities fraud class action, and it is, as Your Honor noted in *Apogee*, it is the plaintiffs' burden to plead that the accounting was false. This isn't just a factual dispute between two differing interpretations. The plaintiffs have to identify facts that would indicate that the reserves taken at any given time were false, that they were otherwise, that they believed that they were -- they should have been higher or lower. None of that has been pleaded.

And so really the question of -- while we have indicated to Your Honor why the ASC 450 was taken later, we did that only to explain for Your Honor the broader context. But as *K-tel* and other cases make very clear, the mere fact that reserves are increased over time or that a charge was later taken doesn't mean that the charge should have been taken or they believe that it should have been taken earlier.

THE COURT:  And it is true, is it not, that 450 and reserving for litigation includes discussions with in-house counsel, with outside litigation counsel, and those discussions are tricky because of privilege and because of counsel's honest assessment of what litigation might be worth and might be settled for?

MS. KOTLER:  That's certainly true.  Many things go into an assessment and a prediction of negative outcomes that undisputedly you're just predicting, they haven't come.

And remember all of this litigation, Your Honor, as 3M identified, it was and is defending.  Whether it's the manufacturing and use cases, the product use cases or otherwise, it is defending all of them.

And as 3M disclosed, it disclosed in both the annual and the quarterly statements it accrues consistent with ASC 450, meaning it only takes an accrual when the loss is both probable and reasonably estimable; and, if not, then

it describes the nature of the contingency and either gives an estimation of possible loss or says that it can't.

And you are correct, Your Honor, that in making those assessments of what is probable and reasonably estimable, a company is to look to many different things, including in-house counsel, outside counsel, a number of circumstances, but it's making a prediction of what it thinks.

And as I was about to say, in the annual reports, there's three pieces of the annual reports, Your Honor.  I know that there's a lot of disclosure.  It's quite lengthy and very fulsome.  There are three pieces.  There's the Contingency and Commitments Footnote, the litigation risk factor, and the PwC clean audit report.

The Contingency and Commitments Footnote does a number of things.  It points out that -- the process for accruing, as I just mentioned.  It then has numerous warnings indicating that this is contingent liability.  It's uncertain.  It's difficult to predict.  There could be unfavorable outcomes.  And it says, We regularly re-examine our estimates each period, and we determine whether or not, you know, we may update our estimates or we may first determine that something is now estimable that wasn't before.

That's no surprise, by the way, for litigation.

Litigation is moving and evolving. You know, when you start a litigation and you are defending, you're defending, and, you know, you may be defending all the way up to the courthouse steps. You may even be defending after a verdict and believe that you have the better of the argument.

But you learn things over time, which is exactly what 3M said, and it said, If, as we learn things over time, we see something different or we're better able to estimate, we will do that.

It then, of course, as Your Honor probably knows, gives very lengthy descriptions, pages and pages and pages, of all the litigation. There is no claim, by the way, no assertion in the amended complaint that anything was missing from that list of litigations, the regulatory, the manufacturing and disposal, the product use cases.

And then it has a statement that they've either accrued for the liability that it deems probable and reasonably estimable and, otherwise, the company cannot estimate possible loss at this time.

Then there's a separate litigation risk factor, which talks again about how litigation is hard to predict and specifically talks about the accruals and says various developments may cause us to change our current assessments of liabilities or make estimates anew. And it even refers back to the Commitments and Contingencies Footnote and,

again, warns that future adverse developments could result in future charges that could have a material adverse effect.

And then, thirdly, it's got the PwC audit report and opinion where PwC says, We've reviewed the financial statements, and we can -- you know, we confirm that they conform to GAAP.

And then the quarterly reports have sort of the same three sections.  The Commitments and Contingency Notes is admittedly shorter.  It doesn't have in the contingency and commitments section all of the warnings about how difficult litigation is to predict and how they redo their assessments every -- you know, every period, but it refers to the annual longer warnings, and then there's also the litigation risk factor which talks about how difficult litigation is to predict.

THE COURT:  And I guess what I was getting at there is there's nothing in -- that jump to 235 -- first of all, I understand where the burden is, but, second, there's nothing there that is, in this particular litigation, we got an expert report that indicated damages would be in this range and previously we thought this.

MS. KOTLER:  No.

THE COURT:  There's nothing that specific.  I'm not saying there needs to be.  But understanding what that says, there isn't anything specific that the report points

to that makes it jump to 235.  It's a general reassessment of many types of litigation.

MS. KOTLER:  Correct.  It was described as this was their assessment of those litigations where they felt they could put a number on it with reasonably -- and that's what they said, this is the number for what we can assess as probable and reasonably estimable.  For the rest of it, we cannot, and we cannot estimate possible loss.  So they say both of those things.

And then of course, Your Honor, as I think you alluded to, the plaintiffs don't plead facts, as it is their burden, that, in fact, either that that 235 should have been accrued earlier -- right? -- that the litigations or the claims had proceeded to such a point earlier that that should have been done, or that, more importantly, that they thought that should have been done; right?  Because the standard is that they have to plead particularities or facts that the defendants had access to infor- -- contrary information that showed that the reserves they took were wrong and that there was -- and for a fraudulent purpose, and that there was, instead, additional probable and reasonably estimable liability that hadn't been accrued for.

And so maybe what I'll do is I'm just going to jump there to what the plaintiffs have and haven't alleged. But of course, as Your Honor knows, what we're really

talking about right now is the main challenge in the complaint, which is the PFAS-related accruals that comes in the, quote, other environmental matters accrual.

So I'll just quickly say that the, you know, non-PFAS environmental remediation accruals are not being challenged. They were highlighted and bolded and italicized in the complaint, but I think the plaintiffs have now admitted they're not challenging that. I mean, it is difficult to tell from this complaint exactly what's challenged, but I do believe, and Mr. Johnson can confirm, they're not challenging them. They don't say they're challenging the non-PFAS environmental remediation accruals in their brief.

They are also not challenging as false the litigation risk factor. They may say that it's not sufficient to trigger the safe harbor, which we disagree with, but they are not challenging the risk factor as false, even though it is one of the many statements cataloged in the section of their complaint that lists all of the false statements.

THE COURT: So your position -- and I -- this is in your reply; I want to just confirm -- is that the environmental remediation accruals are unrelated to PFAS, and the risk factor disclosures, which are in the complaint at paragraph 155, are also not really being challenged by

the plaintiffs?

MS. KOTLER:  So they would have to confirm that.

THE COURT:  No.  I --

MS. KOTLER:  But as we read it, they're not challenging them.

THE COURT:  I'm telegraphing the question to them.

MS. KOTLER:  Yeah, yeah.

THE COURT:  So we're talking about the category of other environmental liabilities?

MS. KOTLER:  That, and then I'll also briefly address they're challenging certain -- three different types of stated beliefs about the potential impact from future charges, which I'll talk about.  Then they're challenging Mr. Roman's statement from April 2018, and Mr. Gangestad's statement.

But, Your Honor, the reason, in fact, that we're having this discussion, you and I, is because I think this does fairly fit within the "everything but the kitchen sink" description that you described in *Apogee*, where you've got -- and that was the basis for dismissal in *Novastar*. What you have is paragraphs 151 through -- excuse me, 152 through 196 that just lists all of these statements, sometimes pages long, each time followed by the rote statement, False for the reasons stated at 141 to -- 144 to 151.

The problem is that's exactly what was done in *Novastar*. The complaint had a full catalog for many paragraphs of all the false statements, and then they boiled down and summarized all the rest of the complaint, I think it was like 32 pages, in like a long paragraph with subparagraphs. And what the Eighth Circuit says is that doesn't connect what is false about each particular one of these long statements and why.

So as between 152 and 196, we see that there are statements that they are challenging, and then they refer us to 144 through 151, but they don't say which of the long catalog of statements is false for which of the reasons in 141 through -- 144 through 151.

It's not the only thing to mention, Your Honor. I just mentioned it because you described it in *Apogee*, and it's why you and I are having a little bit of trouble understanding exactly what's challenged. But certainly what's challenged are, undoubtedly, the PFAS litigation accruals.

There's a threshold failure, Your Honor, which I think you probably remember from the *Apogee* case, which is that the amended complaint nowhere mentions GAAP. It nowhere mentions ASC 450. If you look at the complaint, really any securities litigation complaint that's challenging a part of a financial statement or saying

something doesn't comply with GAAP, because that's what the opposition argues, they detail which provisions of GAAP apply and why they're not met.  In the *Apogee* case, long -- if you go to the complaint, long, detailed allegations about the GAAP provisions that apply and why they haven't been applied.  Same thing in *Novastar*, same thing in *K-tel*, any of the cases we cite.  So this is a strange complaint to begin with, that the reserves that are challenged are alleged to not be compliant with GAAP, but GAAP is not even mentioned in the complaint.

THE COURT:  But easy to fix; right?  I mean, the Court is not going to dismiss a case and say you need to allege GAAP.  I think everybody knows that --

MS. KOTLER:  Fair enough, Your Honor.

THE COURT:  -- the argument is that GAAP 450 wasn't met.  Everybody knows what that standard is now, and that there -- as the plaintiffs would say, this is a premature question of fact as to whether GAAP is met or not. I have questions about the timing of allegedly false statements and when they were allegedly false, but I don't want anyone to hang their hat on you need to say GAAP 450 in the complaint -- or ASC 450.

MS. KOTLER:  Understood, Your Honor, nor are we hanging our hat on that.

THE COURT:  Right.

MS. KOTLER:  The bigger problem is that, as Your Honor said in *Apogee*, as you know, the Eighth Circuit requires they have to plead facts or further particularities that, if true, demonstrate that the defendants had access to or knowledge of information contradicting their assessments of the negative litigation outcomes.

They don't come close.  They can't point to any restatement of the financials or the restatement of the accruals.  They don't identify any contradicting internal set of numbers -- right? -- that the analysis was done and it was done differently.  They don't even identify a single confidential witness or single internal document analyzing the probability and reasonable estimability of any claim. Nowhere do they even allege in the course of the complaint that liability was, in fact, probable, which, again, is at least 70 percent likely or not; or do they ever allege or say in their opposition brief what the accrual should have been, other than to say, quote, massive, significant, and enormous.

Obviously one cannot -- even putting aside ASC 450 and the requirement that the liability has to be probable and reasonably estimable, you can't accrue a number of massive, significant, or enormous.  And the reason for that is precisely because the litigation was being defended, it was ongoing, and they couldn't put numbers on it, which is

exactly what they said.

Now they didn't -- 3M, of course, did not deny liability or say that the litigation was groundless, which is a distinction from the *Bayer* case.  They said, Here's all the litigation that we have, here's everything going on in it, and we're defending it.

In fact, the disclosures in the Minnesota AG case are a really good example.  They disclose there's a trial date, they disclose the Minnesota AG is seeking 5 billion in damages, that the Minnesota AG is seeking punitive damages, that we're in a mediation.  All of that is disclosed.  You can't possibly think that there wasn't possible or potential, you know -- excuse me, potential exposure.

"Potential" is the word that the amended complaint uses.  There's no requirement to accrue for potential liability.  It has to be probable liability.  And they haven't pled facts that anyone in the company did an analysis or that there was some analysis that that liability -- you know, that any probability above zero, which is what the accrual was, was probable.

And I should note, by the way, Your Honor, another piece of ASC 450, which I know you know, so 3M was defending on the merits.  They had full defenses, merits defenses, statute of limitations defenses.  All that was described.  They thought it was, bottom end, zero.  They disclosed that

the AG, unproven, thought it was up to 5 billion.  Even assuming all of that is a range of probable loss -- and none of that has been pleaded; right?  It has not been pleaded that 5 billion was probable loss.  In fact, we know it wasn't, because the settlement, albeit large, was less than a fifth of the 5 billion, but they don't -- what ASC 450 provides was that even if that whole range was probable, which it's not, you accrue the bottom end, which is exactly what they did.

THE COURT:  And at the time of the $850 million settlement, the dispositive motions, including the statute of limitations defense, were pending?

MS. KOTLER:  Yes.

THE COURT:  There's also some indication that a jury was being chosen.  And I -- I have been in state court.

MS. KOTLER:  Yeah.

THE COURT:  I know that's possible, but there was no ruling on dispositive motions and yet a jury was being chosen at the same time?

MS. KOTLER:  So it is my understanding, Your Honor, that the settlement was reached and announced the day trial was beginning.  So --

THE COURT:  While the dispositive motions were still under advisement?

MS. KOTLER:  While the dispositive motions were

still under adjudication.  That's correct.

THE COURT:  Okay.

MS. KOTLER:  But, again, it would be on the plaintiffs to plead facts that would somehow contradict all of that.

And, by the way, as Your Honor is probably familiar, this -- the Minnesota AG case was the very first case brought under the Minnesota statute for harm for environmental liability.  Talk about uncertainty, unpredictability.  There was no precedent.  There were no jury verdicts.  There were no cases interpreting this statute.  That may be a reason why it was sort of a somewhat unusual situation where dispositive motions were still pending and things were moving forward.  This was the first of its kind, only adding to the uncertainty and difficulty to predict things.

So, Your Honor, but that is -- as Your Honor put your finger on, that is one of the pieces of information that the plaintiffs point to.  I would say, though, that is fraud by hindsight.  The fact that a settlement happens and a charge is taken, *K-tel* and other cases make very clear doesn't mean that the liability was probable and reasonably estimable beforehand.

Just -- and the same thing with reserve increases. Just the mere fact that reserves increase over time doesn't

mean that they should have been taken earlier, particularly, by the way, not just for business loss reserves, but for litigation reserves, where litigation, as we talked about, it develops, there's interim rulings, there's summary judgment motions. Rarely, you know, do you know -- when a complaint is filed, rarely is there even a damages number put in it, but that damages number is unproven. It's contested. And you have to go through fact discovery, expert discovery, and, more importantly, adjudication.

And as 3M said and did, it would update over time as it got more visibility into different matters. That's exactly what it said in April of 2019 when it announced that first reserve increase. During the quarter, we've gone through an analysis, we've looked at our matters, and we're updating our reserves based on updates in those cases and updates in productive -- what they described as productive settlement discussions in certain of the product cases. It's exactly what they said they would do. Over time things developed, over time we can see more, over time we can better estimate; and when that happens, we will update the reserves.

So those are the two sort of main pieces that the plaintiffs point to to challenge the accruals, the later reserve increases and the fact that the Minnesota AG settlement wasn't accrued for earlier. But they also then

point to what they call are a series of contemporaneous facts that they claim are those particularities that contradict what the defendant said. However, they don't even come close, Your Honor, respectfully.

The first thing they point to is the fact that DuPont settled some PFAS litigation in 2017. Of course, companies settle cases for any number of reasons, and DuPont settled, per the -- per the information that the plaintiffs highlight, only 18 years after litigation and after a number of high-profile jury trial verdicts. There's nothing remotely similar for 3M. In fact, as the complaint makes clear, 3M's PFAS litigation was mostly very recent and filed only during or toward the end of the class period. The product use cases in particular, the AFFF litigations, the big AFFF litigation that's now MDL'd, that MDL wasn't even established until December of 2018.

We've put in for Your Honor the docket sheet. All discovery was stayed until after May 2019, which is the last challenged statement here. How could you possibly say that anyone would have probable and reasonably estimable litigation outcomes, you know, with an MDL of hundreds of cases where discovery hasn't even started yet? That is the antithesis of a DuPont settlement after 18 years of litigation and multiple adverse trial verdicts. And, by the way, that information, regardless, was public, so the market

was aware of it.

The next thing they point to is, again, the Minnesota AG settlement. And what they say this time is not just that the settlement should have been reserved for earlier, but that that settlement should have rendered liability in other cases. Once that settlement was reached, 3M should have known that liability in other cases was probable and reasonably estimable.

And there's two clear dispositive --

THE COURT: So 180 times 4, 180 times 4 --

MS. KOTLER: Exactly.

THE COURT: Okay.

MS. KOTLER: First of all, that doesn't even address the product cases; right? And as Your Honor knows, and we've defined them, the product cases are entirely different from the manufacturing and disposal cases, which is what the Minnesota AG case was. The Minnesota AG case was brought for harm to natural resources around the Cottage Grove manufacturing plant. That's what that was. Product use cases are about that PFAS is used -- is used for the manufacture of other products, whether manufactured by 3M or other manufacturers around the country, and then those products are used by consumers somewhere else. I mean, entirely different cases, entirely different theories. You couldn't -- they're just completely different.

Even for the manufacturing and disposal cases, it's not just, you know, 850 times 4, because the -- because plaintiffs can't allege -- they don't allege or they can't allege that the footprint -- first that the footprint of manufacturing or disposal is the same in any area; that the activities were the same in the Chicago area, in the Minnesota area, and the Alabama area. And even within the manufacturing and disposal category, there are all different kinds of cases. There's harm to resources, harm to people. They have different theories.

That's why when you accrue for -- for a -- for a litigation contingency, you have to accrue for claims. Who's your plaintiff? What do they say happened? When do they say it happened? What's their theory? What are their claimed damages? What's the jurisdiction you're in? What's the law that you are in? All of those things go into an assessment of whether liability is probable and reasonably estimable. So you can't just say 850 times 4. It's -- that's not how litigation works. You accrue for a particular claim.

The next thing that they point to, and this is a similar issue, is those early science studies. And, by the way, the Minnesota AG settlement was public. So, Your Honor, if the answer was just 850 times 4, the market knew that too.

So then they had the early science studies.  The problem with that is very similar to what I just said.  The science studies don't address potential legal liability or financial exposure from any pending or unasserted or threatened claim, let alone decades later.  These were studies done between 40 and 70 years earlier in laboratories.

THE COURT:  And when were they made public?

MS. KOTLER:  At least in 2017 or 2018.  Certainly during the class period, if not earlier.  Your Honor, let me just check one thing.

THE COURT:  I think it's 2017.

MS. KOTLER:  I'm just looking at what's alleged in the complaint at paragraphs 58 and 115.

THE COURT:  Thank you.

MS. KOTLER:  Some of it was -- some of the scientific data was released earlier.  But we know that the Minnesota AG -- according to 115, more of it was announced after the settlement, so in February of 2018.  But I would also say, Your Honor, actually, if you look at the Fishbein exhibit, Exhibit 1, that is the Minnesota AG's motion for punitive damages, which was public, and that is dated from November of 2017.

But regardless, Your Honor, putting aside that they're all public, the science studies from 40 and 70 years

ago don't even purport to address any proceeding or claim or potential claim, let alone the probability of a negative litigation outcome and the reasonable estimability of what the damages are.  It can't, because it doesn't know who the claimants are.

And certainly, I mean, particularly true for product use cases -- right? -- where again you're talking about a very different theory.  PFAS goes into another product which is then used by consumers.  So these studies aren't probative of the question in this case.

And that's sort of a fundamental problem with the plaintiffs' complaint and the opposition.  This case isn't about PFAS or the harms or dangers from PFAS.  That question, an important question, is being litigated in courtrooms around the country.  This is a securities class action, and the claim is of the financial statements, the accruals, the prediction of what the potential liability is, the future -- undisputedly future unadjudicated liability is.  There's no claim that there was some adverse judgment.  There has been not a single one.  There's not even a claim that there's, you know, some -- some actual assessment.  Judgment has been imposed.  So this case is about the predictions and the assessment -- the assessments of what might happen, what may or may not happen, what a judge may or may not rule, what a jury may or may not rule.

And so it's not about PFAS harms, which is why I would respectfully say, Your Honor, that those studies -- I'm not going to say that they, you know, are completely off topic. Obviously they are about PFAS. But medical and science studies don't address the question. They are not remotely sufficient to address the question of have the plaintiffs pointed to particular facts that the defendants had at the time that showed their estimates of probable and estimable liability were false. They can't possibly do that, and that's the standard.

The last piece that the plaintiffs point to are these three analyst reports. And I would actually say, Your Honor, that these analyst reports make our case for why the plaintiffs can't point to any facts that show that there was somehow probable and reasonably estimable liability that was contrary to the defendants' judgments. And, by the way, those judgments, they're not just like pie-in-the-sky judgments. Those are judgments that were reviewed and signed off on by PwC every quarter.

And, again, I'm not trying to get into fact here, but if you look at the *Podraza* case, that was one of the main -- I mean, I don't know how you get around that. In *Podraza*, the company even restated its financials. And what the Eighth Circuit said was they haven't shown that the defendants intentionally knew of contradictory false

information, including primarily because the auditor signed off.

So these analyst reports from Wolfe, Barclays, and Gordon Haskett, they actually establish and admit the litigation is in early days and early innings for litigation that's going to go on for years. I think it's obvious that when litigation is going on for years, being fought, the probability and the estimability of damages, you know, when you are nowhere near anything other than the early days, is very difficult.

They also admit -- Wolfe admits that its analysis is speculative. None, not one, proffers an estimate of the probability of winning or losing. To the contrary, Gordon Haskett says there could be favorable verdicts for 3M, and Barclays says some of these claims have a low probability of proving causation. Another talks about how the liability for personal injury harm could prove challenging because there's not yet been a direct link established between any harm and PFAS exposure. And then worse, they give contradictory assessments. That, in and of itself, tells you that the number isn't reasonably estimable.

And so we end up with a range according to the plaintiffs, because they haven't given us a number range, that goes from zero to 22-plus billion. Entirely useless information that regardless is public. Except the only

thing it does is it undermines 3M and could undermine 3M in ongoing litigation.

And here I think the *Bank of America AIG* case is really on point.  Slightly different situation because the plaintiffs were complaining about not disclosing the imminence of liability.  But what Judge Koeltl said in that case was the media was reporting, just like the analysts, that there's liability of at least ten billion; that, you know, a range of zero to ten billion-plus is not a reasonably estimable number that needs to be disclosed to the public.

And this, of course, Your Honor, all of this -- and that's it, by the way.  That's the entirety of what the plaintiffs point to to show that the defendants had particular information that would have led them to know that their reserves were false.  That's it.

I want to contrast for Your Honor.  I know -- I hope I'm not repeating this because I know you did it in the *Apogee* case, but I think it bears repeating.  The *Green Tree* case from the Eighth Circuit is entirely different.  There, first of all, the financials were restated, so falsity wasn't even disputed.  But more than that, and this is what Your Honor noted in *Apogee*, the plaintiffs had pleaded that in estimating and disclosing the present value of loan pools, the defendants applied undisclosed assumptions for

loan prepayment rates that had already been discredited by the monthly prepayment rates that they were getting contemporaneously.  So they had pointed to you guys use -- the plaintiff said they used undisclosed assumptions for prepayment rates that they already knew had been discredited by the information they were getting on a monthly basis. That was the problem.  And that is what is not pleaded here.

Now, when I read the opposition brief last night, Your Honor, I noted that the plaintiffs seem to make an argument that the Eighth Circuit held that reserves are factual issues.  That's not remotely what the Eighth Circuit held.

What happened in *Green Tree* was that after the plaintiffs pointed out there were undisclosed assumptions that these folks knew were discredited already based on the information they had, when the plaintiffs pointed that out, in response the defendant said, Oh, we know, but we adjusted our reserves to account for that.  And it was that, whether reserves, quote, were an adequate response to what that -- that contradictory information, that contradiction that the plaintiffs had pointed out, had pleaded, that was a factual issue.

Nobody is saying that.  It's not that -- here. It's not that the plaintiffs have pointed to some -- you know, something undisclosed that showed that the reserves

should have been different or were different and we're now saying, Yeah, but there's a reason, we can get around that. What we're saying is they haven't come close. They haven't pleaded it in their amended complaint and even in their opposition.

The fraud by hindsight later reserve increases, the fact that the Minnesota AG case was settled, the fact that DuPont took a reserve or -- took a reserve, or, you know, these science studies, none of that actually addresses the question that the defendants had information that showed that any liability, not one dollar more, was, in fact, probable and reasonably estimable and should have been disclosed. And that's why, Your Honor, this is not a factual question. It's not a question of judging two different sets of analyses. It's that they haven't pled the facts that the defendants had contrary information, that they violated GAAP. And, of course, I haven't even gotten to scienter. But they'd have to not only show that they violated GAAP, but, as Your Honor noted in *Apogee*, that they did so fraudulently and purposefully for a fraudulent reason, and they haven't done it.

So this case is no different from *Elam* and *K-tel* and *Acceptance*. All, by the way, accounting cases, all contingent liability cases, all decided at the pleading stage where the problem was the plaintiffs didn't point to

contemporaneous reports and witness statements -- or witness statements, excuse me, or other information actually provided to the defendants that indicated that the medical costs were going to be higher or that they should have reserved more or they should have accrued more.

In *Acceptance*, there was a 1995 California Supreme Court decision that increased liability for the construction claims. The company made no disclosure about that or warned about it for two years. And then two years later, they added some general cautionary language, Adverse court rulings may have an adverse effect. They didn't even mention the rulings. And then finally two years later, they increased the reserves. And even there, on a motion to dismiss, the Eighth Circuit said the plaintiffs haven't alleged specific facts -- specific facts that back in 1995 the defendants knew of specifics that would show them they needed to accrue for something different.

And while this is outside of the Eighth Circuit, Your Honor, I do think the *Luna* case is very helpful because it is actually a litigation reserve case. And to underscore, Your Honor, there there was a jury verdict, an adverse jury verdict that had gone against the defendants. But what the Court said was, first of all, it said this is not an issue of competing -- you know, who's got the right judgment. The question is have the plaintiffs alleged that

the accruals were false.  And where, just like here, they disclosed the litigation, they disclosed the verdict, and they disclosed that they hadn't taken an accrual, there's no fraud.

The exact same thing happened, Your Honor, if you go to -- it's Exhibit 8 to the Eisman declaration.  That's the 10-K from 2017.  That's the one that was filed right before -- about three weeks before the trial.  And it says all of that.  We've got a trial date.  We've got a $5 billion expert report.  We've got punitive damages.  And it goes on and says -- and it says we're mediating.  If we don't reach a resolution, an adverse ruling or judgment could have a material adverse effect, and we have not accrued for this litigation.  It's on all fours.

So I spent a lot of time, Your Honor, on reserves.  I want to make sure that I hit the stated beliefs about impact statements because it's just a different set of kinds of statements, and so, you know, there's different problems there.  And I do want to spend a few minutes on obviously oral statements and scienter.  So unless you have questions, I'm going to turn to those.

THE COURT:  No, I'm interested in the oral statements, but just to recap the two main pieces -- you just put things in three buckets, and I want to make sure I'm tracking with you.  One is the later reserves, so the

continuing increase of reserves; the second is the Minnesota AG settlement and its impact; and then the third bucket that you have talked about are these series of contemporaneous facts.  And then I would put in a separate bucket the two oral statements that are made by executives?

MS. KOTLER:  That's exactly -- well, so, Your Honor, what you've just described, the increased reserves, the failure to accrue earlier for the Minnesota AG, and the contemporaneous facts, those are all -- that's the entirety of what the plaintiffs claim show falsity of the reserves, and we would say that's not even -- that's not sufficient.

There are then two other categories of statements that we believe they challenge.  There's the statements about the potential impact of any future charges, and then there are the oral statements.

THE COURT:  Okay.

MS. KOTLER:  Do you have any preference on what order I go?

THE COURT:  No.

MS. KOTLER:  Okay.  So, actually, to make it more complicated, there are actually three types of statements that the plaintiffs challenge about potential impact of future charges.  The main one, it shows up repeatedly in the complaint.  I'm going to give you the paragraph numbers just

so we can be very clear as to what I'm talking about. Paragraphs 153, 159, 162, 165, 169, 176, 179, 182, and 186. These come at the very end of the Contingency and Commitment Footnote after they describe the accrual.

3M makes the, I think, unremarkable sentence, Where environmental remediation is, quote, largely complete, closed quote, and confined to operation and maintenance of the remedy, 3M believes that any additional loss beyond the amount accrued is not material. So where 3M -- where it's almost done, where we've been found liable, we're responsible, we're remediating, and it's just about done, we're just maintaining the remedy, we've accrued, and anything above that we don't think is material.

It then goes -- and there's nothing, by the way, remotely pleaded, no facts pleaded about any situation that fits all of those buckets; right? They've been found liable, they're remediating, they've already put the remediation in place, and they're just remedying it. That there's some future unaccrued amount that is anything other than immaterial, nothing pleaded on that.

It then goes on to say, and where remediation is largely ongoing, we can't estimate the possible loss or range of loss. So I think the plaintiffs really misstate this and mischaracterize this. This is not a statement about how environmental litigation or liabilities wouldn't

have a material adverse effect.  That's directly contrary to what 3M repeatedly stated.  It was a very narrow, specific statement.  Where the remediation is largely complete and we're just maintaining the remedy, we don't think there's anything material above what we've accrued, very limited statement.

Then we point to three sentences, one sentence in each of the 10-Ks that is sandwiched -- it's in the beginning of the Commitments and Contingency Footnote.  And it was not made and could not possibly be read in a vacuum.  It's a statement that although 3M can't estimate its exposure to all legal proceedings, it currently believes that any future charges -- that future charges, if any, would not have a material adverse effect on 3M's consolidated financial position.

There's a number of problems with the claim here.  Most importantly, it was not -- that single sentence was not and cannot be made and cannot be read in a vacuum.  Extensive warnings before, Your Honor.  That litigation is uncertain, complex, and difficult to predict; that there could -- unfavorable developments in the litigations could occur; that adverse developments, rulings, trial could result in future charges that could have a material adverse effect.

Then there were more warnings after.  3M regularly

re-examines and adjusts its estimates over time, including its ability to estimate; that current estimates of potential impact could change. And then it goes on to have the lengthy description of all of the cases and all of the pending liability. And then, of course, there's a separate litigation risk factor.

No reasonable investor reading all of those warnings and that long list of all of the litigation could somehow read that sentence, as the plaintiffs have to claim, that that was somehow -- a single sentence -- a denial of future liability or a, quote, dramatic minimization of 3M's liability. It's not possible. That's turning -- it's ignoring all of the other disclosures, which the plaintiffs cannot do.

In addition, I'll mention that that sentence talks about a material adverse impact on 3M's consolidated financial position. That, of course, is even larger than a company's balance sheet, which, in turn, as Your Honor knows, reflects that 3M's balance sheet has $32 billion. Now, I'm not taking the position that 850 million isn't a large number, but it's actually less than 3 percent of 32 billion, which isn't even the full consolidated financial position.

And I will also add, with respect to the Minnesota AG statement, that that single sentence for the 2017 10-K,

which was filed in February of 2018, three weeks before the trial, that sentence actually said, except as described below. And that was a reference directly to the description of the Minnesota AG case, which said if we don't settle this, an adverse ruling could have a material adverse impact on us and our position, and no accrual has been stated -- has been taken. There was nothing whatsoever misleading about that single sentence sandwiched with all of the other warnings and descriptions of significant liability. And we've cited for Your Honor two cases addressing very similar sentences in our moving brief at Note 19, and the plaintiffs don't even address them.

The last sentence about potential impact is actually, I think, just a mistake. That comes at the end of the environmental law compliance section. And that section itself -- that sentence did say that while we can't predict certainty of future costs of certain cleanup activities that we're describing in this section, we don't believe they'll have a material effect on our CapEx earnings or competitive position. That section expressly is limited to CapEx for building facilities or manufacturing processes to minimize waste and reduce emissions, and it is expressly unrelated to remediation actions for existing conditions caused by past operations, which would be PFAS. It has nothing to do with PFAS or PFAS remediation.

So that's the impact statements and the reserves, and I'm not going to go into it, Your Honor, because we've briefed it, unless you have a question, but I would say, in addition to not pleading falsity, those are also opinions. It's not disputed. The plaintiffs don't dispute that they are opinions.

*Omnicare* from the Supreme Court lays out how you can have -- the only three ways you can have an actionable opinion; and as we've laid out, they haven't alleged any of those three ways. They haven't alleged that the defendants didn't hold those opinions. That's where they would need confidential witnesses or internal documents -- right? -- that they said that the reserves were X, but, in fact, they believe the reserves were Y. And the accruals don't embed facts. The only fact embedded in an accrual is that that's the accrual. So if the plaintiff said, uh-uh, the accruals were actually 28 billion but you told us that they were 28 million, that would be a claim, but they don't and can't plead that.

And the other way you can plead an actionable opinion is if you can plead that the opinion is based -- that there's information cutting the other way that isn't disclosed. But, as we've gone through, every single thing that Your Honor identified -- right? -- the reserve increases, the Minnesota AG, and all those contemporaneous

facts, every single one of those was disclosed to the market.

And as well the reserves and the statements of belief of the impact of any future charges are, of course, forward-looking. I don't think they -- the plaintiffs I don't believe dispute that the statements of belief about future impact, they don't dispute that's forward-looking. I think they do dispute that the litigation reserves are forward-looking. I would just say I think it's hard to take the position that a reserve predicting a future litigation outcome that hasn't yet been adjudicated or decided is anything other than forward-looking.

We've cited cases at page 34 that talks about how reserves are estimates of future payments. And there was never -- a litigation reserve is unlike a business reserve. There is no representation that there's like an adequate reserve against loss. There was no such representation like that as there was in one of the cases that the plaintiffs cited. Nobody ever said, and our litigation reserves are adequate; right? In fact, to the contrary, they said, We've reserved for what we think is probable and reasonably estimable, and everything beyond that, we can't estimate at this time.

So turning now, then that leads us -- oh, I'm sorry. I should also say, unless Your Honor has questions,

we've laid out why these forward-looking statements were accompanied by adequate cautionary language. And I will say there's not even a challenge to all the cautionary language in the annual reports. There's a challenge to the language in the quarterly reports. Your Honor can look through it. It's quite fulsome. And, regardless, the quarterly Commitments and Contingency Note refers investors back to the annual Commitments and Contingencies Note, which, again, I don't think the plaintiff -- I don't read their opposition as challenging.

So that then takes us to the oral statements. And here I think, as in *Apogee*, we have a situation where the plaintiffs are just mischaracterizing what was said. So I will say the Roman statement is at Exhibit 10. We put in a version of the conference call transcript that we found. It is different from what the plaintiffs, I guess, have because they add a word in. I don't know where they are quoting from.

But if you look at Exhibit 10, what -- Mr. Roman is first asked something about the Minnesota AG settlement, and he's asked: Can you update on where you are, what's outstanding? What do you see as the timeline? Do you expect to hear news of issues, even small, dropping? And he goes on and he answers, and he actually gives an answer that, you know, is different. He answers a different way,

and he talks about how, you know, we're in the process of implementing the grant to the State, which was the settlement, and we're working closely with the State.

Then he gets a follow-up question. The follow-up question is: Is that a precedent for other states or does it rule out similar issues? There's been a lot of media mudslinging around different scenarios, most of which seem highly improbable -- that's the analyst, by the way -- but maybe you can just give us your perspective on that. So that's the question he's actually answering. Is that a precedent? Is the settlement a precedent for other states?

And in the transcript that we have, he just says, This is a unique situation. I guess the plaintiffs think he says, No, this is a unique situation. Doesn't matter. We're happy to take their word for it on this motion. Even if he said, No, this is a unique situation, the question he was answering was: Is the Minnesota AG settlement a precedent for other cases? There's nothing remotely untrue that it's not a precedent for other cases.

And then he even gave reasons; this is our home state, something we've been working on for a number of years. The plaintiffs would have to plead facts that Minnesota wasn't the home state or that 3M was working on a similar settlement with other cases. And, of course, as Your Honor now knows, because we're sitting here in the

middle of 2021, there have been no other settlements with AGs, let alone remotely similar settlements or of a remotely similar size.

So we happen to know in hindsight that, you know, this was not a false statement. But, more importantly, they haven't pled the facts that Mr. Roman saying in response to the question, Is that settlement a precedent for other states, him saying, No, it's not, this is our home state and something we've been working on, is just not untrue. And, by the way, he didn't even deny in that that there wouldn't otherwise be some settlements. He just said they wouldn't look like this one. Not a remotely -- really a remotely controversial statement, and certainly not some unconditional denial of further liability, which is what the plaintiffs are claiming.

THE COURT: Could you take the "something that we've been working on" as an indication of prior knowledge of the settlement coming that wasn't disclosed?

MS. KOTLER: That's an interesting question, Your Honor. I think the reason you can't, they would have to plead more than that, and particularly when what is unquestionably the case -- right? -- 3M was getting ready to try the case; right? It was -- the settlement was reached and announced on the day of trial. Parties may be talking settlement back and forth for a long time, but that doesn't

mean that there's a meeting of the minds as to probable liability or estimability of the damages. It could also even -- I mean, it could mean any number of things.

The plaintiffs would have to plead that -- you know, facts supporting that vague reference we're in discussions with the Minnesota AG. Of course they were in discussions with the Minnesota AG. They were litigating against the Minnesota AG for -- since 2010. So the plaintiffs would have to plead some confidential witness, some document, something that would indicate we are in discussions and we all agree that this is the probable liability.

And, again, I'll, you know, remind Your Honor just because you settle a case doesn't at all mean you think that's your -- that you are liable, let alone that that's what you think you're going to be found, you know, liable for by an adjudicator. And to underscore that again, I mean, that's true in any litigation. It's particularly true in a complex litigation like that one was over many, many years and where it was the very first time that the Minnesota natural resources statute was being used.

I mean, there was just -- everything was uncertain. There was no precedent. So there's even more reasons why people might be talking: What's possible? What might we want to do? What might we want to think about?

This is our home state.  These are the natural resources in our home state, having nothing to do with the probability of a negative litigation outcome.

So then I'm going to turn to the Gangestad statement.  That's at Exhibit 21, Your Honor.  And this one I think -- again, I think there was a mischaracterization in the complaint.  The amended complaint really only gives you a snippet of that statement.  And if you look at 137 or 196 through 97, the amended complaint describes that Mr. Gangestad -- this is what the amended complaint claims -- that he was saying that the new 235 million increased reserve was ring-fencing 3M's liability for, quote, manufacture and distribution of PFAS, which would basically mean, you know, liability from anything, from the manufacture and disposal or from the product liability cases.

That's not at all what he did.  In fact, he said to the contrary -- and this had been said as well by Mr. Gangestad and Mr. Roman in recent weeks.  They very clearly said this new increased reserve is unrelated to and does not cover the AFFF or product use cases.  Those cases are too early.  We are not even going to be in the business of predicting liability there.  They were very clear and obvious about that.

And then when the analyst, though, said, Is the --

ERIN D. DROST, RMR-CRR
(651) 848-1227

is the new reserve a ring-fence -- and that was the analyst's word -- a ring-fence for manufacture and disposal cases, so -- right? -- a subset of the cases, what Mr. Gangestad said was, Essentially that's our best -- he literally said, That's our best estimate of what we think the costs will be for that set of cases, our best estimate as we sit here now.

Again, the plaintiffs would have to plead that at that time the defendants and Mr. Gangestad had contrary information that the probable and reasonably estimable costs were other than what they accrued for.  Nor, by the way, was this, again, some unconditional denial or any denial of future liability, because it all has to be taken into context not only with his express statements that day -- we're not touching -- we're not even talking about the product use cases -- but all of the disclosures that 3M makes every quarter and every year, here's all our pending litigation, all these different kinds, all this stuff that's out there.

I would also say that in addition to the fact that those two statements just haven't been pled as false, they haven't -- the plaintiffs haven't pointed to what Mr. Roman or Mr. Gangestad, what facts they had that would have told them at that point -- that actually would have told them that the reserves should have been otherwise; they haven't

done that -- those statements are both opinions. Characterizing something as a -- you know, as a unique settlement or Mr. Gangestad literally saying this is what we believe, it's our best estimate, those are opinions.

And, again, they haven't hit any of the prongs of *Omnicare*. And both of those statements, we would say, are clearly forward-looking. Is this a precedent for future cases? That's something you can only tell if there are future cases. Or Mr. Gangestad saying, This is our best estimate of what the unadjudicated future maybe liability is going to be, unquestionably forward-looking. And both were accompanied by cautionary language.

I raise this, Your Honor, just because the analysis is a little different. We give you the statutory cites. Oral statements come within the safe harbor so long as there's a statement that additional information -- you know, there are factors that could cause things to differ, and that's found in a readily-available document, and here's what that document is. And all of that, we've given you the cites, but it's Exhibit 10 at 2, Exhibit 21 at 2, and Fishbein Exhibit 15 at 2. That's where all of that language pointing you to the 10-Ks and the 10-Qs for the adequate cautionary language is found. So whether it's falsity, inactionable opinion, or forward-looking statement, again, they haven't pled them as false.

I'm going to try to do scienter really quickly, Your Honor, because I know you've been very patient, but there's a lot to say here, a lot of defects in this complaint.

So the puzzle pleading and the failure to plead falsity is enough to dismiss the case, but a similar analysis would show that the amended complaint also fails to plead a strong inference of scienter. And of course they have to plead particularized facts giving rise to a strong inference of scienter, one that's cogent and compelling, and at least as compelling as, you know, inferences going the other way. They try to do this in two ways. There's the motive allegations and then there's the recklessness allegations.

Insider sales, Your Honor, are not inherently suspicious. You don't have to read beyond *Navarre*, 299 F.3d at 747. I point out the citation because the opposition brief cites to an earlier version of the *Navarre* case at 295, and that was superseded. We cited to the applicable one, which is 299 F.3d.

It is the plaintiffs' burden, again, to plead facts to show that sales are unusual in terms of profit, not proceeds, profit, amount traded, portion of holding sold, or number of insiders involved. This case has numerous hallmarks of nonsuspicious trading repeatedly recognized by

the Eighth Circuit and cases -- courts within it finding at the motion to dismiss phase -- it's not a factual question -- at the motion to dismiss phase, that sales are not suspicious as a matter of law.  That includes that each defendant increased his 3M holdings over the class period by 21 to 114 percent.

So we laid out the calculations, Your Honor, and if you have any questions, I'd be happy to go over it.  We tried to give you where we got every number from and what the mathematical formula was to do it.  The plaintiffs had all that from the moving brief.  It was attached to our moving brief filed with the Eisman declaration.  They don't raise a peep.  They don't have a single, you know, claim or objection to any of our calculations.

The holdings unquestionably increased.  *Crowell*, *Ceridian*, *Medtronic*, all cases, plus more, from the Eighth Circuit and within that say that undermines scienter.  In addition to that, each one of them sold only a fraction of their holdings, both as of any date of a sale or even if you do it collectively.  The collective percentages are 1.7, 5.3 and 10.8 percent.  Again, no dispute with any of those calculations.  *Navarre*, *Target*, *Medtronic* all said numbers as high as 32 percent sales of your holdings over the class period are not suspicious as a matter of law.

But even if you step -- even if you put all that

aside and you drill into the specific sales, you can see that the amended complaint fails to plead suspiciousness. Mr. Roman had a single sale, 3 percent of his holdings. It was a cashless carryover. You can just read the *Medtronic* case, which states the obvious. When you do a cashless carryover, which means you have an option that's about to expire, you exercise the option, and you only sell the amount that's necessary to cover the taxes and the option cost, there's nothing remotely suspicious. The plaintiffs say, well, that benefited the defendant. That's just not the standard, Your Honor. Again, all you need to read are *Navarre*, *Crowell*, *Ceridian*, and *Medtronic*; tells you all you need to know.

Mr. Gangestad, he had four sales. Two of them were very early in the class period in 2017. *Target* and *NVE* make very clear sales early in the class period, not suspicious. Plaintiffs don't claim there's anything suspicious about the timing. The only assertion they have is that his February 1, 2018, sale was suspicious because it came about three weeks before the announcement of the settlement. There isn't a single allegation that Mr. Gangestad could have predicted that there was going to be a settlement, let alone at a particular number, when the company was preparing to go to trial and taking it all the way through to literally the courthouse steps.

If that weren't enough, Your Honor, the holdings were literally 1.6 percent.  That's what his sale was, 1.6 percent of the holdings, on that date.  If you are going to dump your stock because you have inside information, you're not selling 1.6 percent.  And I'm not saying that. That's the Eighth Circuit that makes that observation.  None of that renders this suspicious.

Mr. Thulin had six sales.  Again, two of them were very early in the class period, 2017.  Not disputed, nothing suspicious claimed about them.  He had four sets -- the remaining four sets were each in the few months before his two retirements as CEO and as chairman of the board.  The Eighth Circuit in *K-tel* -- *NVE* also describes this -- it is not suspicious to start selling stock in advance of your retirement.  Beyond that, they were all, every one of them, small, less than 6 percent of his holdings at the time.

The ones that they claim are suspicious are the ones from February of 2018.  Both of those happened to be pursuant to a 10b5-1 plan.  Not that you need that, but those plans were entered into a year earlier, and I certainly don't think the plaintiffs are taking the position that anyone knew about a settlement a year early -- that they were about to have a settlement.  And certainly they don't plead as well that Mr. Thulin knew, even as of February 1 as the company was getting ready to try the case,

that there was going to be a settlement.

And all of these, Your Honor, we have pled the context here. Mr. Thulin had a practice of routinely exercising his stock options, his comp-based stock options. He would exercise them and sell some in the last of the nine years. So the options are good for nine years, and even before the class period -- we've put in the Form 4s for you -- he would routinely, in that last nine years -- in that last ninth year, he would exercise some of those options and sell them. There is nothing remotely suspicious. And, again, this isn't a fact dispute, Your Honor. It's the plaintiffs who have to plead suspiciousness.

They do plead that -- well, first of all, they plead no context, by the way, for one of the defendants, which is fatal in and of itself. And for the other two they say that the proceeds were higher -- the proceeds for Thulin and Gangestad were higher than the proceeds from the pre-class period. But as we've cited from cases, *Chapman*, *Woolgar*, others, the plaintiffs would have to plead that the profits were unusual, not just the proceeds, what you get. Proceeds just reflects that they had higher holdings and that the stock sale -- the stock price was higher. So they haven't even pleaded that. And they pled, by the way, no context for Mr. Roman.

But even putting the failure -- the lack of context aside, there is nothing pleaded to render these sales suspicious when at the same time they are increasing their holdings and selling only minuscule percentages of their holdings, all noted by the Eighth Circuit as not suspicious as a matter of law.

And the last thing, Your Honor, I wanted to note on this before I leave, because I want to make sure there's not some confusion on your part -- I would be remiss if I didn't point it out -- the plaintiffs' opposition references 250 sales of stock by the individual defendants. Your Honor, that is just not true. The three individuals sold collectively on a total of 11 days over 30 months. Their Form 4s very carefully disaggregated on any given day as a separate transaction a sale when the stock price moved maybe a cent, two cents, five cents. So when you sell stock, it goes through the market and the market price is changing; right? It can move a couple cents, a couple dimes. The SEC has a rule now that you can actually aggregate all that. As long as the sale price is within a dollar, you can just list that as a single transaction. What these defendants did was very careful. They literally just broke it out by a cent, two cents, three cents. To say that that is 250 separate stock sales, Your Honor, is really misleading. It's not. Each day was a single sale. And

they could have listed it as one transaction, but they were careful and they disaggregated.

So then I turn to, because they haven't pleaded motive -- and, by the way, there's 14 other folks who are swept in in Annex E. I think maybe they pulled every single Form 4 filed for the class period. They've included the human rights person, the IT person, people who aren't anywhere mentioned in the complaint who have nothing to do with contingent litigation liabilities. The case law is clear that doesn't speak to motive either.

So then I turn to, finally, intentional reckless conduct. As Your Honor observed in *Apogee*, without motive, the allegations of scienter have to be particularly strong. And recklessness, of course, is limited to highly unreasonable conduct and an extreme departure from the standard of care so that the danger of misleading investors must have either been actually known or was so obvious that they must have been aware of it.

And just as with falsity, the amended complaint fails to allege any facts that the defendants actually knew or had access to facts that told them that their accruals were so wrong, so violative of GAAP, or that their statements were so wrong they must have known that they were misleading people. And as Your Honor pointed out in *Apogee*, they had to have known that and they must have done it for a

fraudulent purpose.

They can't allege that here.  PwC reviewed these accruals and confirmed compliance every quarter and every year.  They were defending and are defending all of these litigations with full defenses to liability.  There's not a single fact pleaded that any defendant thought they weren't defending these litigations or that they didn't have defenses that would render the liability not probable or not reasonably estimable, and, on top of that, all of the extensive disclosures and warnings that were given, how they accrue, what they've accrued, what they haven't accrued, all of the litigations.

It's rare that you find an Eighth Circuit case really on all fours, but *Podraza* is really it.  It required dismissal under an even harder set of factual circumstances, as I said, times two.  One, the company had, in fact, restated its financials; and, two, that was a case about accounting for environmental remediation.

So, Your Honor, a judge had already decided that the company was liable and responsible for remediating.  The only question was how to account for the costs of that remediation.  The liability we're talking about here is for unadjudicated, pending, or future claims.

And what did the Eighth Circuit say?  After the -- what the plaintiffs pointed to was that the SEC had

questioned the accounting. The company had changed the accounting. The Circuit said no scienter because, one, you can't just infer scienter simply because the accounting was changed. That's the same fraud by hindsight. Two, the auditor had confirmed the financial statements and the accounting had complied with GAAP, exactly as we have. Three, the SEC had provided -- excuse me -- the company had provided the SEC with an explanation for its accounting in the beginning. It described what it did and why it did it. Doesn't have to be right or wrong. In fact, in that case, it turned out it was wrong. They changed it. But for the scienter purposes, they had a reason, they had a rationality, they had an analysis, and they gave that to the SEC at -- which is exactly what happened here for the Minnesota AG. But what didn't happen here was a change in accounting, and of course we know the SEC didn't raise any issues. And, four, that the company had repeatedly disclosed how it would account for its liabilities, which is exactly what 3M has done. It's really, I don't think -- I don't think one can distinguish that case. It really is on all fours.

So then they fall back on a hodge-podge of scienter arguments. The only two I'll hit, unless Your Honor has questions, is they point to, you know, the defendants must have known that the liability was elsewise

because of their positions. That's been rejected by, you know, every court.

And then they try to invoke the core theory, the core operations theory; you know, PFAS is so important to the company that they must have known. Well, for starters, the Eighth Circuit hasn't decided whether core operations applies. That's -- *Elam* mentioned that. And long-chain PFAS undisputedly has been phased out -- you know, was phased out two decades ago, completely phased out a decade ago. I don't know how it's core to operations that, in the class period, make 32 billion in sales a year.

But even putting all that aside, what *Elam* said, and the Eighth Circuit said also in *Kushner*, is even if the core theory were permissible in the circuit, they would still need to plead that either the defendants or others had knowledge of contradictory information at the time. So somebody is going to have to have knowledge. Somebody in finance, somebody in legal, somebody did an analysis that these claims have probable and reasonably estimable liability that is different from what we've accrued, and they haven't pointed to anything like that. So they wouldn't be able to trigger it even if it were applicable.

And so that leaves Your Honor doing the balancing, as you did in *Apogee*, against the noncompeting -- the competing nonfraudulent inferences. And we would

respectfully submit that given the absence of what's been pled and what are the acknowledged sort of larger circumstances, the defendants applied their good-faith judgment to what they knew at the time about ongoing, unadjudicated litigation to predict and establish accruals and make disclosures about contingent unadjudicated liability, all after review by PwC, and then over time they reassessed and updated those accruals as appropriate, as they said they would.  And all along they provided explanations for how they would do their accounting and all the litigation that was pending.  Again, not a single claim that any litigation was hidden or left out.

And so if you put aside the focus on, you know, harm to health and harm to the -- you know, the environment from PFAS, again, important assertions, but not at issue here.  This isn't a case about harms from PFAS.  If you put aside that, there's nothing remotely suggestive of fraud here.

That defendants couldn't or -- couldn't predict or differently predicted unadjudicated future litigation outcomes beyond the stated accruals in cases being actively defended is not a badge of fraud.  It's a reflection, as I said at the beginning, of the basic undeniable reality that PFAS litigation is complex, it's uncertain, it takes a long time, and it's difficult to predict, which is exactly what

3M also told investors in every Commitments and Contingency Footnote.

So with that, Your Honor, we also have loss causation arguments, but I trust you've read our brief. I'm happy to answer any questions about that. It's a separate reason. They haven't pointed to a corrective disclosure for very specific unique reasons here, but, you know, unless Your Honor has questions, I can always address that after my friend, Mr. Thompson [sic], speaks. But I'm happy to answer any other questions, and otherwise I will sit down. You've been very generous with your time.

THE COURT: Thank you.

Mr. Johnson, I'm going to take a little break so that you all can take a little break. I -- this has gone longer than I expected, but you are here and I want to hear you out. So I'm going to give you the equal time if you need it, if we need it. And then, Ms. Kotler, what I'll ask you to do is to limit your rebuttal to ten minutes.

MS. KOTLER: Thank you, Your Honor.

THE COURT: Okay. So let's take a ten-minute break now and come back at 11:25. Thank you. We're in recess.

(Recess taken at 11:14 a.m.)

                    *    *    *    *    *

(11:26 a.m.)

**IN OPEN COURT**

THE COURT:  Mr. Johnson, welcome.  You may proceed.

MR. JOHNSON:  Thank you, Your Honor, and good morning.

THE COURT:  Good morning.

MR. JOHNSON:  I have no intention of taking an equivalent amount of time.  I will try to be as direct as possible.  And I thank Your Honor for your attention already.

First I want to point out that what the defendants are asking the Court to do is to conclude as a matter of law at this point that the documents released by the Minnesota Attorney General's Office in February of 2018 could have no impact on the liability of 3M to liabilities associated with PFAS.  That, Your Honor, would both be inconsistent with the pleading standards, of course, it also would be inconsistent with reality, history, common sense.

For instance, we have put forward the Attorney General -- the Minnesota Attorney General's own submission in her litigation then against 3M, which at that point in 2017 didn't include the disclosure of all the underlying documents, but it was a summary of their import, and she noted all kinds of facts about how those documents evidenced

3M's knowledge for over 50 years of the poisonous effect of PFAS; how 3M had, as a matter of policy, covered up facts about this poisonous chemical; how 3M had affirmatively withheld this information from state and federal regulators; how 3M had corrupted the scientific process of evaluating the dangers of PFAS.  Was she doing that simply because of the scientific value of those documents?  Not at all.  She was putting them forward because they have an impact -- had an impact on the litigation she was pursuing against 3M related to the damage 3M had done to this state.

Beyond that, we've put forward complaints in other jurisdictions subsequent to the filing and disclosure of those documents by the Minnesota Attorney General, which, again, they were released in February of 2018.  Those complaints say on their face that they are based at least in part on the documents released then by the Minnesota Attorney General's Office.  So instead of accepting what the defendants would propose, which is a conclusion, that scientific knowledge, scientific studies, they couldn't be relevant to 3M's liability in connection with PFAS, we would ask the Court to consider the facts presented in the record along with common sense as well.  But the importance of those documents and those facts, yes, it includes after February of 2018 when the world finally had access to those details.  Of course it's crucial to that, as we've put

forward the evidence about it. It also had an impact on the Minnesota Attorney General's Office litigation.

Just to step back for a moment, of course we're talking about documents that were within 3M's files, within their possession, and the Minnesota Attorney General's Office litigation was one that obviously was, as presented by our complaint, of vital importance to the highest levels of the 3M corporate executives. As Defendant Roman said, we have been working with them, meaning the Minnesota Attorney General's Office, on this for years. That, Your Honor, suggests this is not some low-level, trivial, minor litigation of no consequence to them, but rather it was of crucial importance to the company and to the top defendants -- top individual defendants here.

What defense counsel seems to also be asking Your Honor to do is to conflate the company's litigation position in any one or many of these matters with somehow fulfilling its obligation to investors to disclose to them liabilities that are reasonably possible. Of course companies and defendants, any number of litigants anywhere can take litigation positions that are aggressive as long as they're, you know, naturally in conformance with ethical obligations and the like. 3M was entitled, in the litigation with the Minnesota Attorney General's Office, to say to the public and elsewhere we owe nothing. I mean,

maybe in theory they could have said the Minnesota AG should pay us. That is not the same thing as complying with the company's obligation to tell investors about what a reasonably possible liability may be in these circumstances.

We know that the Minnesota Attorney General's Office was seeking $5 billion in damages. Our position is not, as stated by the other side, that the company had to accrue for a $5 billion claim, but we also know that the litigation resulted in a nearly $1 billion payment by 3M.

Now, as a matter of common sense, did -- within 3M, not outside litigation position, is it realistic, is it consistent with common sense to conclude that the defendants believed, honestly believed that they would not have to pay anything beyond a trivial amount to get out of that litigation? Sure, to the outside world, they had all their defenses, they presented them, but they are also living in the real world. And we know that they ended up at nearly $1 billion.

Did they get to nearly a billion dollars in a matter of days or weeks? Realistically we know that's not how settlements at that level typically arise. And, again, Defendant Roman's statement was they'd been working with the Minnesota Attorney General's Office on that matter for years. When construed fairly and not in the defendants' favor, that suggests that there had been settlement talks

ongoing for a considerable period of time.  We even heard what seemed to be an acknowledgment of that reality, which is frankly no surprise here today.  That is consistent with the likelihood -- and, again, under the relevant standards, all we have to show for falsity is a reasonable possibility.  That is -- that is consistent with the likelihood that 3M and the individual defendants understood they were going to have to pay something material to resolve the Minnesota Attorney General's Office claim, and they recognized that realistically long before they announced in February of 2018 that, despite having reserved not a single dollar for that matter previously, that they were then rolling out this settlement acknowledging nearly $1 billion of liability.

THE COURT:  So I have a couple questions about the litigation itself then.  Are there case examples of this circumstance that you are alleging, which, frankly, is a common circumstance -- right? -- that a company is sued in an extremely large litigation, whether it's an AG litigation or class action litigation, it has defenses, statutes of limitation, it has dispositive motions, they are under advisement, they are running along parallel tracks where one team is working on settlement and another team is working on trial, and ultimately it settles on the courthouse steps?  Are there examples that are in the case law where the company, knowing that range of possibilities -- we could go

win our dispositive motions, we could win a defense verdict, we could lose big at the first trial, or we could pay money -- where that failure to accrue for somewhere in the middle is securities fraud?

MR. JOHNSON:  Your Honor, I would point to a case that the defense counsel seems to like, which is the *Luna* case, where what happened was the defendants there actually accrued a reserve.  It was -- I think it was a couple of hundred millions of dollars.  They ended up getting tagged for a much higher amount.  The Court there said, Well, look, they took a reserve.  I mean, that suggests there's good faith here at a minimum, and so the case was dismissed as a result.

Here, to the contrary, what we have are facts, again, when looked at through the prism of common sense and practicality, suggest they -- they had every reason to understand, especially when you consider that they had all the files the Minnesota Attorney General would later release, they had every reason to understand this was not a cheap, you know, cost of litigation-type matter.

They could get a -- sure, could they roll the dice and win it all?  Possible.  Could they roll the dice, lose it all?  Possible.  But what's realistic?  Because the company, as a publicly-traded company, certainly has benefits associated with access to the capital markets, but

they also have certain burdens; and one of them is to honestly and fairly assess what is reasonably possible for their liability and say to shareholders not we will pay this, not we're certain we will pay this amount or anything like that, but there is a reasonable possibility we will have to pay in the range of, you know, a billion dollars to resolve our PFAS litigation, for instance.  What they had to do was undertake a reasonable assessment of this.  It's not a case about predicting the future.  We stipulate the future is uncertain.  This is about a present tense reasonable assessment of what a reasonable possibility of liability is in this space.

THE COURT:  And so are there any cases where that happens, where Exxon for -- any of the companies that have been sued for an enormous amount of money have had defenses that are fulsome defenses and dispositive defenses and the range is zero to 500 million, a range of zero to 5 billion, where the failure to take zero is securities fraud?  Because 450 says you take zero when there's a range.

MR. JOHNSON:  Well, of course it's a bit more nuanced than that.  You take zero if that is your reasonable assessment.  But I would also note, Your Honor, that 450 goes on to talk not just about what's probable, okay, probable is relevant, but what is just more possible than remote, reasonably possible, not probable.  You still, as a

publicly-traded company, have to assess -- and I'm going to come back to your question. I don't mean to sidestep it.

THE COURT: That's all right.

MR. JOHNSON: I'm going to refer to cases. 450 also requires that if there's a reasonable possibility, just more than remote, that the company is going to have to pay a liability that's not trivial, they need to size it up. Case law, Your Honor, I would refer the Court to at least two of the cases that we cite in our papers.

One is the *Citigroup Bond* case where Citigroup was only reserving for actual losses on its portfolio. These were the days of RMBS and ARS and the like, and the world was learning that these portfolios of mortgages could be toxic and result in massive losses for investors. What Citigroup was doing was merely accruing for actual losses, not what was likely. And the Court in that case explained that the company had an obligation to also size up what was likely.

I would also refer the Court to the *Perrigo* case, a decision by Judge Denise Cote, who is one of the most distinguished securities -- especially in the area of securities, one of the most distinguished judges in the country. Her decision there explained that -- so in *Perrigo,* you had the Government saying to Perrigo, we think you have a $5 billion liability. Perrigo was saying to the

world, zero, zero.  And what Judge Cote explained is that ASC 450 requires that if there is a, quote, reasonable possibility that a loss will be incurred, the estimate of the amount must be calculated and disclosed.  She goes on to say, The defendant there, quote, had a duty to quantify its exposure, closed quote, after it received the Government's position even if it disagreed with the Government's position and intended to contest it.  That's at 586 of that case.  And she goes on to say on the next page, 587, that what Perrigo was required to disclose was a reasonable estimate of the possible loss.  The defendants here had that same obligation.

Your Honor asked, I mean, several excellent questions, but one I would point out in particular related to, well, what's the reason they were able to calculate it later.  And the -- and the explanation provided to the investing public, and there's no better explanation provided today, is, well, we looked at the historical information and we came up with this number.  Well, that is an impossibly vague explanation, if it even qualifies as one.  That under all of the circumstances as pled, including about the detailed facts and documents in 3M's possession going back to the beginning of the class period, there is no good explanation as to why 3M could not have calculated these figures vastly earlier, including at the beginning of the

class period.

And the math here, Your Honor, sometimes it gets lost, but it ends up being fairly simple, and the numbers are huge.  It's not just the 900 million that 3M agreed to pay to the Minnesota Attorney General -- or through that settlement.  It's also the $235 million we've talked about, another $214 million reserve in February of 2020 -- I know that's post-class period, but these are still facts -- and another $100 million in loss reserves taken in the rest of 2020.  The total is $1.45 billion related to this area of exposure for the company.  Did they truly, fairly believe that simply because they're taking an aggressive, okay, aggressive litigation position, that that ends the inquiry?  It doesn't, as explained by Judge Cote in the *Perrigo* case.

I would also refer the Court to another case, the -- it's in our papers, the *SEC v. RPM* matter; where the defendant there, the case against them was sustained despite that the defendant had not been ordered to pay any particular amount.  The defendant had not offered to pay any particular amount.  But, rather, the Court concluded that it was entirely realistic for them to size up the -- a fair estimate of their liability and disclose that to the investing public.  That's what investors are entitled to.

I would also note, Your Honor, that defendants, in their papers, when they try to distinguish the *Perrigo* case,

for instance, they say, well, the *Perrigo* case was just about -- it may have been $5 billion, but it was just about one issue.  It was a tax issue.  That's simple.  What we had -- or have are a slew of litigations related to PFAS and that's complicated.

Well, the *Green Tree* Court, the Eighth Circuit rejects that as -- defense or explanation, pointing out that undoubtedly the accounting issues are complex, but whether they were handled within the parameters of good faith or whether the decisions amounted to recklessness will be the focus of the trial in this case.  We don't prejudge that.

THE COURT:  *Green Tree* had a restatement of its financials.  So in that case, there was no question of fact that exists on whether there was a GAAP violation, and the complaint there alleged that the defendant had critical information that was based on discredited assumptions that did not wind their way to the financial statements there.  What here are the items that defendants had in their possession that weren't disclosed?

MR. JOHNSON:  Yes, Your Honor, and just one sentence before I answer that.  I'd also note that in the *Citigroup* and *Perrigo* cases, there's no restatement and the claims were sustained.

But the answer to your question is at least threefold.  One, the company and the individual defendants

knew, obviously had immediate access to -- and if they didn't have it in their hands, it's severe recklessness -- the documents, the details about 3M's knowledge of the poisonous effects of PFAS.  They knew these documents had not been made available to the public.  They knew how damning they were -- I'm still on point one, by the way -- they knew how --

THE COURT:  These are the historical scientific documents?

MR. JOHNSON:  Yes, Your Honor, that's right.

THE COURT:  We'll put those in one group.  All right.

MR. JOHNSON:  Number two, the defendants of course knew all the details about their ongoing negotiations with the Minnesota Attorney General's Office.

THE COURT:  There was reference to those settlement discussions and mediation in the quarterly filings.

MR. JOHNSON:  Sure, that there were discussions, but knowing -- knowing the substance of those discussions is a world apart from knowing that there are discussions. Anyone can look at the litigation, understand, oh, there's a trial date, all right, well, and, oh, they disclosed that there are discussions.  But the substance of those discussions, which, again, result in a $900 million

settlement, did they go from zero, which is what they were saying to the world, to 900 million in a matter of days or even weeks, not -- it's not a fair construction of that set of facts especially when you add to it Defendant Roman's statement that they had been working with the Minnesota AG's office on that for years.

THE COURT: Okay. But you're a plaintiff's lawyer. So I'm really struggling with this; right? You're a plaintiff's lawyer. You walk into a mediation. It's a confidential mediation. You sign a confidentiality statement. And are you pushing the proposition or putting forth the proposition that the contents of the mediation need to be disclosed in order to avoid securities fraud?

MR. JOHNSON: No, Your Honor. It's -- it's definitely a more nuanced point consistent with the obligations that every public company has to its investors, which is not to disclose the detailed substance of privileged and confidential communications, but to realistically size up the liability that's expected in this space. Which, by the way, they didn't have to disclose that we're ready to pay the Minnesota AG 500 million or 750 or we've offered to pay these numbers or something like that. What they could have done, fully compliant with ASC 450, is to say we have assessed this situation related to PFAS at our five manufacturing sites -- put aside products

liability, okay?  We're not trying to add that in.
That's -- let's put it aside.  We have reasonably and fairly assessed our potential liability associated with these five PFAS manufacturing sites; and nothing is certain, nothing is knowable, we make no guarantees, but there is a reasonable possibility we will need to -- we will face a liability exceeding a billion dollars for this entire area.  That doesn't tell anyone what you've offered the Minnesota AG.  It doesn't tell anyone you'd ever pay that in total or even a fraction of it.  You're saying consistent with your obligations to the investing public, look, we know you've invested in us.  There's a reasonable possibility -- more than remote, not more than probable -- there's a reasonable possibility we're going to have to pay $1 billion or more for this area and that's our honest assessment.  Because they had the facts in front of them in their files, in their hands, plus they're involved in these negotiations suggesting that this is not a matter the Minnesota AG's office is going to settle for a song.  They knew that.  They had to know that far before they roll out a $900 million settlement.

Take the counter-factual -- or put the test to the defendants.  If it was not even reasonably possible that they were going to face a material liability for the Minnesota AG's litigation and other sites, how irresponsible

was it for them to agree to pay nearly $1 billion?  You can't have it both ways.  Either it was reasonably possible --

THE COURT:  Well, clients settle litigation for all sorts of reasons and lawyers don't like it; right?

MR. JOHNSON:  Sure.  But that's the point, Your Honor.  This isn't about the strength -- it's not merely about the strength of defenses.  It's not enough to say we sincerely believe we have a great statute of limitations defense, we sincerely believe we have any number of other defenses.  Investors aren't ultimately asking to hear about your litigation position.  They're ultimately asking to hear what is a realistic assessment of the number, the dollars.  What does this mean for our investment?

THE COURT:  So how do you get that; right?  You don't get that in the 26(a)(1) disclosures; right?  Plaintiffs' lawyers don't ask for a dollar amount in the complaint, typically.  You get it through the expert report is probably the first time you hear a damages number; right?

MR. JOHNSON:  And what Your Honor -- yes, except that's what the other side is saying.

THE COURT:  Sure.

MR. JOHNSON:  What we are talking about is the obligation on the company to make a realistic assessment, all facts included, facts that are public, facts that are

not publicly available.

THE COURT:  And so let's go back to -- you were on the scientific studies.  I'm not clear on what was publicly available at the time that the AG sued and what was not.  I know and have read the AG's motion for punitive damages, which was public.  The Court's order allowing those punitive damages was public.  Are you saying there's something separate in documents that 3M had and was holding and not disclosing that is different from the expert report and the -- I guess, more importantly, the AG's complaint and motion for punitive damages, something separate and not disclosed than in those publicly-available documents?

MR. JOHNSON:  Yes, Your Honor.

THE COURT:  Okay.  What are those things?

MR. JOHNSON:  So they are referenced in paragraph 115 of our complaint.

THE COURT:  Okay.

MR. JOHNSON:  We have copies of them.  I don't know that we have them with us.  They're obviously -- they are obviously documents we could submit.  They include things like a resignation letter by a scientific expert who had been employed by 3M detailing all of the efforts 3M had made to corrupt his process of assessing the dangers and poisonous effect of PFAS.  It included memos internal to 3M explaining that the company did not have a good position or

explanation for the poisonous effect of this. It included numerous other documents, which of course we'd be happy to share with the Court. They are in black and white.

But the fact is it's not as simple as the AG's complaint, the AG's expert report. The expert report makes you -- summarizes some of those documents. It's -- and, frankly, as a former Deputy Attorney General in New York, I have never seen this done where an Attorney General's Office settles a matter and then drops a file -- you know, a trove of documents clearly intending to show the world something not good about 3M. And, again, as we've presented to the Court in the record here, other cases sprouted up as a result.

THE COURT: So if the trove of documents dropped after the settlement, is the cata- -- is what 3M was not disclosing, then don't you have a loss causation problem? Because when that trove dropped, there was no stock drop.

MR. JOHNSON: No, Your Honor, because what happens is -- you don't have to have a drop with every single possible disclosure. Later, when the company finally agrees that, okay, well, we've got to disclose more than we have, the $235 million additional reserve, there is the significant drop. Then we have the July 8th drop. So no. But to really --

THE COURT: If I cabined it to that, we'd have a

ERIN D. DROST, RMR-CRR
(651) 848-1227

loss causation problem, but you are saying there are steps here?

MR. JOHNSON:  Frankly, Your Honor, to be as precise as possible, I don't -- I'm not sure about that because we haven't gotten to the stage where we would have an expert weighing in on that.  It is possible that if our case were cabined to that, yes.  I don't mean to suggest it's not, but I also don't mean to concede that an expert wouldn't size it up, you know, differently than lawyers might.

I also want to address the assertion by the other side that somehow the inaction of PwC, the fact that PwC has never required some other statement or disclosure is, itself, as a matter of law, dispositive.  The case law is clear that that's not -- that's not the import of an auditor's silence.  An auditor may be silent for any number of reasons.  In discovery we may find out that the auditor wasn't given a full and fair understanding of what the company knew.  And I would refer the Court to the *Silver Wheaton* case, which is cited in our papers, assembling other cases that address this as well.

I would -- I apologize if this feels disjointed. I'm not -- I don't want to just read things to Your Honor. I want to try to address the points raised by the other side.

You've read and heard the other side suggest that probability requires a 70 percent likelihood. This is an effort by the other side to mix and match provisions in the accounting rules that we do not concede flow that way. That really is an issue for later. But at some level it doesn't matter because probability isn't the only standard. It's not the requirement. If there is a reasonable possibility of a loss -- again, this is Judge Cote in *Perrigo*. If there's a reasonable possibility of a loss, which is just more than remote, they must disclose -- they must calculate and disclose that fairly-determined number.

THE COURT: So let's focus on GAAP, if we could.

MR. JOHNSON: Sure.

THE COURT: I had some discussion with counsel about whether this is a GAAP case, whether this is an allegation by the plaintiffs that the defendant violated GAAP. I don't see those words in your complaint, and I'm curious as to your theory.

MR. JOHNSON: Sure, Your Honor. So the defendants have invoked GAAP as a defense here. We have no obligation to frame this as a GAAP case. We -- we have presented facts that indicate a GAAP violation. Defendants have invoked GAAP to suggest that, no, we've complied with it and, therefore, there's not a solid case here. Our point is GAAP works against them. And so fundamentally the point is the

facts are there.  It's not required that we frame it that way.  Obviously if we're talking about words on a page, that can be addressed, as Your Honor pointed out previously, but there certainly is no fundamental requirement that we frame it that way.  If GAAP didn't exist, the company still had an obligation to disclose what its reasonably likely or possible liability would be in this space.  They failed to do that.

THE COURT:  And so I'm looking, because the law requires me to, again, for things not disclosed.  And I'm getting the trove of scientific documents.  And then I'm hearing -- and I don't mean to oversimplify it, so I really want to focus in on it -- a disagreement between you and 3M about what their honest assessment of the case was.  And the case law is requiring undisclosed facts, something that they knew that they didn't tell the investing public about.  And I'm -- so, for example, if the expert report wasn't disclosed -- if it was publicly available, I don't know what to do with that -- but -- or a grant of punitive damages or something material that happened in the litigation or litigation itself that wasn't disclosed or litigation that they knew coming down the pike that they didn't disclose, I'm looking for something like that, and I'm -- I'm trying to focus in on what that is and where it is in the complaint.

MR. JOHNSON:  So the three main categories that I would focus on for points that 3M and the top executives knew but the public did not, in addition to the scientific documents, which is probably an overly-simplified way to sort them out --

THE COURT:  Understood.

MR. JOHNSON:  -- the knowledge of the details about their honest assessment of the Minnesota AG case, and the possibility of settling that for a trivial or nontrivial amount of money, not just that they were in negotiations, but their honest assessment of their need to pay something nontrivial to get out of that litigation.

THE COURT:  And where is that in the complaint?

MR. JOHNSON:  Your Honor, we certainly talk about their knowledge of the Minnesota AG's litigation and negotiations.

THE COURT:  Okay.

MR. JOHNSON:  And then, third, also in the complaint, their knowledge of the negotiations, details of discussions with plaintiffs in other cases.  And when you combine the documents and the details of the, you know, poisonous effects of PFAS and the like with the likelihood that the disclosure of those documents would fan the flames, would provide ammunition to plaintiffs, whether we're talking about state regulatory authorities or private

plaintiffs and the like, the reality is that 3M had the details that the investing public didn't about all those matters.

Now, we heard, you know, all this argument about how the Minnesota AG settlement supposedly didn't set a precedent for any other matters.  What defendants, in effect, are asking the Court to do is understand precedent to mean something unduly narrow, almost formulaic.  Like there was some talk about times four.  That's not -- as litigators, we know that's not the only form of precedent.

The fact is that when 3M agreed to pay such a substantial amount to Minnesota related to its manufacturing and disposal of PFAS here, precedent isn't limited to:  Is the footprint identical in Alabama?  Were they doing exactly the same thing?  Could it only be the attorney general?  Well, while we've been litigating this case, the Alabama Department of Environmental Protection has entered into what they describe as an unlimited cost settlement with the -- with 3M about their manufacture and disposal of PFAS there in Alabama.  Is our point, oh, well, that's a formula, you just apply a formula?  No.  But there is relevance, there is precedential value to the fact that 3M agreed to pay such a significant amount here, added to the reality that the Minnesota Attorney General, in her wisdom, made a document drop that, again, provided ammunition and grist to these

many other litigations, not limited to Alabama by any means.

I want to say at least a word about *Podraza* because we've heard a lot of talk about that. I would note that in *Podraza*, there's no -- there was no failure to disclose the liability at all. The liability, as I recall, was a $25 million liability. It was disclosed to the investing public. What happened in the fact pattern there is the company ultimately had to reclassify it. They had to -- instead of calling it a capital expenditure, they had to reclassify it as an expense. I believe that's correct. But from the beginning the $25 million exposure was disclosed.

Here, instead, we have trivial reserves, none of which relate to the Minnesota AG's litigation, zero dollars for that, and only a year after that matter -- year-plus after that matter is disclosed does the company start ratcheting up their reserves for this space, again, in a manner that tries to explain this in an impossibly vague, nonspecific manner.

And, again, applying reason, common sense, a fair construction of the facts, the reality is that 3M had within its possession, the individual defendants had within their ready access the information that would have allowed them to undertake, if they didn't already, an honest and good-faith assessment of the reasonable possibility of a nontrivial

liability in this -- in this space.

Your Honor, I've already gone longer than I meant. I'll try to wrap up here. But when it comes to scienter, we point out, frankly, similar facts; the knowledge and access to these details that I've mentioned that are in our complaint, that are discussed in our papers, and that is fundamental.

When it comes to stock sales, I would just point to at least one important fact, which is that all three of the individual defendants made substantial sales shortly before the disclosure of the Minnesota Attorney General settlement. There's a suggestion that we don't plead that they knew about the settlement. The whole point of the case is they knew, they had access to all the facts about what was going on, that they knew this was of paramount importance. It remains of paramount importance.

The suggestion that PFAS is just some historically interesting part of the world, that, you know, that's it, it's just about history, 50 years ago, forget it. If anyone opens up their -- their disclosures, you see the list of litigations. And is it meaningful? Yes. And it's confirmed by -- I mean, the Minnesota AG litigation was confirmed by Roman as having been worked on by them for years. You see them increasing their reserves. This is not merely a quaint historical fact that is buried in the depths

of 3M's history.

I just want to see if there's anything else. There was talk about the analysts' reports that are discussed in our complaint, talk by defense counsel about those analyst reports and a suggestion that somehow those are good for defendants here.  It's hard to fathom how that is.  I mean, the import of analyst reports, including these, is they are an indication of how a reasonable investor responded to the news that was provided.  And these analyst reports were not disclosed -- or did not get published at the beginning of the class period where the analysts were saying, you know what, from everything we can read right now, it sure looks like it might be a 520 to whatever, you know, huge liability.  It was only when the company started rolling out their acknowledgment that they had to increase their reserves, that analysts started tuning into and publishing detailed analyses about how this seems indicative of a much larger problem than the company wants to acknowledge.

Your Honor, I've already gone longer than I meant, so unless there's anything else in particular, I'm happy to sit down.

THE COURT:  Just a moment.

MR. JOHNSON:  Sure.

THE COURT:  The -- the allegations in the

complaint appear to be limited to false statements regarding other environmental liabilities.  The complaint also highlights environmental remediation accruals.  It also highlights on -- I think it's paragraph 155 that talks about boilerplate risk factors.  Are those false statements under the plaintiffs' complaint, or are we limited to other environmental liabilities?

MR. JOHNSON:  The category you mentioned, which I think it's environmental remediation, no, that's not a part of our case, but here's why, Your Honor.  Before we received 3M's motion to dismiss, their brief in support of that, it was unclear from 3M's disclosures whether that other category was meant to somehow encompass PFAS liabilities.  So we discussed it, because we're not trying to carve out something that they were putting out as a disclosure about PFAS.  It turns out that as -- as finally, I guess, explained by 3M in their brief, that doesn't have anything to do with PFAS.  So it turns out the numbers are actually smaller than we explained in our complaint.

THE COURT:  Okay.

MR. JOHNSON:  To the point about risk factors, Your Honor, it's not about the falsity of risk factors.  Our point is not, again, that there's no risk, that it's -- you know, that the future is knowable.  The point is the risk factors are not enough to immunize them from liability here.

Because this ultimately isn't about predicting. It's not ultimately about the risk that things go wrong tomorrow. It's about a present-sense assessment of the reasonable possibility of a liability. Will things have to happen in the future? Sure. It is a present-sense -- present-tense assessment. And this is explained by Judge Cote in the *Perrigo* decision where she rejects the notion of these amounting to forward-looking statements and the like. But that's the point. It's not about predicting. It's not about guessing. It's not about how things can go worse. Sure, they can go worse and they can go better. It's what is the honest present-sense assessment. And it's not enough, under these facts, under these detailed facts, to say zero, immaterial, and then you go to a billion, and then you go to another 235 million, then you go to another 100, then you go to another 214 million. Under all these circumstances, when they had the knowledge of these detailed documents, damning documents, that's not enough, Your Honor.

THE COURT: I have three specific questions for Ms. Kotler, and then I want to hear your response. You may want to respond, and I want that opportunity as well.

MR. JOHNSON: Sure.

THE COURT: And then Ms. Kotler also can say what she would like to say. But here are my three questions.

MS. KOTLER: Yes.

THE COURT:  One is to respond to the *Perrigo* case; two is to talk about the -- what the plaintiffs are alleging that -- about 450, which is that probability isn't the standard; and then the third is whether that document dump by the AG was truly a disclosure of unreleased documents.

MS. KOTLER:  Exactly the points I wanted to make, Your Honor.

THE COURT:  Well, there you go.

MS. KOTLER:  What was so interesting about what was just said, Your Honor, is that there was no claim that any liability was probable and reasonably estimable.  You heard reasonably possible and potential.

THE COURT:  But they don't think that's the standard, so --

MS. KOTLER:  I understand.  But, Your Honor, you don't take an accrual unless you have probable and reasonably estimable liability.  Now, what Mr. Johnson pointed to is if you think you have a reasonably possible loss, then what you do is two things, which he did not state.  You, one, disclose the nature of the contingency.  There's no dispute the nature of the contingency was disclosed.  That's all of the descriptions of the litigation.  And then you do one of two different things, you either estimate the possible loss or you state that the possible loss cannot be estimated.  That is ASC 450-20-50-4.

Plain as day. You disclose the nature of the contingency, and you either estimate the loss or you state you can't. There is no dispute 3M, in every single Commitments and Contingency Note, after describing the nature of the contingency after -- page after page after page, said we have accrued for what's probable and estimable, and for the rest, we cannot estimate possible loss.

Perrigo, Your Honor, I'm so glad that Mr. Johnson raised it because I meant to and I forgot. Perrigo, number one, was not a case where there was any claim about the accruals. No accrual was taken for the assessment of 1.6 billion euro. Judge Cote did not say that an accrual needed to be taken. And I think, Your Honor, that is a concession that all other challenges to the accruals have to be gone, because if they can't even plead that any litigation was probable, they can't possibly point to facts that would show that the accruals themselves were or should have been anything else. So I think all of the accruals are off the table. That leaves them with the claim that there should have been either a disclosure of the reasonably possible loss or a statement that could not be estimated.

The reason Judge Cote in Perrigo found that there could have been a description of reasonably possible loss is because the Government had not only done an audit, they calculated the amount and they assessed it at 1.6 million

euros.  So while the company said we can't estimate, what Judge Cote reasonably said was --

THE COURT:  Yes, you can.

MS. KOTLER:  -- yes, you can.  You can say that the Government has assessed you 1.6 billion in euros.

There is, with one exception, no similar situation here, no judgment, no assessment in any PFAS litigation that happened and wasn't disclosed with one exception, possibly, and that was the Minnesota AG expert report which said we think there's 5 billion in damages in this case.  And guess what?  Of course 3M disclosed that number.  It was -- they didn't say it was reasonably possible, but it was disclosed to investors, so investors knew -- whether you call it reasonably possible, potential, whatever, investors knew that there was even up to a chance of 5 billion.  So they didn't even have to disclose that number because I don't think it hit reasonably possible, but they disclosed it nonetheless.  Plaintiffs do not point to any other assessment, calculation, or imposition of any number that happened and wasn't disclosed.

There is a big difference, Your Honor.  There's just two different regimes.  It is the plaintiffs who are mixing and matching.  There's accruals, and then there's if you don't have probable and reasonably estimable, you cannot accrue.  And as I hear it now today, there is no challenge,

there's not even an assertion that there was any liability that was probable that wasn't accrued. And then there's the second regime, which is if you are in the land of reasonably possible, which I take the plaintiffs claim was there, you do two things, you disclose it, you disclose the nature of the contingency -- of course that was disclosed; no dispute there -- and then you either give your amount or your range or you say you can't estimate it. And that's -- the latter is what 3M did. And there was no assessment or calculation that had been made.

In fact, the notion that a company should just, what you heard was realistically size up its liability in an area and disclose that is not only not required by the securities laws, it's contrary to the securities laws. The securities laws, and we cite cases in our brief, are very clear. The company doesn't have to self-flagellate. It doesn't have to accuse itself of wrongdoing. It doesn't have to say, you know, we think there might be liability of X when it's defending a case and when it can't estimate that liability. And there has not been a single fact pleaded, an actual particularized fact pleaded that they could estimate it and that they did estimate it differently.

So that hit *Perrigo*, probability. And then I think your last question, Your Honor, which I was going to get to, is sort of similar, which is, okay, well, are there

any other facts that the plaintiffs point to to say either that the liability was probable or reasonably estimable or that there was reasonably possible liability that they should have somehow disclosed was reasonably possible, not accrue, but reasonably possible.

THE COURT: It's paragraph 115 of the complaint, which is the document dump, which I know I'm shortcutting and Mr. Johnson doesn't want me to do that. Paragraph 115, Soon after the settlement was announced, the Minnesota Attorney General posted a trove of internal e-mails and memoranda.

MS. KOTLER: Yeah. So, Your Honor, I had actually addressed a number of other facts, the DuPont settlement, the Minnesota settlement, but I guess that we've heard a lot about these documents and the fact that the Minnesota AG decided to make some of them public. With all due respect, I don't know what the fact that the Minnesota AG decided to release certain documents to the public has to do with whether liability in any other case is probable or reasonably possible, let alone estimable.

THE COURT: Well, reasonably possible you can see certainly because making public documents that had been withheld by 3M led to and fanned the flames for other litigation going forward that is now ongoing that 3M has now placed significant reserves on.

MS. KOTLER: Well, they have placed reserves for that which they can calculate as probable and reasonably estimable. But the release of those documents -- right? -- which from, you know, one view, you know, says one thing, doesn't mean what is the -- what are the damages in any given case or possible case. Those -- those documents don't actually say there is a reason -- a calculable number for damages that are -- whether probable or even reasonably estimable. It's sort of the same concept, Your Honor. You still have to have reasonable estimability of what you'll have to pay out, whether you are talking about probable liability for an accrual or whether you are talking about disclosing the cases, disclosing the contingencies, and either giving a range of what -- you know, a statement of what's poss- -- of reasonably possible or saying you can't estimate it.

And so the fact that there were documents out there from the '40s, '50s, '60s, '70s, '80s, or '90s -- excuse me, I think they started in the '50s, I apologize -- that PFAS are harmful -- again, I'm not saying that's completely irrelevant or has nothing to do with anything -- but it is not sufficient -- not remotely sufficient to ask the question -- or to answer the question are there damage assessments for claims that are estimable that we know -- right? -- whether -- and the answer is no, because the

litigation, and they haven't pointed to any litigation, that had made it far enough along that the company could estimate this is what is, you know, reasonably estimated as whether it's probable for accruals or even reasonably possible for the disclosure piece of this.

Again, and the perfect contrast is *Perrigo*; right? Nobody was claiming that and Judge Cote didn't claim that the company should have been saying this stuff while it was in conversations with the Government.  In fact, very interestingly, Your Honor, if you read that case, Judge Cote notes that, significantly, the assessment -- the calculation and the assessment that was finally done months later, the analysis for that had been discussed with the company for a long time, including at their initial meeting, but she didn't find that there was an obligation even to disclose the reasonable possibility until the final calculation and assessment.

So, again, no accrual was needed.  They didn't need to accrue anything.  They just needed to -- once the calculation had been made and had been assessed with a specific number, they needed to disclose that number.  And it didn't matter, although she observed, that they had been told the Government's assessment -- or its analysis and its reasoning months earlier.  That's the equivalent of you've been litigating cases, you've been in settlement discussions

on and off, you know, you know what the other side is saying. That doesn't mean, you know, you have reasonably estimable possible loss for some kind of disclosure. Even if we're outside the world, again, which I think we now are, of -- we're not talking about accruals. We're just saying you have to disclose the cases and state what is a reasonable possible loss or say you can't estimate it, which is exactly what 3M did.

And that trove of documents doesn't put numbers on anything. It doesn't put estimates. It doesn't talk about claims. It doesn't talk about specific plaintiffs. They don't even -- none of that trove even purports to. The fact that we heard today that there was a resignation e-mail from someone, that doesn't speak to whether there's going to be a claim, what the circumstances are, what the claimed damages are, and how you estimate those claimed damages. They are two worlds apart.

And so that trove of documents, while it is certainly relevant in PFAS cases if you are a plaintiff trying to claim that you were harmed by PFAS, for purposes of a securities class action where the question is what did investors need to be told, there is just no case law that says you have to -- you know, you have to estimate a number on your own when you think you have -- you know, when you think there's nothing probable, when you think you have

defenses, when you are defending, and when you can't -- and when you say you can't put a specific number on it.

Now, had the plaintiffs come in with confidential witnesses or internal documents saying, well, actually, you know, Confidential Witness One said we were putting numbers on it, we did estimate it at this, or we did estimate it at that, we tried to estimate it at this, that would be one thing. They haven't pled that. That's their burden under the PSLRA.

THE COURT: Putting GAAP aside for a moment, hiding the nature of data indicating harm of chemicals that one is producing and putting out in the world, securities violation, not a securities violation?

MS. KOTLER: A couple things there, Your Honor. I don't even think that's a fair reading -- I mean, that's not a fair reading of the complaint. It's one thing to say they haven't pled or alleged a GAAP violation, but now you're talking about a totally different theory. Not that they hid the extent of the liabilities or the financial exposure, which is what this complaint is about, but that they hid the danger of PFAS? That's a totally different case that is not pled.

I will also say, by the way, Your Honor, I just want to correct from before, the information, as the complaint shows, I think paragraphs 56, 58 -- 56, 58, and

then the later paragraph that I had already identified, shows that, you know, these documents, a number of studies about the asserted harm from PFAS, those had all been public -- made public even before the 2017 document -- made public by the Minnesota AG in 2017, so that's all made public.

But to answer your question, Your Honor, that is -- the theory that you are hearing today that 3M hid the dangers of -- you know, the environmental or health dangers of PFAS, no, that's not security -- it's not securities fraud, and it's not what's alleged in the amended complaint. What's alleged in this amended complaint is that 3M hid and mischaracterized its financial status, its legal exposure to unadjudicated future litigation outcomes.

I just want to make sure, Your Honor, that there wasn't anything else that I wanted to address. I hit the point on the trove e-mails. I don't know, Your Honor, if you have any other questions about that.

Mr. Johnson mentioned that at some point, you know, 3M must have known it would need to pay something nontrivial to make the -- you know, to settle the case. With respect, Your Honor, that is not the standard for accruals or even for disclosing reasonably possible loss. That's not something that a company has to disclose. I would also say I think any reasonable investor knows when

you are seeing all this litigation, you know, if you want to try to resolve it, you're going to have to pay money.

The only other two things that Mr. Johnson mentioned, one was that I think he claimed, if I heard him correctly, that 3M must have known -- or must have been able to estimate reasonably possible liability.  Again, I'm not even talking now about probable liability because I don't hear him saying any of this was probable.  But that they must have known about even reasonably possible liability that they could estimate because of discussions with the AG or other plaintiffs.  That's, again, generic.  They'd have to plead facts.  Well, what was said in those discussions? Was -- they would have to plead that something was said in those discussions that would, in fact, make it reasonably estimable, that 3M -- some detail that a number was put on the table, that an amount was, you know, agreed to or that an amount was conceded, something.  There's nothing pleaded as to that.  So the mere fact that a defendant is in discussions with plaintiffs doesn't mean liability is probable or reasonably estimable.

And the last thing I'll just say on the sales, it was mentioned that there were, quote, substantial sales in the weeks before, I think it was at least three weeks before the settlement was reached and announced.  "Substantial" isn't a word that the Eighth Circuit used.  It's suspicious.

But the amounts, anyway, are undisputed and they are known, 3 percent, 1.6 percent, and 5.6 percent of holdings. Again, *Navarre*, *Crowell*, a number of Eighth Circuit cases that we cite make clear those numbers are not suspicious as a matter of law.

THE COURT: Thank you.

MS. KOTLER: Unless the Court has any further questions, I hope I haven't overstayed my ten minutes. I wasn't checking.

THE COURT: You're fine.

MS. KOTLER: Thank you.

THE COURT: Thank you.

Mr. Johnson, I would like your response to the three points that I asked about, beginning with is counsel right that the accruals aren't at issue because you're not arguing that liability was probable?

MR. JOHNSON: No, Your Honor. I've -- we are continuing to argue it was probable. I am, in this setting, talking about reasonably possible because it's obviously a lower standard, but we believe we've pled facts showing that it was probable.

Now, we heard defense counsel suggest, oh, it's absurd to expect us to reasonably size up our liabilities in this area. Well, they've done it. They've done it at least several times since -- since 2017. In April of 2019,

July -- I've got the dates, but they've done it several times.  So it's not clear how that would be so absurd.

Your Honor asked about -- if I addressed that --

THE COURT:  Yes.  Thank you.

MR. JOHNSON:  Your Honor asked about *Perrigo*.  Well, *Perrigo* -- it's interesting we're both invoking *Perrigo*, but so be it.  *Perrigo* has some surprisingly analogous facts.  So the Government there was saying to the company, You owe us X in taxes.  The company didn't disclose that.  But here's what Judge Cote really honed in on.  The company didn't do its own calculation.  And Judge Cote didn't say, for instance, Well, plaintiffs, you're not bringing us a calculation they did.  Where's the videotape?  Where's the audio tape?  Where's the confidential witness of this calculation?  No.  Judge Cote was upholding -- sustaining this claim because the company hadn't even gone through the exercise of doing the calculation.  Instead, they said zero.

And here's what -- here's how she explained it.  She said defendants' interpretation would severely undermine the disclosure obligations in ASC 450.  If the defendants' position were adopted, whenever a reporting entity intends to contest the amount at issue, it could avoid quantifying and reporting its exposure by saying that it disagreed with the other side's position and that there was no, as of yet,

final determination on the amount of any deficiency.  So there are very similar facts there as presented and explained by Judge Cote.

The point about the disclosure of documents by the Minnesota Attorney General's Office, were there new documents?  Yes, Your Honor, there were -- we have thousands of documents from the website that she created after that settlement.  And the argument by the other side that, well, those documents don't do enough because what they don't do is they don't say in Litigation X, the company's liability will be Y or something like that, Your Honor, respectfully, that's a standard that is absurd.

The point is not merely that the company was withholding this information.  It's not merely that it was interesting, damning.  It's that it was ammunition.  It served as ammunition for the Minnesota Attorney General's Office.  And once it was disclosed by her, it served as ammunition and a catalyst, frankly, to spark other litigations and to fan the flames behind other litigations that already existed.  We've put forward complaints that actually cite to those very documents as -- as critical to their claims being brought in the first place.

So we are not saying -- well, this is not a case that is as simple as, oh, the company was hiding these damning documents.  It's what it meant to their exposure.

Was it calculable?  Well, they've demonstrated it's calculable.  What did they know?  They knew all of these facts we've detailed.  And were they new?  Yes, Your Honor, as pled.  And they're available even to this day.

I would also note that those documents included detailed explanations of how the company had imposed policies to try to influence litigations later.  So, for instance, one scientist wrote that 3M had instructed him not -- and others not to write down our thoughts or have e-mail discussions on issues because of how our views could be used in a legal proceeding.  So do these documents say will -- the company ought to pay X in Y litigation?  No, I don't think they do.  But are they relevant to their exposure?  Absolutely yes.

THE COURT:  I think the point there is they make it more probable that there's exposure.  I'm struggling with under ASC 450 how they make it more estimable.  If the ASC 450 rule is you either disclose a range or you say you can't estimate it, how is it violating ASC 450 to say here's what our litigation is, we can't estimate?

MR. JOHNSON:  Your Honor, a couple things.  First, the facts here include the company's intimate dealings with the Minnesota AG about how to quantify exposure.  Is it a perfect formula that applies elsewhere?  No.  We're not claiming that.  But it certainly was shedding light on how a

reasonable regulatory authority and law enforcement officer would seek to calculate the exposure of the company in this region.

Beyond that, I would also note the company -- because it has all the access that the outside investing public doesn't have, the company has an obligation to go through with the exercise. As Judge Cote explained, it's not enough to just say no.

THE COURT: You can't bury your head in the sand.

MR. JOHNSON: No. Exactly. Exactly. You've got the access. Do the -- do -- go through the exercise, do it. And, again, Judge Cote didn't require that the plaintiffs there or, for instance, we here come forward with a videotape or a document where they have done the estimate. The point is you can do it. You did do it later. You could have done it then. You had all the facts necessary.

THE COURT: Thank you. I'm really going to let you go. But, Ms. Kotler, I'd like you to respond to that last point, which is you did it later. Why didn't you do it earlier?

MS. KOTLER: Thank you, Your Honor. We seem to be on the same wavelength. There were three things I wanted to say and that was one of them.

They became calculable later for the simple reason, as 3M said, litigation progresses. We learn more

things.  We have ongoing discussions.  We hear things.

THE COURT:  Isn't that really vague?  That sounds really vague.

MS. KOTLER:  Well, Your Honor, that's also -- it's also just -- it's obvious.  Litigation progresses and evolves over time.  Anybody who's litigated a case knows that you know different things at one time, you learn more, you learn more, and you learn more.  It would be the plaintiffs' burden to plead that back when the challenged accruals were made, they knew that stuff then.

THE COURT:  And so under the -- I'm now getting confused, but the later accrual was 235; right?

MS. KOTLER:  Yes, it was announced in April 2019.

THE COURT:  So when Mr. Johnson says it was done later, it means it was done at 235.  The earlier accrual wasn't zero, was it?

MS. KOTLER:  No, there were numbers at around 38, 40, they ranged a little bit, but there were numbers around between 28 and 50 million.  And then as different -- and some of that got paid out.  And then as other litigations progressed, and this is what 3M said, as we went through certain things and as we went through settlement discussions or as we learned whatever we did, we learned information about the ongoing litigations, and so we -- just in this past quarter, and so we are reserving our increases.

THE COURT:  Increase our reserves.

MS. KOTLER:  Sorry.  Increasing our reserves.  The notion that just because reserves were later -- litigation reserves were later increased doesn't mean they should have been increased earlier.  It doesn't mean that the defendants knew earlier or had access to information earlier than -- that they had at the time they increased reserves.  That's exactly what *Elam* says.  It's what *K-tel* says.  Just because you take a charge later, just because you increase your expected medical costs later doesn't mean that six months ago or a year ago you knew that.

You'd have to plead contemporaneous reports, witness statements, or other data that would indicate at the earlier times, not in April of 2019, but in February of 2017, when the class period started and when most of this litigation wasn't even filed, in February of 2018, in December of 2018, they'd have to plead that at those times the information that led to the later litigation reserve increases was known and existed back then.  And to just say they could calculate it later, they should have been able to calculate it before, that is fraud by hindsight.  That's exactly their pleading burden.  They can't just say if they calculated it later, they could calculate it earlier, particularly for litigation.

On Judge Cote, Your Honor, I know you won't

just --

THE COURT:  I've read the case.

MS. KOTLER:  You've read the case.  What Judge Cote said was you can't put your head in the sand because the Government has calculated it, not that the company has an independent requirement to assess it.

The last thing I'll say, Your Honor, is that that trove of documents from the AG, it didn't even purport to address defenses, statute of limitations.  There's a whole other side to potential negative litigation outcomes that aren't just, you know, are PFAS dangerous.  There's a slew of defenses on the merits, procedurally and otherwise.

So even accepting that that trove had important information that, again, plaintiffs in PFAS cases might find very relevant for them, they aren't sufficient to answer the question in this case, which was:  Was any liability -- any negative litigation outcome probable and was it reasonably estimable?  What were the damages?  How -- can we put our arms around that and give a number?

THE COURT:  Thank you.

MS. KOTLER:  Thank you, Your Honor.

THE COURT:  Thank you for your arguments here today, for your patience here today.  I'm glad that you all are, again, here, present, and in person.  Have a good afternoon, everybody.  Thanks.

THE LAW CLERK:  All rise.

(Court adjourned at 12:43 p.m.)

*       *       *

I, Erin D. Drost, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.


Certified by:   *s/ Erin D. Drost*

Erin D. Drost, RMR-CRR